# United States Court of Appeals
# for the Federal Circuit

ALLERGAN, INC.,

*Plaintiff-Appellee,*

v.

SANDOZ INC., LUPIN LTD., LUPIN PHARMACEUTICALS, INC.,
HI-TECH PHARMACAL CO., INC., WATSON LABORATORIRES, INC.,
WATSON PHARMACEUTICALS, INC., nka Actavis, Inc., and
WATSON PHARMA, INC., nka Actavis Pharma, Inc.,

*Defendants-Appellants.*

**Appeal from the United States District Court for the
Eastern District of Texas in case no. 6:11-cv-00441-MHS,
Judge Michael H. Schneider.**

**OPENING BRIEF FOR DEFENDANTS-APPELLANTS
SANDOZ INC., WATSON LABORATORIES, INC.,
WATSON PHARMACEUTICALS, INC., AND WATSON PHARMA, INC.**

JOHN H. BARR, JR.
JEFFREY L. OLDHAM
JOHN A. YATES
BRACEWELL & GIULIANI LLP
771 Louisiana Street
Suite 2300
Houston, TX 77002
Telephone:  (713) 223-2300
Facsimile: (800) 404-3970

*Counsel for Defendants-Appellants
Watson Laboratories, Inc., Watson
Pharmaceuticals, Inc., and Watson
Pharma, Inc.*

DEANNE E. MAYNARD
BRIAN R. MATSUI
JESSICA E. PALMER
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone:  (202) 887-8740
Facsimile: (202) 887-0763

DAVID C. DOYLE
ANDERS T. AANNESTAD
JAMES J. CEKOLA
MORRISON & FOERSTER LLP
12531 High Bluff Drive
Suite 100
San Diego, CA 92130
Telephone:  (858) 720-5100
Facsimile: (858) 720-5125

*Counsel for Defendant-Appellant
Sandoz Inc.*

May 5, 2014

# CERTIFICATE OF INTEREST

Counsel for defendant-appellant Sandoz Inc. certifies the following:

1.  The full name of every party or amicus represented by me is:

Sandoz Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Novartis AG

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

MORRISON & FOERSTER LLP: Anders T. Aannestad, Eric M. Acker, James J. Cekola, David C. Doyle, Stephen D. Keane, Brian M. Kramer, Brian R. Matsui, Deanne E. Maynard, Jessica E. Palmer, and Marc D. Sharp (no longer with firm);

THE DAVIS FIRM, PC: William E. Davis III; and

STEPTOE & JOHNSON LLP: Thomas J. Filarski, Meredith M. Addy, Thomas G. Pasternak, and Brandon C. Helms.

Dated:  May 5, 2014                     /s/ Deanne E. Maynard
                                        Deanne E. Maynard

# CERTIFICATE OF INTEREST

Counsel for defendants-appellants Watson Laboratories, Inc., Watson Pharmaceuticals, Inc., and Watson Pharma, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

Watson Laboratories, Inc.,
Watson Pharmaceuticals, Inc., and
Watson Pharma, Inc.

2.     The name of the real party in interest (if the party name is not the real party in interest) represented by me is:

Watson Laboratories, Inc.,
Actavis, Inc. (f/n/a Watson Pharmaceuticals, Inc.), and
Actavis Pharma, Inc. (f/n/a Watson Pharma, Inc.)

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Actavis plc

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

BRACEWELL & GIULIANI, LLP: John H. Barr, Jr.; Jeffrey L. Oldham; John Allen Yates.

Dated:  May 5, 2014                    /s/ John H. Barr, Jr.
                                       John H. Barr, Jr.

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................... i

TABLE OF AUTHORITIES ......................................................................v

STATEMENT OF RELATED CASES .................................................1

JURISDICTIONAL STATEMENT ....................................................2

STATEMENT OF THE ISSUES............................................................3

INTRODUCTION ...................................................................................3

STATEMENT OF THE CASE.............................................................6

    A.    Technical Background....................................................7

        1.    Prior art glaucoma treatments ....................................7

        2.    Lumigan® 0.01% ..................................................9

        3.    BAK ...................................................................10

    B.    Allergan's Asserted Patents ..............................................13

    C.    The Prior Art ...................................................................18

        1.    Allergan's prior art patents ....................................18

        2.    Prior art teaching that 0.01% bimatoprost is effective .............19

        3.    Prior art disclosing 200 ppm BAK and BAK's benefits in ophthalmic formulations ........................................21

    D.    District Court Proceedings ................................................22

SUMMARY OF ARGUMENT .............................................................25

STANDARD OF REVIEW ...................................................................28

ARGUMENT ........................................................................................29

I.  THE ASSERTED CLAIMS ARE INVALID AS OBVIOUS BECAUSE THEY CLAIM NOTHING MORE THAN A FORMULATION DISCLOSED IN A RANGE IN THE PRIOR ART WITH NO PERTINENT INDICIA OF NONOBVIOUSNESS ...................29

    A.  The District Court Erroneously Framed The Obviousness Analysis ..............................................................................29

    B.  Under The Correct Legal Standard, The Asserted Claims Are Obvious.................................................................................34

        1.  The prior art did not teach away from Allergan's claimed composition, which was disclosed in the prior art....................34

            a.  The district court applied the wrong legal standard for teaching away.............................................34

            b.  The prior art does not teach away from 0.01% bimatoprost ..................................................37

            c.  The prior art does not teach away from 200 ppm BAK .............................................................39

        2.  The clinical results of the claimed formulations were not unexpected ................................................................47

        3.  The district court erred in concluding that "commercial success" supported nonobviousness .........................................52

        4.  The other secondary considerations provide no evidence of nonobviousness...................................................56

II.  IF NOT HELD INVALID AS OBVIOUS, THE CLAIMS OF THE '353 AND '118 PATENTS RECITING CLINICAL PROPERTIES MUST BE HELD INVALID FOR LACK OF WRITTEN DESCRIPTION ................................................................57

CONCLUSION...................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Baxter Pharm. Prods.*,
    471 F.3d 1363 (Fed. Cir. 2007) ..........................................................................51

*Allergan, Inc. v. Sandoz Inc.*,
    726 F.3d 1286 (Fed. Cir. 2013) ..................................................................56, 57

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) (en banc) ..................................................59, 61

*Baxter Int'l, Inc. v. McGaw, Inc.*,
    149 F.3d 1321 (Fed. Cir. 1998) ........................................................................35

*Bristol-Myers Squibb Co. v. Ben Venue Labs.*,
    246 F.3d 1368 (Fed. Cir. 2001) ........................................................................51

*Centocor Ortho Biotech, Inc. v. Abbott Labs.*,
    636 F.3d 1341 (Fed. Cir. 2011) ........................................................................60

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009) ........................................................................35

*Galderma Labs., L.P. v. Tolmar, Inc.*,
    737 F.3d 731 (Fed. Cir. 2013) ..................................................................*passim*

*GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*,
    744 F.3d 725 (Fed. Cir. 2014) ..................................................................59, 60

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ..............................................................................................28

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
    No. 2013-1128 (Fed. Cir. Apr. 11, 2014) ..................................................36, 40

*In re Aller*,
    220 F.2d 454 (C.C.P.A. 1955) ........................................................................48

*In re Cruciferous Sprout Litig.*,
    301 F.3d 1343 (Fed. Cir. 2002) ........................................................................51

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012) ...........................................................................30

*In re Gurley*,
    27 F.3d 551 (Fed. Cir. 1994) .................................................................5, 35, 37

*In re Harris*,
    409 F.3d 1339 (Fed. Cir. 2005) ........................................................................48

*In re Huang*,
    100 F.3d 135 (Fed. Cir. 1996) ....................................................................48, 49

*In re Kao*,
    639 F.3d 1057 (Fed. Cir. 2011) ........................................................................50

*In re Mouttet*,
    636 F.3d ....................................................................................................39, 40

*In re Mouttet*,
    686 F.3d 1322 (Fed. Cir. 2012) ...................................................................35, 38

*In re Spada*,
    911 F.2d 705 (Fed. Cir. 1990) ..........................................................................50

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
    392 F.3d 1317 (Fed. Cir. 2004) ......................................................29, 30, 31, 48

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*,
    106 F.3d 1563 (Fed. Cir. 1997) ........................................................................52

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)...........................................................................................29

*Lockwood v. American Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997) ........................................................................62

*Martin v. Mayer*,
    823 F.2d 500 (Fed. Cir. 1987) ..........................................................................62

*Merck & Co. v. Teva Pharm. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ...................................................................53, 55

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
  723 F.3d 1336 (Fed. Cir. 2013) ...........................................................61

*Ormco Corp. v. Align Tech., Inc.*,
  463 F.3d 1299 (Fed. Cir. 2006) ..................................................52, 55

*Pfizer, Inc. v. Apotex, Inc.*,
  480 F.3d 1348 (Fed. Cir. 2007) .........................................................28

*Regents of Univ. of Cal. v. Eli Lilly & Co.*,
  119 F.3d 1559 (Fed. Cir. 1997) .........................................................60

*Richardson-Vicks Inc. v. Upjohn Co.*,
  122 F.3d 1476 (Fed. Cir. 1997) .........................................................29

*Santarus, Inc. v. Par Pharm., Inc.*,
  694 F.3d 1344 (Fed. Cir. 2012) ..................................................50, 51

*Solder Removal Co. v. United States Int'l Trade Comm'n*,
  582 F.2d 628 (C.C.P.A. 1978) ...........................................................55

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
  407 F.3d 1371 (Fed. Cir. 2005) ......................................37, 39, 53, 55

*Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*,
  642 F.3d 1370 (Fed. Cir. 2011) .................................................*passim*

*Union Oil Co. of Cal. v. Atlantic Richfield Co.*,
  208 F.3d 989 (Fed. Cir. 2000) ...........................................................51

*United States v. United States Gypsum Co.*,
  333 U.S. 364 (1948).............................................................................29

*Vas-Cath Inc. v. Mahurkar*,
  935 F.2d 1555 (Fed. Cir. 1991) .........................................................59

## STATUTES

35 U.S.C. § 103 ...................................................................................28

35 U.S.C. § 112 ...................................................................................61

## STATEMENT OF RELATED CASES

This appeal stems from consolidated civil actions filed by Allergan, Inc. ("Allergan") against different Abbreviated New Drug Application ("ANDA") applicants. *Allergan, Inc. v. Sandoz Inc.*, No. 6:11-cv-00441-MHS (E.D. Tex.); *Allergan, Inc. v. Lupin Ltd.*, No. 6:11-cv-00611-MHS (E.D. Tex.); *Allergan, Inc. v. Hi-Tech Pharmacal Co.*, No. 6:12-cv-00043-MHS (E.D. Tex.); *Allergan, Inc. v. Watson Laboratories, Inc.*, No. 6:12-cv-00197-MHS (E.D. Tex.). No other appeal in or from these same civil actions in the district court was previously before this or any other court of appeals. Counsel for defendants-appellants are unaware of any pending case that will affect or be affected directly by this Court's decision.

1

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. The district court entered final judgment on January 13, 2014, which included an injunction against each of the defendants-appellants Sandoz Inc. ("Sandoz"), Hi-Tech Pharmacal Co., Inc. ("Hi-Tech"), Lupin Ltd. and Lupin Pharmaceuticals, Inc. (collectively, "Lupin"), and Watson Laboratories, Inc., Watson Pharma, Inc. and Watson Pharmaceuticals, Inc. (collectively, "Watson"). A1-A5. Sandoz, Hi-Tech, Lupin and Watson (collectively, "the ANDA applicants") timely appealed on February 11, 2014. A7899-A7903.

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a).

## STATEMENT OF THE ISSUES

1.    Whether the asserted claims of U.S. Patent Nos. 7,851,504 ("the '504 patent"), 8,278,353 ("the '353 patent"), 8,299,118 ("the '118 patent"), 8,309,605 ("the '605 patent"), and 8,338,479 ("the '479 patent") are invalid as obvious.

2.    Whether the asserted claims of the '118 and '353 patents are invalid for lack of written description.

## INTRODUCTION

This Hatch-Waxman Act appeal addresses the ANDA applicants' applications to produce a generic form of Lumigan® 0.01%—a treatment for glaucoma.  Lumigan® 0.01% is a composition containing 0.01% (w/v) bimatoprost and 200 parts-per-million ("ppm") benzalkonium chloride ("BAK"), and it is the commercial embodiment of the asserted patents.

There is nothing inventive about Lumigan® 0.01%.  Allergan holds a soon-to-expire prior art patent that discloses a composition and method of use for treating glaucoma containing about 0.001% to 1.0% (w/v) bimatoprost and a preservative (such as BAK) with a concentration up to 1000 ppm.  A commercial embodiment of that prior art patent (Lumigan® 0.03%) was formulated at 0.03% bimatoprost and 50 ppm BAK.  While successful in treating glaucoma, Lumigan® 0.03% caused a side effect known as red eye.  The prior art explained that red eye was caused by higher concentrations of bimatoprost, and that lower concentrations

of bimatoprost—such as 0.01%—would still be effective at treating glaucoma while causing less red eye. And other prior art glaucoma treatments were formulated with 200 ppm BAK.

In light of this prior art, Lumigan® 0.01% and the asserted patents were obvious. This Court has held that a straightforward and compelling obviousness case exists when a claimed invention falls within a range disclosed in the prior art. For good reason—when the prior art discloses a range, and an applicant seeks to patent subject matter disclosed within that range, the public is being deprived of that which previously was in the public domain.

Yet the district court held the asserted patents nonobvious. The district court did so by effectively ignoring the range Allergan previously disclosed in its own prior art patent. Even though that prior art disclosed the claimed "invention," the district court required the ANDA applicants to show a specific motivation in the prior art to modify Lumigan® 0.03%—a motivation to decrease the concentration of bimatoprost by three times and to increase the concentration of BAK by four times. But that is not the law. Because the prior art disclosed a range that encompasses the claimed invention, that establishes both a motivation and a reasonable expectation of success. *E.g.*, *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731 (Fed. Cir. 2013). All that should have remained was whether there was any teaching away, new and unexpected results, or other objective indicia of

nonobviousness. In not recognizing the straightforward and potent case of obviousness demonstrated by the disclosures in the prior art, the district court failed to apply well-established principles of this Court's precedent.

The district court then made additional legal errors in analyzing whether there was any teaching away, unexpected result, or other secondary consideration. Rather than consider whether the prior art disparaged or taught that 0.01% bimatoprost and 200 ppm BAK would not work, the district court instead examined whether the prior art taught that Allergan's new formulation would have been inferior to its old one. That too was legal error. To teach away, the prior art must discourage further investigation and suggest that more development is unlikely to be productive; simply being inferior is not enough. *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

Moreover, there were no unexpected results or other secondary considerations of nonobviousness. Those of skill in the art would have expected that less bimatoprost and greater BAK would be slightly less efficacious with fewer side effects than Allergan's prior commercial product. But even if that result had been "unexpected," it would have been only a difference in degree, and thus not probative of nonobviousness. At most, the results from using Lumigan® 0.01% were nothing but the inherent properties from the use of an otherwise obvious combination already claimed in the prior art.

Finally, if not invalid as obvious, the asserted claims of the '353 and '118 patents—which recite limitations relating to the clinical performance of the 0.01% bimatoprost and 200 ppm BAK formulation—are invalid for lack of adequate written description. This is because the specification discloses nothing about the clinical performance properties of a 0.01% bimatoprost and 200 ppm BAK formulation—a result Allergan contends is "unexpected." At most, the clinical performance properties can be inferred from the prior art; but if that is so, the claims should be held invalid as obvious. The asserted claims of the '353 and '118 patents thus must either be invalid as obvious or for lack of written description.

## STATEMENT OF THE CASE

In this Hatch-Waxman Act case, the ANDA applicants sought FDA approval to market a generic version of Allergan's glaucoma treatment Lumigan® 0.01%. In response, Allergan asserted claims from five patents.

Lumigan® 0.01% is a reformulation of Allergan's Lumigan® 0.03% product. Both Lumigan® formulations contain the active ingredient bimatoprost and the commonly used ophthalmic preservative BAK. The only differences between the formulations are that Lumigan® 0.01% has a lower bimatoprost concentration (0.01% rather than 0.03%) and a higher BAK concentration (200 ppm rather than 50 ppm).

The central question in this appeal is whether the Lumigan® 0.01% formulation is obvious. The district court held it nonobvious, even though the concentrations of bimatoprost and BAK in that formulation fall within ranges expressly disclosed by the prior art—most notably, Allergan's own soon-to-expire prior art patent covering Lumigan®.

## A.    Technical Background

### 1.    *Prior art glaucoma treatments*

Millions of people suffer from the eye disease glaucoma. If left untreated, glaucoma can damage the optic nerve, permanently impair vision, and ultimately may progress to blindness. A12; A5721-A5723 (Samples, the ANDA applicants' expert ophthalmologist and glaucoma specialist, A5719).

One major cause of glaucoma-related damage is an increase in the pressure of the aqueous humor, which is the fluid inside the eye. A5721 (Samples). Elevated intraocular pressure ("IOP") is typically measured in millimeters of mercury ("mm Hg"). A5444-A5446 (Noecker, Allergan's expert ophthalmologist and glaucoma specialist); A5242 (Batoosingh, Allergan's Senior Director in Clinical Development in Ophthalmology, A5237). Although there is no cure for glaucoma, treatments that reduce intraocular pressure can slow its progression. A12; A5721-A5723 (Samples).

The most common treatments for elevated intraocular pressure are prostaglandin eye drops. A5724 (Samples). Prostaglandin drugs, or prostaglandin analogs, are a class of drugs that includes bimatoprost. A5724-A5726 (Samples). Prostaglandin drugs lower intraocular pressure by increasing the flow of aqueous humor out of the eye. A5725 (Samples). Prostaglandin eye drops also can cause the undesired side effect hyperemia, or red eye. A5727, A5737 (Samples). Severe hyperemia may prompt patients to inappropriately discontinue glaucoma medications. A14.

When the application leading to the asserted patents was filed in 2005, prostaglandin eye drops had been available in the United States for nearly a decade. A5724, A5726 (Samples). Prior art prostaglandin treatments included Xalatan®, which contains the active ingredient latanoprost and 200 ppm of the preservative BAK; Travatan®, which contains the active ingredient travoprost and 150 ppm BAK; and Allergan's own Lumigan® 0.03%, which contains 0.03% of the active ingredient bimatoprost and 50 ppm BAK. A5726. The FDA approved Xalatan® in 1996 and both Travatan® and Lumigan® 0.03% in 2001. A5726.

While Allergan's Lumigan® 0.03% was effective at lowering intraocular pressure, it caused more frequent and severe hyperemia than other glaucoma treatments. A14.

### 2.    *Lumigan® 0.01%*

Allergan developed the Lumigan® 0.01% reformulation to replace Lumigan® 0.03%, which was set to lose patent protection in 2014. Allergan's reformulated Lumigan® 0.01% product was FDA-approved in 2010. A21. Allergan launched Lumigan® 0.01% in October 2010, and it withdrew Lumigan® 0.03% from the market in December 2012. A5315, A5328 (LeCause, Allergan's vice president of U.S. eye care sales and marketing, A5310).

Lumigan® 0.01% is basically identical to Lumigan® 0.03%, except that the reformulation has a lower bimatoprost concentration (0.01%) and a higher BAK concentration (200 ppm). A8123-A8130 at A8127-A8128 (Lumigan® 0.01%/0.03% label). Lumigan® 0.01% is not quite as effective at lowering intraocular pressure as Lumigan® 0.03%. *See* A8129 (stating that Lumigan® 0.01% is "*less* effective" than Lumigan® 0.03%). Lumigan® 0.01% has a "similar overall safety profile" to Lumigan® 0.03%. A8129. But Lumigan® 0.01% causes less hyperemia. A5849 (Samples).

Lumigan® 0.01% is covered by not only the asserted patents (which claim priority to a 2005 application) but also by three of Allergan's unasserted prior art patents (the '819, '655, and '649 patents).[1] These unasserted prior art patents disclose concentration ranges of bimatoprost and BAK that encompass the 0.01%

---

[1] U.S. Patent Nos. 5,688,819, 8,017,655, and 6,403,649.

bimatoprost and 200 ppm BAK required by the asserted claims. *See* A9103-A9119 at A9107(col.8:6-60) ('819 patent); A8894-A8905 at A8902-A8903(col.8:42-col.9:25) ('655 patent); A8840-A8853 at A8844-A8845(col.8:17-col.9:10) ('649 patent). Allergan listed these patents in the Orange Book as covering both Lumigan® 0.03% *and* Lumigan® 0.01%.[2]

### 3.    BAK

At the time of the "invention," BAK was the most-used preservative in ophthalmic formulations, and it was used at the precise concentration claimed by the asserted patents. A5732, A5769 (Samples); A25813-A25814 (Abelson) (describing BAK as "the gold standard for preservatives in topical ophthalmic medications" and indicating that BAK is used in 72% of eye drops); A9139-A9182 at A9145 (Lee). Indeed, five drug formulations used 200 ppm BAK: Xalatan®, Neodecadron®, Decadron Phosphate®, Natacyn®, and Xalacom®. A25815 (Abelson); A22216-A22220 at A22218 (2004 Canadian Drug Reference ("CDR") entry for Xalacom). BAK continues to be commonly used today. A5769 (Samples) ("It is still the most common preservative.").

---

[2] Sandoz and Watson have certified that they are not seeking FDA approval for their generic products prior to the expiration of the '819 patent in August of 2014. *See* A2894; A1995; A1041; A4428 nn.2-3. The '655 and '649 patents expired in 2012.

Although BAK is commonly used, it does have known risks. Exposure to high levels of BAK can damage cells, A53-A54; A25813-A25814 (Abelson), and can be problematic in patients using more than one BAK-containing medication, A54; A5794 (Samples). BAK formulations are inappropriate for certain patients, such as patients with BAK allergies or severe dry eye, and BAK should not be injected inside the eye. A5766-A5767, A5786-A5787 (Samples). In 2005, those of skill in the art thus would have weighed the pros and cons of using BAK in a given formulation. The 2002 Abelson article, which reviewed the risks of BAK, concluded: "the presence of BAK in the composition of any topical ophthalmic preparation can be viewed as a benefit or a risk. It's apparent that, if used within reasonable bounds, BAK can provide more help than harm." A25815. The ANDA applicants' expert Dr. Samples likewise testified that the knowledge in the field overall with regard to BAK was "just as Mark Abelson says, . . . a matter of balancing the pros and the cons, and the pros generally outweigh the cons here." A5769, A5743 (Samples).

In 2005, 200 ppm BAK had "a fairly well-established safety profile" based in part on experience with Xalatan®, a long-term glaucoma treatment launched in 1996. A5698-A5699 (Schiffman, inventor of the asserted patents and Allergan's former head of global product enhancement, A5698); *see* A5913-A5917 (Majumdar, the ANDA applicants' expert in ophthalmic drug formulation, A5875);

A5646 (Gryziewicz, Allergan's Senior Director of Regulatory Affairs, A5634); A5761 (Samples). Allergan's application for Lumigan® 0.01% told the FDA that 200 ppm BAK had an "acceptable safety profile" and "is also present in other authorized formulations for ocular administration (e.g. Xalatan® and Natacyn®)." A8260-A8272 at A8264.

In addition to acting as a preservative, BAK was well-known to enhance the penetration of drugs into the eye, which allowed formulators to include a lower concentration of the active ingredient in the composition. A5734, A5760 (Samples); A5897 (Majumdar). Abelson taught that "BAK may enhance a drug's ability to reach the site of action, as it can increase ocular permeability." A25815, A25813 ("BAK can also enhance the effectiveness of some drugs by increasing their penetration and delivery to the cornea."). Dr. Samples testified that "considerable literature" in the prior art established that BAK enhanced ocular penetration of a wide variety of drugs. A5734 (Samples). These included the 1986 Lee article, which taught that BAK enhanced the ocular absorption of a variety of drugs, including glaucoma medications. A9139-A9182 at A9145, A9156, A9162 (Lee); A5731-A5732 (Samples); A6204 (Loftsson, Allergan's expert in ophthalmic drug formulation, A6157). Two inventors of the asserted patents testified that in 2004, they expected BAK to enhance drug penetration. A5697 (J. Chang); A5690-A5691 (Lin).

## B.    Allergan's Asserted Patents

The five asserted patents are all entitled "Enhanced Bimatoprost Ophthalmic Solution."   A10-A11; A89; A95; A105; A115; A124.   They share an identical specification and an effective filing date of March 16, 2005.  A10-A11; A89; A95; A105; A115; A124.   According to the Orange Book, the '504 patent expires on June 13, 2027, and the remaining asserted patents expire on March 16, 2025.

Allergan asserts the following claims:

| Patent | Asserted Claim(s) |
|--------|-------------------|
| '504 patent | 2 |
| '605 patent | 1, 6, 10, and 12 |
| '479 patent | 15 |
| '353 patent | 1, 7, and 8 |
| '118 patent | 1, 7, and 8 |

A1; A22.   Like Allergan's prior art patents, the asserted claims are generally directed to compositions comprising bimatoprost and BAK, and to methods of using such compositions to lower intraocular pressure in glaucoma or ocular hypertension patients.   Specifically, the asserted claims require compositions having 0.01% bimatoprost and 200 ppm BAK.  Certain asserted claims also recite the clinical efficacy and hyperemia of such compositions and methods as compared to 0.03% bimatoprost and 50 ppm BAK.     A103(col.5:48-56, col.6:3-15);

A113(col.5:48-56, col.6:3-16).   The district court held that all of the asserted claims cover the formulation or use of Lumigan® 0.01%.   A25.

*The '504, '605, and '479 patents.*   The asserted claims of the '504, '605, and '479 patents are directed to compositions comprising about 0.01% bimatoprost, about 200 ppm BAK, and various other inactive ingredients, as well as methods of using such compositions to lower intraocular pressure.  The specific ingredients and concentrations claimed by the asserted patents are all taught in the prior art.   A9344-A9352 at A9351 (Woodward); A5738-A5739 (Samples); A25352-A25357 at A25352 (Lumigan® 0.03% label); A8127-A8128 (Lumigan® 0.01%/0.03% label); A9107(col.8:4-60) ('819 patent).   Indeed, the district court and Allergan identified only one difference between the components recited in the asserted claims and the components of the prior art Lumigan® 0.03% formulation: the specific concentrations of 0.01% bimatoprost and 200 ppm BAK.   A59-A60; A6405-A6406.

Claim 2 of the '504 patent recites:

> 2. A composition having a pH of about 7.3 which comprises about 0.01% bimatoprost, about 200 ppm benzalkonium chloride, citric acid monohydrate, a phosphate buffer, and NaCl wherein said composition is an aqueous liquid which is formulated for ophthalmic administration.

A94(col.6:21-25).

Claims 1, 6, 10, and 12 of the '605 patent all recite methods of lowering intraocular pressure by applying a solution of about 0.01% bimatoprost and about 200 ppm BAK.  A123(col.5:47-55, col.6:3-11, 18-19, 22-30).  For example, claim 1 recites:

> 1. A method of lowering elevated intraocular pressure in a patient with open-angle glaucoma or ocular hypertension which comprises applying to the eyes of the patient an aqueous solution comprised of:
> about 0.01% w/v bimatoprost;
> about 200 ppm benzalkonium chloride;
> the solution having a pH of about 7.3;
> a phosphate buffer; and,
> water.

A123(col.5:47-55).

Claim 15 of the '479 patent depends from unasserted claim 1.  These claims recite:

> 1. A composition for the treatment of elevated intraocular pressure comprising about 0.01% w/v bimatoprost and about 200 ppm benzalkonium chloride, at least one buffer and having a pH of about 7.3 wherein said composition is an aqueous liquid which is formulated for ophthalmic administration.

> 15. The composition of claim 1 comprising about 0.01% w/v bimatoprost, about 0.02% w/v benzalkonium chloride, about 0.26% w/v sodium phosphate dibasic heptahydrate, about 0.014% w/v citric acid monohydrate, about 0.8% w/v sodium chloride, and water.

A132(col.5:47-col.6:2, col.6:40-44).

*The '353 and '118 patents.*   The asserted claims of the '353 patent are directed to compositions comprising 0.01% bimatoprost and 200 ppm BAK, such as Lumigan® 0.01%.   And the asserted claims of the '118 patent are directed to methods of using such compositions.   Both patents' claims include limitations related to the clinical effects of compositions comprising 0.01% bimatoprost and 200 ppm BAK, as compared to compositions comprising 0.03% bimatoprost and 50 ppm BAK (e.g., Lumigan® 0.03%).     A103(col.5:48-56, col.6:3-15); A113(col.5:48-56, col.6:3-16).

Claims 1 and 8 of both patents recite that 0.01% bimatoprost and 200 ppm BAK "results in less hyperemia" as compared to 0.03% bimatoprost and 50 ppm BAK.   A103(col.5:53, col.6:13-14); A113(col.5:53, col.6:14).   For example, claim 1 of the '353 patent recites:

> 1. A first composition administered once daily for lowering intraocular pressure in a person with glaucoma or ocular hypertension, the first composition comprising about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride, wherein the first composition lowers intraocular pressure and results in less hyperemia as compared to the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

A103(col.5:48-56);   *see*   A113(col.5:48-56).     The district court found that Lumigan® 0.01% satisfied this limitation because it causes less frequent and severe hyperemia than Lumigan® 0.03%.   A26.

Claim 7 of both patents recites that 0.01% bimatoprost and 200 ppm BAK "lowers intraocular pressure without a substantial reduction in the intraocular pressure lowering benefit provided" as compared to 0.03% bimatoprost and 50 ppm BAK:

> 7. A first composition administered once daily for lowering intraocular pressure in a person with glaucoma or ocular hypertension, the first composition comprising about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride, wherein the first composition lowers intraocular pressure without a substantial reduction in the intraocular pressure lowering benefit provided by the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

A103(col.6:3-11); *see* A113(col.6:3-12).   The district court construed the claim terms "lowers intraocular pressure without a substantial reduction in the intraocular pressure lowering benefit provided" to mean with "nearly equivalent" intraocular pressure lowering benefit.   A25-A26; A2826.   The district court found that Lumigan® 0.01% satisfied this limitation, because it reduced intraocular pressure almost as much as Lumigan® 0.03% (within 0.5 mm Hg).   A25-A26; A8129 (Lumigan® 0.01%/0.03% label).

The patents' specifications do not disclose any clinical results of the Lumigan® 0.01% formulation with respect to either efficacy or hyperemia.

## C.    The Prior Art

The prior art disclosed compositions having 0.01% bimatoprost and 200 ppm BAK.  A80.  The prior art further disclosed that (a) bimatoprost causes hyperemia;  (b) 0.01% bimatoprost is an effective glaucoma treatment; and (c) 200 ppm BAK is likely to increase the amount of bimatoprost that passes through the cornea.

### 1.    *Allergan's prior art patents*

Allergan holds additional patents directed to ophthalmic compositions comprising bimatoprost and BAK, and the use of such compositions to treat glaucoma.  As the district court correctly found, one of these patents—the '819 patent—discloses ranges that include the 0.01% bimatoprost and 200 ppm BAK required by the asserted claims.  A80.  Two other prior art patents—the '655 and '649 patents—share a similar specification and also disclose that same range. These patents teach that corneal surface exposure to prostaglandins, such as bimatoprost, can lead to hyperemia.   A9105(col.3:14-19),  A9108-A9109(col.10:58-col.11:37)   ('819   patent);   *see*   A8900(col.3:14-19), A8904(col.11:20-65) ('655 patent).

The prior art '819 patent claims methods of treating ocular hypertension or glaucoma using prostaglandin compounds such as bimatoprost.  A9110(col.13:16-19); *see* A9104(col.1:25-26).  The '819 patent discloses formulations comprising a

therapeutically effective amount of a prostaglandin, such as bimatoprost, in a concentration of "preferably about 0.001 to about 1.0% (w/v) in liquid formulations," and a preservative such as BAK, in a concentration up to 1000 ppm (0.10% (w/v)). A9107(col.8:4-60).[3]

Like the '819 patent, the '655 and '649 patents disclose concentration ranges that encompass 0.01% bimatoprost and 200 ppm BAK. A8902-A8903(col.8:38-51, col.9:10-25); A8844-A8845(col.8:17-col.9:10).

### 2.    *Prior art teaching that 0.01% bimatoprost is effective*

The prior art taught that concentrations less than 0.03% bimatoprost, including the 0.01% bimatoprost concentration claimed by the asserted patents, would be effective at treating glaucoma and ocular hypertension while decreasing bimatoprost's side effects.

The Lyons patent (U.S. Patent No. 6,933,289) is directed to a method for reducing bimatoprost's side effects, including hyperemia, by formulating it with cyclodextrin. A8340-A8350; A5733, A5755 (Samples). Lyons teaches that to reduce red eye, the free bimatoprost concentration should be less than 0.02%. A8346(col.7:35-39); A5852 (Samples). To that end, Lyons claims formulations of 0.01% bimatoprost, and its specification states that the concentration of

---

[3] The '819 patent discusses BAK concentration in % (w/v) rather than ppm. 0.10% (w/v) is equivalent to 1000 ppm; 0.02% (w/v) is equivalent to 200 ppm.

bimatoprost is "more preferably" between about 0.01% and about 0.05%. A8349(col.14:43-45), A8346(col.7:24-28); *see* A5756-A5757 (Samples); A5888-A5889 (Majumdar).

Similarly, the prior art Laibovitz reference, *Comparison of the Ocular Hypotensive Lipid AGN 192024 With Timolol*, reports the results from Allergan's clinical trial investigating the efficacy of BAK-free preparations of 0.003%, 0.01%, and 0.03% bimatoprost. A8832-A8839. These bimatoprost formulations were compared against the "gold standard" drug 0.5% timolol. A5730, A5746 (Samples); A5887-A5888 (Majumdar). Laibovitz reports that a 0.01% bimatoprost formulation had "significantly greater" efficacy than the gold standard timolol in reducing intraocular pressure. A8835 (Laibovitz, Figures 1 & 2); A5730-A5731, A5745-A5754 (Samples); A5289, A5307 (Batoosingh); A5887, A5896 (Majumdar). Indeed, Laibovitz teaches that 0.01% bimatoprost was nearly as effective at reducing intraocular pressure as 0.03% bimatoprost. A5746 (Samples); A5887 (Majumdar).[4]

---

[4] Laibovitz taught that the 0.01% and 0.03% bimatoprost treatment groups ended with approximately the same intraocular pressure (about 19 or 20 mm Hg). A8835 (Laibovitz, Table 2); A5749 ("[T]hey both end at approximately the same point. And in glaucoma studies, there is some tendency to achieve a floor.") (Samples). As Dr. Samples explained, the starting intraocular pressure on the first day of the study (or "baseline" intraocular pressure) was almost 2 mm Hg higher in the 0.03% bimatoprost group (27.0 mm Hg) than the 0.01% bimatoprost group (25.2 mm Hg). A8835 (Laibovitz, Table 2); A5747 (Samples). Thus, over the

(Footnote continues on next page.)

### 3. *Prior art disclosing 200 ppm BAK and BAK's benefits in ophthalmic formulations*

The prior art also disclosed that certain concentrations of BAK, including 200 ppm BAK, were useful in ophthalmic formulations.

The Abelson article, *How to Handle BAK Talk*, reviews the published literature on the use of BAK in ophthalmic formulations as of 2002. A25813-A25816. Abelson discloses that 200 ppm BAK was used in prior art ophthalmic products. A25815 (Abelson); *see* A25805-A25809 at A25808 (Remington, stating that quaternary ammonium preservatives, including BAK, are used in a concentration range of 0.004-0.02%). Abelson acknowledges that BAK has risks but concludes that "if used within reasonable bounds, BAK can provide more help than harm." A25815; *see* A5744-A5745, A5769 (Samples). And Abelson taught that BAK could act as a penetration enhancer, which "may enhance a drug's ability to reach the site of action, as it can increase ocular permeability." A25815.

---

(Footnote continued from previous page.)

course of the study, the 0.03% treatment reduced intraocular pressure by about 2 mm Hg more than the 0.01% treatment. A5750 (Samples). Dr. Samples further explained that "[i]f you start with a higher number, it's easier to show more change in glaucoma than if you start with a lower number." A5748. Thus, one of skill in the art would appreciate that intraocular pressure reduction would be easier to see in the 0.03% bimatoprost group (which started with a higher intraocular pressure), and the actual difference in efficacy between the treatments was probably even less than about 2 mm Hg. A5747-A5749 (Samples).

The 1986 Lee article, *Topical Ocular Drug Delivery:  Recent Developments and Future Challenges*, teaches that BAK is a known penetration enhancer. A9139-A9182.  Lee teaches that BAK enhances the ocular absorption of a variety of drugs varying in molecular size and lipophilicity, including glaucoma medications such as carbachol and pilocarpine.  A9145, A9156, A9162; A5731-A5732 (Samples); A6204 (Loftsson).  Additional prior art references that taught the use of BAK to enhance drug penetration into the eye included Keller (disclosing the use of 200 ppm BAK to enhance the penetration of the drug inulin) and Higaki (disclosing that BAK enhanced the penetration of three out of four prostaglandins), and Camber (disclosing that BAK "increases the corneal permeability of a variety of compounds," including a prostaglandin).  A9183-A9192 (Keller); A9125-A9134 (Higaki); A44079-A44084 at A44082-A44083 (Camber).

### D.    District Court Proceedings

After a bench trial, the district court held the asserted claims not invalid. A79-A80.

The district court recognized that the prior art '819 patent disclosed a range of bimatoprost and BAK concentrations encompassing the claimed invention. A80.  And the district court further recognized that "[o]ther prior art references also disclose similar ranges."  A80.  Yet the district court effectively disregarded

these disclosures, because it found no "reason to select the claimed concentrations of bimatoprost and BAK in the range disclosed in the prior art."   A79.   In particular, the district court concluded that the prior art provided no motivation to modify Allergan's Lumigan® 0.03% product by "decreasing the bimatoprost concentration from 0.03% to 0.01%," A60, or by "quadrupling the concentration of BAK from 50 ppm to 200 ppm."   A40; *see* A33-A34, A52-A53.

The district court explained that the prior art "does not teach that a formulation of 0.01% bimatoprost and 200 ppm BAK would have equivalent efficacy in lowering IOP as 0.03% bimatoprost and 50 ppm BAK."   A59. Moreover, the district court stated that the prior art failed to teach that "BAK would act as a permeation enhancer for bimatoprost" or that "increasing the BAK to 200 ppm would be safe or desirable."   A60.   Instead, the district court concluded that it was an "unexpected result" that Lumigan® 0.01% was nearly as effective with less hyperemia than Lumigan® 0.03%.   A62-A63.   But a number of prior art references (Laibovitz, Lyons, and Lee) disclosed that 0.01% bimatoprost was expected to produce "less hyperemia" than 0.03% bimatoprost with almost the same efficacy.   And the prior art (for example, Lee and Abelson) also taught that BAK was a penetration enhancer.   Indeed, Allergan told the FDA in 2004 that BAK was "known to enhance ocular absorption of ophthalmic drugs." A8263-A8264.

The district court further concluded that Allergan encountered difficulties in developing its 0.01% bimatoprost formulation, and that those difficulties demonstrated nonobviousness. A35. But many of Allergan's so-called failures related to Allergan's efforts to make other formulations—specifically, to formulate bimatoprost with its proprietary Purite® preservative instead of BAK, or in its patented cyclodextrin formulation. A14-A16. Once formulators at Allergan finally decided to explore a BAK formulation in 2004, they readily developed the claimed formulation of 0.01% bimatoprost and 200 ppm BAK. A17-A18; A8911-A8946 (2004 study confirming 200 ppm BAK's absorption-increasing effect); A41922-A41965 (November 2004 clinical test protocol including 0.01% bimatoprost and 200 ppm BAK).

As to the objective indicia of nonobviousness, the district court concluded that there was a long-felt need for a glaucoma drug with Lumigan® 0.03%'s efficacy without as much hyperemia. A61-A62. But the district court did not address other glaucoma treatments available in 2005, including Lumigan® 0.03%'s more successful competitor, Xalatan®, which was just as efficacious with less hyperemia. A9371-A9386 (Parrish). And the district court concluded that Lumigan® 0.01% enjoyed commercial success—but it did so without considering whether that "success" was due to the patented features (as the

law requires) or the anti-competitive effect of Allergan's prior art patents covering Lumigan® 0.03%.  A63-A64.

Finally, the district court held that the asserted claims of the '118 and '353 patents, which recite the clinical-performance limitations, were not invalid for lack of written description.  The district court concluded that "[t]he formulation for Lumigan® 0.01% is explicitly disclosed in the specification" and "has the clinical performance that is recited in the claims."  A83.  But the specification is devoid of any clinical results comparing Lumigan® 0.01% to Lumigan® 0.03%.  And if the clinical performance properties were nonobvious (as the district court concluded), then one of skill in the art would need to see the clinical results to know that Allergan possessed the invention it claims.

## SUMMARY OF ARGUMENT

I.     The district court applied the wrong legal test for obviousness.  All the asserted claims recite a formulation of 0.01% bimatoprost with 200 ppm BAK.  That formulation is obvious.  Allergan's own soon-to-expire prior art patent disclosed a range that reads on that formulation.  All Allergan did was select different, previously disclosed concentrations of bimatoprost and BAK, to be used in the same way as the prior art.

A.     The district court required the ANDA applicants to prove obviousness by demonstrating a motivation in the prior art to modify Allergan's prior art

commercial embodiment, Lumigan® 0.03%, by decreasing its bimatoprost concentration from 0.03% to 0.01% and increasing its BAK concentration from 50 ppm to 200 ppm. But there is no such requirement in the law. Where, as here, a claimed composition falls within a range disclosed in the prior art, a compelling case of obviousness exists, and the claimed invention is likely obvious unless: (1) the prior art taught away from the composition; (2) the composition produces an unexpected result; or (3) there are other pertinent secondary considerations. In failing to recognize the compelling case of obviousness here, the district court misapplied the well-established principles of this Court's decisions involving claimed "inventions" falling within a range disclosed in the prior art.

B.    Having made that foundational legal error, the district court then made additional legal errors. The district court concluded that the prior art taught away from 0.01% bimatoprost and 200 ppm BAK because the prior art taught that a formulation having those concentrations would be inferior to Lumigan® 0.03% (0.03% bimatoprost and 50 ppm BAK). But that is not the test. To teach away, the prior art must disparage the claimed invention and suggest it will not work. That an alternative may be superior to the claimed invention is not enough for the prior art to teach away. And here, the prior art amply teaches *toward* lower concentrations of bimatoprost (for less hyperemia) and 200 ppm BAK (the precise BAK concentration in a number of prior art glaucoma treatments).

The district court also misapplied the law with respect to unexpected results. Even if it would have been unexpected (and it would not have been) that the claimed formulation would lead to less hyperemia and "nearly equivalent" efficacy as Lumigan® 0.03%, those results were not probative of nonobviousness. At best, those results reflect a small difference in degree, not a difference in kind that this Court's "unexpected results" precedent requires. Indeed, the district court should not have concluded those results were unexpected. As the ANDA applicants explained, the prior art taught that 0.01% bimatoprost would be effective and would produce less hyperemia, and it further taught that 200 ppm BAK would improve the efficacy of bimatoprost. Finally, reciting those results in the claims (as Allergan did in the claims of two of the asserted patents) cannot save those claims from obviousness, because they are merely inherent properties resulting from the use of the claimed formulation.

The district court's remaining analysis with respect to secondary considerations is conclusory and misapplies the law. Under the correct legal standard, there was no showing of commercial success because sales of Allergan's Lumigan® 0.01% product are not attributable to any unique features of the asserted claims. Nor was there a showing of long-felt need, failure of others, or initial skepticism that could support nonobviousness. Because none of these factors is present here, the asserted claims are obvious.

II.    Certain claims of the asserted patents recite limitations related to the clinical effects of the use of 0.01% bimatoprost and 200 ppm BAK as compared to 0.03% bimatoprost and 50 ppm BAK (e.g., Lumigan® 0.03%).  To the extent those claims would not have been obvious, the claims are invalid for lack of written description.  To be sufficient, the written description must clearly show one of skill in the art that the inventor invented what is claimed.    Here, the identical specifications disclose no clinical performance properties of the Lumigan® 0.01% formulation with respect to either efficacy or hyperemia.  At most, the evidence cited by the district court for written description is no different than the prior art in 2005.  But if that prior art were not enough to render the claims obvious (and it was), then there was inadequate written description to support any nonobvious "invention."

## STANDARD OF REVIEW

This Court reviews legal conclusions de novo and factual findings for clear error.  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007).  Under 35 U.S.C. § 103, obviousness is a legal conclusion based on underlying facts. *Galderma*, 737 F.3d at 736.  Factual considerations that underlie the obviousness inquiry include the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and any relevant secondary considerations.  *Id.*  (citing *Graham v. John Deere Co.*, 383

U.S. 1, 17-18 (1966)). A factual finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). While the presence of objective indicia of nonobviousness is a factual question, the ultimate weighing of those indicia to determine patentability is a legal question, reviewed de novo. *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997).

## ARGUMENT

## I. THE ASSERTED CLAIMS ARE INVALID AS OBVIOUS BECAUSE THEY CLAIM NOTHING MORE THAN A FORMULATION DISCLOSED IN A RANGE IN THE PRIOR ART WITH NO PERTINENT INDICIA OF NONOBVIOUSNESS

### A. The District Court Erroneously Framed The Obviousness Analysis

This Court has held that a "straightforward and potent" obviousness case exists where a claimed invention falls within a range disclosed in the prior art. *Galderma*, 737 F.3d at 736; *Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*, 642 F.3d 1370, 1372-73 (Fed. Cir. 2011); *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004). In such circumstances, a patent reciting a narrower range reads on the prior art disclosing a broader range. That often is enough to show obviousness—after all, "[i]f the claim extends to what is obvious, it is invalid under § 103." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419 (2007). Yet a more narrow range disclosed in the prior art may be nonobvious if "the prior

art taught away from the invention or by a showing of new and unexpected results relative to the prior art." *Tyco*, 642 F.3d at 1373. Thus, the absence of any teaching away, new and unexpected result, or other secondary considerations demonstrates obviousness. *Galderma*, 737 F.3d at 738 (explaining that while the defendant always retains "[t]he ultimate burden of proving obviousness," there must be evidence of a teaching away, unexpected result, or secondary considerations for the patent to be nonobvious); *see In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1077 (Fed. Cir. 2012) (noting that in *Iron Grip* the fact finder "consider[ed] *all* evidence of obviousness and nonobviousness before reaching a determination").

Applying these principles, this Court has invalidated as obvious patents that recite purportedly inventive subject matter falling within a range previously disclosed by the prior art. In *Iron Grip*, for instance, this Court held invalid as obvious a patent that claimed a "range [that was] disclosed in multiple prior art patents." *Iron Grip*, 392 F.3d at 1322. There, the asserted patent recited a weight plate with three hand grips, and the prior art disclosed barbell weight plates with one, two, and four hand grips. *Id.* Similarly, in *Tyco*, this Court held invalid a claim that recited a pharmaceutical compound to treat insomnia with a range of "6 to 8 milligrams of crystalline temazepam" when the prior art disclosed "the use of temazepam at a dosage between 5 and 15 mg." *Tyco*, 642 F.3d at 1371. In both

*Iron Grip* and *Tyco*, the more narrow range recited in the asserted patents was proven obvious by the absence of any teaching away, new or unexpected results, or objective indicia of nonobviousness. *Iron Grip*, 392 F.3d at 1322-25; *Tyco*, 642 F.3d at 1374-77.

This Court recently reaffirmed these principles in *Galderma*. There, the asserted patents included formulation and method claims reciting the composition adapalene 0.3%, which was a reformulation of a prior art composition adapalene 0.1% formulation. *Galderma*, 737 F.3d at 736. A prior art patent claimed a range of adapalene concentrations from 0.01% to 1%. *Id*. Notwithstanding the fact that the claimed adapalene 0.3% formulation squarely fell within the range recited in the prior art patent, the district court held that the claims were nonobvious because the defendant showed no motivation to modify the prior art adapalene 0.1% by tripling the concentration of adapalene. *Id.* at 737.

This Court reversed: "[t]he district court framed the obviousness inquiry as requiring [the defendant] to provide motivation in the prior art to triple the concentration of adapalene from 0.1% to 0.3%." *Id.* This Court held that the defendant "carried no such burden," because there is no requirement "to prove obviousness by starting with a prior art commercial embodiment and then providing motivation to alter that commercial embodiment." *Id.* Rather, "the dispute is whether there was motivation to select the claimed 0.3% adapalene

composition in the disclosed range." *Id.* at 737-38. Because the claimed invention fell within a range disclosed in the prior art, that motivation exists unless there is evidence "that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations." *Id*. at 738.

These well-established principles apply equally here. The asserted claims recite a composition with 0.01% bimatoprost and 200 ppm BAK. A22-A25. There is nothing inventive about that combination at those concentrations. Allergan's own soon-to-expire prior art '819 patent discloses bimatoprost concentrations "preferably about 0.001 to about 1.0%" and BAK concentrations of 0 to 1000 ppm. A9107(col.8:6-60); *see* A8844(col.8:14-15, 60-66); A8902-A8903(col.8:39-41, col.9:15-25).[5]

Other than simply reciting a more narrow range than that disclosed in the prior art, the asserted claims add nothing "new" to the prior art formulation. *See* A9103-A9112, at A9107(col.7:65-col.8:60) ('819 patent); A8894-A8905 at

---

[5] This range also is disclosed in the prior art '655 and '649 patents. And other prior art (Lyons, Laibovitz, and Abelson, for example) discloses ranges that encompass the claimed 0.01% bimatoprost and 200 ppm BAK composition that Allergan now claims. A8346(col.7:24-28) ("preferred . . . concentration of bimatoprost in an ophthalmic formulation is between about 0.003% and about 0.1%, more preferably the concentration is between about 0.01% and about 0.05%"); A8832 (disclosing 0.003%, 0.01% and 0.03% bimatoprost compositions); A25815 (disclosing ophthalmic compositions with up to 200 ppm BAK).

A8902-A8903(col.8:42-col.9:25) ('655 patent); A5702 (Wheeler, Allergan's Senior Vice President of Biological Sciences, A5700); A8273; A9351 (Woodward); A25352-A25353 (Lumigan® 0.03% label); A5735-A5739 (Samples); A5883, A5924 (Majumdar); A6267 (Noecker); A8261 (Lumigan® 0.01% application); A5185-A5186 (C. Chang). On that basis alone, the ANDA applicants demonstrated a "straightforward and potent" case of obviousness. *Galderma*, 737 F.3d at 736; *Tyco*, 642 F.3d at 1371.

In holding otherwise, the district court replicated the error of the district court in *Galderma*. The district court here required the ANDA applicants to provide specific motivation to reduce the bimatoprost concentration of the prior art Lumigan® 0.03% product to one-third (from 0.03% to 0.01%) and to quadruple the BAK concentration (from 50 ppm to 200 ppm). Finding no such specific motivation, the district court held the asserted claims nonobvious. *See, e.g.*, A34, A79-A80. That was legal error. *Galderma*, 737 F.3d at 738. The district court itself recognized that Allergan's prior art '819 patent disclosed ranges of bimatoprost and BAK covering the claimed "invention," and the '819 patent disclosed that such a formulation would be useful for the treatment of glaucoma. A80; A9105(col.3:9-18). Yet the district court disregarded the prior art ranges by wrongly requiring a motivation to *modify* the prior art Lumigan® 0.03% product by increasing BAK. A80-A81.

Because the prior art discloses a range encompassing the claimed invention, the ANDA applicants demonstrated a straightforward and potent case of obviousness. As such, whether the asserted claims nevertheless could be held nonobvious should have turned only on whether the prior art teaches away, there is a new or unexpected result, or other relevant objective indicia of nonobviousness. *Galderma*, 737 F.3d at 738. As explained below, there are no legally relevant indicia of nonobviousness.

## B.   Under The Correct Legal Standard, The Asserted Claims Are Obvious

Having erroneously framed the legal analysis, the district court went on to make additional legal errors. Under the correct legal standard, the undisputed record demonstrates the absence of any teaching away, new or unexpected results, or objective indicia of nonobviousness.

### 1.   *The prior art did not teach away from Allergan's claimed composition, which was disclosed in the prior art*

#### a.   *The district court applied the wrong legal standard for teaching away*

The district court concluded that the prior art taught away from decreasing bimatoprost in an ophthalmic formulation from 0.03% to 0.01% and from increasing BAK from 50 ppm to 200 ppm. A34, A36, A81. But the district court so concluded only by incorrectly applying this Court's teaching away precedent.

This Court has held that for a prior art reference to teach away, it must "criticize, discredit, or otherwise discourage" further investigation. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) (internal quotation marks omitted). A reference teaches away when "a person of ordinary skill, upon reading the reference, would be discouraged" because the reference "suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought." *In re Gurley*, 27 F.3d at 553. It is not enough that a reference describes the claimed invention as inferior: "[a] known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use." *Id.*; *see also Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1328 (Fed. Cir. 1998) (in inequitable conduct case, undisclosed reference did not teach away). To teach away, the prior art reference must suggest that the claimed invention would not work. *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012).

In *In re Mouttet*, for instance, this Court explained that the prior art did not teach away by teaching that the claimed invention "may be inferior for certain purposes." *Id.* And the Court found no teaching away because the applicant "fail[ed] to cite any reference suggesting that the claimed invention would be unlikely to work." *Id.* Similarly, in *Galderma*, the Court reversed the district court's finding that the prior art taught away from the claimed 0.3% adapalene

formulation. *Galderma*, 737 F.3d at 738-39. The prior art disclosed that "the increase in adapalene concentration from 0.03% to 0.1% resulted in an increase in side effects." *Id.* at 738. But this Court held that those references "failed to discourage even the use of 0.1% adapalene." *Id.* at 739. Nor did they teach away from a still greater increase to 0.3% adapalene because "there is nothing in either of these references to indicate that increasing the concentration to 0.3% would be unproductive, nor do these articles indicate in any way that the side effects would be serious enough to dissuade the development of a 0.3% adapalene product." *Id.* Likewise, in *Hoffmann-La Roche*, this Court explained that a teaching that a particular invention causes worse side effects as compared to an alternative "does not necessarily teach away," because one of skill would have understood that the "side effects must be weighed in light of the benefits of the [claimed invention]." *Hoffmann-La Roche Inc. v. Apotex Inc.*, No. 2013-1128, slip op. at 15 (Fed. Cir. Apr. 11, 2014).

The district court did not apply this legal standard. Rather than address whether or not the prior art taught that the claimed composition would be unlikely to work, the district court instead examined whether one of skill in the art would have viewed the formulation in Allergan's prior art Lumigan® 0.03% product as superior. *See* A33-A34, A36-A39 (finding that 0.03% bimatoprost was preferable), A52, A59-A60 (finding that less BAK was preferable); *see supra* Part

36

I.A. But a preference for an alternative invention does not teach away. *In re Gurley*, 27 F.3d at 553; *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005) ("A statement that a particular combination is not a preferred embodiment does not teach away absent clear discouragement . . . .").

### b.    The prior art does not teach away from 0.01% bimatoprost

Under the correct legal standard, nothing in the prior art teaches away from 0.01% bimatoprost. Quite the contrary:  the prior art taught *toward* using low concentrations of bimatoprost to minimize hyperemia.

As the district court found, "by Allergan's own admission, there was motivation to select a lower concentration of bimatoprost because it was known in the prior art that bimatoprost causes hyperemia."  A80; *see* A55 ("bimatoprost is the leading cause of hyperemia in Lumigan®").

That finding is unquestionably correct.  *See, e.g.*, A8346(col.7:35-39) (Lyons, teaching that reducing the eye's exposure to bimatoprost would reduce hyperemia); A8832 (Laibovitz, disclosing "a dose-related" increase in hyperemia with bimatoprost treatment); A25356 (Lumigan® 0.03% label); A9382 (Parrish); A5124-A5125, A5218 (C. Chang); A5659-A5660 (Jordan); A5733, A5736-A5737, A5755-A5756 (Samples); A5888 (Majumdar); A6201 (Loftsson); A5163 (C. Chang).  And that finding should have ended any teaching away analysis.

The district court nevertheless concluded that the prior art taught away from bimatoprost 0.01%, by applying its legally erroneous teaching away analysis. *See* A36-A40. The district court reasoned that Laibovitz and Lyons "taught away from decreasing the concentration of bimatoprost" because "decreasing the amount of bimatoprost would result in a decreased IOP-lowering effect" compared to 0.03% bimatoprost. A36. Specifically, the district court concluded that Laibovitz taught "that 0.03% bimatoprost had significantly better efficacy than 0.01% bimatoprost." A36-A37. Even if that were correct, describing 0.03% as superior to 0.01% does not teach away from 0.01%. *In re Mouttet*, 686 F.3d at 1334.

But in any event, there is no teaching in Laibovitz (or in Lyons) that bimatoprost 0.03% is "significantly" better than 0.01% bimatoprost, much less that 0.01% bimatoprost should not be used. A36. Dr. Samples testified that Laibovitz taught a person of ordinary skill that "*both* .03 and .01 are more effective in lowering intraocular pressure than timolol" and also "that .01 works *a little bit* less well than .03." A5750 (emphases added), A5753 ("Laibovitz says that they both work significantly better than the gold standard timolol"), A5745-A5751 (Samples); A8835 (Laibovitz, Figure 2). If anything, Laibovitz taught toward 0.01% bimatoprost, given that it worked *better* than timolol.

Nor does Lyons teach away from 0.01% bimatoprost. *See* A38. The district court was correct that Lyons selected 0.03% bimatoprost as its "most preferabl[e]"

concentration. A38. And Lyons does state that "[c]linical trials have shown that 0.02% bimatoprost shows little hyperemia, but also loses efficacy." A38; A8348(col.12:30-31); A6173 (Loftsson). But just because 0.01% bimatoprost was not Lyons' *most* preferred embodiment does not mean Lyons teaches away. *See Syntex*, 407 F.3d at 1380. Indeed, Lyons *also* teaches that preferred embodiments have bimatoprost concentrations of 0.003-0.1%, and "more preferably," *0.01-0.05%*. A8346(col.7:24-28) (emphasis added). And Lyons nowhere states that the efficacy of 0.01% bimatoprost would be unacceptably low or "unlikely to work." *See In re Mouttet*, 636 F.3d at 1332. To the contrary, Lyons *claimed* formulations of 0.01% bimatoprost. A8346(col.7:24-28); A8349(col.14:43-45); A5990-A5993 (Majumdar).

### c.    *The prior art does not teach away from 200 ppm BAK*

The prior art also does not teach away from 200 ppm BAK. To the contrary, the prior art taught that the use of BAK had certain advantages, including increased corneal permeability.

***BAK is an effective preservative.*** The district court found a teaching away based on its conclusion that "the prior art taught away from *increasing* the amount of BAK in the formulation to 200 ppm because long-term, chronic use of BAK would cause corneal damage or disorders." A34 (emphasis added); *see* A52 ("the prior art taught away from increasing the BAK concentration to 200 ppm with

bimatoprost"); A81 ("one of ordinary skill in the art ... would have been motivated to reduce or eliminate BAK—not increase its concentration"). But again, teaching away does not depend on whether 200 ppm BAK is inferior to 50 ppm BAK. Teaching away requires the prior art to disclose that using 200 ppm BAK would not work. *See In re Mouttet*, 636 F.3d at 1334. Thus, it is not sufficient that BAK has side effects; to teach away, the prior art must indicate that "the side effects would be serious enough to dissuade the development of [the claimed] product." *Galderma*, 737 F.3d at 739; *see Hoffmann-La Roche*, slip op. at 15 ("[S]ide effects must be weighed in light of the benefits of the [claimed invention].").

Here, the prior art demonstrates that a formulation with 200 ppm BAK *would* work. Indeed, 200 ppm BAK was used in a number of ophthalmic formulations. In 2005, five ophthalmic products used 200 ppm BAK. One of those products was Xalatan®, a more successful competitor to Allergan's Lumigan®; Xalatan® was known to have "wonderful tolerability" and an excellent safety profile. A5761 (Samples); A25815 (Abelson); A9382 (Parrish). Indeed, Allergan itself used 200 ppm BAK in its first bimatoprost permeability study. A25815; A8911-A8946.

This evidence established that there was no teaching away; only the district court's legal error could have led to its different conclusion. The district court

erroneously focused on prior art teachings that BAK (like most pharmaceutical ingredients) has both benefits and risks. In so doing, the district court ignored that those of skill in the art used BAK (including 200 ppm BAK) *despite* these known risks. A25815 (Abelson); A5743, A5769 (Samples). At most, the prior art cited by the district court taught that all else being equal, it was preferable to use less rather than more BAK, and that BAK concentrations above 200 ppm might be too harmful. But that does not teach away from 200 ppm BAK—a concentration that was disclosed in the prior art '819 patent's range and that was used in several prior art ophthalmic formulations. Indeed, *no* prior art reference taught that 200 ppm BAK should not be used.

As the district court noted, the ANDA applicants' expert Dr. Samples, a glaucoma specialist with experience studying BAK, has called BAK "a natural-born killer." A80-A81; A53-A54; A5766-A5768 (Samples). But Dr. Samples' hope that BAK will be replaced by a different, as-yet-unknown preservative in the next several decades does not support the conclusion of a teaching away in 2005. *See* A54; A5767-A5769, A5803 (Samples) (describing the elimination of BAK as a "distant horizon goal in ophthalmology").

To the contrary, neither Dr. Samples nor anyone else ever testified that the use of BAK was unacceptable in 2005. In fact, Dr. Samples testified that BAK continues to be used in new formulations. A5768-A5769 (Samples). And Dr.

Samples agreed with the Abelson reference that with respect to BAK, "the pros generally outweigh the cons here." A5769, A5743 (Samples). Allergan likewise reached that conclusion: Allergan admits that it did nothing to reduce the risks of BAK in Lumigan® 0.01%. A5198 (C. Chang); A5637-A5638 (Gryziewicz); A6285 (Noecker); A44439-A44445.

*BAK enhances corneal permeability.* The district court committed further legal error by requiring the ANDA applicants to show that BAK would have provided the benefit of improving bimatoprost penetration into the eye. *Contra* A40, A52, A60, A79-A80. Sufficient motivation to select 200 ppm BAK was supplied by the '819, '655, and '649 patents themselves, which expressly disclosed that bimatoprost solutions could be formulated containing a preservative that is preferably BAK, and in concentrations from 0 to 1000 ppm. *Galderma*, 737 F.3d at 737-38.

Even if more were required (and it is not), the prior art *did* teach that BAK enhances the penetration of drugs into the eye. The prior art taught that when used as a preservative, "BAK can also enhance the effectiveness of some drugs by increasing their penetration and delivery to the cornea." A25813; A25815 (Abelson). BAK was known to increase the permeability of the corneal surface by disrupting the connections between its cells, which makes it easier for ophthalmic drugs to pass through. A48 (citing the Lee reference); A5757-A5758 (Samples).

BAK also was known to enhance the penetration of a variety of drugs, including some prostaglandins.  A43-A44; A5760 (Samples).  The 1996 Higaki reference taught that BAK increased the penetration of three out of four prostaglandin analogs into the cornea.  A9132 (Higaki, Figure 4); A5764 (Samples); A6198-A6200 (Loftsson); A5905-A5909 (Majumdar).  And the 1980 Keller reference taught that 200 ppm BAK was effective at enhancing the penetration of drugs into rabbit corneas, and that it was more effective than 100 ppm BAK.  A9190-A9191 (Keller); A5762-A5763 (Samples).  These references would have suggested that 200 ppm BAK would enhance the intraocular pressure-reducing efficacy of 0.01% bimatoprost by making it easier for bimatoprost to penetrate the cornea.

Indeed, the inventors of the asserted patents believed BAK would enhance corneal penetration of bimatoprost.  Inventor James Chang testified that in April 2004—before Allergan completed its first study to evaluate the effect of BAK on bimatoprost penetration—he "knew BAK would enhance penetration, not from this [Lumigan Enhancement] project, just as a lot of history working on ophthalmic products," and that he "wouldn't be surprised" that BAK enhanced bimatoprost penetration.  A5696-A5697 (J. Chang).  Inventor Joan-En Lin testified that in 2004, she *expected* BAK to improve bimatoprost penetration and that "[i]t would have been a surprise" if Allergan's study showed that BAK did *not* increase its penetration.  A5690-A5691 (Lin).

The district court's erroneous conclusion that "[t]he prior art does not teach one of ordinary skill in the art that high concentrations of BAK would enhance the corneal penetration of bimatoprost" was based on three erroneous assumptions. A40.

*First*, the district court assumed that BAK's "toxicity profile" necessarily outweighed the potential benefit of enhancing drug penetration. A57; *see also* A40. The prior art as a whole, however, taught that the benefits and risks of using BAK should be *weighed*; it did not teach that due to its risks, BAK should not be used. *See supra* pp. 11, 40-42. Enhanced drug penetration would be a benefit to weigh. This is particularly true because, as the district court acknowledged, the mechanism by which BAK enhances drug penetration is the same mechanism that causes "adverse effects on the eye, specifically, compromising the integrity of the corneal epithelial barrier." A48 (citing the Lee reference); A5757-A5758 (Samples).

*Second*, the district court concluded that one of skill in the art would not know if BAK would increase corneal permeability with bimatoprost, because the prior art (such as Higaki and Camber) taught that BAK did not enhance the penetration of every drug. A40, A43-A48. But such certainty is not required. That BAK enhanced the penetration of several known prostaglandins, in addition to other molecules, would have provided more than enough motivation for one of

skill in the art to try it with bimatoprost.  *See* A9132 (Higaki, Figure 4); A5764 (Samples).

***Third***, the district court relied on a redacted summary in an FDA Medical Review to find that BAK did not enhance bimatoprost penetration into the cornea. A41.  To the extent enhancing corneal penetration is pertinent to obviousness (and it is not), that finding is clearly erroneous.  Nowhere does the FDA Medical Review study mention bimatoprost penetration, and one of skill in the art would have no way of knowing the components of the formulations tested in the study due to the redactions.  A44420; A5267 (Batoosingh).  Indeed, the study cannot teach away from the use of BAK because it does not even disclose the use of BAK. As shown below, the study does not reveal the contents of the tested formulations:



A44420.   Without access to confidential, non-public information, a person of ordinary skill in the art could not have drawn any conclusions from the summary. A6260-A6264 (Noecker); A9313-A9314; A25752  Thus, the district court clearly erred in finding that the FDA Medical Review summary would have taught those of skill in the art that BAK would be ineffective as a permeation enhancer.

*     *     *     *     *

In short, the district court applied an incorrect teaching away standard. Here, the prior art taught *toward* the claimed invention.  But even if the prior art did not, it at most taught that the claimed concentrations of bimatoprost and BAK

might be less effective or safe compared to Lumigan® 0.03%.  Under this Court's precedent, inferiority is not enough for a teaching away.

### 2.    The clinical results of the claimed formulations were not unexpected

The district court held that unexpected results provided evidence of nonobviousness.  A23-A24; *see also* A35, A62-A63, A81.  But that conclusion was wrong for multiple reasons.

*First*, contrary to the district court's conclusion, the decreased hyperemia and nearly equivalent efficacy to Lumigan® 0.03% were not an "unexpected result" probative of nonobviousness.  A62-A63.

Under this Court's precedent, not every result that was not predicted by the prior art is an "unexpected result" that "is probative of nonobviousness." *Galderma*, 737 F.3d at 739.  To be probative, a result must be more than just a difference in degree; it must be a difference in kind.  *Id.*

For example, in *Galderma*, "[t]he district court found that the comparable tolerability of 0.1% and 0.3% adapalene was unexpected" because "a skilled artisan would have expected that tripling the concentration of adapalene would have resulted in a clinically significant increase in side effects." *Id.*  This Court "agree[d] that this result was unexpected." *Id.*  But that was not enough.  The Court explained that it nonetheless "does not constitute an unexpected result that is probative of nonobviousness," because it represented a difference in degree rather

than kind. *Id.* "Results which differ by percentages are differences in degree rather than kind, where the modification of the percentage is within the capabilities of one skilled in the art at the time." *Id.*; *see Iron Grip*, 392 F.3d at 1322-23 (explaining that to be probative of nonobviousness, an unexpected result must be "'different in kind and not merely in degree from the results of the prior art'") (quoting *In re Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955)); *In re Harris*, 409 F.3d 1339, 1344 (Fed. Cir. 2005); *In re Huang*, 100 F.3d 135, 139 (Fed. Cir. 1996).

Here, the almost-equivalent efficacy and decreased hyperemia seen with the 0.01% formulation relative to the prior art 0.03% formulation are no more than differences in degree. For one thing, any differences are minor: the Lumigan® label states that Lumigan® 0.01% is "approximately 0.5 mm Hg less effective" and has a "similar overall safety profile" compared to Lumigan® 0.03%. A8129. For another, the lower concentration of bimatoprost *does* produce the expected decrease in hyperemia and decrease in efficacy, as compared to the higher prior art concentration. At best, the only so-called unexpected result of the 0.01% bimatoprost formulation is that the efficacy of that formulation decreases to a lesser extent than expected. That is a quintessential "difference in degree rather than kind."[6]

---

[6] Moreover, although unnecessary for reversal here, when the penetration-enhancing effect of 200 ppm BAK is taken into account, the results are not even

(Footnote continues on next page.)

***Second***, the district court erred in distinguishing *Galderma* on the basis that "both Laibovitz and Lyons taught that decreasing the bimatoprost concentration results in lower efficacy," but "[t]he patentees were able to reach the *opposite* result (by using 200 ppm BAK)." A81 (emphasis added). Indeed, the district court concluded that "the patentees were able to *reverse* the concentration-efficacy relationship known in the prior art." A81 (emphasis in original). But that is not so. For the district court to be correct, the claimed formulation would have had to achieve *higher* efficacy with less bimatoprost. There is no evidence of that result.

In any event, the results themselves are hardly "unexpected." In 2005, based on the teachings of prior art references (such as Laibovitz, Lyons, and Lee), one of skill in the art would have expected 0.01% bimatoprost and 200 ppm BAK to result in about the same efficacy as Lumigan® 0.03% with less hyperemia. *See supra* Part I.B.1. After all, the district court recognized that hyperemia is a dose-dependent *result* of bimatoprost—Lyons and Laibovitz taught that less bimatoprost results in less hyperemia. A80; A8346(col.7:35-39); A8832. Nor is it surprising that bimatoprost 0.01% is about as effective in lowering intraocular pressure as

---

(Footnote continued from previous page.)

unexpected in degree. As discussed above, the prior art clearly taught that high concentrations of BAK (such as 200 ppm) were known to enhance drug penetration. *See supra* pp. 12, 22, 42-43. One of skill in the art thus would have predicted an increase in the efficacy of 0.01% bimatoprost due to increased corneal penetration. *Id.*

bimatoprost 0.03%. Laibovitz taught that in BAK-free formulations, 0.01% bimatoprost was only slightly less effective than 0.03% bimatoprost at reducing intraocular pressure. A8835 (Laibovitz, Figure 2); A5750, A5753, A5745-A5751 (Samples).

*Third*, the fact that these purportedly "unexpected" clinical results are recited in claims 1, 7, and 8 of the '353 patent and claims 1, 7, and 8 of the '118 patent cannot save those claims. The recitation of a formulation's clinical results in a claim generally cannot make an otherwise obvious claim nonobvious. This Court has explained that "an obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the result[]." *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012).

In *Tyco*, for example, this Court rejected as "unavailing" a patentee's argument that the effectiveness of the claimed composition supported nonobviousness: "'The discovery of a new property or use of a previously known composition, even when that property and use are unobvious from the prior art, can not impart patentability.'" *Tyco*, 642 F.3d at 1373 (quoting *In re Spada*, 911 F.2d 705, 708 (Fed. Cir. 1990)). Likewise, this Court in *In re Kao* held that where the prior art rendered the claimed formulation obvious, the addition of a "food effect" limitation reciting the *results* of administering the formulation to a patient "add[ed] nothing of patentable consequence." *In re Kao*, 639 F.3d 1057, 1070 (Fed. Cir.

2011) (affirming the PTO's determination of obviousness). And in *Santarus*, this Court affirmed the district court's conclusion that claims reciting a drug formulation were obvious where the ranges of ingredients in the claimed formulation overlapped with ranges disclosed in the prior art. *Santarus*, 694 F.3d at 1353-54. The Court further held that a limitation specifying a resulting concentration of drug in the blood serum was directed merely to the inherent result of the drug formulation and thus could not make the claims nonobvious. *Id.* at 1354; *see also Abbott Labs. v. Baxter Pharm. Prods.*, 471 F.3d 1363, 1368-69 (Fed. Cir. 2007); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1350-51 & n.4 (Fed. Cir. 2002); *Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 246 F.3d 1368, 1376, 1374-77 (Fed. Cir. 2001); *Union Oil Co. of Cal. v. Atlantic Richfield Co.*, 208 F.3d 989, 995 (Fed. Cir. 2000).

Those precedents apply with equal force here. The undisputed testimony from both sides' experts was that the claimed clinical effects *necessarily* result from using 0.01% bimatoprost and 200 ppm BAK. A5537-A5541 (Noecker); A5764-A5766 (Samples). Specifically, administering the claimed formulation will result in less hyperemia, and nearly equivalent intraocular pressure reduction, as 0.03% bimatoprost and 50 ppm BAK. Just as in *Santarus*, the recitation of additional limitations directed to the clinical effects that necessarily follow from the use of the formulation cannot save the claims. *Santarus*, 694 F.3d at 1354.

In sum, the results of the Lumigan® 0.01% formulation were not unexpected; they were merely the inherent result of a formulation already disclosed in the prior art. Even if the results were unexpected, the difference would be merely one of degree, not of kind, and therefore not probative of nonobviousness. *Galderma*, 737 F.3d at 739. The asserted claims cannot be upheld on that basis.

### 3. *The district court erred in concluding that "commercial success" supported nonobviousness*

The district court also held that the commercial success of the claimed formulation was evidence of nonobviousness. A63-A64. But the district court committed legal error in so concluding.

A patentee can demonstrate commercial success by showing "'significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent.'" *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) (quoting *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997)). But sales alone are not probative of nonobviousness, unless they are "due to the merits of the claimed invention beyond what was readily available in the prior art." *J.T. Eaton*, 106 F.3d at 1571; *Ormco*, 463 F.3d at 1312 ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent."). In particular, the commercial success of a product has "limited value in determining whether or not the presently asserted claims are obvious" when the patentee also held other patents (so-called

"blocking patents") that prevented competitors from marketing the product at issue. *Galderma*, 737 F.3d at 740; *see Syntex*, 407 F.3d at 1383 (explaining that blocking patents "prevent[] others from competing to reach the solution embodied in the claims at issue"); *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005) (same).

Under a correct application of these legal principles here, there was no commercial success supporting nonobviousness. The district court simply concluded without explanation that the success of Lumigan® 0.01% was "due to the unique features of Lumigan® 0.01%." A63. In so doing, the district court failed to consider Allergan's blocking patents—most importantly the '819 patent (an Orange Book patent on Lumigan® 0.03%), which will expire in August 2014. That was legal error. The '819 patent claims the use of the active ingredient bimatoprost to treat glaucoma and covers both the 0.01% and the 0.03% products. Without addressing Allergan's blocking patents, the district court should not have assumed that sales of Lumigan® 0.01% are probative of the nonobviousness of the asserted claims, rather than the Lumigan® features covered by Allergan's blocking patents. *Galderma*, 737 F.3d at 740 ("Where market entry by others was precluded due to blocking patents, the inference of non-obviousness of the asserted claims, from evidence of commercial success, is weak.") (internal quotation marks and alterations omitted).

Here, consideration of the blocking patents was critical because the evidence shows that Lumigan® 0.01% enjoyed little, if any, commercial success beyond that inherited from its prior art predecessor.  When Lumigan® 0.01% was launched in October 2010, Lumigan® 0.03% was a well-established prostaglandin drug. A9200-A9226; A8408; A5314, A5341 (LeCause).  To move the Lumigan® 0.03% market to Lumigan® 0.01%, Allergan spent more than $83 million on rebates, discounts, and other sales and promotion expenses in 2011 alone.  A8721; A5386-A5387 (LeCause).  In 2012, Allergan more than doubled these expenditures to over $175 million.  A8721; A5387 (LeCause).  Yet despite these expenditures, the Lumigan® franchise remained virtually unchanged—only 0.2% greater than before the Lumigan® 0.01% launch.  A25841 (22.8% prostaglandin market share for 2011); A8408 (22.6% prostaglandin market share for August 2010).  And Lumigan® 0.01% represented just a fraction of the Lumigan® market.  A25841. And it was not until Lumigan® 0.03% was discontinued in December of 2012 (prior to the expiration of the '819 patent), that Lumigan® 0.01% was able to cannibalize the sales of its predecessor product.  A6013-A6015, A6011-A6041 at A6030-A6031 (Rausser, the ANDA applicants' commercial success expert, A6011) ("[Allergan] decided to set the two prices the same because they didn't want any resistance to take place with regard to the cannibalization of .03 into their .01 formulation."); A5349, A5368-A5369, A5371-A5372 (LeCause).  Indeed, the

district court erred by failing to address whether Lumigan® 0.01%'s limited success resulted from Allergan's promotional expenditures, rather than the features of the asserted claims. *See Solder Removal Co. v. United States Int'l Trade Comm'n*, 582 F.2d 628, 637 (C.C.P.A. 1978).

Finally, the district court further erred by concluding that the commercial performance of Lumigan® 0.01% was "particularly significant" given the 2011 launch of a generic version of Xalatan (another prostaglandin drug used to treat glaucoma). A63-A64. For the success of Lumigan® 0.01% to be probative of nonobviousness, Lumigan® 0.01% would need to do more than merely maintain its predecessor's market share with the help of blocking patents. If anything, generic Xalatan's strong sales, despite Allergan's strategy of maintaining market share by discounting Lumigan® to roughly the same cost as generic Xalatan, indicate that Lumigan® 0.01% is *not* a significant improvement over prior art prostaglandin drugs. A6031-A6033 (Rausser); A9200-A9226; A8721.

In short, Lumigan® 0.01% sales have "'minimal probative value'" with respect to the nonobviousness of the asserted claims. *Galderma*, 737 F.3d at 740 (quoting *Merck*, 395 F.3d at 1376); *Ormco*, 463 F.3d at 1312; *Syntex*, 407 F.3d at 1383. Under the correct legal standard, the district court's determination of commercial success should be set aside.

### 4. *The other secondary considerations provide no evidence of nonobviousness*

The remaining secondary considerations do not support the district court's nonobviousness ruling.

The district court clearly erred when it stated in two passing sentences that an unmet need supports nonobviousness. A64, A81. Those "findings [were] entirely conclusory" and thus provide this Court "with little help in performing [its] de novo review of obviousness." *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1293 (Fed. Cir. 2013). Moreover, the probative value of this factor is minimal here due to Allergan's own conduct. The '819 patent excludes all but Allergan from marketing bimatoprost 0.01% and 0.03%, and Allergan itself withdrew Lumigan® 0.03% from the market. A5328 (LeCause). And the district court ignored the numerous other glaucoma medications in the prior art. If anything, any unmet need already was met by Xalatan®, an efficacious product with less hyperemia than Lumigan® 0.03%. A5761 (Samples); A6257-A6258 (Noecker).

The district court also found, based solely on Allergan's struggles, that "others" failed to develop the claimed invention. This is not a failure of others, but rather of Allergan itself. In any event, the evidence demonstrates a rapid, successful development once Allergan abandoned its "attempts to utilize a proprietary preservative, rather than BAK," *Allergan*, 726 F.3d at 1292, and instead focused on BAK and its known permeability enhancement.

Allergan's "struggles" thus were based on a desire to use its own proprietary preservative Purite®. As inventor Lin testified, Allergan was trying "to stay away from BAK" during its failed reformulation attempts. A5681-A5682 (Lin). Inventor James Chang testified to Allergan's "bias against BAK when stacked with purite," its proprietary preservative, and that Allergan "tried to use purite as much as possible wherever we can." A5694-A5695 (J. Chang). Such "struggles" are not probative of nonobviousness. *Allergan*, 726 F.3d at 1292.

*    *    *    *    *

In sum, the asserted patents recite a formulation that falls within a range disclosed in the prior art. Under this Court's longstanding precedent, that creates a straightforward and potent case of obviousness. And because under the correct legal standards, there also was no teaching away, new or unexpected result, or other secondary considerations, all of the asserted claims are invalid as obvious. That warrants reversal of the entire judgment below.

## II.   IF NOT HELD INVALID AS OBVIOUS, THE CLAIMS OF THE '353 AND '118 PATENTS RECITING CLINICAL PROPERTIES MUST BE HELD INVALID FOR LACK OF WRITTEN DESCRIPTION

The asserted claims of the '353 and '118 patents recite limitations requiring that the claimed 0.01% bimatoprost formulation will function in such a way as to produce a specific clinical result. A103(col.5:48-56, col.6:3-15); A113(col.5:48-56, col.6:3-16). Claims 1 and 8 of both patents recite that the formulation of

57

0.01% bimatoprost and 200 ppm BAK "results in less hyperemia" as compared to a formulation of 0.03% bimatoprost and 50 ppm BAK (e.g., Lumigan® 0.03%). A103(col.5:53, col.6:13-14); A113(col.5:53, col.6:14).    Claim 7 of both patents recites that the formulation of 0.01% bimatoprost and 200 ppm BAK "lowers intraocular pressure without a substantial reduction in the intraocular pressure lowering benefit provided" as compared to a formulation of 0.03% bimatoprost and 50 ppm BAK.    A103(col.6:3-11); *see* A113(col.6:3-12).

As discussed above, these claims are invalid as obvious.    The claimed clinical results are no more than inherent properties that flow from the use of an obvious combination, and they would not have been unexpected compared to Allergan's prior art Lumigan® 0.03% formulation. *See supra* pp. 50-52.    But to the extent those claims are not obvious, they fail to satisfy Section 112's written description requirement.

As an initial matter, although the district court's decision states that "[d]efendants did not present any evidence or argument on [written description] at trial," A82, that is simply not so.    To the contrary, the ANDA applicants raised this issue in their pre-trial and post-trial briefing, citing the evidence pertaining to the lack of written description and explaining that the written description failed to describe the claimed formulation's clinical results. *E.g.*, A4307-A4310; A4408-A4410; A6620-A6626; A6808-A6816.    Allergan was on notice that the ANDA

applicants were raising this issue and responded.  A4185-A4187; A4259-A4263; A6740-A6752.  Indeed, the district court did not conclude (and could not have concluded) that the ANDA applicants waived this issue.  Instead, the district court addressed the written description issue at length in its decision.  A82-A84.

That decision is wrong on the merits.  Under this Court's precedent, a patent specification must "'clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'"  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (quoting *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991)).  "In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Id.*

Here, the claims use functional language to distinguish the claimed formulation by "a particular performance property," i.e., producing less hyperemia than Lumigan® 0.03% or lowering intraocular pressure nearly as well as Lumigan® 0.03%.  *GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, 744 F.3d 725, 731 (Fed. Cir. 2014).  But the patents' specifications fail to establish that the claimed formulations have those clinical performance properties.  Indeed, they disclose no clinical results of the Lumigan® 0.01% formulation with respect to either hyperemia or efficacy.  Without such evidence in the written description,

there is no evidence the inventor possessed the invention, and the patents risk preempting some "yet-unidentified ways of achieving a desired result." *Id.* The '353 and '118 patents thus are invalid for lack of written description.

The district court's contrary conclusion is erroneous, for several reasons.

***First***, the district court found that the written description was adequate because "Lumigan® 0.01% has the clinical performance that is recited in the claims." A83. But nothing in the specification discloses the clinical performance of 0.01% bimatoprost and 200 ppm BAK; nor does it show that the inventors possessed a Lumigan® 0.01% formulation having the claimed clinical performance properties. The clinical performance claim limitations merely represent "a wish list of properties" that it would be desirable for a 0.01% bimatoprost, 200 ppm BAK formulation to have. *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1351 (Fed. Cir. 2011). "But a 'mere wish or plan' for obtaining the claimed invention is not sufficient." *Id.* (quoting *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997)). A disclosure establishing possession by the inventor is required to ensure that the patent "does not attempt to preempt the future before it has arrived." *GlaxoSmithKline*, 744 F.3d at 731 (internal quotation marks omitted).

***Second***, the district court erred in relying on confidential, internal Allergan documents to hold the written description adequate. A84. Whether a written

description is adequate depends on what is in "the specification." 35 U.S.C. § 112; *Ariad*, 598 F.3d at 1351-52. Confidential, internal documents cannot substitute for an inadequate written description, because a person of ordinary skill in the art would not have had access to those files. The district court's reliance on these internal documents was legal error.

But even if those internal documents could satisfy the written description requirement (and they cannot), the documents fail to provide any details beyond that already taught by the prior art (such as Laibovitz, Lyons, and Lee). *Compare* A41934-A41935, *with* A8832-A8839; A8346(col.7:20-39); A9145, A9156, A9162. With respect to obviousness, the district court held that this prior art was not enough to invalidate the claims. A79-A82; *see* A59-A61. But if that were so—i.e., if the prior art did not teach those of skill in the art that Lumigan® 0.01% would perform as the claims require—then the specification needed to include whatever additional information was necessary to confirm that Lumigan® 0.01% did have the claimed clinical performance properties. The inventors did not provide such a confirmation. The claims' prediction that a 0.01% bimatoprost and 200 ppm BAK formulation *would* have such purportedly unexpected clinical performance properties is not enough. *See Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1350 (Fed. Cir. 2013) (holding claims invalid for lack of written description because "to actually possess the variant enzymes

claimed in the '723 patent would have required Novozymes to confirm its predictions by actually making and testing individual variants").

*Third*, the district court erred in finding adequate written description of the claimed clinical performance properties based on the prophetic example: "intraocular pressure drops more and less hyperemia is observed" from administering 0.015% bimatoprost and 125 ppm BAK as compared to 0.03% bimatoprost and 50 ppm BAK. A83. This example does not go to the claimed formulation. It is not enough that the example in the specification is a variation of the claimed invention: "[t]he question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification." *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997); *Martin v. Mayer*, 823 F.2d 500, 505 (Fed. Cir. 1987) (it is "not a question of whether one skilled in the art might be able to construct the patentee's device from the teachings of the disclosure" but "whether the application necessarily discloses that particular device") (internal quotation marks omitted). Instead, the specification must describe *the* invention, "and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought." *Lockwood*, 107 F.3d at 1572.

Moreover, the district court's conclusion that the clinical effects of 0.015% bimatoprost disclosed the clinical effects of 0.01% bimatoprost cannot be

reconciled with the district court's obviousness ruling.  After all, the district court held that it would have been "an unexpected result of a different *kind*" that Lumigan® 0.01% would be nearly as efficacious with fewer side effects than Lumigan® 0.03%.  A80-A81 (emphasis in original).  If that were so, then it also would have been unexpected that a Lumigan® 0.01% formulation would be about as efficacious with fewer side effects as the prophetic example disclosed in the specification.   Yet the district court instead concluded that based on the performance of the 0.015% bimatoprost and 125 ppm BAK formulation, one of skill in the art would have known the inventors possessed a 0.01% bimatoprost and 200 ppm BAK formulation with similar clinical performance properties.   A83-A84.

*Fourth*, the district court cited the *in vivo* and *in vitro* rabbit data comparing permeability and absorption of bimatoprost in various test formulations.  But that data, which is reproduced in Figures 1 and 2 of the specification, hardly shows that Allergan possessed clinical data that supported the asserted claims of the '353 and '118 patents.  Like the prophetic example discussed above, those figures contain no data on the actual claimed formulation:  0.01% bimatoprost.  Instead, the only concentrations reported were 0.015% and 0.03% bimatoprost.  A109-A110.  Thus, the data in the specification does not satisfy the written description requirement for

the claimed clinical hyperemia and efficacy limitations for a 0.01% bimatoprost and 200 ppm BAK formulation.

In short, to the extent the claims of the '353 and '118 patent are not invalid as obvious, they lack adequate written description.

## CONCLUSION

For the reasons above, the asserted claims are all invalid as obvious. Furthermore, if not obvious, the asserted claims of the '118 and '353 patents are invalid for lack of written description. Accordingly, the judgment should be reversed and the injunction and order precluding FDA approval should be vacated.

Respectfully submitted,

Dated:  May 5, 2014

/s/ Deanne E. Maynard

DEANNE E. MAYNARD
BRIAN R. MATSUI
JESSICA E. PALMER
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 887-8740
Facsimile: (202) 887-0763

DAVID C. DOYLE
ANDERS T. AANNESTAD
JAMES J. CEKOLA
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, CA 92130
Telephone: (858) 720-5100
Facsimile: (858) 720-5125

*Counsel for Defendant-Appellant
Sandoz Inc.*

/s/ John H. Barr, Jr.

JOHN H. BARR, JR.
JEFFREY L. OLDHAM
JOHN A. YATES
BRACEWELL & GIULIANI LLP
771 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile: (800) 404-3970

*Counsel for Defendants-Appellants
Watson Laboratories, Inc., Watson
Pharmaceuticals, Inc., and
Watson Pharma, Inc.*

**ADDENDUM**

# United States District Court

### EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| ALLERGAN, INC. | § | |
| | § | |
| v. | § | **Cause No. 6:11-cv-441** |
| | § | **Consolidated Case** |
| SANDOZ INC., ET AL. | § | |

## FINAL JUDGMENT AND PERMANENT INJUNCTION

In accordance with Federal Rule of Civil Procedure 58, the Court enters the following final judgment.

A bench trial was held in the above-styled case from July 15–19, 2013. Consistent with the Court's contemporaneously filed Findings of Fact and Conclusions of Law, it is **ORDERED** that:

1. Allegan Inc. ("Allergan") asserted the following claims against Sandoz Inc. ("Sandoz"); Lupin Ltd. and Lupin Pharmaceuticals, Inc. ("Lupin"); Hi-Tech Pharmacal Co., Inc. ("Hi-Tech"); and Watson Laboratories Inc., Watson Pharmaceuticals, Inc. and Watson Pharma Inc. ("Watson"): claim 2 of the '504 patent; claims 1, 7, and 8 of the '353 patent; claim 15 of the '479 patent; claims 1, 7, and 8 of the '118 patent; and claims 1, 6, 10, and 12 of the '605 patent (the "asserted claims").

2. PURSUANT TO 35 U.S.C. § 271(e), 28 U.S.C. §§ 2201 and 2202, the COURT ENTERS JUDGMENT THAT Sandoz's proposed products described in Abbreviated New Drug Application ("ANDA") No. 203056, and the COMMERCIAL USE, SALE, OFFER FOR SALE, MANUFACTURE AND IMPORTATION of those products, WILL AND DO directly and indirectly infringe the asserted claims of the patents-in-suit pursuant to 35 U.S.C. §§ 271(a), (b), (c) and (e).

3.  PURSUANT TO 35 U.S.C. § 271(e) 28 U.S.C. §§ 2201 and 2202, the COURT ENTERS JUDGMENT THAT Lupin's proposed products described in Abbreviated New Drug Application ("ANDA") No. 202911, and the COMMERCIAL USE, SALE, OFFER FOR SALE, MANUFACTURE AND IMPORTATION of those products, WILL AND DO directly and indirectly infringe the asserted claims of the patents-in-suit pursuant to 35 U.S.C. §§ 271(a), (b), (c) and (e).

4.  PURSUANT TO 35 U.S.C. § 271(e), 28 U.S.C. §§ 2201 and 2202, the COURT ENTERS JUDGMENT THAT Hi- Tech's proposed products described in Abbreviated New Drug Application ("ANDA") No. 203604, and the COMMERCIAL USE, SALE, OFFER FOR SALE, MANUFACTURE AND IMPORTATION of those products, WILL AND DO directly and indirectly infringe the asserted claims of the patents-in-suit pursuant to 35 U.S.C. §§ 271(a), (b), (c) and (e).

5.  PURSUANT TO 35 U.S.C. § 271(e), 28 U.S.C. §§ 2201 and 2202, the COURT ENTERS JUDGMENT THAT Watson's proposed products described in Abbreviated New Drug Application ("ANDA") No. 203748, and the COMMERCIAL USE, SALE, OFFER FOR SALE, MANUFACTURE AND IMPORTATION of those products, WILL AND DO directly and indirectly infringe the asserted claims of the patents-in-suit pursuant to 35 U.S.C. §§ 271(a), (b), (c) and (e).

6.  The asserted claims are not invalid.  The asserted claims are not unenforceable.

7.  Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any FDA approval of any of the drugs described in Sandoz's ANDA No. 203056 will be a date that is not earlier than the date of the expiration of all of U.S. Patent Nos. 7,851,504; 8,278,353; 8,299,118; 8,309,605; and 8,338,479, plus any exclusivities afforded under the statute.

8.  Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any FDA approval of any of the drugs described in Lupin's ANDA No. 202911 will be a date that is not earlier than the date of the expiration of all of U.S. Patent Nos. 7,851,504; 8,278,353; 8,299,118; 8,309,605; and 8,338,479, plus any exclusivities afforded under the statute.

9.  Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any FDA approval of any of the drugs described in Hi-Tech's ANDA No. 203604, will be a date that is not earlier than the date of the expiration of all of U.S. Patent Nos. 7,851,504; 8,278,353; 8,299,118; 8,309,605; and 8,338,479, plus any exclusivities afforded under the statute.

10. Pursuant to 35 U.S.C. §§ 271(e)(4)(A) and 283, the effective date of any FDA approval of any of the drugs described in Watson's ANDA No. 203748 will be a date that is not earlier than the date of the expiration of all of U.S. Patent Nos. 7,851,504; 8,278,353; 8,299,118; 8,309,605; and 8,338,479, plus any exclusivities afforded under the statute.

11. Pursuant to 35 U.S.C. §§ 271(e)(4)(B) and 283, Sandoz Inc., including any of its subsidiaries, successors, assigns, officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any or all of them ("Sandoz"), and any persons in privity with Sandoz, and any person or entity to whom Sandoz transfers Abbreviated New Drug Application No. 203056 are enjoined from the commercial manufacture, use, offer to sell and/or sale of the products described in Sandoz's Abbreviated New Drug Application No. 203056 within the United States and its territories or importing the described products into the United States and its territories until after the latest of the expiration dates of U.S. Patent Nos. 7,851,504; 8,278,353; 8,299,118; 8,309,605; and 8,338,479, plus any exclusivities afforded under the statute.

12. Pursuant to 35 U.S.C. §§ 271(e)(4)(B) and 283,  Lupin Ltd. and Lupin Pharmaceuticals, Inc., including any of their subsidiaries, successors, assigns, officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any or all of them ("Lupin"), and any persons in privity with Lupin, and any person or entity to whom Lupin transfers Abbreviated New Drug Application No. 202911  are enjoined from the commercial manufacture, use, offer to sell and/or sale of the products described in Lupin's Abbreviated New Drug Application No. 202911 within the United States and its territories or importing the described products into the United States and its territories until after the latest of the expiration dates of U.S. Patent Nos. 7,851,504; 8,278,353; 8,299,118; 8,309,605; and 8,338,479, plus any exclusivities afforded under the statute.

13. Pursuant to 35 U.S.C. §§ 271(e)(4)(B) and 283, Hi-Tech Pharmacal Co., Inc., including any of its subsidiaries, successors, assigns, officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any or all of them ("Hi-Tech"), and any persons in privity with Hi-Tech, and any person or entity to whom Hi-Tech transfers Abbreviated New Drug Application No. 203604  are enjoined from the commercial manufacture, use, offer to sell and/or sale of the products described in Hi-Tech's Abbreviated New Drug Application No. 203604 within the United States and its territories or importing the described products into the United States and its territories until after the latest of the expiration dates of U.S. Patent Nos. 7,851,504; 8,278,353; 8,299,118; 8,309,605; and 8,338,479, plus any exclusivities afforded under the statute.

14. Pursuant to 35 U.S.C. §§ 271(e)(4)(B) and 283, Watson Laboratories Inc., Watson Pharmaceuticals, Inc. and Watson Pharma Inc., including any of their subsidiaries, successors, assigns, officers, agents, servants, employees, and attorneys, and those

persons in active concert or participation with any or all of them ("Watson"), and any persons in privity with Watson, and any person or entity to whom Watson transfers Abbreviated New Drug Application No. 203748 are enjoined from the commercial manufacture, use, offer to sell and/or sale of the products described in Watson's Abbreviated New Drug Application No. 203748 within the United States and its territories or importing the described products into the United States and its territories until after the latest of the expiration dates of U.S. Patent Nos. 7,851,504; 8,278,353; 8,299,118; 8,309,605; and 8,338,479, plus any exclusivities afforded under the statute.

15. Judgment is entered in favor of Plaintiffs and against Defendants on all counterclaims.

16. Allergan is the prevailing party, and costs are awarded to Allergan.

It is additionally **ORDERED, ADJUDGED, and DECREED** that final judgment be entered in this case.

All relief not previously granted is hereby **DENIED**.

**It is SO ORDERED.**

**SIGNED this 13th day of January, 2014.**

MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE

# United States District Court
### EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **ALLERGAN, INC.** | § | |
| | § | **Cause No. 6:11-cv-441** |
| **V.** | § | **Consolidated Case** |
| | § | |
| **SANDOZ INC., ET AL.** | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Allergan, Inc. filed this consolidated action under the Hatch-Waxman Act alleging patent infringement against Defendants Sandoz Inc.; Lupin Pharmaceuticals, Inc. and Lupin Ltd. (collectively Lupin); Hi-Tech Pharmacal Co., Inc.; and Watson Laboratories, Inc., Watson Pharmaceuticals, Inc., and Watson Pharma, Inc. (collectively Watson).

This dispute revolves around Defendants seeking approval to market and sell generic drugs. Allergan alleges that Defendants infringe its patents and that injunctive relief is warranted to prevent Defendants from introducing generic versions of Allergan's drug Lumigan® 0.01% bimatoprost ophthalmic solution. Defendants deny infringement and contend that the patents are invalid and unenforceable.

The Court conducted a bench trial from July 15–19, 2013. Having considered the parties' stipulations, the pleadings, the testimony and credibility of the witnesses, the evidence, the arguments and briefs of counsel, and the applicable law—including the parties' supplemental briefing on the latest Federal Circuit decision that issued after the bench trial (*see* Doc. No. 301)—the Court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.    BACKGROUND

This is a patent infringement action filed under the Hatch-Waxman Act. Congress passed the Hatch-Waxman Act in 1984 to promote the manufacturing of generic pharmaceuticals. *See Drug Price Competition and Patent Term Restoration Act*, 98 Stat. 1585 (1984); *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2574 (2011). "Under this law, 'generic drugs' can gain [Federal Drug Administration (FDA)] approval simply by showing equivalence to a reference listed drug that has already been approved by the FDA." *Mensing*, 131 S. Ct. at 2574. "This allows manufacturers to develop generic drugs inexpensively, without duplicating the clinical trials already performed on the equivalent brand-name drug." *Id*.

Allergan obtained FDA approval for Lumigan® 0.03% bimatoprost ophthalmic solution in 2001. In late 2010, Allergan obtained FDA approval for Lumigan® 0.01% bimatoprost ophthalmic solution for the reduction of elevated intraocular pressure in certain patients, including those with open angle glaucoma or ocular hypertension. The active ingredient in Lumigan® is the prostaglandin analog bimatoprost, which operates by increasing the outflow of aqueous humor from the eye.

Defendants have each filed an Abbreviated New Drug Application (ANDA) for FDA approval to market and sell a generic version of Plaintiff's Lumigan® 0.01% bimatoprost ophthalmic solution. Defendants seek to market and sell their generic versions prior to the expiration of the patents listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations publication (known as the Orange Book) as covering Allergan's Lumigan® 0.01% bimatoprost ophthalmic solution.

Defendants filed their ANDAs pursuant to a procedure called paragraph IV certification. *See* 21 U.S.C. § 355(j)(2)(A). Under this procedure, Defendants certified that the patents listed in the Orange Book are invalid or will not be infringed by their generic pharmaceuticals. "Such a

certification constitutes an artificial act of infringement." *Pozen Inc. v. PAR Pharm., Inc.*, 696 F.3d 1151, 1157 (Fed. Cir. 2012). Accordingly, Allergan filed complaints against Defendants for infringement of its five patents covering the 0.01% bimatoprost solution: U.S. Patent Nos. 7,851,504 (the '504 Patent); 8,278,353 (the '353 Patent); 8,299,118 (the '118 Patent); 8,309,605 (the '605 Patent); and 8,339,479 (the '479 Patent). In light of Defendants' alleged infringement, Allergan also seeks injunctive relief to prevent Defendants from marketing and selling generic versions of Allergan's drug until the expiration of the patents. Generally, Defendants deny infringing the patents and maintain that they are invalid, primarily based upon obviousness.

At the time of the bench trial in this case, the parties raised several legal and factual issues for resolution: first, whether Defendants' proposed generic drugs infringe Allergan's patents; second, whether Allergan's patents are invalid and unenforceable; and third, whether injunctive relief is justified.

The Court reaches the following conclusions on these issues:

1) Defendants' proposed generic drug products infringe Allergan's patents.

2) Allergan's patents are not invalid and are enforceable.

3) Allergan is entitled to a permanent injunction preventing Defendants from introducing generic versions of Lumigan® 0.01% until the expiration of Allergan's patents.

These issues are more fully addressed in the findings of fact and conclusions of law set forth below.[1] The findings are limited to the relevant factual disputes raised.[2]

---

[1] Any finding of fact more properly characterized as a conclusion of law is adopted as such. Any conclusion of law more properly characterized as a finding of fact is adopted as such.

[2] For purposes of this order, the Court only considered relevant and admissible evidence.

## II.   FINDINGS OF FACT

1. The facts set forth in the background section—whether disputed or undisputed—are found by the Court to be true by a preponderance of the evidence.

### A. The Parties' Stipulations

Prior to the commencement of trial, the parties stipulated that certain facts are true (Doc. No. 207 at 24–27). The Court considers these facts as conclusively established.

2. Subject matter jurisdiction is proper in this Court for claims asserted by Allergan under 35 U.S.C. § 271(e)(2)(A), and for Defendants' declaratory judgment counterclaims.

3. The parties do not contest personal jurisdiction or venue in this Court solely for the limited purpose of this action only.

4. Allergan, Inc. is a Delaware corporation with its principal place of business at 2525 Dupont Drive, Irvine, California 92612.

5. Sandoz, Inc. is a Colorado corporation with its principal place of business at 506 Carnegie Center, Suite 400, Princeton, New Jersey 08540.

6. Lupin Ltd. is a company organized and existing under the laws of India, with a place of business at Laxmi Towers "B" Wing, 5th floor, Banda Kurla Complex, Mumbai 400 051, India.

7. Lupin Pharmaceuticals, Inc. is a Virginia corporation with a place of business at Harborplace Tower, 111 South Calvert Street, Baltimore, Maryland 21202. Lupin Pharmaceuticals, Inc. is a wholly owned subsidiary of Lupin Ltd.

8. Hi-Tech Pharmacal Co., Inc. is a corporation incorporated under the laws of the State of Delaware, with a place of business at 369 Bayview Avenue, Amityville, NY 11701.

9.  Watson Pharmaceuticals, Inc. (now known as Actavis, Inc.) is a Nevada corporation with a principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.

10. Watson Laboratories, Inc. is a Nevada corporation with a place of business at 311 Bonnie Circle, Corona, California 92880. Watson Laboratories, Inc. is a wholly owned subsidiary of Watson Pharmaceuticals, Inc. (now known as Actavis, Inc.).

11. Watson Pharma, Inc. is a Delaware corporation having a place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054. Watson Pharma, Inc. is a wholly owned subsidiary of Watson Pharmaceuticals, Inc. (now known as Actavis, Inc.).

12. The '504 Patent issued on December 14, 2010, and is entitled "Enhanced Bimatoprost Ophthalmic Solution." The application for the '504 Patent was filed on March 16, 2005.

13. The '353 Patent issued on October 2, 2012, and is entitled "Enhanced Bimatoprost Ophthalmic Solution." The application for the '353 Patent was filed on February 10, 2012, and is a continuation of the application that led to the '504 Patent.

14. The '118 Patent issued on October 30, 2012, and is entitled "Enhanced Bimatoprost Ophthalmic Solution." The application for the '118 Patent was filed on February 10, 2012, and is a continuation of the application that led to the '504 Patent.

15. The '605 Patent issued on November 13, 2012, and is entitled "Enhanced Bimatoprost Ophthalmic Solution." The application for the '605 Patent was filed on December 10, 2010, and is a continuation of the application that led to the '504 Patent.

16. The '479 Patent issued on December 25, 2012, and is entitled "Enhanced Bimatoprost Ophthalmic Solution." The application for the '479 Patent was filed on January 9, 2009, and is a continuation of the application that led to the '504 Patent.

17. The following claim of the '504 Patent is asserted in this case: 2.

18. The following claims of the '353 Patent are asserted in this case: 1, 7, 8, 15, and 16.

19. The following claims of the '118 Patent are asserted in this case: 1, 7, 8, 15, and 16.

20. The following claims of the '605 Patent are asserted in this case: 1, 6, 10, and 12.

21. The following claims of the '479 Patent are asserted in this case: 2, 6, 11, 13, 15, and 16.

22. The named inventors of the patents in Suit are Chin-Ming Chang, James N. Chang, Rhett M. Schiffman, R. Scott Jordan, and Joan-En Chang-Lin.

23. Sandoz filed ANDA No. 203506 with the FDA seeking to market its bimatoprost ophthalmic solution, 0.01% product.

24. The formulation of Sandoz's proposed generic bimatoprost ophthalmic solution, 0.01% product is set forth in Sandoz's ANDA.

25. Lupin filed ANDA No. 202911 with the FDA seeking to market its bimatoprost ophthalmic solution, 0.01% product.

26. The formulation of Lupin's proposed generic bimatoprost ophthalmic solution, 0.01% product is set forth in Lupin's ANDA.

27. Hi-Tech filed ANDA No. 203604 with the FDA seeking to market its bimatoprost ophthalmic solution, 0.01% product.

28. The formulation of Hi-Tech's proposed generic bimatoprost ophthalmic solution, 0.01% product is set forth in Hi-Tech's ANDA.

29. The pH stability specification set forth in ANDA No. 203604 for Hi-Tech's proposed bimatoprost 0.01% product is 6.8 to 7.2.

30. Watson filed ANDA No. 203748 with the FDA seeking to market its bimatoprost ophthalmic solution, 0.01% product.

31. The formulation of Watson's proposed generic bimatoprost ophthalmic solution, 0.01% product is set forth in Watson's ANDA.

**B.   Lumigan® 0.03% Bimatoprost Ophthalmic Solution**

32. Open-angle glaucoma is a condition that affects millions of patients worldwide.

33. One major cause of the condition is elevated intraocular pressure (IOP). Increased ocular pressure is believed to damage and eventually kill optic nerve cells.

34. If left untreated, glaucoma causes gradual vision loss and can ultimately lead to complete blindness.

35. Currently there are no known cures for optic nerve cell damage. But there are surgical and pharmacological treatments that can reduce IOP, therefore slowing or abating the progression of glaucoma in affected patients.

36. Allergan first developed Lumigan® 0.03% to reduce IOP.

37. The active ingredient in Lumigan® 0.03% is bimatoprost. The chemical structure of bimatoprost is as follows:

38. Bimatoprost is structurally related to the naturally occurring prostaglandin molecule PGF$_{2\alpha}$, and is one of several prostaglandin-analog drugs that are used for the treatment of glaucoma.

39. One structural difference from other prostaglandin analogs is the amide group, highlighted in the red box above.

40. In 2001, the FDA approved the use of bimatoprost in Lumigan® 0.03% for treating glaucoma and ocular hypertension.

41. Lumigan® 0.03% includes the preservative benzalkonium chloride (BAK) at a concentration of 50 parts per million (ppm) to inhibit bacterial growth. It also includes citric acid monohydrate, a phosphate buffer, and sodium chloride. The target pH for Lumigan® 0.03% is 7.3.

42. Main competitors to Lumigan® 0.03% included the prostaglandin analogs Xalatan® (with the active ingredient latanoprost) and Travatan® (with the active ingredient travoprost).

43. Although Xalatan® and Travatan® are prostaglandin analogs, they act by different means than Lumigan®. Xalatan® and Travatan® are prodrugs. Prodrugs are administered in an inactive form but are converted upon administration into an active form, in this case the free-acid form. Conversely, bimatoprost is administered in its active form.

44. Clinical studies showed that Lumigan® 0.03% lowered IOP more than other available drugs, including Xalatan®.

45. Although effective at lowering IOP, Lumigan® 0.03% had a severe side effect. The use of Lumigan® 0.03% caused more frequent and severe conjunctival hyperemia—or red eye—than other drugs.

46. Experts for the parties agreed that hyperemia associated with Lumigan® 0.03% was severe enough that it caused glaucoma patients to stop taking the medication without consulting or notifying their physicians.

47. Although hyperemia would cease upon termination of the treatment, the patient's IOP remained unregulated and could therefore result in increased vision loss or blindness.

48. Because vision loss due to glaucoma progresses gradually, a patient does not recognize or appreciate the harm by discontinuing treatment.

**C. Development of Lumigan® 0.01% Bimatoprost Ophthalmic Solution**

49. In order to address the hyperemia concerns of Lumigan® 0.03%, Allergan began working on a solution in February 2002. Allergan's goal was to maintain the efficacy of Lumigan® 0.03% while reducing the incidence and severity of hyperemia.

50. Allergan believed this was a challenging proposal due to the properties of Lumigan® 0.03%. The active ingredient bimatoprost was effective in lowering IOP, but it also caused the hyperemia side effect.

51. At first, Allergan looked for solutions other than changing the 0.03% concentration of bimatoprost because its researchers believed that decreasing the amount of bimatoprost would result in a decreased efficacy in lowering IOP.

52. Allergan attempted a number of alternative formulations before achieving its desired result. It took Allergan approximately a year and a half of formulation work before uncovering the solution.

53. In one formulation, Allergan used 0.03% bimatoprost with a cyclodextrin. The cyclodextrin would complex with the bimatoprost—or envelop the bimatoprost—and reduce the amount of free (non-complexed) drug available on the ocular surface. Allergan believed that reducing the amount of free drug on the eye would result in less hyperemia. Although this work ultimately led to another patent issued to Robert Lyons and James Chang, it proved unsuccessful in achieving Allergan's goal of reduced hyperemia.

54. Similarly, Allergan probed the efficacy of several other formulations. These included formations contained 0.03% bimatoprost and the following: (1) Refresh Liquigel; (2) high calcium borate buffer; (3) castor oil emulsion; and (4) gellan gum.

55. Many of these formulations increased the viscosity of the drug to attempt the keep the active ingredient on the surface of the eye longer so the drug could slowly penetrate the cornea. Allergan believed that delaying the full release of the drug would curb severe hyperemia. Other approaches, including that for the calcium borate buffer system, were explored in order to cause vasoconstriction. Allergan used this system in an attempt to substitute the citric acid/phosphate buffer system in Lumigan® 0.03%. Hyperemia is caused by vasodilation, or the enlargement of blood vessels. Therefore, Allergan believed increasing vasoconstriction would reduce hyperemia. Unfortunately, none of these formulations satisfied Allergan's criteria of lowering hyperemia.

56. At this same time, Allergan also worked on formulations eliminating BAK as an ingredient. It was understood that BAK—although widely used in ophthalmic therapies—had negative side effects on the eye. Because BAK irritated the eye, Allergan pursued formations eliminating it as an ingredient.

57. In one formulation, Allergan replaced BAK with Purite®. Purite® is a less irritating preservative that Allergan had used in other glaucoma pharmaceuticals. But this formulation failed because bimatoprost was unstable when combined with Purite®.

58. In another attempt, Allergan used nitric oxide scavengers to control vasodilatation. Under this theory, Allergan hypothesized that bimatoprost could be interacting with nitric oxide to cause hyperemia. Therefore, Allergan assumed using the nitric oxide scavengers would reduce the available nitric oxide, and potentially decrease the prevalence of hyperemia.

59. In pursuing this hypothesis, Allergan created two different "cocktail" formulations in June 2003, each containing 0.03% bimatoprost. One cocktail was called the nitric oxide scavenger cocktail and the other the nitric oxide scavenger emulsion cocktail. The water-soluble scavengers were used in the nitric oxide scavenger cocktail while the oil-soluble scavengers were used in the emulsion cocktail.

60. Vitamin E-TPGS is one of the antioxidants included in the emulsion cocktail because of its known properties as an antioxidant and as a surfactant solubilizer.

61. Allergan observed a surprising result during testing of the emulsion cocktail. Although the ultimate goal was hyperemia reduction, Allergan observed no changes or reduction in hyperemia while testing the emulsion cocktail. But Allergan unexpectedly observed that the emulsion cocktail showed a greater IOP-lowering effect.

62. In investigating the cause of the increased IOP lowering, Allergan concluded that the Vitamin E-TPGS—that was included as a solubilizer—also potentially acted as a permeation enhancer.

63. Thus, Allergan found this formulation to be a potential lead for increasing the efficacy of bimatoprost penetration into the eye to increase the IOP lowering effect.

64. In December 2003, Allergan next conducted studies addressing the impact of Vitamin E-TPGS on preservatives. Allergan observed that Vitamin E-TPGS formulations with BAK were not meeting pharmacopeia requirements for antimicrobial preservative effectiveness. In effect, Vitamin E-TPGS reduced the preservative effectiveness of BAK. Allergan observed this same result when Allergan combined Vitamin E-TPGS with the gentler preservative Purite®.

65. In January 2004—two years into Allergan's research—Allergan studied Vitamin E-TPGS formulations focusing on the preservative efficacy of BAK at different concentrations. Allergan sought to study the level of BAK required in the formulation to meet preservative effectiveness requirements. This was the first instance since initiating its research to improve upon Lumigan® 0.03% that Allergan decided to raise the amount of BAK in the formulation. In light of this testing, Allergan still sought to keep the amount of preservative at a minimum.

66. In 2004, Allergan conducted *in vivo* and *in vitro* studies in rabbits to compare the new Vitamin E-TPGS formulations with Lumigan® 0.03%.

67. In this study, all formulations contained 0.03% bimatoprost. One set of testing included several concentrations of Vitamin E-TPGS with 100 ppm BAK. The control group for this dataset was Lumigan® 0.03% with 50 ppm BAK. Another testing set included various concentrations of Vitamin E-TPGS with 200 ppm BAK. Lumigan® 0.03% with 200 ppm BAK was the control group for this batch. Allergan included the control groups only for comparison purposes regarding the efficacy of the Vitamin E-TPGS formulations.

68. Allergan expected the higher Vitamin E-TPGS formulations to exhibit the greatest amount of corneal penetration.

69. To Allergan's surprise, the control group formulation with 0.03% bimatoprost and 200 ppm BAK—but without any Vitamin E-TPGS—exhibited extraordinary increases in bimatoprost's *in vivo* and *in vitro* corneal penetration.

70. The following figure from Allergan's testing later became a figure in its patents on Lumigan® 0.01% and demonstrates the unexpected results:

**Fig. 1**



(PTX-1 at 2).

71. After this discovery, Allergan made the bimatoprost formulation with 200 ppm BAK the leading candidate for further investigation.

72. Even though the bimatoprost formulation with 200 ppm BAK showed promise, the scientists at Allergan were not entirely convinced of its potential. For example, in June 2004, inventor Scott Jordan explained that the "lead formulation, believe it or not, is Lumigan® with 200 ppm BAK" (PTX-240). Scientists at Allergan still viewed this

formulation as a last resort because BAK is damaging to the cells on the ocular surface. Allergan understood that at higher concentrations, BAK increased the ocular penetration by compromising the cell layer integrity and increased toxicity. Allergan recognized that BAK was effective as a preservative, but was cautious about its use in higher concentrations.

73. Because of the undesired side effects of using BAK, Allergan still pursued other alternatives, including calcium-borate and cyclodextrin formulations.

74. In June 2004, Allergan experimented with formations including increased concentrations of BAK—up to 150 ppm—with the chelating agent EDTA. This was also the first instance in which Allergan studied the effects on formulations of decreasing the concentration of the active ingredient bimatoprost. In this instance, Allergan tested formulations at 0.015% bimatoprost. EDTA has both antioxidant effects and acts as a penetration enhancer. Allergan believed that it could reduce the concentration of BAK because of EDTA's penetration-enhancing properties. Therefore, Allergan surmised that including BAK and EDTA with lower concentrations of bimatoprost could achieve the same IOP lowering efficacy of Lumigan® 0.03%, but reduce instance and severity of hyperemia.

75. The testing confirmed that BAK increased ocular penetration. But the testing established that EDTA had no impact. Accordingly, 0.015% bimatoprost with 200 pm BAK was recommended for further investigation and Phase II human clinical studies.

76. The following figure from Allergan's testing later became a figure in its patents on Lumigan® 0.01% and demonstrates these results:

**Fig. 2**



(PTX-1 at 3).

77. Allergan's scientists debated whether 0.01% bimatoprost would be worthwhile to include in the Phase II studies. Many of the scientists believed this concentration would be too low to have any efficacy.

78. Although Allergan was moving forward with clinical testing, its scientists remained skeptical that bimatoprost at lower concentrations—including 0.01%—would maintain comparable efficacy to Lumigan® 0.03% and whether the studies would translate in human clinical studies.

79. In November 2004, the testing protocol for Phase II human clinical studies included several formulations, including 0.01% bimatoprost. The clinical hypotheses of the study included that "[a]t least one investigational test formulation has less hyperemia when compared to LUMIGAN® [0.03%] once-daily" and also that "[a]ll investigational test

formulations are comparable to LUMIGAN® [0.03%] once-daily in intraocular pressure lowering effects" (PTX-48 at 13–14).

80. Phase II human clinical testing initiated in January 2005.

81. The inventors filed their patent application in March 2005.

82. In June 2005, the Phase II data showed promising results and were consistent with the inventors' clinical hypotheses.

83. Allergan initiated Phase III studies in late 2005. The results of the study were published in a 2010 peer-reviewed article which concluded that "[b]imatoprost 0.01% was equivalent to bimatoprost 0.03% in lowering IOP throughout 12 months of treatment and demonstrated improved tolerability, including less frequent and severe conjunctival hyperemia" (PTX-135 at 1).

84. In late 2010, the FDA approved Lumigan® 0.01% and Allergan initiated sales of its product.

85. The formulation of Lumigan® 0.01% is:

**Table 2.3.P.1-1      List of Components and Quantitative Composition**

| Component | Concentration (% w/v) | Concentration (mg/mL) | Reference of Quality Standard | Function |
|---|---|---|---|---|
| Bimatoprost | 0.01 | 0.1 | In-house standard | Drug Substance |
| Benzalkonium Chloride[a] | 0.02 | 0.2 | NF/Ph Eur | Preservative |
| Dibasic Sodium Phosphate Heptahydrate | 0.268 | 2.68 | USP | Buffering Agent |
| Citric Acid Monohydrate | 0.014 | 0.14 | USP/Ph Eur | Buffering Agent |
| Sodium Chloride | 0.81 | 8.1 | USP/Ph Eur | Tonicity Agent |
| Hydrochloric Acid[b] | Adjust pH to 7.3 | | NF/Ph Eur | pH Adjuster |
| Sodium Hydroxide[b] | | | NF/Ph Eur | pH Adjuster |
| Purified Water[c] | q.s. ad 100 | q.s. ad 1 mL | USP/Ph Eur | Vehicle |

(PTX-11A at 1).

86. The FDA approved Lumigan® 0.01% "for the reduction of elevated intraocular pressure in patients with open angle glaucoma or ocular hypertension," and it is to be administered using "[o]ne drop in the affected eye(s) once daily in the evening" (PTX-214 at 1).

**D. The Asserted Patents**

87. The asserted patents all claim priority to the inventors' March 2005 application and share a common specification.

88. After the partied filed their pretrial stipulations of uncontested facts (Section II-A, *supra*) but prior to trial, Allergan further narrowed the asserted claims are as follows:

- '504 Patent: claim 2;

- '353 Patent: claims 1, 7, and 8;

- '118 Patent: claims 1, 7, and 8;

- '605 Patent: claims 1, 6, 10, and 12; and

- '479 Patent: claim 15.

(*See* Doc. No. 265 at 1.)

89. The '504 Patent includes claims to the Lumigan® 0.01% formulation. Asserted claim 2 is reproduced below:

> A composition having a pH of about 7.3 which comprises about 0.01% bimatoprost, about 200 ppm benzalkonium chloride, citric acid monohydrate, a phosphate buffer, and NaCl wherein said composition is an aqueous liquid which is formulated for ophthalmic administration.

(PTX-1 at 6:21–25).

90. Asserted claim 15 of the '479 Patent, which depends from claim 1 of the '479 Patent, is similar and makes explicit that the composition "is for the treatment of elevated intraocular pressure," as shown below:

> 1. A composition for the treatment of elevated intraocular pressure comprising about 0.01% w/v bimatoprost and about 200 ppm benzalkonium chloride, at least one buffer and having a pH of about 7.3 wherein said composition is an aqueous liquid which is formulated for ophthalmic administration.
>
> 15. The composition of claim 1 comprising about 0.01% w/v bimatoprost, about 0.02% w/v benzalkonium chloride, about 0.26% w/v sodium phosphate dibasic heptahydrate, about 0.014% w/v citric acid monohydrate, about 0.8% w/v sodium chloride, and water.

(PTX-5 at 5:47–6:2, 6:40–44).

91. Asserted claims 1, 7, and 8 of the '353 Patent cover the composition of Lumigan® 0.01%

that exhibits the unexpected efficacy and reduced hyperemia observed when compared

with Lumigan® 0.03%. Those claims are reproduced below:

> 1. A first composition administered once daily for lowering intraocular pressure in a person with glaucoma or ocular hypertension, the first composition comprising about 0.01% w/v bimatoprost and about 0.02% benzalkonium chloride, wherein the first composition lowers intraocular pressure and results in less hyperemia as compared to the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.
>
> 7. A first composition administered once daily for lowering intraocular pressure in a person with glaucoma or ocular hypertension, the first composition comprising about 0.01% w/v bimatoprost and about 0.02% benzalkonium chloride, wherein the first composition lowers intraocular pressure without a substantial reduction in the intraocular pressure lowering benefit provided by the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.
>
> 8. The composition of claim 7 wherein the once daily administration of the first composition results in less hyperemia as compared to the once daily administration of the second composition.

(PTX-2 at 5:48–6:15).

92. Asserted claims 1, 6, 10, and 12 of the '605 Patent cover a method of using Lumigan®

0.01%, and are reproduced below:

> 1. A method of lowering elevated intraocular pressure in a patient
> with open-angle glaucoma or ocular hypertension which comprises
> applying to the eyes of the patient an aqueous solution comprised
> of:
>> about 0.01% bimatoprost;
>> about 200 ppm benzalkonium chloride;
>> the solution having a pH of about 7.3;
>> a phosphate buffer; and,
>> water.

> 6. A method of lowering intraocular pressure in a patient suffering
> from elevated intraocular pressure which comprises applying to the
> eyes of the patient an aqueous solution comprising:
>> 0.01% w/v bimatoprost;
>> about 200 ppm benzalkonium chloride;
>> the solution having a pH of about 7.3;
>> a citric acid buffer; and,
>> water.

> 7. The method of claim 6 wherein the method is applied to patients
> suffering from glaucoma.

> 10. The method of claim 7 wherein the glaucoma is open angle
> glaucoma.

> 12. A method of treating glaucoma in a patient comprising the
> following steps:
>> applying at least once a day a formulation comprising:
>> about 0.01% w/v bimatoprost;
>> benzalkonium chloride in the amount of 200 ppm;
>> at least one buffering agent selected from the group
>> consisting of dibasic sodium phosphate heptahydrate, citric
>> acid monohydrate and EDTA;
>> and wherein the formulation has a pH of about 7.3.

(PTX-4 at 5:47–6:30).

93. The '118 Patent includes claims to a method of using Lumigan® 0.01% that recite the

unexpected efficacy and reduced hyperemia observed when compared with Lumigan®

0.03%. Asserted claims 1, 7, and 8 of the '118 Patent are reproduced below:

1. A method of lowering intraocular pressure in a person with glaucoma or ocular hypertension, the method comprising administering once daily to an eye of the person a first composition comprising about 0.01% w/v bimatoprost and about 0.02% benzalkonium chloride, wherein the method lowers intraocular pressure and results in less hyperemia as compared to the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

7. A method of lowering intraocular pressure in a person with glaucoma or ocular hypertension, the method comprising administering once daily to an eye of the person a first composition comprising about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride, wherein the method lowers intraocular pressure without a substantial reduction in the intraocular pressure lowering benefit provided by the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

8. The method of claim 7 wherein the once daily administration of the first composition results in less hyperemia as compared to the once daily administration of the second composition.

(PTX-3 at 5:48–6:16).

94. The Court entered two claim construction orders in this case construing certain terms and rejecting Defendants' indefiniteness claims (Doc. Nos. 118, 173). The Court adopts those constructions for purposes of this order.

**i.  Allergan's Patents Cover Lumigan® 0.01%**

95. The asserted claims cover the formulation for and use of Lumigan® 0.01%. Accordingly, the patents cover the composition of Allergan's branded Lumigan® 0.01% product.

96. Moreover, Lumigan® 0.01% satisfies the clinical performance limitations of the '353 and '118 Patents. For example, claim 7 of the '118 and '353 Patents requires a 0.01% bimatoprost/200 ppm BAK solution that "lowers intraocular pressure without a substantial reduction in the intraocular pressure lowering benefit provided by the once daily administration" of a 0.03% bimatoprost/50 ppm BAK solution. The Court construed

the term "without a substantial reduction in the intraocular pressure lowering benefit" to mean "with nearly equivalent intraocular pressure lowering benefit" (Doc. No. 173 at 15). The Lumigan® 0.01% label states that its IOP-lowering effect is within 0.5 mm Hg of Lumigan® 0.03%, which Allergan's expert explained shows that the two products are nearly equivalent. Furthermore, the clinical trials show that Lumigan® 0.03% and 0.01% had equivalent efficacy in IOP-lowering benefits. Additionally, the Katz paper concluded that Lumigan® 0.01% was "equivalent" to Lumigan® 0.03% "in lowering IOP throughout 12 months of treatment" (PTX-135 at 1). Therefore, the composition and use of Lumigan® 0.01% meet this requirement.

97. Claim 1 of both the '118 and '353 Patents requires a 0.01% bimatoprost/200 ppm BAK solution that "lowers intraocular pressure" when administered once-daily (PTX-3 at 5:48–56; PTX-2 at 5:48–56.) The composition and use of Lumigan® 0.01% satisfy this requirement based on the clinical data discussed above.

98. Claims 1 and 8 of the '118 and '353 Patents further require a 0.01% bimatoprost/200 ppm BAK solution that "results in less hyperemia as compared to the once daily administration" of a 0.03% bimatoprost/50 ppm BAK solution (PTX-3 at 5:53–54, 6:13–14; PTX-2 at 5:53–54, 6:14–15). The Court has construed "results in less hyperemia" to mean "results in hyperemia in fewer patients or the level of hyperemia observed is lower in some patients (or both)" (Doc. No. 173 at 15). Lumigan® 0.01% meets this requirement. For example, Katz reported that Lumigan® 0.01% has "less frequent and severe conjunctival hyperemia" than Lumigan® 0.03% (PTX-135 at 1).

**E.  Defendants' Proposed Generic Pharmaceuticals**

99. Sandoz, Lupin, Watson, and Hi-Tech each filed ANDA applications with the FDA seeking approval to market and sell a generic 0.01% bimatoprost ophthalmic solution.

### i.    Sandoz's ANDA Filing

100.    Sandoz submitted ANDA 203056 to the FDA seeking approval to market and sell a 0.01% bimatoprost ophthalmic solution. The proposed prescribing information for Sandoz's product states that—like Lumigan® 0.01%—it is "for the reduction of elevated intraocular pressure in patients with open angle glaucoma or ocular hypertension" and is to be administered with "one drop in the affected eye(s) once daily in the evening" (PTX-348 at 3).

101.    Sandoz's ANDA further states that its product is only "0.5 mm Hg less effective" than a 0.03% bimatoprost product (PTX-348 at 9).

102.    The composition of Sandoz's proposed product is set out in the portion of its ANDA reproduced below, which compares the Sandoz product to Lumigan® 0.01%:

| Ingredient | Lumigan®(Bimatoprost Ophthalmic Solution, 0.01% (Allergan) Quantity (%) | Bimatoprost Ophthalmic Solution, 0.01% (Sandoz Canada) Quantity (%) |
|---|---|---|
| Bimatoprost | 0.01 | 0.01 |
| Benzalkonium chloride[1] | 0.02 | 0.02 |
| Sodium Phosphate Dibasic Heptahydrate[2] | 0.268 | 0.268 |
| Sodium chloride[2] | 0.81 | 0.81 |
| Citric acid, monohydrate[2] | 0.014 | 0.014 |
| Hydrochloric acid | pH adjustment | pH adjustment |
| Sodium hydroxide | pH adjustment | pH adjustment |
| Water for injection | q.s to 100 % | q.s 1 mL |

(PTX-14C at 31).

103.    As the table shows, Sandoz's product contains the same ingredients in the same quantities as claimed in the patents and as compared to Allergan's Lumigan® 0.01%.

104.    Regarding the pH of Sandoz's product during its shelf life, Sandoz's ANDA indicates that it will have a pH in the range of 6.8–7.8. Testing on Sandoz's actual proposed product indicates a pH of 7.2.

105.     Sandoz has also repeatedly indicated that its proposed product will have the same efficacy and hyperemia profile as Lumigan® 0.01%. For example, Sandoz asked the FDA to grant a waiver from conducting human trials on its product, stating that the product "[c]ontains the same active and inactive ingredients in the same concentration" as Lumigan® 0.01% and that "*in vivo* bioavailability or bioequivalence may be considered self-evident" between its proposed product and Lumigan® 0.01% (PTX-14B at 2). Sandoz's project manager Amanda Skoumbourdis confirmed that Sandoz expects its product will have the same clinical efficacy, side-effect profile, and therapeutic effect as Lumigan® 0.01%.

**ii.     Lupin's ANDA Filing**

106.     Lupin submitted ANDA 202911 to the FDA seeking approval to market and sell a 0.01% bimatoprost ophthalmic solution. The proposed prescribing information for Lupin's product states that—like Lumigan® 0.01%—it is "for the reduction of elevated intraocular pressure in patients with open angle glaucoma or ocular hypertension" and is to be administered with "[o]ne drop in the affected eye(s) once daily in the evening." (PTX-13B at 2).

107.     Lupin's label states that its product is only "0.5 mm Hg less effective" than a 0.03% bimatoprost product (PTX-13B at 6).

108.     The composition of Lupin's proposed product is disclosed in its ANDA in the portion set forth below:

| Ingredients | 0.01% (0.1 mg/mL) | | Category | Reference to Standards | IIG Limits (%) |
|---|---|---|---|---|---|
| | Quantity mg/mL | % w/v | | | |
| **ACTIVE INGREDIENT** | | | | | |
| Bimatoprost* | 0.100 | 0.010 | Active | IH | -- |
| **OTHER INGREDIENTS** | | | | | |
| Benzalkonium Chloride Solution 50%<br>eq. to Benzalkonium Chloride** | 0.400<br>0.200 | 0.040<br>0.020 | Preservative | NF | 2.00 |
| Sodium Chloride EMPROVE® Low Endotoxin | 8.100 | 0.810 | Tonicity Agent | USP | 55.00 |
| Di-sodium Hydrogen Phosphate Heptahydrate (EMPROVE® DAC) | 2.680 | 0.268 | Buffering Agent | USP | 2.50 |
| Citric Acid Monohydrate (EMPROVE®) | 0.140 | 0.014 | Buffering Agent | USP | 0.05 |
| Sodium Hydroxide⁵ | Q. S. | -- | pH Modifier | NF | 0.10 |
| Hydrochloric Acid⁵ | Q. S. | -- | pH Modifier | NF | 1.06 |
| Water for Injection | Q. S. to 1 mL | -- | Vehicle | USP | -- |
| **FILLING AID AND BLANKETING AGENT** | | | | | |
| Nitrogen Gas (0.2 μ filtered) | Q. S. | -- | Filling Aid and Blanketing Agent | NF | -- |

(PTX-13D at 2).

109.    Lupin represented in its ANDA that its product would have "the same active and inactive ingredients in the same concentration" as Lumigan® 0.01% (PTX-13A at 1).

110.    As to the pH of Lupin's generic, Lupin's ANDA indicates that it will have a pH in the range of 6.8–7.8. The stability data for one batch of Lupin's proposed bimatoprost 0.01% product shows that the initial pH of Lupin's product was 7.3. The pH was 7.2 after three months.

111.    Lupin has also repeatedly stated that its generic product will have the same efficacy and hyperemia profile as Lumigan® 0.01%. For example, Lupin has asked the FDA to let it forgo human clinical trials because the "bioequivalence" of its product and Lumigan® 0.01 % is "self-evident" because they contain the same ingredients in the same amounts (PTX-13A).

### iii.    Watson's ANDA Filing

112.    Watson submitted ANDA 203748 to the FDA seeking approval to market and sell a 0.01% bimatoprost ophthalmic solution. The proposed prescribing information for Watson's product states that it is "for the reduction of elevated intraocular pressure in patients with open angle glaucoma or ocular hypertension" and is to be administered with "[o]ne drop in the affected eye(s) once daily in the evening" (PTX-15A at 1).

113.    The label also states that Watson's product is only "0.5 mm Hg less effective" than a 0.03% bimatoprost product (PTX-15A at 8).

114.    The composition of Watson's proposed ANDA product is disclosed in the ANDA, which is reproduced in part below:

| Ingredients/Grade | Function | Qty (mg/mL) | % w/v |
|---|---|---|---|
| Bimatoprost (In-house)* | Active Ingredient | 0.10 | 0.01% |
| Benzalkonium Chloride** NF | Antimicrobial Preservative | 0.20 | 0.02% |
| Sodium Chloride USP | Tonicity agent | 7.90 | 0.79% |
| Sodium Phosphate dibasic heptahydrate USP (Dibasic Sodium Phosphate Heptahydrate) | Buffering agent | 2.70 | 0.27% |
| Citric Acid monohydrate USP | Buffering agent | 0.14 | 0.014% |
| Sodium Hydroxide NF | pH Adjusting Agent | q.s. | --- |
| Hydrochloric Acid NF | pH Adjusting Agent | q.s. | --- |
| Water for Injection USP | Vehicle | q.s. | --- |
| Nitrogen NF | Processing Aid | q.s. | --- |

(PTX-15D at 3).

115.    Watson's ANDA represents that its product will have a pH during its shelf life that ranges from 6.8–7.8 (PTX-15A at 6). Stability testing on test batches indicates that at optimum conditions, the pH is 7.21.

116.     Watson has also repeatedly indicated that its proposed product will have the same

efficacy and hyperemia profile as Lumigan® 0.01%. Watson asked the FDA for a waiver

from conducting human trials, stating that the "*in vivo* bioequivalence" of its product and

Lumigan® 0.01% is "self-evident" because they contain "the same active and inactive

ingredients in the same concentration" (PTX-15C at 3).

**iv.     Hi-Tech's ANDA Filing**

117.     Hi-Tech submitted ANDA 203604 to the FDA seeking approval to market and

sell a 0.01% bimatoprost ophthalmic solution. The proposed prescribing information for

Hi-Tech's product states that it is "for the reduction of elevated intraocular pressure in

patients with open angle glaucoma or ocular hypertension" and is to be administered with

"[o]ne drop in the affected eye(s) once daily in the evening" (PTX-12A at 1).

118.     The label also states that Hi-Tech's product is only "0.5 mm Hg less effective"

than a 0.03% bimatoprost product (PTX-12A at 10).

119.     Hi-Tech's ANDA, reproduced in part below, sets out the composition of its

proposed product:

| Ingredient | Function | Quantity Amount per 1 mL |
|---|---|---|
| Bimatoprost | Active | 0.1 mg |
| Sodium Chloride, USP | Isotonic Agent | 8.4 mg |
| Dibasic Sodium Phosphate Heptahydrate, USP | Buffering Agent | 2.56 mg |
| Citric Acid Monohydrate, USP | Buffering Agent | 0.146 mg |
| Benzalkonium Chloride Solution, NF (50%) | Preservative | 0.4 mg* |
| 10% Sodium Hydroxide Solution | To adjust pH | as needed |
| 10% Hydrochloric Acid Solution | To adjust pH | as needed |
| Purified Water, USP | Vehicle | QS to 1 mL |
| Nitrogen 97%, NF | To reduce dissolved oxygen | Quantity sufficient |

*Equivalent to 0.2 mg of Benzalkonium Chloride, NF per mL

(PTX-12C at 11; Trial Tr. July 26, 2013, Doc. No. 249 at 89:15–23, 91:22–92:8, 95:13–

96:23, 98:11–21, 99:18–100:21, 101:16–22.)

120.     Hi-Tech's ANDA additionally confirms that its product "contains the same active ingredient, in the same concentration" as Lumigan® 0.01% and that "the inactive ingredients contained in our formulation are the same as" Lumigan® 0.01% (PTX-12B at 1).

121.     Regarding the pH of Hi-Tech's generic, Hi-Tech represented to the FDA that its product would have a shelf life pH in the range of 6.8–7.2 (PTX-12A at 9). Batch testing of Hi-Tech's product indicates a pH of 7.0. Hi-Tech represented in its ANDA that "[b]oth the Hi-Tech Pharmacal product (Bimatoprost Ophthalmic Solution, 0.01%) and the Reference Listed Drug Product (Lumigan® (Bimatoporst) Ophthalmic Solution, 0.01%) display very similar physical parameters, such as pH, specific gravity, and osmolality" (PTX-12B at 5).

122.     As part of its defense of non-infringement regarding the pH limitation, Hi-Tech argues that there can be no infringement based upon prosecution history estoppel. The original application for the '504 Patent included independent claims with broad concentration ranges for bimatoprost and BAK, but did not include pH limitations. The original application also included narrower dependent claims that included specific requirements for bimatoprost, BAK, and pH. Although the U.S. Patent and Trademark Office (PTO) rejected the broader claims, it concluded that the claims directed to higher concentrations of BAK were patentable because the prior art taught away from these levels of BAK. Therefore, the amendments during prosecution focused upon the patentability of certain concentrations of bimatoprost and BAK, and not on pH limitations. Allergan's changes to pH limitations in the claims during prosecution were tangential to the amendments.

123.     Furthermore, Hi-Tech has also repeatedly indicated that its proposed product will

have the same efficacy and hyperemia profile as Lumigan® 0.01%. For example, Hi-

Tech has asked FDA to grant a waiver from conducting human clinical trials on its

product, stating that the product contains the same formulation as Lumigan® 0.01%. Hi-

Tech's ANDA assures the FDA that there "would be no difference in the effectiveness of

the active drug substance, and one would also observe the same clinical response" when

comparing its product to Allergan's Lumigan® 0.01% (PTX-12B at 1).

**F.  Level of Ordinary Skill in the Art**

124.     In this case, a person of ordinary skill in the art would be "a person with a

scientific degree, either Ph.D., M.D. or B.S., who has at least 2–3 years of experience

developing pharmaceutical formulations or treatment methods for the eye or studying or

working with bimatoprost and its characteristics or has 2–3 years of experience as a

specialist in treating glaucoma, ocular hypertension, and other diseases of the eye, such as

an ophthalmologist, who has also assisted in developing ophthalmic pharmaceutical

formulations or in designing and running clinical trials on such formulations. This person

may also work in collaboration with other scientists and/or clinicians who have

experience developing ophthalmic pharmaceutical formulations, running clinical trials

related to such formulations, and/or treating patients using such formulations" (Trial Tr.

July 18, 2013 Afternoon Session at 28:13–29:5).[3]

**G.  Scope and Content of the Prior Art**

125.     The prior art taught several things that undermine the factual premises of

Defendants' obviousness case: (1) ophthalmic formulation is a very unpredictable field in

---

[3]  Although the Court adopts Allergan's proposed definition of a person of ordinary skill in the
art at the time of invention, the Court's ultimate analysis on infringement and invalidity would
remain unchanged had it adopted Defendants' proposal on this issue.

which there are many potential ways for one skilled in the art to modify a product to try to reduce side effects while maintaining efficacy; (2) bimatoprost was known to lose significant IOP-lowering efficacy if its concentration were reduced from 0.03% to 0.01%, thereby teaching away from the claimed invention; (3) the specific dose-response curve for bimatoprost concentration and hyperemia was unknown, making it difficult for the skilled artisan to know how much of a reduction in bimatoprost would be necessary to address hyperemia and whether such a reduction would be possible while maintaining efficacy; (4) the skilled artisan would not have tried to solve the hyperemia problem by quadrupling the amount of BAK because the prior art suggested BAK would not increase the corneal permeability of bimatoprost; and (5) the prior art taught away from increasing the amount of BAK in the formulation to 200 ppm because long-term, chronic use of BAK would cause corneal damage or disorders. The Court discusses each category in detail below.

126.    The prior art as a whole strongly discouraged the inventor's approach of significantly increasing the amount of BAK because of the cytotoxic effects of BAK. Importantly, Defendants' expert Dr. John Samples acknowledged that all but one of the prior art references he relied upon to establish obviousness—an article entitled "How to Handle BAK Talk"—had previously been considered by the PTO during prosecution.

**i.    The Challenges in Ophthalmic Drug Formulation**

127.    Ophthalmic treatments are often topically applied. But this can lead to formulation complications given the eye's anatomy.

128.    The anatomy of the eye presents unique challenges because: (1) a drug formulation administered to the eye has only a very limited time in which it can be absorbed before it is washed away, typically within a minute; (2) the drug must remain

stable after administration for long periods of time; (3) the surface area where the drug may be absorbed is very small; and (4) the eye is very sensitive and is a strong natural barrier that is designed to keep substances out.

129.    The problem in this case was exacerbated because Allergan needed to figure out how to disassociate the IOP-lowering effect of bimatoprost from its high instance and severity of hyperemia.

130.    The complications in ophthalmic drug formulation are evident by Allergan's surprises during the development of Lumigan® 0.01%. These unexpected results included: (1) that increased concentrations of BAK led to an enormous increase in bimatoprost penetration (especially because the increased concentration of BAK had been included in the testing as a control group, and not as a formulation the inventors expected to enhance penetration); (2) Vitamin E-TPGS—which was included in the emulsion cocktail as a solubilizer—appeared to increase IOP lowering; and (3) Vitamin E-TPGS's apparent enhancement effect did not translate in later testing.

131.    The unpredictability is further demonstrated by the Burstein reference. That reference addressed an *in vivo* rabbit study showing 200 ppm BAK improved permeability of fluorescein. But that same amount of BAK did not show any statistically significant improvements in permeation in humans. The drop size in that study was approximately 100 microliters. The drop size for Lumigan® 0.01% is approximately 30 microliters. Therefore, although more BAK was administered to the eye in the Burstein study than with Lumigan® 0.01%, the study showed that BAK did not increase fluorescein permeation in humans.

132.     Because of the challenges in ophthalmic formulation, there are a number of

approaches that one of skill in the art would have pursued in seeking an improvement to

Lumigan® 0.03%. These include: (1) maintaining the same total amount of drug by

adding an ingredient—like a cyclodextrin—to complex some of the free drug; (2) adding

something to the formulation to selectively block the drug's side effects but not its IOP-

lowering activity, such as a calcium borate buffer or a nitric oxide scavenger; (3)

reducing the drug concentration but modifying the formulation to keep the drop on the

surface of the eye longer, such as by using a gel, gum, suspension, ointment, or

nanoparticles; and (4) using a chemical penetration enhancer to increase the absorption of

drug into the eye.

133.     The Court does not find that ophthalmic drug formulation is a field with a finite

number of identified or predictable solutions.

**ii.     The Prior Art Teachings on Lowering Bimatoprost**

134.     The prior art—including a 2001 paper by Laibovitz et al. and U.S. Patent No.

6,933,289 (the Lyons Patent)—taught away from decreasing the concentration of

bimatoprost. These references taught that decreasing the amount of bimatoprost would

result in a decreased IOP-lowering effect.

135.     The Laibovitz reference reported a study comparing the safety profile and

efficacy of bimatoprost to timolol. The study compared three dosages of bimatoprost,

0.003%, 0.01%, and 0.03%, administered once daily for three weeks and then twice daily

for one week, with 0.5% timolol administered twice daily. The results showed that 0.03%

bimatoprost had significantly better efficacy than 0.01% bimatoprost. The Laibovitz

article reported that 0.03% bimatoprost resulted in approximately 2 mm Hg lowering of

IOP more than 0.01% bimatoprost. This is a statistically significant result because the

National Eye Institute conducted research that found that for every millimeter of mercury that eye pressure decreased, patients had a 10% lower chance that their glaucoma would worsen. Therefore, the Laibovitz reference concludes that 0.03% bimatoprost "had the most advantageous overall therapeutic profile" (DTX-151 at 7).

136.    The results in Laibovitz showed that 0.01% bimatoprost outperformed timolol. Timolol showed a 12.9% reduction in IOP from the baseline (the typical range reported for timolol was 20–25% from the baseline), whereas 0.01% bimatoprost showed a 20.7% reduction. Laibovitz addressed this as an anomaly, explaining that "[t]he mean reductions from baseline IOP achieved with timolol treatment in this clinical trial were less than anticipated, possible because patients were not excluded for previous use of timolol" (DTX-151 at 4). Allergan's expert Dr. Robert Noecker explained that patients who previously used timolol would achieve tachyphylaxis, where the eyes acclimate to the drug over time and the drug then losses efficacy. Thus, the Court finds that the results in Laibovitz did not indicate that 0.01% bimatoprost would be an encouraging lead even though it lowered IOP more than timolol did.

137.    Defendants contend that the efficacy of 0.03% and 0.01% bimatoprost in Laibovitz is closer than 2 mm Hg. Defendants highlight that for once-daily administration, the baseline IOP for 0.01% bimatoprost was 25.2 +/– 0.05 mm Hg and the range of mean changes from baseline was -5.4 to -6.0 mm Hg. For 0.03% bimatoprost, the baseline IOP was 27.0 +/– 0.07 mm Hg and the range of mean changes from baseline was -7.2 to -8.2 mm Hg. Defendants believe that since the overall end values for both groups are nearly equivalent, the two concentrations of bimatoprost are equally efficacious. The Court disagrees. Because of the complexities associated with the

statistical calculations, the Court finds that the end values are not comparable or meaningful to the analysis in Laibovitz.

138.    Turning to the Lyons Patent, this reference discloses that "[c]linical trials have shown that 0.02% bimatoprost shows little hyperemia, but also loses efficacy" (DTX-71 at 12:30–31). The patent repeatedly discloses that the preferred concentration is 0.03% bimatoprost. Therefore, the Lyons Patent discloses addressing hyperemia by adding a cyclodextrin to complex with bimatoprost and reducing the free bimatoprost available to cause hyperemia while also adding a viscosity agent to keep the formulation on the eye longer to maintain efficacy. Accordingly, the Lyons Patent teaches away from trying to reduce the total amount of bimatoprost and instead suggests keeping the total bimatoprost concentration at 0.03% to avoid losing efficacy while making other changes to the formulation to address hyperemia. Although the patent discloses the use of 0.01% bimatoprost, it also requires the additions of a cyclodextrin and a viscosity enhancer. Even at the 0.01% bimatoprost concentration, the patent does not represent that it is as effective as 0.03% bimatoprost. Instead, the opposite is true.

139.    The Lyons Patent additionally states that "it is preferable that the concentration of free (uncomplexed) bimatoprost is less than 0.02%" (DTX-71 at 7:37–39). The Court does not find this statement to refer to the total concentration of bimatoprost. Rather, it refers to the amount of free bimatoprost remaining—after permeation—that could cause hyperemia.

140.    Based upon the Laibovitz paper and the Lyons Patent, one of ordinary skill in the art would have looked at solutions other than lowering the concentration of bimatoprost

from 0.03%. To the extent bimatoprost was lowered to 0.01%, a person of ordinary skill in the art would have expected the formulation to lose efficacy in lowering IOP.

### iii.    Dose-Response Curve for Bimatoprost and Hyperemia

141.    Nowhere in the prior art is it disclosed that a concentration reduction in bimatoprost causes a reduction in the frequency or severity of hyperemia.

142.    The Laibovitz paper actually teaches that a reduction in bimatoprost concentration from 0.03% to 0.01% does not result in reduced hyperemia. In that study, more patients in the 0.01% bimatoprost group (15%) experienced conjunctival hyperemia than did patients in the 0.03% bimatoprost group (5%). And the two groups showed similar severity of hyperemia. The mean range of hyperemia scores for patients in the 0.01% bimatoprost group were 0.85 to 0.95, while mean scores for patients in the 0.03% group were 0.80 to 0.98. Therefore, Laibovitz teaches a person of ordinary skill in the art that a reduction in bimatoprost from 0.03% to 0.01% does not reduce the frequency or severity of hyperemia.

143.    This data is consistent with what one of ordinary skill in the art would have appreciated about drug formulation and dose-response curves. Dose-response curves for efficacy and side effects vary from drug to drug. It is not uncommon for a reduction in dose concentration to have no impact on side-effect reduction.

144.    The Lyons Patent does not disclose a specific dose-response curve for bimatoprost and hyperemia. But Defendants highlight that the patent discloses that "[c]linical trials have shown that 0.02% bimatoprost shows little hyperemia" (DTX-71 at 12:30–31). But the Lyons Patent provides no details regarding the frequency or severity that could be expected with a 0.02% bimatoprost formulation. Furthermore, the reference gives no comparison to the efficacy of 0.03% bimatoprost. The Lyons Patent sought to

remove free bimatoprost from the ocular surface; it did not attempt to reduce hyperemia via reduced bimatoprost concentrations. In light of Laibovitz, a person of ordinary skill in the art looking at the Lyons Patent would have no guidance as to whether a reduction from 0.03% to 0.01% bimatoprost would result in decreased frequency or severity of hyperemia.

iv.   **BAK as a Permeation Enhancer**

145.     The prior art does not teach one of ordinary skill in the art that high concentrations of BAK would enhance the corneal penetration of bimatoprost. A person of ordinary skill in the art would not—based upon the prior art—appreciate that quadrupling the concentration of BAK from 50 ppm to 200 ppm would counteract a reduction of bimatoprost from 0.03% to 0.01% and result in equivalent efficacy but an improved hyperemia profile.

146.     Regarding the prior art teachings of increased bimatoprost concentrations, the Court finds that: (1) the only prior art that reports data on the effect of BAK on bimatoprost's IOP-lowering effect suggested that increasing the amount of BAK would have no effect; (2) the prior art that examined prostaglandin-analog molecules that were most similar to bimatoprost—the Higaki and Camber articles—showed that BAK actually inhibited their corneal penetration; and (3) Defendants' prior art showing increased BAK concentrations is inadequate because (i) it dealt with active drugs that are molecularly dissimilar to bimatoprost, (ii) it did not report any meaningful results in humans, and (iii) it repeatedly warned about the potential risks and toxicological complications of using increased BAK.

### a. *Prior Art Does Not Show that Increased BAK Increases Corneal Penetration*

147.    A study that was a part of the Medical Review published by the FDA on
Lumigan® 0.03% compared the results of 0.03% bimatoprost preserved with BAK to
0.03% bimatoprost non-preserved. Based upon the formulation numbering, the data in the
Medical Review, and the publically available information on the label for Lumigan®
0.03%, one of ordinary skill in the art would have understood that the preserved
formulation included 50 ppm BAK while the non-preserved formulation did not include
any BAK. But because the other ingredients in the formulations were redacted by the
FDA prior to publication, one of ordinary skill in the art would not have known what else
was included in the formulations.

148.    The results of the study demonstrate that the formulation with 0.03% bimatoprost
with 50 ppm BAK and the formulation with 0.03% bimatoprost with no BAK achieved
equivalent IOP lowering.

149.    The FDA reviewer commented that "[t]here is not a clear separation in IOPs
between the active treatment groups until Day 29 Hour 12 when the greatest IOP
lowering effect is demonstrated by 0.03% [non-preserved]" (PTX-213 at 112). For
comparison purposes, at the end of the 29-day study, 0.03% bimatoprost with BAK
lowered mean IOP from the baseline by -5.92 mm Hg while 0.03% bimatoprost without
BAK lowered mean IOP from the baseline by -7.31 mm Hg.

150.    Accordingly, this study teaches one of ordinary skill in the art that BAK does not
function as a permeation enhancer for bimatoprost. The teachings in this study are
corroborated by the thoughts of Allergan's scientists that increased BAK would not be a
promising approach in human trials.

151.    Even though the main goal of the Medical Review study was to investigate IOP lowering in humans, the data on permeation is informative. The purpose of the invention was to create a formulation that maintained the same IOP-lowering effect as Lumigan® 0.03% in humans. It would have been immaterial if BAK increased ocular penetration if that increased penetration did not also result in greater IOP-lowering efficacy. The FDA Medical Review results focus on lowering IOP, meaning that they speak to the exact issue addressed by the claimed invention.

152.    At trial, Defendants indicated that the 0.03% bimatoprost non-preserved formulation contained poloxamer 407, which was not included in the preserved formulation. At the time of publication of the Medical Review, a person of ordinary skill in the art would have no means of obtaining that information. Furthermore, there is no evidence that poloxamer 407 would actually change the amount of IOP lowering observed with the non-preserved formulation. In fact, inventor Scott Jordan's August 2004 e-mail explicitly addresses that the unpreserved formulation contained poloxamer, but also indicates that the study described in the FDA Medical Review made him skeptical that BAK would enhance bimatoprost's ocular penetration in humans. This contemporaneous evidence from near the time of invention shows that a person of ordinary skill in the art at the time would not have thought that poloxamer would impact the results.

153.    The Court has considered Defendants' argument that a January 2010 Allergan document indicated that "a definitive conclusion could not be made" about the relative IOP lowering of the preserved and unpreserved formulations due to the presence of poloxamer (DTX-720). But this argument is not persuasive because the January 2010

document was written years after the invention and because the mere fact that a "definitive" conclusion could not be made does not undermine the teachings of the study. The Court finds that the contemporaneous interpretation of the study from Mr. Jordan's August 2004 email more accurately reflects what the study results would have taught one skilled in the art at the relevant time.

154.    Ultimately, the Court finds that the FDA's Medical Review taught away from increasing the concentration of BAK as a permeation enhancer for bimatoprost.

### b. BAK Inhibited Penetration of Prostaglandin Analogs Similar to Bimatoprost

155.    Two references—the Higaki reference and the Camber reference—address the impact of BAK on prostaglandin-analog drugs. The Court finds that both of these references teach that BAK would decrease the permeation of a prostaglandin-analog drug, like bimatoprost. Additionally, the use of increased BAK in Xalatan® would not have taught one of ordinary skill in the art to use BAK as a penetration enhancer.

156.    The 1996 Higaki paper studied the effects of BAK on corneal penetration of S-1033 acid, a prostaglandin-derivative and S-1033 methly ester. The Higaki study determined that although BAK improved the corneal permeability of S-1033 acid, it reduced the permeability of S-1033 methyl ester. One skilled in the art would have recognized that S-1033 acid is a charged molecule at physiological pH (approximately pH 7), while S-1033 methyl ester is a neutral molecule. One skilled in the art also would have known that bimatoprost was a neutral molecule, both at the time of administration and throughout the course of its pharmacological activity in the eye. Accordingly, a person of ordinary skill in the art would have concluded that BAK would inhibit—rather than promote—corneal penetration of bimatoprost. Therefore, this reference teaches away from using BAK as a penetration enhancer for bimatoprost.

157.     At trial, Defendants took the log P value calculated by Allergan for bimatoprost

and compared it to the log P values in figure four of the Higaki reference (DTX-183 at 8).

Based upon a regression curve, one can compare log P values to determine the

expectation that a particular molecule will have enhanced corneal penetration with BAK.

The Court finds Defendants' comparison inherently flawed. Initially, the log P taken from

Allergan's documents would not have been available to a person of ordinary skill in the

art at the time of the invention. Additionally, in order to compare log P values on the

same regression curve, the values must all be calculated using the same methodology.

Log P values can be calculated experimentally or by computer software. But the log P

value calculated under one methodology differs considerable when calculated via other

methods or parameters. Therefore, for purposes of comparison on a single regression

curve, the data must come from the same methodology. No evidence supports that the

methodology in the Higaki reference for calculating log P values is identical to the

methodology used by Allergan. Defendants also do not do an independent analysis of all

the log P values using a single method.

158.     The 1987 paper by Camber and Edman addressed the "[f]actors influencing the

corneal permeability of prostaglandin $F_{2\alpha}$ and its isopropyl ester *in vitro*" (PTX-90 at 1).

The Camber reference reported that the addition of BAK decreased the corneal

permeability of $PGF_{2\alpha}$ isopropyl ester, while increasing the permeability of $PGF_{2\alpha}$, which

is an acid. The data established that adding 100 ppm BAK resulted in a nearly 50%

reduction in the permeability coefficient for the isopropyl ester. As Camber teaches, a

person of ordinary skill in the art would have the knowledge that $PGF_{2\alpha}$ is a charged

molecule and that $PGF_{2\alpha}$ isopropyl ester is a neutral molecule. As previously addressed, a

person of ordinary skill in the art would have also understood that bimatoprost was a neutral molecule. As Allergan's expert Timothy McDonald explained at trial, the charge of a molecule is one of the most important features for determining permeability of molecules passing through the lipophilic corneal membrane. Therefore, the Camber reference teaches that BAK would not increase permeability for neutral molecules (including bimatoprost). In fact, Camber teaches that the administration of BAK with a neutral drug would inhibit ocular penetration.

159.    Xalatan® was a competitor to Lumigan® 0.03%. The active drug ingredient in Xalatan® is latanoprost. A Canadian patent (the Asada reference) discloses that Xalatan® uses BAK in increased concentrations. In fact, Xalatan® contains 200 ppm BAK. Although Xalatan® uses increased concentrations of BAK, the Asada reference does not teach that it was used as a penetration enhancer. BAK has no penetration enhancing benefits for latanaprost. Instead, BAK is included in high concentrations in Xalatan® because it prevents precipitate from salting out of solution. If lower concentrations of BAK are used, then white solids form in the product, making it unacceptable for ocular administration. Therefore, the majority of BAK in solution complexed with latanaprost and was not free in solution to interact with the epithelial cells. The purpose of BAK in Xalatan® was to keep the solution dissolved, rather than act as a penetration enhancer. Furthermore, the Asada reference explains that although "BAK is the excellent preservative, it may cause the corneal disorders when used at the high concentration. Accordingly, when BAK is added to the ophthalmic solution, it is desirable to lower its concentration as low as possible" (DTX-22 at 7). The Asada reference teaches that preferred concentrations of BAK range from 30–100 ppm.

160.    A 2006 research abstract looked at the influence of BAK on the permeation of latanoprost into rabbit aqueous humor. The abstract states that "[b]enzalkonium chloride (BAK) is a most-used preservative in ophthalmic solutions, however, it is well-known that a high concentration of BAK might lead to corneal disorder. The purpose of this study is to evaluate the influence of BAK in latanoprost ophthalmic solution on the penetration of latanoprost into rabbit aqueous humor, and the possibility of reducing the BAK concentration in the product" (PTX-110). The authors tested latanoprost formulations with 200 ppm BAK, with less BAK, and with no BAK. The study concluded that "[t]he BAK concentration in latanoprost ophthalmic solution did not affect [*sic*] on the penetration of latanoprost into rabbit aqueous humor after a single ocular instillation" (PTX-110). In light of this result, the study concluded that a "reduced BAK concentration should be available for the latanoprost ophthalmic solution" (PTX-110). Although this abstract was published after the invention date, the Court notes that it is consistent with the teachings in Higaki and Camber that BAK does not enhance the penetration of neutral molecules, such as latanoprost. Therefore, one of ordinary skill in the art would again conclude that BAK did not function as a penetration enhancer of neutral prostaglandin-analog compounds, including bimatoprost.

### c.   *Defendants' Cited Prior Art is Inadequate*

161.    During trial, Defendants raised several pieces of prior art to show that a person of ordinary skill in the art would have recognized that BAK would be a penetration enhancer for bimatoprost. The Court disagrees. The Court finds that the prior art cited by defendants does not teach BAK as a penetration enhancer for bimatoprost and also does not teach that if BAK were increased with bimatoprost, the resulting product would remain as efficacious as Lumigan® 0.03%. Although the Court highlights several of

Defendants' prior art below, the Court notes that in considering all of the evidence, the prior art is inconsistent with Defendants' position.

162.       A 1986 review paper by Vincent Lee looks at a number of methods for improving ocular drug delivery systems. Part of the reference states that "[b]enzalkonium chloride and other cationic surfactants are probably the most popular preservatives in ophthalmic solutions. By altering integrity of the corneal epithelium, these surfactants have been found to enhance the ocular absorption of a variety of drugs varying in molecular size and lipophilicity, including pilocarpine, prednisolone, homatropine, inulin, and horseradish peroxidase" (DTX-185 at 7 (citations omitted)). Although the reference teaches that BAK could be used to increase penetration of certain molecules, those molecules are all readily distinguishable from bimatoprost. As the experts identified at trial, there are a number of factors that influence permeability, including whether the compound is charged or neutral, the size of the molecule, the molecular structure of the compound, and whether the compound is hydrophilic (water-loving) or lipophilic (fat-loving). Pilocarpine and carbachol are both charged molecules, and behave very differently than bimatoprost, a neutral molecule. Insulin and horseradish peroxidase are two very large hydrophilic compounds that would behave differently than bimatoprost, a small lipophilic compound. The remaining compounds of prednisolone and homatropine are both 150 to 200 times less lipophilic than bimatoprost, and therefore behave considerably differently. Given bimatoprost's properties, the Lee reference does not disclose how BAK would impact its permeability. Overall, the Lee reference did not give any information regarding prostaglandin molecules.

163.    The Lee reference also explains that "[a] drawback of this approach is the possibility of accumulation of surfactants within the eye resulting in unknown toxicological complications, as exemplified by benzalkonium chloride" (DTX-185 at 7 (citations omitted)). The reference concludes that "[o]verall, the mechanisms by which these inert ingredients affect ocular drug bioavailability are only begun to be understood. Further work is necessary to determine if any of these ingredients can be safely used to optimize the ocular bioavailability of certain drugs while achieving their primary goal of preserving product stability and sterility" (DTX-185 at 7). The Lee reference was published prior to either Higaki or Camber. In light of the subsequent findings in Higaki and Camber, a person of ordinary skill in the art would not have thought that BAK would increase permeation of bimatoprost. In light of the known toxic effects of BAK, the reference actually cautions against its use. The Lee reference itself recognizes that any increased permeability seen by BAK may be a result of its adverse effects on the eye, specifically, compromising the integrity of the corneal epithelial barrier. In this regard, Lee states that "the usefulness of this approach to enhance corneal absorption is questionable" (DTX-185 at 24). In total, the Court does not find that the Lee reference discloses the use of BAK to increase bimatoprost permeability.

164.    A 1980 article by Keller et al. discloses increased permeability of inulin in rabbits using 200 ppm BAK. Although this reference teaches the use of higher concentrations of BAK to increase inulin permeation, the Court does not find the results translate to using BAK to enhance bimatoprost penetration. As an initial matter, inulin is a very large and hydrophilic molecule, characteristics dissimilar from bimatoprost. Furthermore, inulin is not a prostaglandin, but a sugar molecule derived from the chicory root. The study states

that "[i]nulin was used because this molecule, due to its relatively large size (mol. wt. 5000), has virtually no capacity to penetrate an intact corneal epithelium" (DTX-184 at 4). Therefore, the Keller article does not teach anything about BAK's potential impact on bimatoprost's permeability, especially given that prior art addressing other prostaglandin taught away from the claimed invention. Furthermore, any permeability caused by BAK for inulin is likely due to its harmful effects. The reference states that "[s]tructural changes in the epithelium due to benzalkonium chloride have been shown. At 5 to 15 min after instillation of 0.01% BAC in vivo, cell damage and separation are observed in the superficial layers of the corneal epithelium" (DTX-186 at 9).[4] Ultimately, the reference concludes that "[i]n vitro and in vivo studies of the deleterious effects of BAC solutions on the cornea indicate that eyedrops containing BAC should be used with caution in the treatment of at least some eye conditions" (DTX-186 at 10). Nowhere does the reference suggest increasing BAK would benefit bimatoprost penetration. The Court finds that a person of skill in the art would not have found the Keller reference encouraging. In fact, Keller teaches away from using BAK at concentrations over 100 ppm BAK due to potential damage to the corneal epithelium cells.

165.     Defendants also highlight a 2002 non-peer reviewed article titled "How to Handle BAK Talk" to support their assertion that BAK was a known penetration enhancer. The reference addresses prior studies involving beta blockers and peptides, both of which are structurally dissimilar from bimatoprost and other neutral prostaglandin analogs (DTX-741 at 1). The reference provides no data or explanation of under what circumstances BAK will enhance penetration. In light of Higaki, Camber, and the FDA's Medical

---

[4]  Although the Court uses BAK to identify benzalkonium chloride, another common notation for the preservative is BAC.

Review, a person of ordinary skill in the art would have continued to recognize that BAK

was not a penetration enhancer for bimatoprost.

166.       A February 2005 article (the Okabe reference) considers the impact of BAK on

the scleral permeability of betamethasone-21-phosphate. The reference states that "[t]he

results of this study demonstrate that BAK may improve the ocular penetration of a drug

in a transscleral drug delivery system without producing toxic reactions" (DTX-308 at 2).

But betamethasone-21-phosphate is a charged molecule that is considerably more

hydrophilic than the neutral lipophilic compound bimatoprost. Furthermore, the reference

does not disclose any suggestion of using BAK with prostaglandin analogs. Additionally,

the drug delivery system in the Okabe reference was considerably different than with

bimatoprost application. Bimatoprost is administered to the human eye in eye drops. In

Okabe, the drug was delivered to the eye of rabbits using an osmotic pump that was

implanted in the rabbit as follows: "[a]fter the sclera was exposed, a sclera pocket was

made with a crescent knife 2 mm from the limbus at half the depth of the total scleral

thickness. . . . The osmotic pump was implanted subcutaneously. A silicone tube

connected to the osmotic pump was placed in the scleral pocket and sutured with 7-0 silk

(Fig. 1)" (DTX-308 at 3). Figure one from the reference is reproduced below as

illustration:



FIGURE 1.   Sketch of a rabbit eye showing the projected implantation
site of the osmotic pump.

(DTX-308 at 3). This delivery system is not comparable to the eye drop delivery system for bimatoprost. As previously addressed, results seen in animal testing are not guaranteed to translate to human testing. The Court finds that a person of ordinary skill in the art would not have found the Okabe reference to teach anything about whether BAK could increase bimatoprost's permeability in a live human.

167.    A 2002 article (the Ke reference) studies the use of penetration enhancers and viscosity enhancers to improve the bioavailability of the antibiotic ciprofloxacin. The study found that the use of a penetration enhancer and a viscosity enhancer overcame penetration barriers and loss due to wash-out. This resulted in increased penetration of the drug. But the permeation-enhancing compound studied in this case was dodecylmaltoside, not BAK. The Ke reference is actually critical of the use of BAK. It states that "high concentrations of BAC or anesthetics can be toxic to the eye" (DTX-339 at 2). This reference merely provides an alternative preservative that might have penetration-enhancing capabilities. A person of ordinary skill in the art would gather no information regarding BAK or bimatoprost from this reference.

168.    Defendants' expert Dr. Soumyajit Majumdar also indicated that the nasal spray Miacalcin uses BAK as a penetration enhancer. But drug delivery via nasal administration versus ophthalmic administration is markedly different because they are different organs. Defendants presented no evidence that would suggest that BAK would behave similarly in these two different areas of the body and made no showing that the active ingredient in Miacalcin would be structurally similar. Defendants did not demonstrate that the active ingredient in Miacalcin has some characteristic that would

teach that BAK would enhance bimatoprost's permeability, especially when all of the prior art addressing prostaglandin analog taught the opposite.

169.    Defendants' expert Dr. Majumdar stated that although bimatoprost is a lipophilic molecule, it behaves like a hydrophilic compound, and therefore a good candidate for BAK absorption enhancement. Dr. Majumdar looked at a 2004 article by Krauss et al. (DTX-210) and a 2001 article by Tak et al. (DTX-343) to reach this conclusion. Specifically, he reaches his conclusion using data on bimatoprost's scleral and corneal penetration rates from the Krauss reference and comparing them to data from the Tak reference, which addresses the penetration rates of the molecules mannitol and diazepam. But Dr. Majumdar agreed that nothing in the literature supports categorizing bimatoprost as a hydrophilic compound. Bimatoprost permeates the eye via both the cornea and sclera. The fact that its scleral penetration rate is approximately four times faster than its corneal penetration rate does not mandate a conclusion that the compound behaves like a hydrophilic molecule. Dr. Majumdar could point to no evidence as to why bimatoprost does not have better corneal—or for that matter scleral—penetration. Accordingly, the Court finds Dr. Majumdar's position without merit.

170.    The Court does not find that any of Defendants' prior art teaches or suggests that BAK would enhance the penetration of bimatoprost or that the person of ordinary skill in the art should try such an approach or would have a reasonable expectation of success.

v.    **The Prior Art Teachings on Increasing BAK Concentrations**

171.    The Court additionally finds that the prior art taught away from increasing the BAK concentration to 200 ppm with bimatoprost. BAK is a known cytotoxin (i.e., an agent that kills cells), so the prior art taught to minimize the use of BAK in ophthalmic formulations. BAK was known to be an irritant and associated with hyperemia. Thus,

increasing its concentration would exacerbate the hyperemia problem. Defendants' own experts previously cautioned against the use of BAK because of its side-effect profile. Additionally, the Court finds Defendants' reliance on products with increased BAK concentrations misplaced. The Court addresses each issue in more detail below.

### a. BAK Causes Cellular Damage

172.    Defendants' expert Dr. John W. Samples confirmed that a person of ordinary skill in the art would have known as early as 1983 of the toxic effects of BAK in the eye.

173.    Dr. Samples agreed regarding the concerns about the long-term effects of BAK administration and that "it is possible that the basic function of the trabecular meshwork may become impaired as a result of chronic benzalkonium exposure" (Trial Tr. July 17, 2013 Morning Session at 79:19–21).

174.    Dr. Samples also explained that one of the concerns of BAK was that it was harming the function of the trabecular cells in the eye. These cells are responsible for the fluid outflow from the eye. In harming these cells, BAK would therefore impair that draining system. The result would be increased IOP. This result mimics the effects of open angle glaucoma.

175.    Dr. Samples further agreed that another concern of BAK was "its role in and contribution to dry eye conditions. This is a particular concern because dry eye conditions and ocular surface disease are particularly common in glaucoma patients" (Trial Tr. July 17, 2013 Morning Session at 84:1–4).

176.    Dr. Samples confirmed that the toxicological effects of BAK were widely known in the field. Exemplary of this is a 2004 article by Dr. Noecker explaining that "1-month treatment with glaucoma medications containing higher levels of BAK resulted in more

corneal damage and conjunctival lymphocytic infiltration than lower levels of BAK"
(PTX-163 at 7).

177.      Dr. Samples also agreed that the effects of BAK are dose dependent. Increasing
the dose of BAK also increases the instance and severity of its negative effects, in this
case the damage to ocular epithelial cells.

178.      Dr. Samples confirmed that BAK's negative effect is universal for all cells,
including "corneal, epithelium, and endothelium conjunctival epithelium, and trabecular
meshwork cells" (Trial Tr. July 17, 2013 Morning Session 87:21–22).

179.      Given BAK's toxicity, Dr. Samples concluded that "clinicians should consider the
total amount of BAK included in each of their patient's glaucoma treatment regimens.
This is especially critical if multiple BAK-containing medications are prescribed
simultaneously" (Trial Tr. July 17, 2013 Morning Session 88:6–10). At the time of
invention, it was understood that many glaucoma patients were on multiple treatments
and therefore subject to the cumulative degenerative effects of BAK.

**b.   *The Prior Art Taught that BAK Should be Minimized in Ophthalmic Formulations***

180.      Given BAK's ophthalmic toxicity, the prior art taught that BAK should be
minimized in ophthalmic formulations.

181.      Dr. Samples and Dr. Noecker agreed that a goal in ophthalmology is to eliminate
BAK as a preservative in all ophthalmic formulations. To the extent it could not be
eliminated, the experts agreed that its use should be minimized.

182.      Dr. Chin-Ming Chang of Allergan was one of the lead formulators on the
Lumigan® 0.01% project. He explained that "using less preservative is the gold standard
for the formulation development" and agreed that the least amount of BAK present would

be the most beneficial formulation (Trial Tr. July 15, 2013 Afternoon Session 40:19–20).

Dr. Chang also explained that a person of skill in the art would not have increased the

amount of BAK in a formulation "because we know that the minimum amount of

preservative need[s] to be utilized, not only from a scientific perspective, but also from a

regulatory perspective" (Trial Tr. July 15, 2013 Morning Session 78:15–18). A person of

ordinary skill in the art at the time would have feared that "BAK increased the ocular

penetration purely by compromising cell layer integrity and toxicity" (Trial Tr. July 15,

2013 Morning Session 81:15–17).

183.    Dr. Noecker noted three industry examples of products reformulated to decrease

the concentration of BAK. The drugs Alphagan® and Travatan® both eliminated BAK

while Acular® reduced its concentration of BAK. Conversely, neither party identified

any product reformulated to increase its concentration of BAK.

### c.  A Person of Skill in the Art Would Not Use BAK to Reduce Hyperemia

184.    Dr. Loftsson stated that a person of ordinary skill in the art would not use BAK to

reduce hyperemia because BAK itself leads to hyperemia.

185.    Dr. Samples highlighted two examples where elimination of BAK resulted in

decreased hyperemia: Travatan Z® and Alphagan P®. In those products, other

preservatives were substituted for BAK. As a result, both showed lower rates of

hyperemia.

186.    Although bimatoprost is the leading cause of hyperemia in Lumigan®, a person

of ordinary skill in the art would not have increased the concentration of BAK for

purposes of eliminating hyperemia.

#### d. *Defendants' Experts Cautioned Against the Use of BAK*

187.    Defendants' experts at trial recounted their prior statements regarding BAK and discouraging its use.

188.    Defendants' expert Dr. Samples—prior to the instant litigation—wrote in his book on glaucoma that "BAK contributes greatly to symptoms of ocular surface disease experienced by many glaucoma patients" (Trial Tr. July 17, 2013 Morning Session 113:24–114:1). Dr. Samples has also previously written that "[i]t has been argued that BAK has some anti-infective roles or that BAK is somehow desirable to perform penetration of antibiotics" (Trial Tr. July 17, 2013 Morning Session 114:7–9). But Dr. Samples goes on to warn a person of ordinary skill in the art that "such arguments ignore the cellular consequences associated with the use of preservatives" (Trial Tr. July 17, 2013 Morning Session 114:14–16).

189.    These consequences are highlighted in the 2002 Kaur et al. article. Although the article states that BAK "shows the highest promoting effect on corneal drug penetration from amongst the currently used preservatives" it goes on to explain the negative consequences of BAK that caused that permeability (DTX-286 at 7). Specifically, that "0.01% BAC has been reported to cause cells of the corneal epithelium to peel at their borders" and "enlarge the intercellular spaces in the superficial cells of the cornea" (DTX-286 at 8). Dr. Samples agreed these consequences naturally flow from the use of BAK. Dr. Samples confirmed that the removal of the "grout" between the cells increases permeability, but is the result of BAK's damaging effects as a "grout-dissolver" (Trial Tr. July 17, 2013 Morning Session at 36:25, 37:2).

190.    Similarly, Dr. Majumdar authored an article in 2006 stating that although the approach of using surfactants as permeation enhancers "was initially received with a lot

of enthusiasm, cytotoxic and membrane damage properties at the concentrations necessary to produce sufficient permeability enhancement has limited their utility in drug delivery" (Trial Tr. July 17, 2013 Afternoon Session 151:10–14). Dr. Majumdar's comments help establish that one of ordinary skill in the art would have been discouraged that increased BAK—because of its cytotoxic effects—would promote permeation.

191.    The prior statements by Defendants' experts confirm that one skilled in the art at the time of invention would not have tried to use BAK as a penetration enhancer given its toxicity profile.

*e. Defendants' Reliance on Products with Increased BAK*

192.    As previously addressed, Xalatan® contained 200 ppm BAK for the purpose of keeping the latanaprost dissolved, not for permeation enhancement. The increased BAK complexed with latanaprost, therefore reducing the amount of free BAK to interact with the eye. Like the Asada reference, both Dr. Samples and Dr. Noecker agree that Xalatan® "showed a decrease in cell membrane integrity and a significant increase in apoptosis [i.e. targeted cell death]" when compared with another prostaglandin with 50 ppm BAK (Trial Tr. July 17, 2013 Morning Session 103:13–14). Dr. Noecker's 2004 article confirms this and discloses that "[b]imatoprost, which contains the lowest BAK concentrations of the evaluated medications (0.005%) [50 ppm], was associated with less damage than latanoprost, timolol, or dorzolamide" (PTX-163 at 6). As Dr. Samples and Dr. Noecker agree, Xalatan® was the only chronically used FDA-approved ophthalmic drug that included 200 ppm BAK as of 2005. And its use taught away from increased BAK concentrations for the reasons already discussed. Given the experts' statements, a person of ordinary skill in the art would have sought to not to increase the amount of BAK in Lumigan®. The Court finds that these references teach away from using

prostaglandin analogs with an increased BAK concentration, which increase the risk of corneal damage.

193.     During trial, Defendants repeatedly highlighted the 2002 article "How to Handle BAK Talk" (DTX-741). In this reference, Defendants emphasized several formulations including 200 ppm BAK. These drugs include Natacyn, Decadron phosphate, and Neodecadron. Natacyn, Decadron phosphate, and Neodecadron are not for chronic long-term use, and would teach nothing about whether it was safe to use 200 ppm BAK with a lifelong glaucoma drug. The "How to Handle BAK Talk" reference states that "BAK may enhance a drug's ability to reach the site of action, and it can increase ocular permeability" (DTX-741 at 3). But it goes on to explain that its use comes with complications, "[t]here can be damage to the ocular surface if use of the drop becomes too frequent for a long period of time or if several preserved topical ophthalmic medications are used daily" (DTX-741 at 3). For example, Natacyn is used as treatment for patients who have fungal infections in their eyes. Natacyn is an extremely toxic agent because it kills the fungus eating at the eye as well as some surface cells. Therefore, Natacyn use is limited to only when a fungus is present. Decadron phosphate and Neodecadron are both steroid preparations used for short-term treatment of inflammation. In light of the short-term use of the drugs identified by Defendants, this reference does not teach that BAK in increased concentrations would be promising for chronic or long-term use.

194.     Defendants also pointed to Xalacom as safely using 200 ppm BAK. Xalacom includes latanaprost as one of its active ingredients. As previously discussed, latanaprost

and BAK complex in solution and reduce the amount of free BAK. Under these circumstances, BAK in increased concentrations is not acting as a permeation enhancer.

195.    Defendants also addressed the previous research done by Allergan's expert Dr. Thorsteinn Loftsson. Dr. Loftsson previously used 200 ppm BAK with cyclodextrins. But at trial, Dr. Loftsson explained that "[i]f you use cyclodextrin together with a preservative, you will reduce the amount of free preservative in your formulation, so only a small fraction of your preservative is able to interact with the bacteria and have this antibacterial effect" (Trial Tr. July 18, 2013 Afternoon Session 76:23–77:2). This research does not teach that 200 ppm BAK in one formulation means that concentration is universally recommended for all formulations, regardless of ingredients. This is especially true when the preservative complexes in the product.

196.    Consequently, the Court finds that the prior art as a whole taught away from increasing the concentration of BAK from 50 ppm to 200 ppm in an ophthalmic formulation of prostaglandin analogs.

**H. Difference Between Prior Art and the Claims**

197.    Although Defendants did not explicitly compare the prior art to the claims, the Court finds it prudent to do so. Overall, the Court finds there are meaningful differences between the prior art and the claims.

198.    The Court does not find that that the prior art teaches a formulation of 0.01% bimatoprost with 200 ppm BAK.

199.    The prior art also does not teach that a formulation of 0.01% bimatoprost and 200 ppm BAK would have equivalent efficacy in lowering IOP as 0.03% bimatoprost and 50 ppm BAK.

200.    The prior art does not teach that BAK would act as a permeation enhancer for bimatoprost.

201.    The prior art does not teach that increasing the BAK to 200 ppm would be safe or desirable given its toxicity profile.

202.    The Court also does not find that there would have been a reason or motivation for a person of ordinary skill in the art to combine the prior art or choose specific concentrations of bimatoprost and BAK to arrive at the claimed invention. The prior art taught that BAK would not enhance bimatoprost penetration and that decreasing the bimatoprost concentration from 0.03% to 0.01% would decrease efficacy in IOP lowering. As detailed above, Allergan spent over two years pursuing other solutions. This is true even though Allergan was aware of data that BAK was a penetration enhancer for some drugs under limited conditions. The Court finds that the inventors' contemporaneous efforts are probative of how one of ordinary skill in the art would have approached the problem at the time. The Court also does not find that Allergan's motivation to solve the hyperemia problem with Lumigan® 0.03% equates to motivation for combining the prior art to reach the ultimate invention. Although there was a desire to develop an improved formulation of Lumigan® 0.03%, no evidence indicates that a person of skill in the art would have known how to fulfill that goal.

203.    The Court finds that in view of the prior art, there was no reasonable expectation of success in making the claimed invention. Looking at the Laibovitz reference and the Lyons Patent, a person of ordinary skill in the art would not have expected that a formulation containing 0.01% bimatoprost would have been able to maintain the IOP-lowering efficacy of 0.03% bimatoprost. The inventors themselves remained skeptical of

a formulation of 0.01% bimatoprost even after their initial research. Similarly, a person of ordinary skill in the art would not have known whether reducing the concentration of bimatoprost to 0.01% would have reduced the hyperemia seen with Lumigan® 0.03%. A person of ordinary skill in the art would not have expected that BAK would increase the corneal penetration of bimatoprost, given that the prior art taught away from the invention and demonstrated that BAK did not increase the permeability of many compounds, including bimatoprost and other neutral prostaglandin analogs.

## I.   Objective Indicia of Non-Obviousness

204.    The Court finds that the objective considerations also counsel against a finding that a person of ordinary skill in the art would have found the invention obvious.

205.    Allergan released Lumigan® 0.03% in 2001. Although the drug reduced IOP, it caused high instance and severity of hyperemia. This often caused patients to discontinue treatment. In March 2005—when Allergan filed its patent application for the instant invention—there existed a long-felt need for a glaucoma drug with Lumigan® 0.03%'s efficacy, but with an improved side-effect profile, including decreased instance and severity of hyperemia. The 1996 Higaki article exemplifies this point. The Higaki reference explains that:

> [A] new type of antiglaucoma medication is needed. One candidate has been prostaglandin because prostaglandin $F_{2\alpha}$ ($PGF_{2\alpha}$) and $E_2$ ($PGE_2$) have long-lasting and highly significant activity for decreasing intraocular pressure. However, they also have several adverse effects which must be overcome before they can be clinically used; they can cause initial hypertension, inflammatory response, breakdown of the blood-aqueous barrier, and systemic side effects.

(DTX-183 at 3 (citations omitted)). Defendants contend that Allergan developed Lumigan® 0.01% to extend its patent monopoly on bimatoprost. The Court disagrees.

Allergan immediately began research into improvements on Lumigan® 0.03% to develop an improved drug with decreased side effects. Dr. Samples agreed that eliminating hyperemia would have been a paramount concern with Lumigan® 0.03%.

206.    Allergan's failed research attempts also support non-obviousness. Allergan's scientists attempted several approaches which all resulted in failures. The goal of decreasing hyperemia while maintaining IOP lowering efficacy was not readily solvable. Many of these approaches were tested by scientists at Allergan other than the inventors in this case.

207.    The Court finds that the inventors proceeded contrary to conventional wisdom in developing Lumigan® 0.01%. The prior art and wisdom taught that BAK should be reduced or eliminated from ophthalmic formulations. Moreover, there were no other reformulations that had ever increased the concentration of BAK, only examples of reducing or eliminating BAK. In fact, the conventional wisdom—demonstrated in the Higaki, Camber, and FDA Medical Review references—teaches that BAK would not enhance the penetration of bimatoprost, a small, neutral, lipophilic prostaglandin analog.

208.    As discussed above, the Court finds that Allergan's research yielded unexpected results in increasing BAK concentrations with bimatoprost. Given the similar hyperemia rates of 0.03% and 0.01% bimatoprost shown in the Laibovitz reference, it was unexpected that Lumigan® 0.01% would be able to reduce the incidence and severity of hyperemia compared to treatment with Lumigan® 0.03% while also maintaining the IOP-lowering efficacy of Lumigan® 0.03%. It was also unexpected that 200 ppm BAK would enhance the penetration of bimatoprost into the eye, and specifically, that it would

increase permeation sufficiently to reduce bimatoprost concentration from 0.03% to 0.01% without any loss in efficacy and still meet regulatory standards.

209.     Even after their initial research, the inventors and others at Allergan doubted the potential of a formulation using 0.01% bimatoprost and 200 ppm BAK.

210.     The commercial success of Lumigan® 0.01% is proof of its innovation. Since its launch in October 2010, total prescriptions, market share, and gross sales have grown annually. For example, gross sales were $11,172,596 for the remainder of 2010, $138,643,391 for 2011, and $303,070,540 for 2012. Allergan expects gross sales for 2013 to top $500,000,000. It is currently Allergan's top-selling glaucoma product and the second best-selling drug in Allergan's entire eye care portfolio, Allergan's largest business unit. Defendants contend that the performance of Lumigan® 0.01% is due to its cannibalization of Lumigan® 0.03% sales, marketing efforts, and that the commercial success is more properly attributed to bimatoprost. The Court disagrees. Allergan's total Lumigan® business—which included both 0.03% and 0.01% products—expanded after the introduction of 0.01%, which was due to the unique features of Lumigan® 0.01%. The Lumigan® franchise continued to grow even after Lumigan® 0.03% was removed from the market in order to transition completely to Lumigan® 0.01%.

211.     The strong commercial performance of Lumigan® 0.01% is particularly significant because in March 2011, a lower-priced, generic version of Xalatan® (with the active drug latanoprost)—which was then the best-selling prostaglandin—became available and quickly captured market share. Lumigan® 0.01% performed better than Allergan expected in light of the generic latanoprost launch, and Lumigan® 0.01% has since become the best-selling branded glaucoma drug in the United States. The fact that

consumers continued to purchase Lumigan® 0.01% despite having access to generic latanoprost demonstrates that Lumigan® 0.01% has unique attributes that fulfill a need unmet by any competitor.

212.    The Court finds there is a nexus between the commercial success of Lumigan® 0.01%, which is an embodiment of the claimed invention.

**J.  Irreparable Harm**

213.    The Court finds that Allergan would be irreparably harmed if Defendants were permitted to enter the market with generic versions of Lumigan® 0.01%.

214.    Allergan's market share would be quickly eroded with the introduction of generic products. Market erosion is expected when generics are introduced, as was the case with Xalatan®. While patented, Xalatan® was the leading drug in the prostaglandin-analog class, controlling approximately 50% of the prostaglandin market. When Xanatan® went off patent, generics flooded the market. Two months after the introduction of generics, Xalatan® lost 90% of its market share, and within 12 months it lost a total of 95% of its market share. Currently, branded Xalatan® maintains only 1% of the market. Lumigan® 0.01% would suffer the same fate if generics entered into the market.

215.    In addition to lost market share, the price of Lumigan® 0.01% would also suffer erosion. Increased competition by cheaply available generics would put downward pressure on Allergan's price in order for Lumigan® 0.01% to remain competitive in the marketplace.

216.    The Court also finds that the revenue loss from generic entry would directly affect Allergan's ability to invest in the development of new treatments, harming both Allergan and ailing patients.

217.    It would be difficult, if not impossible, to quantify all these harms from lost sales, price erosion, lack of reinvestment potential, and injury to goodwill and reputation. This further demonstrates the harm is irreparable and could not be later compensated by an award of damages.

## III.    CONCLUSIONS OF LAW

### A.    Jurisdiction

1.    The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338(a).

2.    Pursuant to 35 U.S.C. § 271(e)(2)(a), the filing of an ANDA "provides an 'artificial' act of infringement that creates case-or-controversy jurisdiction to enable the resolution of an infringement dispute before the ANDA applicant has actually made or marketed the proposed product." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003).

3.    Venue is proper in the Eastern District of Texas under 28 U.S.C. § 1391(b).

4.    Because this action arises under the patent laws, Federal Circuit precedent is controlling. *See* 28 U.S.C. § 1295(a)(1).

### B.    Burden of Proof

5.    A patent holder asserting infringement bears the burden of proving its claim by a preponderance of the evidence. *See Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011).

6.    A party challenging a patent's validity must overcome the presumption of validity and prove that claim by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

## C.  Infringement

7.  "To prove infringement, a plaintiff must prove the presence of each and every claim element or its equivalent in the accused method or device." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1378 (Fed. Cir. 2011).

8.  Infringement is a two-step test. The first prong requires that "the claim must be properly construed to determine its scope and meaning." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993). Next, "the claim as properly construed must be compared to the accused device or process." *Id.*

9.  Because the filing of an ANDA application is an artificial act of infringement, the appropriate inquiry is whether the generic ANDA product would infringe the asserted patents if it was introduced into the market. *See Warner-Lambert*, 316 F.3d at 1365–66.

### i.  Direct Infringement

10. An entity is liable for direct infringement if it "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent." 35 U.S.C. § 271(a).

11. A patent holder must prove a claim for direct infringement by establishing that the accused product contains every limitation—either literally or under the doctrine of equivalents—of the asserted claim. *Star Scientific*, 655 F.3d at 1378.

12. Literal infringement requires that every claim limitation be present in the accused product. *Pozen Inc. v. PAR Pharm., Inc.*, 696 F.3d 1151, 1167 n.11 (Fed. Cir. 2012).

13. "Infringement under the doctrine of equivalents may be established by showing that 'the substitute element matches the function, way, and result of the claimed element.'" *Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1380 (Fed. Cir. 2013) (quoting *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir. 2012)).

14. Infringement under the doctrine of equivalents frequently turns on questions of fact, such as "[w]hether the substitute element (1) has substantially the same function as the recited element, (2) achieves that function in substantially the same way, and (3) achieves substantially the same result." *Id.*

15. The Court finds that Allergan has proved by a preponderance of the evidence that Defendants' proposed ANDA products will directly infringe the asserted claims that cover the composition of Lumigan® 0.01%—i.e., claim 2 of the '504 Patent; claims 1, 7, and 8 of the '353 Patent; and claim 15 of the '479 Patent—if it makes, sells, offers to sell, or imports its proposed generic product in the United States.

16. Sandoz's proposed product includes 0.01% bimatoprost, 200 ppm BAK, citric acid monohydrate, a phosphate buffer, sodium chloride, and water, it has a pH of "about 7.3," it is formulated for ophthalmic administration, it is for the treatment of glaucoma or ocular hypertension, and it is to be used once-daily and applied topically (PTX-348; PTX-14C).

17. Sandoz's label and its representations to the FDA confirm that its product meets the clinical limitations of the asserted claims of the '353 and '118 Patents because it will have the same efficacy and hyperemia as Lumigan® 0.01%, which, as discussed previously, meets the claim limitations.

18. Therefore, the Court finds that Sandoz directly infringes claim 2 of the '504 Patent; claims 1, 7, and 8 of the '353 Patent; and claim 15 of the '479 Patent and that any patient or doctor using Sandoz's product would directly infringe claims 1, 7, and 8 of the '118 Patent and claims 1, 6, 10, and 12 of the '605 Patent.

19. Sandoz has stipulated that it infringes claim 2 of the '504 Patent and claim 15 of the '479 Patent, and that it meets many of the elements of the remaining asserted claims (Doc. No. 241 at 1–2).

20. Lupin's proposed product includes 0.01% bimatoprost, 200 ppm BAK, citric acid monohydrate, a phosphate buffer, sodium chloride, and water, it has a pH of "about 7.3," it is formulated for ophthalmic administration, it is for the treatment of glaucoma or ocular hypertension, and it is to be used once-daily and applied topically (PTX-13A; PTX-13B; PTX-13D).

21. Lupin's label and its representations to FDA confirm that its product meets the clinical limitations of the asserted claims of the '353 and '118 Patents because it will have the same efficacy and hyperemia as Lumigan® 0.01%, which, as discussed previously, meets the claim limitations.

22. Therefore, the Court finds that Lupin directly infringes claim 2 of the '504 Patent, claims 1, 7, and 8 of the '353 Patent, and claim 15 of the '479 Patent, and that any patient or doctor using Lupin's product would directly infringe claims 1, 7, and 8 of the '118 Patent and claims 1, 6, 10, and 12 of the '605 Patent.

23. Watson's proposed product includes 0.01% bimatoprost, 200 ppm BAK, citric acid monohydrate, a phosphate buffer, sodium chloride, and water, it has a pH of "about 7.3," it is formulated for ophthalmic administration, it is for the treatment of glaucoma or ocular hypertension, and it is to be used once-daily and applied topically (PTX-15A; PTX-15D).

24. Watson's representations to the FDA confirm that its product meets the clinical limitations of the asserted claims of the '353 and '118 Patents because it will have the

same efficacy and hyperemia as Lumigan® 0.01%, which, as discussed previously, meets the claim limitations.

25. Therefore, the Court finds that that Watson directly infringes claim 2 of the '504 Patent; claims 1, 7, and 8 of the '353 Patent; and claim 15 of the '479 Patent and that any patient or doctor using Watson's product would infringe claims 1, 7, and 8 of the '118 Patent and claims 1, 6, 10, and 12 of the '605 Patent.

26. Hi-Tech's proposed generic includes 0.01% bimatoprost, 200 ppm BAK, citric acid monohydrate, a phosphate buffer, sodium chloride, and water, it has a pH of "about 7.3," it is formulated for ophthalmic administration, it is for the treatment of glaucoma or ocular hypertension, and it is to be used once-daily and applied topically (PTX-12A; PTX-12B; PTX-12C).

27. Hi-Tech argues that its product does not meet the pH limitation of the claims. Hi-Tech disclosed in its ANDA that the pH range for its product during its shelf life is 6.8–7.2. The asserted claims of the '502, '497, and '605 Patents all require a pH of "about 7.3" (*See* PTX-1 at 6:21). The Court finds that the pH range for Hi-Tech's generic literally infringes, and in the alternative, infringes the claims under the doctrine of equivalents. During claim construction, the Court adopted the parties' agreed construction of the phrase "about 7.3": "approximately 7.3" (Doc. No. 118 at 16). Hi-Tech's range includes an upper limit of 7.2. The Court finds that a pH of 7.2 literally meets the requirement of "approximately 7.3." The Court also finds that a pH range of 6.8–7.2 literally meets the "about 7.3" claim limitation.

28. The Court also finds that the pH range of Hi-Tech's product of 6.8–7.2 meets the claim limitation of "about 7.3" under the doctrine of equivalents. From a chemical standpoint,

the Court finds no appreciable difference in a pH from 6.8–7.2 and a pH of "about 7.3."

The Court finds that a pH in Hi-Tech's proposed range performs substantially the same

function as a pH of "about 7.3" (ensuring the formulation is stable and comfortable for

ophthalmic administration), achieves that function in the same way (by keeping the pH of

the formulation relatively close to the pH of the tear film and at a level where the active

ingredient is stable), and achieves substantially the same result (a stable formulation that

delivers the active ingredient to the patient's eye so that it can be absorbed). This is

consistent with Hi-Tech's representation to the FDA that its proposed product is

bioequivalent to Lumigan® 0.01%.

29. The Court also finds that Hi-Tech's prosecution history estoppel argument regarding pH

   is without merit.

30. "Where an amendment narrows the scope of the claims, and that amendment is adopted

   for a substantial reason related to patentability, the amendment gives rise to a

   presumption of surrender for all equivalents that reside in 'the territory between the

   original claim and the amended claim.'" *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1291

   (Fed. Cir. 2010) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535

   U.S. 722, 740 (2002)).

31. "This presumption can be overcome by showing that 'at the time of the amendment one

   skilled in the art could not reasonably be expected to have drafted a claim that would

   have literally encompassed the alleged equivalent.'" *Id.* (quoting *Festo*, 535 U.S. at 741).

32. "One way to make this showing is to demonstrate that 'the rationale underlying the

   narrowing amendment bore no more than a tangential relation to the equivalent in

question.'" *Id.* (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1368 (Fed. Cir. 2003) (en banc)).

33. "Although there is no hard-and-fast test for what is and what is not a tangential relation, it is clear that an amendment made to avoid prior art that contains the equivalent in question is not tangential." *Id.*

34. The Court concludes that the amendments during prosecution were all tangential to the pH issue. The amendments dealt with eliminating independent claims with broad ranges of concentrations for bimatoprost and BAK. These claims included no pH limitations. The narrower dependent claims contained specific requirements for bimatoprost, BAK, and pH. Therefore, the Court finds that the amendments that added the pH limitation were tangential to the amendments regarding bimatoprost and BAK concentration range. At the same time Allergan amended the asserted claims, it also added new claims to a method of using 0.01% bimatoprost with 200 ppm BAK but without any pH limitation. Although the PTO examiner rejected these claims as procedurally improper (i.e., inserting new claims in a Request for Continued Examination), it highlights that Allergan did not intend to surrender any subject matter regarding pH. Accordingly, the Court finds that prosecution history estoppel does not preclude use of the doctrine of equivalents in this case.

35. For the above reasons, the Court finds that Hi-Tech directly infringes claim 2 of the '504 Patent and claim 15 of the '479 Patent, and that any patient or doctor using Hi-Tech's product would infringe claims 1, 6, 10, and 12 of the '605 Patent.

36. The Court also finds that Hi-Tech infringes claims 1, 7, and 8 of the '353 Patent and claims 1, 7, and 8 of the '118 Patent. None of these asserted claims include a specific limitation regarding pH, thus all of Hi-Tech's pH arguments are inconsequential.

37. Hi-Tech additionally contends that the '353 and '118 Patents are unenforceable under the equitable defense of prosecution laches.

38. "The doctrine 'may render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution' that constitutes an egregious misuse of the statutory patent system under the totality of the circumstances." *Cancer Research Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 728 (Fed. Cir. 2010) (quoting *Symbols Techs., Inc. v. Lemelson Med., Educ., & Research Found.*, 422 F.3d 1378, 1385 (Fed. Cir. 2005)). "To establish prejudice an accused infringer must show evidence of intervening rights, *i.e.*, that either the accused infringer or others invested in, worked on, or used the claimed technology during the period of delay." *Id.* at 729.

39. The Court does not find any delay by Allergan unreasonable. Allergan filed the initial patent application that led to the asserted patents on March 16, 2005. That application included broad independent claims without the pH limitation and narrower dependent claims with a pH limitation of 7.4. The claims without the pH limitation remained pending until they were cancelled on August 18, 2010. On February 10, 2012, Allergan filed continuation applications that led to the '353 and '118 Patents, this application—and the resulting patents—included claims without pH limitations. From August 18, 2010, until February 10, 2012, all of Allergan's pending claims included a pH limitation. Hi-Tech argues that the period of delay spans from March 2005, until February 2012. Allergan maintains that the only period of delay is between August 2010, and February

2012, the period during which Allergan did not have pending claims without the pH limitations. The Court agrees with Allergan. Between August 2010 and February 2012, is the only time when Hi-Tech could argue that it could have designed around Allergan's patents with respect to the pH limitation. The Court does not find this 18 month delay unreasonable. Even under Hi-Tech's calculated delay, the Court does not find that Allergan unreasonably delayed under the totality of the circumstances. *See Holmes Grp. v. RPS Prods., Inc.*, No. 03-40146-FDS, 2010 WL 7867756, at *9 (D. Mass. June 25, 2010) (finding that a delay of "only five to seven years" did not amount to unreasonableness). Moreover, the Court does not find that Allergan engaged in an egregious misuse of the patent system in prosecuting its claims. In summary, the Court does not find that Hi-Tech's equitable defense of prosecution laches is meritorious.

40. Accordingly, the Court finds that Hi-Tech directly infringes claims 1, 7, and 8 of the '353 Patent, and that patients and doctors using Hi-Tech's product would directly infringe claims 1, 7, and 8 of the '118 Patent.

## ii. Indirect Infringement

41. An entity is liable for indirect infringement if it induces or contributes to infringement.

42. The Court finds that Allergan has proved by a preponderance of the evidence that each Defendant will induce or contribute to the infringement of the asserted claims that cover methods of using Lumigan® 0.01%—i.e., claims 1, 7, and 8 of the '118 Patent and claims 1, 6, 10, and 12 of the '605 Patent—if it makes, sells, offers to sell, or imports its generic product in the United States. *See* 35 U.S.C. §§ 271(b)–(c).

## a. *Induced Infringement*

43. A party is liable for induced infringement if it "actively induces infringement of the patent." 35 U.S.C. § 271(b).

44. "In order to prevail on an inducement claim, the patentee must establish 'first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.'" *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) (quoting *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002)).

45. In other words, "[a] finding of inducement requires both knowledge of the existence of the patent and 'knowledge that the induced acts constitute patent infringement.'" *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1367 (Fed. Cir. 2013) (quoting *Global-Tech Appliance, Inc. v. SEB S.A.*, 131 S.Ct. 2060, 2068 (2011)).

46. The intent element also is satisfied where an infringer was willfully blind to any infringement. *Global-Tech Appliances*, 131 S. Ct. at 2068–69.

47. "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually know the critical facts." *Id.* at 2070–71.

48. "Accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc).

49. Intent can be proven by either direct or circumstantial evidence. *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005).

50. Importantly, "[i]ntent is a factual determination particularly within the province of the trier of fact." *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1988).

51. In this case, Defendants knew of the asserted patents at least as of the filing of the complaints in these consolidated cases. As addressed previously, direct infringement would occur by instructing doctors and patients with the proscribing information of a generic 0.01% bimatoprost product to use it in an infringing manner, that is for treating glaucoma or ocular hypertension. Defendants would possess the specific intent to cause that infringement.

52. Defendants' proposed prescribing information and labeling is also proof that there is no non-infringing use for any of the Defendants' products and further establishes Defendants' specific intent to infringe. *See AstraZenca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010) ("In the context of specific intent, it is irrelevant that some users may ignore the warnings in the proposed label. The pertinent question is whether the proposed label instructs users to perform the patented method. If so, the proposed label may provide evidence of [the accused infringer's] affirmative intent to induce infringement.").

53. The Court finds that Defendants are liable for induced infringement of claims 1, 7, and 8 of the '118 Patent and claims 1, 6, 10, and 12 of the '605 Patent.

**b.  *Contributory Infringement***

54. "Contributory infringement occurs if a party sells or offers to sell, a material or apparatus for use in practicing a patented process, and that 'material or apparatus' is material to practicing the invention, has no substantial non-infringing uses, and is known by the party 'to be especially made or especially adapted for use in an infringement of such patent.'" *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2002) (quoting 35 U.S.C. § 271(c)).

55. Defendants knew of the asserted patents at least as of the filing of the complaints in these consolidated cases. If Defendants' products are approved by the FDA, Defendants will each sell a product that patients and doctors will use to infringe. Defendants' products meet all the limitations of the asserted claims, and use of Defendants' generics would infringe all the asserted claims. Defendants' products are a material part of the invention, specifically, the method claims cover a method of administering the product to treat glaucoma or ocular hypertension.

56. Finally, there are no non-infringing uses for any of Defendants' products. Rather, the proposed labeling instructs patients to use the product in an infringing manner.

57. Therefore, the Court finds that Defendants are all liable for contributory infringement of claims 1, 7, and 8 of the '118 Patent and claims 1, 6, 10, and 12 of the '605 Patent.

**D. Invalidity**

 **i. Obviousness**

58. A patent is invalid "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103

59. Obviousness is a legal finding underpinned by factual findings. *See In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009).

60. "An analysis of obviousness must be based on several factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention was made; and (4) objective evidence of nonobviousness, if any." *Id.*

61. "The teachings of a prior art reference are underlying factual questions in the obviousness inquiry." *Id.*

62. "A party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (internal quotations omitted). While the patent owner has the burden of going forward with rebuttal evidence if the challenger successfully presents a prima facie invalidity case, this "does not in substance shift the burden of persuasion, because the presumption of validity remains intact and *the ultimate burden of proving invalidity remains with the challenger throughout the litigation.*" *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1352 (Fed. Cir. 2013) (emphasis original).

63. The patentee can meet its burden of production with evidence of objective indicia of non-obviousness. These include "(1) commercial success; (2) long felt need; (3) copying; (4) unexpected results; (5) acceptance by others; and (6) initial skepticism." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1370 (Fed. Cir. 2012); *see also Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010) (explaining that praise from a competitor in the industry related to the patented features is evidence of non-obviousness).

64. In order to prevent hindsight bias, "the proper analysis requires a form of amnesia that 'forgets' the invention and analyzes the prior art and understanding of the problem at the date of invention." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).

65. In light of the facts previously outlined, the Court finds that ophthalmic formulation is an unpredictable art. Results in this field are generally more likely to be unexpected. *See Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008) ("To the extent an art is unpredictable, as the chemical arts often are, *KSR*'s focus on these 'identified, predictable solutions' may present a difficult hurdle because potential solutions are less likely to be genuinely predictable." (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007)). Yet while "formulation science carries with it a degree of unpredictability, 'obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success.'" *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013) (quoting *Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348, 1364 (Fed. Cir. 2007). But here, not only did the prior art not suggest that there were a finite number of predictable solutions, the Burstein reference taught that using 200 ppm BAK in humans would not increase permeability in humans.

66. "Evidence of obviousness, especially when that evidence is proffered in support of an 'obvious-to-try' theory, is insufficient unless it indicates that the possible options skilled artisans would have encountered were 'finite,' 'small,' or 'easily traversed,' and that skilled artisans would have had a reason to select the route that produced the claimed invention." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1072 (Fed. Cir. 2012) (internal quotations omitted). "[W]here the prior art, at best, '[gives] only general guidance as to the particular form of the claimed invention or how to achieve it,' relying on an 'obvious-to-try' theory to support an

obviousness finding is 'impermissible.'" *Id.* (quoting *In re Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009)).

67. In light of the Court's factual findings, Defendants have failed to prove by clear and convincing evidence that any asserted claim would have been obvious to a person of ordinary skill in the art at the time of the invention. The most important considerations include: (1) that there were significant differences between the prior art and the asserted claims; (2) that there was no reason to select the claimed concentrations of bimatoprost and BAK in the range disclosed in the prior art; (3) that a person of ordinary skill in the art would have had no reasonable expectation that combining the prior art to arrive at the claimed invention would lead to success; (4) that the prior art taught away from the claimed invention; and (5) that the objective indicia all strongly demonstrate non-obviousness.

68. The Court also rejects Defendants' arguments that the asserted claims would have been obvious under an "obvious to try" theory. The Court finds that the field of ophthalmic formulation is unpredictable because: (1) there were many possible solutions to the formulation problem; (2) the field was unpredictable; (3) there was skepticism in the field regarding the use of BAK; and (4) the prior art taught away from the claimed invention. The Court finds that a person of ordinary skill in the art would not have had a reasonable probability of success in developing the invention. The Court also finds that it would not have been obvious to try the claimed invention. The prior art taught away from the claimed invention by teaching: (1) that bimatoprost lost efficacy as its concentration decreased; (2) that BAK had no impact on bimatoprost's permeability; and (3) that BAK

was cytotoxic and could cause corneal disorders, therefore encouraging the elimination or

reduction in the concentration of BAK.

69. Finally, the Court rejects Defendants' arguments that *Galderma Labs., L.P. v Tolmar, Inc.*, 737 F.3d 731, (Fed. Cir. Dec. 11, 2013), compels this Court to find the asserted claims obvious. First, Defendants failed to presented a prima facie case of invalidity by demonstrating that (1) "there is a range disclosed in the prior art" for both bimatoprost and BAK; (2) "the claimed invention falls within that range"; and (3) "there was motivation to select the claimed [concentration of the] composition in the disclosed range." *See id.* at 737–38. And, even assuming that Defendants presented its prima facie case, Allergan has met its burden of producing rebuttal evidence, i.e., "that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations." *Id.* at 738.

70. As Defendants note, the Orange Book patent for the predecessor Lumigan® 0.03% product discloses a range of bimatoprost concentrations ("preferably about 0.001 to about 1.0%") and concentrations of BAK (0–0.10% or  to 1000 ppm) (*see* Doc. No. 301-1 at 3–4). Other prior art references also disclose similar ranges. The claimed invention falls within those ranges. And, by Allergan's own admission, there was a motivation to select a lower concentration of bimatoprost because it was known in the prior art that bimatoprost causes hyperemia. But Defendants have failed to produce any evidence as to why one of ordinary skill in the art would select a BAK concentration of 200 ppm given that the prior art was explicitly disparaging of BAK. In fact, Defendants' expert witness, Dr. Samples, had serious concerns about BAK since 1983 and used facetious

hyperboles—such as stating that "BAK is from Satan" or calling BAK "a natural-born killer"—to draw the ophthalmic community's attention to BAK's cytotoxicity (*see* Trial Tr., Doc. No. 251 at 60:11–61:15; 86:20–88:24). Thus, one of ordinary skill in the art at the time of the invention would have been motivated to reduce or eliminate BAK—not increase its concentration—from ophthalmic solutions, and Defendants failed to provide any evidence to the contrary.

71. Furthermore, assuming, *arguendo*, that Defendants established its prima facie case of obviousness, Allergan has produced ample rebuttal evidence. First, as noted above, prior art taught away from choosing a high concentration of BAK. Second, maintaining the same efficacy while decreasing the bimatoprost is an unexpected result of a different *kind*, not just of different *degree*. As noted above, both Laibovitz and Lyons taught that decreasing the bimatoprost concentration results in lower efficacy. The patentees were able to reach the opposite result (by using 200 ppm BAK). This is clearly distinguishable from *Galderma*, where "an unexpected increase in efficacy is measured by a small percentage[.]" *See* 737 F.3d at 739. Here, the patentees were able to *reverse* the concentration–efficacy relationship known in the prior art by choosing a higher concentration of BAK. And it was not known in the prior art nor was it inherent that increased concentrations of BAK would lead to a significant increase in bimatoprost penetration. *See Allergan*, 726 F.3d at 1294. Finally, other secondary considerations— such as commercial success, long felt need, failure of others, and initial skepticism—all point in Allergan's favor. The commercial success here, unlike *Galderma*, is demonstrated by its status as the best-selling branded glaucoma drug in the United States despite the generic latanoprost launch in March 2011. For years since Lumigan® 0.03%'s

launch in 2002, researchers experienced much trial and error to reduce the hyperemia side effect. Even after deciding to further study the formulations with 200 ppm BAK, Allergan's own researchers were initially skeptical of formulation of the claimed invention (with 0.01% bimatoprost) because those concentrations were chosen to be tested as a control group and not as a viable solution. Their skepticism is further evidenced by the fact that they continued to pursue formulations without BAK (e.g., calcium borate, cyclodextrin, and EDTA). In sum, the Court finds that all of the objective indicators weigh strongly in favor of nonobviousness.

72. Based upon the totality of the evidence, the Court finds that Defendants have not proved by clear and convincing evidence obviousness of claim 2 of the '504 Patent; claim 15 of the '479 Patent; claims 1, 7, and 8 of the '353 Patent; claims 1, 7, and 8 of the '118 Patent; or claims 1, 6, 10, and 12 of the '605 Patent.

**ii. Written Description Requirement**

73. In addition to obviousness, Defendants contend that Allergan's patents directed to the use of the invention to treat glaucoma and ocular hypertension in humans do not meet the written description requirement of 35 U.S.C. § 112. Defendants argue that the patents are invalid because the written description does not also include human clinical data. Specifically, Defendants challenge the written description for claims 1, 7, and 8 of the '353 and '118 Patents.

74. Defendants did not present any evidence or argument on this issue at trial.

75. The written description requirement under 25 U.S.C. § 112 requires that a patent "must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *In re Gosteli*, 872 F.2d 1008, 1012 (Fed. Cir. 1989); *see also Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).

76. Therefore, "the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351.

77. "[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id*.

78. The Court finds that disputed claims have adequate support in the written description.

79. The formulation for Lumigan® 0.01% is explicitly disclosed in the specification and is identified as the best mode of the invention. Lumigan® 0.01% has the clinical performance that is recited in the claims—i.e., nearly equivalent efficacy and less hyperemia than Lumigan® 0.03%.

80. The patents in suit are all entitled "Enhanced Bimatoprost Ophthalmic Solution," and they present *in vivo* and *in vitro* rabbit data comparing the permeability and ocular absorption of bimatoprost in various test formulations as compared to Lumigan® 0.03%. The specification also includes an example in which "intraocular pressure drops more and less hyperemia is observed" from administration of a formulation with 0.015% bimatoprost, 125 ppm BAK, and 0.015% EDTA than of Lumigan® 0.03% (PTX-3 at 40–45). A person of ordinary skill in the art would conclude—upon reading these disclosures—that the specification adequately describes the clinical performance requirements in the asserted claims, especially given the express disclosure that Lumigan® 0.01% is an example of the best mode of the invention.

81. The specification here satisfies the written description requirements because it discloses the exact formulation for Lumigan® 0.01% and the animal testing data that led the

inventors to take the 0.01% bimatoprost and 200 ppm BAK formulation that became Lumigan® 0.01% into Phase II human testing.

82. Additionally, the Court finds that the inventors had possession of the invention before they filed the original patent in March 2005 based on the contemporaneous documents. For example, the clinical protocol that described the procedures for the initial human clinical studies on Lumigan® 0.01% explained that the "clinical hypotheses" were that "[a]t least one investigational test formulation has less hyperemia when compared to LUMIGAN® [0.03%] once-daily" and that "[a]ll investigational test formulations are comparable to LUMIGAN® [0.03%] once-daily in intraocular pressure lowering effects" (PTX-48B at 13–14). The Clinical Protocol Review Committee at Allergan signed off on the protocol by November 17, 2004, and then submitted it to the FDA for approval. The Phase II human clinical studies based on the protocol began in January 2005. All of this occurred before the March 2005 filing date of the original patent. This establishes that the inventors had possession of the invention before they filed the original patent application.

83. Accordingly, the Court finds that Defendants have failed to prove by clear and convincing evidence the asserted claims of the '353 and '118 Patents are invalid for lack of written description.

### iii. Enablement Requirement

84. Lupin additionally alleges that the asserted patents are not sufficiently enabled because they do not include the results of human clinical studies.

85. Lupin did not present any evidence or argument on this issue at trial.

86. Enablement under 35 U.S.C. § 112 requires that "the specification must enable one of ordinary skill in the art to practice the claimed invention without undue experimentation." *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed.

Cir. 1999); *see also Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1355 (Fed. Cir. 2012).

87. Several factors that may assist the Court in determining whether experimentation is undue are:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

88. "Although the ultimate determination of whether one skilled in the art could make and use the claimed invention without undue experimentation is a legal one, it is based on underlying findings of fact." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1337 (Fed. Cir. 2005).

89. The Manual of Patent Examining Procedures (MPEP) used by PTO examiners during prosecution "instructs examiners to give presumptive weight to the utility for which human trials have been initiated." *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 435 F. App'x 917, 924 (Fed. Cir. 2011). "Before a drug can *enter* human clinical trials, the sponsor, often the applicant, must provide a convincing rationale to those *especially* skilled in the art (e.g., the Food and Drug Administration) that the investigation may be successful." *Id.* (quoting MPEP § 2107.03).

90. Based upon the entirety of the evidence, the Court finds the claims are adequately enabled. *See id.* at 925–26. As corroborated by Allergan's contemporaneous research at the time of filing, Lumigan® 0.01% has the clinical performance as recited in the asserted claims and is disclosed as the best mode in the specification. Thus,

specification's disclosure of the Lumigan® 0.01% formulation would enable one of ordinary skill in the art to make and use the claimed invention without undue experimentation.

**E.  Injunctive Relief**

91. Under the Hatch-Waxman Act, "the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed." 35 U.S.C. § 271(e)(4)(A).

92. The Hatch-Waxman Act also provides that "injunctive relief may be granted against an infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug, veterinary biological product, or biological product." 35 U.S.C. § 271(e)(4)(B).

93. A permanent injunction is appropriate when a party demonstrates: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

**i.  Irreparable Harm and Inadequate Remedies at Law**

94. As previously addressed, Allergan would suffer irreparable harm if Defendants are not enjoined. Allergan would lose significant revenue, irreversibly lose market share, suffer price erosion, have an inability to reinvest in future research, and suffer damage to its goodwill and market reputation.

95. "Irreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013).

96. The entry into the market by Defendants' generics would irreparably harm Allergan. Those injuries are difficult to quantify. *See id.* Remedies at law, such as monetary damages, would not adequately compensate Allergan for its injury.

**ii.  Balance of Equities**

97. The Court finds that the balance of equities favors Allergan.

98. Upon entry of Defendants' ANDA products into the market, Allergan will suffer irreparable harm. The Court does not find that Defendants would suffer little to no harm from continuing to be excluded from the market until the expiration of the patents in suit.

**iii.  Public Interest in an Injunction**

99. The Court finds that the public interest is best served by the issuance of an injunction.

100.    A fundamental premise of the patent system is encouraging innovation. "The encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude." *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 599 (Fed. Cir. 1985).

101.    Although Defendants' generic products would increase competition and make the drug available at lower prices, the Court does not find this outweighs the importance of patent protection. *See Douglas Dynamics*, 717 F.3d at 1346 ("[T]he public has a greater interest in acquiring new technology through the protections provided by the Patent Act than it has in buying 'cheaper knock-offs.'").

102.    Accordingly, the Court grants Allergan's request for a permanent injunction. Defendants shall be enjoined from making, using, importing, selling, or offering to sell

their ANDA products in the United States, or inducing others to manufacture, use, import, offer to sell, or sell their ANDA products in the United States until the expiration of Allergan's asserted patents.

## IV.    CONCLUSION

103.    Based upon the evidence, the Court finds that Allergan has proven by a preponderance of the evidence that Defendants infringe all asserted claims of Allergan's patents.

104.    The Court finds that Defendants have failed to rebut the presumption of validity of Allergan's patents by clear and convincing evidence. Therefore, the Court does not find that Allergan's patents are invalid or unenforceable.

105.    In accordance with 35 U.S.C. § 271(e)(4)(A), the Court orders that the effective date of FDA approval of any of the drugs described in Defendants' ANDAs 203056, 202911, 203748, and 203604, will be a date that is not earlier than the date of the expiration of all of U.S. Patent Nos. 7,851,504; 8,278,353; 8,299,118; 8,309,605; and 8,338,479.

106.    The Court grants Allergan's request for a permanent injunction as addressed in the Court's contemporaneously filed Final Judgment and Permanent Injunction.

**It is SO ORDERED.**

**SIGNED this 13th day of January, 2014.**


_Michael Schneider_
MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE



US007851504B2

(12) **United States Patent**
   Chang et al.

(10) **Patent No.:**  **US 7,851,504 B2**
(45) **Date of Patent:**  **Dec. 14, 2010**

(54) **ENHANCED BIMATOPROST OPHTHALMIC SOLUTION**

(75) Inventors: **Chin-Ming Chang**, Tustin, CA (US);
   **James N. Chang**, Newport Beach, CA
   (US); **Rhett M. Schiffman**, Laguna
   Beach, CA (US); **R. Scott Jordan**,
   Trabuco Canyon, CA (US); **Joan-En
   Chang-Lin**, Tustin, CA (US)

(73) Assignee: **Allergan, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this
   patent is extended or adjusted under 35
   U.S.C. 154(b) by 819 days.

(21) Appl. No.: **11/083,261**

(22) Filed: **Mar. 16, 2005**

(65) **Prior Publication Data**

   US 2006/0211770 A1   Sep. 21, 2006

(51) **Int. Cl.**
   *A61K 31/19*    (2006.01)
   *A61K 31/215*   (2006.01)
(52) **U.S. Cl.** ...................................... **514/530**; 514/573
(58) **Field of Classification Search** ................. 514/530,
                                                        514/575
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,128,577 A | 12/1978 | Nelson | |
| 4,543,353 A | 9/1985 | Faustini | |
| 4,812,457 A | 3/1989 | Narumiya | |
| 5,474,979 A | 12/1995 | Ding et al. | ................... 243/279 |
| 6,596,765 B2 | 7/2003 | Ueno | ......................... 514/530 |
| 6,646,001 B2 | 11/2003 | Hellberg et al. | ............. 514/530 |
| 6,743,439 B1 | 6/2004 | Castillo et al. | |
| 2005/0004074 A1 | 1/2005 | Lyons et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2498233 | 3/2004 |
| EP | 0098141 | 11/1984 |
| FR | 2239458 | 7/1973 |
| JP | S49-69636 | 7/1974 |
| JP | S62215537 | 9/1987 |
| WO | WO2004/133119 | 2/2004 |

OTHER PUBLICATIONS

Bito, L.Z. & Baroody, R.A., The Ocular Pharmacokinetics of
Eicosanoids and Their Derivatives . . . , 44 Exp. Eye Res. 217-26
(1987).
Pfeiffer, N., New Development in Glaucoma Drug Therapy, 89
Ophthalmologe W1-W13 (1992).
Schumer, Robert A., MD, PhD & Podos, Steven M.,MD, Medical
Treatment of Glaucoma, 2 Ophthalmology 140-50 (1991).
Woodford Roger, PhD & Barry, Brian W., PhD, Penetration Enhanc-
ers and the Percutaneous Absorption of Drugs: An Update, 5(3) J.
Toxicology.—Cut. & Ocular Toxicology 167-77.
Faulkner, R., Aqueous Humor Concentrations of Bimatoprost Free
Acid, Bimatoprost and Travoprost . . . , 26 Journal of Ocular Phar-
macology and Therapeutics, 147-156 (2010).
Camras, Carl B., Detection of the Free Acid of Bimatoprost in Aque-
ous Humor Samples from Human Eyes . . . , 111 Ophthalmology
2193-2198 (2004).
Cantor, Louis B., Levels of bimatoprost acid in the aqueous humor
after bimatoprost treatment . . . , 91 Br J Ophthalmol 629-632 (2007).
Noecker, Robert J., Corneal and Conjunctival Changes Caused by
Commonly Used Glaucoma Medications, Cornea, vol. 23, No. 5,
490-496 (Jul. 2004).
Kaur, I.P., Penetration enhancers and ocular bioadhesives: Two new
avenues for ophthalmic drug delivery, Drug Development and Indus-
trial Pharmacy, 28(4), 353-369 (2002).

*Primary Examiner*—Zohreh A Fay
(74) *Attorney, Agent, or Firm*—John E. Wurst; Kevin J.
Forrestal; Doina G. Ene

(57)    **ABSTRACT**

A composition comprising from 0.005% to 0.02% bimato-
prost by weight and from 100 ppm to 250 ppm benzalkonium
chloride, wherein said composition is an aqueous liquid
which is formulated for ophthalmic administration is dis-
closed herein.

A method which is useful in treating glaucoma or ocular
hypertension related thereto is also disclosed herein.

**3 Claims, 2 Drawing Sheets**

**Fig. 1**



**Fig. 2**



US 7,851,504 B2

**1**

# ENHANCED BIMATOPROST OPHTHALMIC SOLUTION

### FIELD OF THE INVENTION

This invention relates to pharmaceutical compositions comprising bimatoprost.

### BACKGROUND OF THE INVENTION

#### Description of Related Art

Bimatoprost, shown below, is a prostamide marketed commercially for the treatment of glaucoma and ocular hypertension.

Formula I



Benzalkonium chloride (BAK) is a preservative used in many commercial ophthalmic products to prevent microbial contamination in multi-use products. The commercial eye drops (Bimatoprost, Allergan, Inc., Irvine, Calif.) contain 0.03% bimatoprost and 0.005% BAK. Although no other prostamides are currently marketed for the treatment of glaucoma, several prostaglandin analogs are commercially available which use BAK as a preservative. These include latanoprost (Xalatan), travoprost (Travatan), and unoprostone isopropyl (Rescula), which require significantly more BAK, from 150-200 ppm, to meet antimicrobial effectiveness tests in the United States and Europe.

U.S. Pat. No. 6,596,765 B2 discloses a composition comprising 0.005% or 0.0005% latanoprost and 0.2 mg/mL BAK.

U.S. Pat. No. 6,646,001 B2 discloses compositions comprising 0.03% bimatoprost and 0.01% BAK or "0.01%+5% excess" BAK.

### BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. 1 is a plot showing the aqueous humor concentration of the parent acid of bimatoprost after topical administration of several formulations.

FIG. 2 is a plot showing the membrane permeability of bimatoprost in several different formulations.

### DETAILED DESCRIPTION OF THE INVENTION

A composition comprising from 0.005% to 0.02% bimatoprost by weight and from 100 ppm to 250 ppm benzalkonium chloride, wherein said composition is an aqueous liquid which is formulated for ophthalmic administration is disclosed herein.

A method which is useful in treating glaucoma or ocular hypertension related thereto is also disclosed herein.

**2**

An aqueous liquid which is formulated for ophthalmic administration is formulated such that it can be administered topically to the eye. The comfort should be maximized as much as possible, although sometimes formulation considerations (e.g. drug stability) may necessitate less than optimal comfort.

In certain compositions the concentration of bimatoprost is from 0.01% to 0.02%. In other compositions the concentration of bimatoprost is from 0.015% to 0.02%.

In certain compositions the concentration of BAK is from 150 ppm to 200 ppm. In other compositions the concentration of BAK is from 150 ppm to 200 ppm. In other compositions the concentration of BAK is from 150 ppm to 250 ppm.

In ophthalmic compositions, a chelating agent may be used to enhance preservative effectiveness. Suitable chelating agents are those known in the art, and, while not intending to be limiting, edetate salts (EDTA) are useful chelating agents.

In certain compositions, concentration of EDTA is at least 0.001%. In other compositions, the concentration of EDTA is at least 0.01%. In other compositions the concentration of EDTA is 0.15% or less. In other compositions the concentration of EDTA is 0.1% or less. In other compositions the concentration of EDTA is 0.05% or less.

Certain compositions comprise from 150 to 250 ppm BAK and an effective amount of EDTA.

As is known in the art, buffers are commonly used to adjust the pH to a desirable range for ophthalmic use. Generally, a pH of around 6-8 is desired, and in certain compositions a pH of 7.4 is desired. Many buffers including salts of inorganic acids such as phosphate, borate, and sulfate are known.

Another commonly used excipient in ophthalmic compositions is a viscosity-enhancing, or a thickening agent. Thickening agents are used for a variety of reasons, ranging from improving the form of the formulation for convenient administration to improving the contact with the eye to improve bioavailability. The viscosity-enhancing agent may comprise a polymer containing hydrophilic groups such as monosaccharides, polysaccharides, ethylene oxide groups, hydroxyl groups, carboxylic acids or other charged functional groups. While not intending to limit the scope of the invention, some examples of useful viscosity-enhancing agents are sodium carboxymethylcellulose, hydroxypropylmethylcellulose, povidone, polyvinyl alcohol, and polyethylene glycol.

In ophthalmic solutions, tonicity agents often are used to adjust the composition of the formulation to the desired isotonic range. Tonicity agents are well known in the art and some examples include glycerin, mannitol, sorbitol, sodium chloride, and other electrolytes.

One composition has a pH of 7.4 and consists essentially of 0.015% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

Another composition has a pH of 7.4 and comprises 0.02% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

Another composition has a pH of 7.4 and consists of 0.01% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

The best mode of making and using the present invention are described in the following examples. These examples are given only to provide direction and guidance in how to make and use the invention, and are not intended to limit the scope of the invention in any way.

One embodiment comprises 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

US 7,851,504 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

Another embodiment comprises 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment comprises 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment comprises 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment consists of 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

## EXAMPLE 1

Formulations containing 0.268% sodium phosphate dibasic heptahydrate, 0.014% citric acid, 0.83% sodium chloride, with the pH adjusted to 7.3 in qs water, and the amounts of bimatoprost, BAK, and EDTA listed in Table 1 below were prepared by conventional methods well known in the art.

TABLE 1

| Formulation |
| --- |
| 1. 0.03% Bimatoprost (50 ppm BAK) Control |
| 2. 0.03% Bimatoprost - 200 ppm BAK |
| 3. 0.03% Bimatoprost - 0.015% TPGS (no preservative) |
| 4. 0.03% Bimatoprost - 0.2% TPGS (no preservative) |

TABLE 1-continued

| Formulation |
| --- |
| 5. 0.03% Bimatoprost - 0.4% TPGS (no preservative) |
| 6. 0.03% Bimatoprost - 1.0% TPGS (no preservative) |

## EXAMPLE 2

Studies were carried out to determine the effect of benzalkonium chloride (BAK) and d-alpha tocopheryl polyethylene glycol 1000 succinate (TPGS) on ocular absorption of bimatoprost in vivo. For the in vivo study, eighteen female rabbits were given a single 28 μL eyedrop bilaterally and aqueous humor samples were collected (n=3 animals with 6 eyes per formulation) at 60 min postdose. Two rabbits (4 eyes) remained untreated to serve as pre-dose bioanalytical controls. Bimatoprost and its parent carboxylic acid extracted from aqueous humor and in vitro samples were analyzed by a liquid chromatography tandem mass spectrometry (LC-MS/MS) method with a quantitation range of 0.25-60 ng/mL.

Due to extensive metabolism of bimatoprost in rabbit eyes, its parent acid was used as a surrogate for determining ocular absorption of bimatoprost. Concentration of the acid in rabbit aqueous humor following single dose of 6 different bimatoprost formulations are summarized in FIG. 1 and Table 2 below.

TABLE 2

| Formulation | Aqueous Humor[a] (ng/mL) |
| --- | --- |
| 1. 0.03% Bimatoprost (50 ppm BAK) Control | 51.0 ± 9.4 |
| 2. 0.03% Bimatoprost - 200 ppm BAK | 87.2 ± 19.0* |
| 3. 0.03% Bimatoprost - 0.015% TPGS (no preservative) | 26.1 ± 3.3* |
| 4. 0.03% Bimatoprost - 0.2% TPGS (no preservative) | 22.9 ± 3.2* |
| 5. 0.03% Bimatoprost - 0.4% TPGS (no preservative) | 19.3 ± 5.6* |
| 6. 0.03% Bimatoprost - 1.0% TPGS (no preservative) | 15.4 ± 3.3* |

[a]Mean ± SD. Per formulation, N = 3 rabbits (6 eyes).
*Statistically different ($p < 0.05$) compared to 0.03% bimatoprost

Test formulations containing 0.015%, 0.2%, 0.4% and 1.0% TPGS resulted in a lower aqueous humor carboxylic acid concentration compared to Bimatoprost by 52%, 59%, 62% and 72%, respectively. In contrast, 0.03% Bimatoprost containing 200 ppm BAK resulted in 57% higher aqueous humor AGN 191522 concentration compared to Bimatoprost (50 ppm BAK).

While not intending to limit the scope of the invention in any way, or be bound by theory, compared to the Bimatoprost control, formulations containing TPGS resulted in decrease bimatoprost permeability. In contrast, formulations with higher BAK resulted in higher permeability.

## EXAMPLE 3

Formulations containing 0.268% sodium phosphate dibasic heptahydrate, 0.014% citric acid, 0.83% sodium chloride, with the pH adjusted to 7.3 in qs water, and the amounts of bimatoprost, BAK, and EDTA listed in Table 3 below were prepared by conventional methods well known in the art.

US 7,851,504 B2

5

TABLE 3

| Formulation |
| --- |
| A. 0.03% Bimatoprost (50 ppm BAK) - Control |
| B. 0.015% Bimatoprost (50 ppm BAK) |
| C. 0.015% Bimatoprost (50 ppm BAK) 0.03% EDTA |
| D. 0.015% Bimatoprost (200 ppm BAK) |
| E. 0.015% Bimatoprost (200 ppm BAK) 0.03% EDTA |
| F. 0.015% Bimatoprost (50 ppm BAK) 0.015% EDTA |
| G. 0.015% Bimatoprost (200 ppm BAK) 0.015% EDTA |
| H. 0.015% Bimatoprost (125 ppm BAK) |
| I. 0.015% Bimatoprost (125 ppm BAK) 0.03% EDTA |
| J. 0.015% Bimatoprost (125 ppm BAK) 0.015% EDTA |
| K. 0.015% Bimatoprost (150 ppm BAK) |
| L. 0.015% Bimatoprost (150 ppm BAK) 0.1% EDTA |
| M. 0.015% Bimatoprost |
| N. 0.03% Bimatoprost |

EXAMPLE 4

The effect of benzalkonium chloride (BAK) and ethylene-
diaminetetraacetic acid (EDTA) on bimatoprost permeability
across primary culture of rabbit corneal epithelial cell layers
(RCECL). Corneal epithelial cells were harvested from New
Zealand White rabbits and cultured on Transwell™ filters
until confluency (Day 5). For the transport experiment, cells
were first equilibrated in transport buffer for 1 hour at 37° C.
Dosing solution containing 0.015% or 0.03% bimatoprost
with varying concentrations of BAK and EDTA was then
applied to the apical compartment of the Transwell™ (2
cultures; n=3-4 per culture) and the cells were incubated at
37° C. At 30, 60, 90 and 120 minutes postdose, 200 μL

6

samples were taken from the basolateral chamber for apical to
basolateral (AB) transport. The samples were analyzed by a
liquid chromatography tandem mass spectrometry (LC-MS/
MS) method with quantitation range of 1-600 ng/mL.

The results are presented in FIG. 2.

EXAMPLE 5

A drop of formulation J is administered once daily topi-
cally to the eye of a person suffering from glaucoma. After a
few hours, intraocular pressure drops more and less hyper-
emia is observed than would be observed for formulation A.
Lowered intraocular pressure persists for as long as the treat-
ment continues.

What is claimed is:

**1**. A composition having a pH of about 7.3 which consists
essentially of about 0.01% bimatoprost, about 200 ppm ben-
zalkonium chloride, a phosphate buffer, NaCl, and water,
wherein said composition is an aqueous liquid which is for-
mulated for ophthalmic administration.

**2**. A composition having a pH of about 7.3 which com-
prises about 0.01% bimatoprost, about 200 ppm benzalko-
nium chloride, citric acid monohydrate, a phosphate buffer,
and NaCl wherein said composition is an aqueous liquid
which is formulated for ophthalmic administration.

**3**. A composition having a pH of about 7.3 which com-
prises about 0.01% bimatoprost, 200 ppm benzalkonium
chloride, about 0.014 citric acid monohydrate, a phosphate
buffer, NaCl, and water wherein said composition is an aque-
ous liquid which is formulated for ophthalmic administration.

\*    \*    \*    \*    \*



US008278353B2

(12) **United States Patent**
    Chang et al.

(10) **Patent No.:**     **US 8,278,353 B2**
(45) **Date of Patent:**     *Oct. 2, 2012**

(54) **ENHANCED BIMATOPROST OPHTHALMIC SOLUTION**

(75) Inventors: **Chin-Ming Chang**, Tustin, CA (US);
    **James N. Chang**, Newport Beach, CA
    (US); **Rhett M. Schiffman**, Laguna
    Beach, CA (US); **R. Scott Jordan**,
    Trabuco Canyon, CA (US); **Joan-En
    Chang-Lin**, Tustin, CA (US)

(73) Assignee: **Allergan, Inc.**, Irvine, CA (US)

( * ) Notice:    Subject to any disclaimer, the term of this
    patent is extended or adjusted under 35
    U.S.C. 154(b) by 0 days.

    This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/370,574**

(22) Filed:    **Feb. 10, 2012**

(65)         **Prior Publication Data**

    US 2012/0142783 A1    Jun. 7, 2012

         **Related U.S. Application Data**

(63) Continuation of application No. 12/965,514, filed on
    Dec. 10, 2010, which is a continuation of application
    No. 11/083,261, filed on Mar. 16, 2005, now Pat. No.
    7,851,504.

(51) **Int. Cl.**
    *A61K 31/19*      (2006.01)
    *A61K 31/215*     (2006.01)

(52) **U.S. Cl.** ........................................ 514/530; 514/573

(58) **Field of Classification Search** .................. 514/530,
                                                514/573
    See application file for complete search history.

(56)           **References Cited**

           U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,055,602 | A | 10/1977 | Nelson |
| 4,100,192 | A | 7/1978 | Morozowich |
| 4,122,282 | A | 10/1978 | Nelson |
| 4,123,441 | A | 10/1978 | Johnson |
| 4,128,577 | A | 12/1978 | Nelson |
| 4,171,331 | A | 10/1979 | Biddlecom |
| 4,183,870 | A | 1/1980 | Caton |
| 4,303,796 | A | 12/1981 | Nelson |
| 4,382,953 | A | 5/1983 | Ishii |
| 4,543,353 | A | 9/1985 | Faustini |
| 4,599,353 | A | 7/1986 | Bito |
| 4,812,457 | A | 3/1989 | Narumiya |
| 4,994,274 | A | 2/1991 | Chan |
| 5,034,413 | A | 7/1991 | Chan |
| 5,281,591 | A | 1/1994 | Burke |
| 5,352,708 | A | 10/1994 | Woodward |
| 5,474,979 | A | 12/1995 | Ding |
| 5,510,383 | A | 4/1996 | Bishop |
| 5,545,665 | A | 8/1996 | Burk |
| 5,587,391 | A | 12/1996 | Burk |
| 5,607,978 | A | 3/1997 | Woodward |
| 5,688,819 | A | 11/1997 | Woodward |
| 6,403,649 | B1 | 6/2002 | Woodward |
| 6,596,765 | B2 | 7/2003 | Ueno |

| | | | |
|---|---|---|---|
| 6,646,001 | B2 | 11/2003 | Hellberg |
| 6,743,439 | B1 | 6/2004 | Castillo |
| 6,933,289 | B2 | 8/2005 | Lyons |
| 8,017,655 | B2 | 9/2011 | Woodward |
| 2002/0103255 | A1 | 8/2002 | Hellberg |
| 2004/0029771 | A1 | 2/2004 | Rigdon |
| 2004/0115234 | A1 | 6/2004 | Gewirtz |
| 2005/0004074 | A1 | 1/2005 | Lyons |
| 2005/0276867 | A1 | 12/2005 | Lyons |

         FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2144967 | 3/1994 |
| CA | 2498233 | 3/2004 |
| DE | 2721534 | 12/1977 |
| EP | 0093380 | 11/1983 |
| EP | 0102230 | 3/1984 |
| EP | 0098141 | 11/1984 |
| EP | 0253094 | 1/1988 |
| EP | 0364417 | 4/1990 |
| EP | 0453127 | 10/1991 |
| FR | 2239458 | 2/1975 |
| FR | 2312240 | 12/1976 |
| FR | 2386523 | 11/1978 |
| FR | 2402644 | 4/1979 |
| JP | S49-069636 | 7/1974 |
| JP | S62-215537 | 9/1987 |
| LU | 68940 | 12/1973 |
| WO | WO 90-02553 | 3/1990 |
| WO | 92-008465 | 5/1992 |
| WO | WO 94-06433 | 3/1994 |
| WO | 2002-007731 | 1/2002 |
| WO | WO 2004-013119 | 2/2004 |

           OTHER PUBLICATIONS

Burstein, Neal L. et al., "Electrophysiologic and Morphologic Effects
of Ophthalmic Preparations on Rabbit Cornea Epithelium," Invest.
Ophthalmol. Visual Sci., vol. 16, No. 10, 899-911, Oct. 1977.
Eisenberg, Dan et al., "Bimatoprost and Travoprost: A Review of
Recent Studies of Two New Glaucoma Drugs", Survey of Ophthalmology, vol. 47, sup. 1, SI05-S115, Aug. 2002.
Green, Keith et al., "Prednisolone Phosphate Penetration Into and
Through the Cornea," Investigative Ophthalmology, vol. 13, No. 4,
316-319, Apr. 1974.
LUMIGAN® monograph in the 57th PDR (2003).
Mealy, N.E. et al., "Ophthalmic Drugs," Drugs of the Future, 27(5),
509-523, 2002.
Medical Review, Application No. 21-275, Center for Drug Evaluation and Research, 2001.
Pfister, Roswell R. et al., "The Effects of Ophthalmic Drugs,
Vehicles, and Preservatives on Corneal Epithelium: a Scanning Electron Microscope Study," Effects of Ophthalmic Drugs, vol. 15, No. 4,
246-259, Apr. 1976.

           (Continued)

*Primary Examiner* — Zohreh Fay

(74) *Attorney, Agent, or Firm* — John E. Wurst; Doina G.
Ene; Allergan, Inc.

(57)           **ABSTRACT**

A composition comprising from 0.005% to 0.02% bimatoprost by weight and from 100 ppm to 250 ppm benzalkonium
chloride, wherein said composition is an aqueous liquid
which is formulated for ophthalmic administration is disclosed herein.

**30 Claims, 2 Drawing Sheets**

US 8,278,353 B2

Page 2

OTHER PUBLICATIONS

Remington, The Science and Practice of Pharmacy, 20th ed. at 831 (2000).

Remington, The Science and Practice of Pharmacy, 21st ed. at 864 (2005).

Stewart, William et al., "Corneal Punctate Staining with Latanoprost, Bimatoprost, and Travoprost in Healthy Subjects", J. Glaucoma, vol. 12, No. 6, 475-479, Dec. 2003.

XALATAN® monograph in the 59th PDR (2005).

Alm, Albert et al., "Uveoscleral Outflow—A Review", Exp. Eye Res., vol. 88(4), pp. 760-768 (Apr. 2009).

Answer, Defenses and Counterclaims of Defendants Apotex Inc. and Apotex Corp., Civil Action No. 10-CV-681, Allergan, Inc. and Duke University v. Apotex Inc. and Apotex Corp., 20 pages (Nov. 22, 2010).

Bean, Gerald et al., "Commercially Available Prostaglandin Analogs for the Reduction of Intraocular Pressure: Similarities and Differences", Survey of Ophthalmology, vol. 53, Suppl. 1, pp. S69-S84 (Nov. 2008).

Berglund, Barbara et al., Investigation of Structural Analogs of Prostaglandin Amides for Binding to and Activation of $CB_1$ and $CB_2$ Cannabinoid Receptors in Rat Brain and Human Tonsils, Adv. Exp. Med. Bio., vol. 469, pp. 527-533 (1999).

Bito, Laszlo et al., The Ocular Pharmacokinetics of Eicosanoids and Their Derivatives. 1. Comparison of Ocular Eicosanoid Penetration and Distribution Following the Topical Application of $PGF_{2\alpha}$, $PGF_{2\alpha}$-1-methyl Ester, and $PGF_{2\alpha}$-1-Isopropyl Ester, Exp. Eye Res., vol. 44, pp. 217-226 (1987).

Bito, Laszlo, "Prostaglandins, Other Eicosanoids, and Their Derivatives as Potential Antiglaucoma Agents", Glaucoma: Applied Pharmacology in Medical Treatment, pp. 477-505 (1984).

Boyd, James, "Quantitative Comparison of Methods of Administering Physostigmine", Archives Ophthalmology, vol. 30(4), pp. 521-525 (1943).

Burstein, Neal, "Preservative Alteration of Corneal Permeability in Humans and Rabbits", Investigative Ophthalmology & Visual Science, vol. 25, No. 12, pp. 1453-1457 (Dec. 1984).

Cadet, Patrick et al., "Molecular identification and Functional Expression of μ 3, a Novel Alternatively Spliced Variant of the Human μ Opiate Receptor Gene", J. Immunol., vol. 170(10), pp. 5118-5123 (May 15, 2005).

Camber, Ola et al., "Influence of Some Preservatives on the Corneal Permeability of Pilocarpine and Dexamethasone, in Vitro", International Journal of Pharmaceutics, vol. 39, pp. 229-234 (1987).

Camras, Carl et al., "Detection of the Free Acid of Bimatoprost in Aqueous Humor Samples From Human Eyes Treated with Bimatoprost Before Cataract Surgery", Ophthalmology, vol. 111, No. 12, pp. 2193-2198 (2004).

Camras, Carl et al., "Bimatoprost, the Prodrug of a Prostaglandin Analogue", Br. J. Ophthalmol., vol. 92(6), pp. 862-863 (Jun. 2008).

Cantor, Louis et al., "Levels of Bimatoprost Acid in the Aqueous Humor After Bimatoprost Treatment of Patients With Cataract", Br. J. Ophthalmol., vol. 91, No. 5, pp. 629-632 (2007).

Cantor, Louis, "Reply—Bimatoprost, the Prodrug of a Prostaglandin Analogue", Br. J. Ophthalmol., vol. 92, pp. 863-864 (2008).

Collin, Barry, "Ultrastructural Changes to Corneal Stromal Cells Due to Ophthalmic Preservatives", ACTA Ophthalmalogica, vol. 64, pp. 72-78 (1986).

Complaint for Patent Infringment: Civil Action No. 1:10-CV-681; Allergan, Inc. And Duke University V. Apotex Inc. And Apotex Corp., 12 pages, Filed Sep. 8, 2010.

Crowston, Jonathan et al., "Effect of Bimatoprost on Intraocular Pressure in Prostaglandin FP Receptor Knockout Mice", Investigative Ophthalmology & Visual Science, vol. 46, pp. 4571-4577 (2005).

Curri, Joanne (Hi-Tech Pharmacal Co., Inc., Amityville, NY). Paragraph IV Letter to: Allergan, Inc. (Irvine, CA). 12 pages, Dec. 23, 2011.

Davies, Sean et al., "Hydrolysis of Bimatoprost (Lumigan) to its Free Acid by Ocular Tissue in Vitro", J. Ocul. Pharniacol. Ther., vol. 19(1), pp. 45-54 (Feb. 2003).

Declaration of Larry Wheeler, Ph.D., 30 pages, Dec. 14, 2010.

Faulkner, Robert et al., "Aqueous Humor Concentrations of Bimatoprost Free Acid, Bimatoprost and Travoprost Free Acid in Cataract Surgical Patients Administered Multiple Topical Ocular Doses of LUMIGAN® or TRAVATAN®", Journal of Ocular Pharmacology and Therapeutics, vol. 26, No. 2, pp. 147-156 (2010).

FDA Label for Approved NDA 22-184 of Lumigan 0.01% and Lumigan 0.03%, Aug. 31, 2010.

Frenkel, Ronald et al., "Evaluation of Circadian Control of Intraocular Pressure After a Single Drop of Bimatoprost 0.03% or Travoprost 0.004%", Curr. Med. Res. Opin., vol. 24(4), pp. 919-923 (2008).

Hellberg, Mark et al., "The Hydrolysis of the Prostaglandin Analog Prodrug Bimatoprost to 17-Phenyl-trinor $PGF_{2\alpha}$ by Human and Rabbit Ocular Tissue", J. Ocular Pharmacol. Ther., vol. 19, No. 2, pp. 97-103 (2003).

Higaki, Kazutaka et al., "Estimation and Enhancement of in Vitro Corneal Transport of S-1033, a Novel Antiglaucoma Medication", International Journal of Pharmaceutics 132, pp. 165-173 (1996).

Ho, Norman et al., "Physical Model Approach to the Design of Drugs with Improved Intestinal Absorption", in Design of Biopharmaceutical Properties Through Prodrugs & Analogs, pp. 136-227 (Edward B. Roche ed., 1977).

Huang, Andrew et al., "Paracellular Permeability of Corneal and Conjunctival Epithelia", Investigative Opthalmology & Visual Sci., vol. 30, No. 4, pp. 684-289 (1989).

Jordan, Bryen et al., "G-Protein-Coupled Receptor Heterodimerization Modulates Receptor Function", Nature, vol. 399(6737), pp. 697-700 (Jun. 17, 1999).

Katz, L. Jay et al., "Comparison of Human Ocular Distribution of Bimatoprost and Latanoprost", Jul. 9, 2010 (manuscript submitted).

Kaur, Indu Pal et al., "Penetration Enhancer and Ocular Bioadhesives: Two New Avenues for Ophthalmic Drug Delivery", Drug Development and Industrial Pharmacy, vol. 28(4), pp. 353-369 (2002).

Keller, N. et al., "Increased Corneal Permeability Induced by the Dual Effects of Transient Tear Film Acidification and Exposure to Benzalkonium Chloride", Exp. Eye Res., vol. 30, pp. 203-210 (1980).

Lee, Vincent et al., "Improved Ocular Drug Delivery with Prodrugs", in Prodrugs, Topical & Ocular Drug Delivery, pp. 221-297 (1992).

Lee, Vincent et al., "Review: Topical Ocular Drug Delivery: Recent Developments and Future Challenges", Journal of Ocular Pharmacology, vol. 2, No. 1, pp. 67-108 (1986).

Liang, Y. et al., "Identification and Pharmacological Characterization of the Prostaglandin FP Receptor and FP Receptor Variant Complexes", Br. J. Pharmacol., vol. 154, pp. 1079-1093 (2008).

Lumigan®, 6 Pages, Jul. 2003.

Lumigan® 0,1 mg/ml, 3 pages, Jan. 2010.

Lyle, Donald, "Early Ocular Manifestations in the Laurence-Moon-Biedl Syndrome", Society Proceedings, J. Ophthalmology, vol. 29, pp. 939-946 (1946).

Maxey, Kirk et al., "The Hydrolysis of Bimatoprost in Corneal Tissue Generates a Potent Prostanoid FP Receptor Agonist", Surv. Ophthalmol., vol. 47, Suppl. 1, pp. S34-S40 (Aug. 2002).

Miller, William et al., "Biological Activities of 17-Phenyl-18, 19,20-Trinorprostaglandins", Prostaglandins, vol. 9, No. 1, pp. 9-18 (Jan. 1975).

Noecker, Robert et al., "Corneal and Conjunctival Changes Caused by Commonly Used Glaucoma Medications", Cornea, vol. 23, No. 5, pp. 490-496 (Jul. 2004).

Okabe, Komei et al., "Effect of Benzalkonium Chloride on Transscleral Drug Delivery", Investigative Ophthalmology & Visual Sci., vol. 46, pp. 703-708 (2005).

Pfeiffer, N. et al., "New Development in Glaucoma Drug Therapy", Ophthalmology, vol. 89, pp. W1-W13 (1992).

Poyer, John et al., "Prostaglandin $F_{2\alpha}$ Effects on Isolated Rhesus Monkey Ciliary Muscle", Invest. Ophthalmol. Vis. Sci., vol. 36(12), pp. 2461-2465 (Nov. 1995).

Remington's Pharmaceutical Sciences 1501 (15th ed. 1975).

Response from the Food and Drug Administration to Pfizer's Citizen Petition and a Supplement at 23 (Exhibit 5), 27 pages (Aug. 31, 2010).

Resul, Bahram et al., "Phenyl-Substituted Prostaglandins: Potent and Selective Antiglaucoma Agents", J. Med. Chem., vol. 36(2), pp. 243-248 (Jan. 22, 1993).

US 8,278,353 B2

Page 3

Romano, Maria et al., "Evidence for the Involvement of Cannabinoid $CB_1$ Receptors in the Bimatoprost-Induced Contractions on the Human Isolated Ciliary Muscle", Invest. Ophthalmol. Vis. Sci., vol. 48(8), pp. 3677-3682 (Aug. 2007).

Sandoz Paragraph 4 Letter, 19 pages, dated Jul. 11, 2011.

Schumer, Robert et al., "Medical Treatment of Glaucoma", Ophthalmology, vol. 2, pp. 140-150 (1991).

Sharif, N. A. et al., "Ocular Hypotensive FP Prostaglandin (PG) Analogs: PG Receptor Subtype Binding Affinities and Selectivities, and Agonist Potencies at FP and Other PG Receptors in Cultured Cells", J. Ocul. Pharmacol. Ther., vol. 19(6), vol. 501-15 (Dec. 2003).

Sharif, Najam et al., "Update and Commentary on the Pro-Drug Bimatoprost and a Putative Prostamide Receptor", Expert Rev. Ophthal., vol. 4(5), pp. 477-489 (2009).

Sharif, Najam et al., "Human Trabecular Meshwork Cell Responses Induced by Bimatoprost, Travoprost, Unoprostone, and Other FP Prostaglandin Receptor Agonist Analogues", Invest. Ophthalmol. Vis. Sci., vol. 44, pp. 715-721 (2003).

Sharif, Najam et al., Human Ciliary Muscle Cell Responses to FP Class Prostaglandin Analogs: Phosphoinositide Hydrolysis, Intracellular $Ca^{2+}$ Mobilization and MAP Kinase Activation, J. Ocul. Pharmacol. Ther., vol. 19, pp. 437-455 (2003).

Sharif, Najam et al., "Cat Iris Sphincter Smooth-Muscle Contraction: Comparison of FP-Class Prostaglandin Analog Agonist Activities", J. Ocul. Pharmacol. Ther., vol. 24(2), pp. 152-163 (Apr. 2008).

Sjoquist, Birgitta et al., "Pharmacokinetics of Latanoprost in the Cynomolgus Monkey. 3rd Communication: Tissue Distribution After Topical Administration on the Eye Studied by Whole Body Autoradiography", Glaucoma Research Laboratories, Arzneim-Forsch/Drug Res., vol. 49, pp. 240-249 (1999).

Sjoquist, Birgitta et al., "Ocular and Systemic Pharmacokinetics of Latanoprost in Humans", Surv. Ophthalmol., vol. 47 (Supp. 1), pp. S6-S12 (2002).

Spada, Clayton et al., "Bimatoprost and Prostaglandin $F_{2\alpha}$ Selectively Stimulate Intracellular Calcium Signaling in Different Cat Iris Sphincter Cells", Exp. Eye. Res., vol. 80(1), pp. 135-145 (Jan. 2005).

Stamer, W. Daniel et al., "Cellular Basis for Bimatoprost Effects on Human Conventional Outflow", Invest. Ophthalmol. Vis. Sci., vol. 51(10), pp. 5176-5181 (Oct. 2010).

Stjernschantz, Johan, "Studies on Ocular Inflammation and Development of a Prostaglandin Analogue for Glaucoma Treatment", Exp. Eye Res., vol. 78(4), pp. 759-766 (Apr. 2004).

Stjernschantz, Johan, "From $PGF_{2\alpha}$-Isopropyl Ester to Latanoprost: A Review of the Development of Xalatan: the Proctor Lecture", Invest. Ophthalmol. Vis. Sci., vol. 42(6), pp. 1134-1145 (May 2001).

Van Alphen, G.W.H.M. et al., "The Effect of Prostaglandins on the Isolated Internal Muscles of the Mammalian Eye, Including Man", Documenta Ophthalmologica, vol. 42, No. 2, pp. 397-415 (1977).

Vielhauer, George et al., "Cloning and Localization of $hFP_s$: a Six-Transmembrane mRNA Splice Variant of the Human FP Prostanoid Receptor", Arch. Biochem. Biophys., vol. 421(2), pp. 175-185 (Jan. 15, 2004).

White, Julia et al., "Heterodimerization is Required for the Formation of a Functional $GABA_B$ Receptor", Nature, vol. 396(6712), pp. 679-682 (Dec. 17, 1998).

Wilson, Stephen et al., "Dimerization of the Human Receptors for Prostacyclin and Thromboxane Facilitates Thromboxane Receptor-Mediated cAMP Generation", J. Biol. Chem., vol. 279(51 ), pp. 53036-53047 (Dec. 17, 2004).

Woodford, Roger et al., "Penetration Enhancers and the Percutaneous Absorption of Drugs : An Update", J. Toxicology-Cut. & Ocular Toxicology, vol. 5(3), pp. 167-177 (1986).

Woodward, David et al., "Bimatoprost Effects on Aqueous Humor Dynamics in Monkeys", J. Ophthalmol., 5 pages (2010).

Woodward, David et al., The Pharmacology of Bimatoprost (Lumigan™), Surv. Ophthalmol., vol. 45(Suppl 4), pp. S337-S345 (May 2001).

Woodward, David et al., "Bimatoprost: A Novel Antiglaucoma Agent", Cardiovasc. Drug Rev., vol. 22(2), pp. 103-120 (2004).

Woodward, David et al., "Pharmacological Characterization of a Novel Anti-Glaucoma agent", J. Pharmacol. Exp. Ther., vol. 305, pp. 772-785 (2003).

Woodward, David et al., "Identification of an Antagonist That Selectively Blocks the Activity of Prostamides (Prostaglandin Ethanolamides) in the Feline Iris." Br. J. Pharmacol, vol. 150, pp. 342-352 (2007).

Xalatan® Eye Drops, 3 pages, Retrieval Date : Oct. 2, 2010, http://home.intekom.com/pharm/pharmaca/xalatan.html.

Yamaji, Kazutsuna et al., "Prostaglandins $E_1$ and $E_2$, but not $F_{2\alpha}$ or Latanoprost, Inhibit Monkey Ciliary Muscle Contraction", Curr. Eye Res., vol. 30(8), pp. 661-665 (2005).

Asbjorn Tonjum, Jan. 22, 1975, Permeability of Rabbit Corneal Epithelium to Horseradish Peroxidase After the Influence of Benzalkonium Chloride, Acta Ophthalmologica, 53, 335-347.

Bito, 1985, Biological Protection with Prostanoids, CRC Press, Inc., 1, 231-252, Cohen, M. M., ed., Boca Raton, Fla., CRC Press Inc.

Bito, 1987, Prostaglandins, Old Concepts and New Perspectives, Archives of Opthalmology, 105, 1036-1039.

C.A. Lawrence, 1955, An Evaluation of Chemical Preservatives for Ophthalmic Solutions, J Am Pharm Assoc, 44 (8), 457.

C.A. Lawrence, 1955, Chemical Preservatives for Ophthalmic Solutions, Am J Ophthal, 39, 385.

C.B. Camras, Dec. 1977, Reduction of Intraocular Pressure by Prostaglandins Applied topically to the Eyes of Conscious Rabbits, Investigative Ophthalmology & Visual Science, 16(12), 1125-1134.

C.B. Camras, 1981, Reduction of Intraocular Pressure in Normal and Glaucomatous Primate (Aotus Trivirgatus) Eyes by Topically Applied Prostaglandin F2a, Current Eye Research, 1 (4), 205-209.

C.S. O'Brien, 1941, Doryl in the Treatment of Glaucoma Simplex, Tran Am Ophthal Soc, 39, 175.

C.S. O'Brien, 1942, Carbaminoyl-choline Chloride in the Treatment of Glaucoma Simplex, Arch Ophthal, 27, 253.

Center for Drug Evaluation and Research, Summary Review of Application No. 22-184 (Lumigan 0.01%) (Jul. 2010).

David Maurice, 1995, The Effect of the Low Blink Rate in Rabbits on Topical Drug Penetration, J Ocular Pharmacology and Therapeutics, 11(3), 297-304.

Diane Tang-Liu, 1994, Effects of Four Penetration Enhancers on Corneal Permeability of Drugs in Vitro, Journal of Pharmaceutical Sciences, 83 (1), 85-90.

Dwight Deardorff, 1975, Ophthalmic Preparation, Remington's Pharmaceutical Sciences, 15th ed., 1488.

F.A. Stern, 1982, Comparison of the Hypotensive and Other Ocular Effects of Prostaglandins E2 and F2a on Cat and Rhesus Monkey Eyes, Invest Ophthal Visual Sci, 22, 588-598.

F.N. Martin, 1950, Preparation of Ophthalmic Solutions With Special Reference to Hydrogen Ion Concentration and Tonicity, Arch Ophthal, 44, 561.

George Grass, Jan. 1988, Mechanisms of Corneal Drug Penetration I: In Vivo and In Vitro Kinetics, Journal of Pharmaceutical Sciences, 77 (1), 3-14.

Giuseppe Giuffre, 1985, The Effects of Prostaglandin F2a in the Human Eye, Graefe's Archive Clin. & Exper. Ophthal., 222, 139-141.

H.C. Arndt, 1977, The Synthesis and Biological Activity of Prostaglandin Analogs Containing Spirocyclic Rings, Prostaglandins, 13 (5), 837-843.

Handbook of Pharmaceutical Excipients, Monographs for Water, Sodium Phosphate, Sodium Chloride, and Citric Acid Monohydrate (1994).

Harvey Dubiner, 2001, Efficacy and Safety of Bimatoprost in Patients With Elevated Intraocular Pressure: a 30-Day Comparison With Latanoprost, Surv. Ophthalmol, 45 (4), S353-S560.

Hitoshi Sasaki, 1995, Ocular Permeability of FITC-Dextran with Absorption Promoter for Ocular Delivery of Peptide Drug, J Drug Target, 3, 129.

Hitoshi Sasaki, 1995, Ophthalmic Preservatives As Absorption Promoters for Ocular Drug Delivery, J. Pharm. Pharmacol., 47, 703-707.

Hitoshi Sasaki, 2000, Modification of Ocular Permeability of Peptide Drugs by Absorption Promoters, Biol Pharm Bull, 23(12), 1524.

J. Thygesen, 2000, Short-term Effect of Latanoprost and Timolol Eye Drops on Tear Fluid and the Ocular Surface in Patients with Primary Open-Angle Glaucoma and Ocular Hypertension, Acta Ophthal Scand, 78, 37-41.

US 8,278,353 B2

Page 4

Jay Katz, 2010, Twelve-Month, Randomized, Controlled Trial of Bimatoprost 0.01%, 0.0125%, and 0.03% in Patients with Glaucoma or Ocular Hypertension, Am J Ophthalmology, 149(4), 661-671.

Ke-Ping Xu, 2000, Corneal Organ Culture Model for Assessing Epithelial Responses to Surfactants, Tox. Sci., 58, 306.

Keith Green, 1971, Influence of Various Agents on Corneal Permeability, American Journal of Ophthalmology, 72, 897-905.

Martina Scholz, 2002, Pilocarpine Permeability Across Ocular Tissues and Cell Cultures: Influence of Formulation Parameters, Journal of Ocular Pharmacology and Therapeutics, 18 (5), 455-468.

Michael Brown, 1967, Control of Contamination in Ophthalmic Solutions, Proc. R. Sco. Med., 60, 354-357.

Milton Skolaut, 1948, Ophthalmic Medication, Bull Am Soc Hosp Pharm, 5(4), 172.

Modell Walter, 1947, Pharmacologic Action of Some Ophthalmic Drugs, Arch Ophthal, 37, 160.

Neal Burstein, 1980, Preservative Cytotoxic Threshold for Benzalkonium Chloride and Chlorhexidine Digluconate in Cat and Rabbit Corneas, Invest. Ophthal. & Visual Sci., 19 (3), 308-313.

Nilsson, 1987, PGF 2a Increases Uveoscleral Outflow, Invest. Ophthalmol. Vis. Sci, 28 (Suppl), 284.

P. De Clercq, 1976, Cyclopentanones-VXI.., Prostaglandin Synthesis Involving Catalytic Hydrogenation of 2,3-Dialky1-4-Hydroxy-2-Cyclopentenones, Tetrahedron, 32, 2747-2752.

Paul Ashton, 1991, Formulation Influence on Conjunctival Penetration of Four Beta Blockers in the Pigmented Rabbit: A Comparison with Corneal Penetration, Pharmaceutical Research, 8 (9), 1166-1174.

Physicians' Desk Reference, 56th ed., pp. 212-213, 543, 553-554, 2864-65 (2002).

Physicians' Desk Reference, 59th ed., pp. 555-556 (2005).

Pierre-Jean Pisella, 2004, Conjunctival Proinflammatory and Proapoptotic Effects of Latanoprost and Preserved and Unpreserved Timolol: An Ex Vivo and In Vitro Study, Investigative Ophthalmology & Visual Science, 45, 1360-1368.

Pieter Van Der Bijl, 2001, Effects of Three Penetration Enhancers on Transcorneal Permeation of Cyclosporine, Cornea, 20 (5), 505-508.

R. Roggeband 2000, Eye Irritation in Rabbit and Man After Single Applications of Equal Volumes of Undiluted Model Liquid Detergent Products, Food & Chem Toxic, 38, 727.

Richard Parrish, 2003, A Comparison of Latanoprost, Bimatoprost, and Travoprost in Patients With Elevated Intraocular Pressure: A 12-Week, Randomized, Masked Evaluator Multicenter Study, Am J Ophthalmol, 135, 688-703.

Robert Laibovitz, 2001, Comparison of the Ocular Hypotensive Lipid AGN 192024 With Timolol, Arch Ophthal, 119, 994.

Robert Noecker, 2003, Bimatoprost/Latanoprost Study Group. A Six Month Randomized Clinical Trial Comparing the Intraocular Pressure Lowering Efficacy of Bimatoprost and Latanoprost in Patients With Ocular Hypertension or Glaucoma, Am J Ophthalm, 135, 55-63.

Samir Podder, 1992, Improving the Safety of Topically Applied Timolol in the Pigmented Rabbit Through Manipulation of Formulation Composition, Exp. Eye Res., 54, 747-757.

Samuel McPherson, 1949, Self-Sterilizing Ophthalmic Solutions, Am J Ophthal, 32, 675.

Starr, 1971, Further Studies on the Effects of Prostagladin on Intraocular Pressure in the Rabbit, Exp. Eye Res., 11, 170-177.

Stefano Gandolfi, 2001, Three-month Comparison of Bimatoprost and Latanoprost in Patients With Glaucoma and Ocular Hypertension, Adv. Ther., 18, 110-121.

Thomas Honohan, 1980, Duration of Activity of the Acid, Methyl Ester and Amide of an Orally Active Platelet Aggregation Inhibitory Prostanoid in the Rat, Prostoglandins, 19, 139.

Thomas Walter, 2004, 24-Hour IOP Control with Once-daily Bimatoprost, Timolol Gel-forming Solution, or Latanoprost: A 1-Month, Randomized, Comparative Clinical Trial, Survey of Ophthalmology, 49(1), S26-S35.

William Mullen, 1973, Ophthalmic Preservatives and Vehicles, Surv Ophthal, 17(6), 469.

Fig. 1

Fig. 2



US 8,278,353 B2

**1**

# ENHANCED BIMATOPROST OPHTHALMIC SOLUTION

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application. Ser. No. 12/965,514, filed Dec. 10, 2010 which is a continuation of U.S. patent application Ser. No. 11/083,261, filed Mar. 16, 2005, which is incorporated herein by reference in its entirety.

## FIELD OF THE INVENTION

This invention relates to pharmaceutical compositions comprising bimatoprost.

## BACKGROUND OF THE INVENTION

### Description of Related Art

Bimatoprost, shown below, is a prostamide marketed commercially for the treatment of glaucoma and ocular hypertension.



Formula I

Benzalkonium chloride (BAK) is a preservative used in many commercial ophthalmic products to prevent microbial contamination in multi-use products. The commercial eye drops (Bimatoprost, Allergan, Inc., Irvine, Calif.) contain 0.03% bimatoprost and 0.005% BAK. Although no other prostamides are currently marketed for the treatment of glaucoma, several prostaglandin analogs are commercially available which use BAK as a preservative. These include latanoprost (Xalatan), travoprost (Travatan), and unoprostone isopropyl (Rescula). These require significantly more BAK, from 150-200 ppm, to meet antimicrobial effectiveness tests in the United States and Europe.

U.S. Pat. No. 6,596,765 B2 discloses a composition comprising 0.005% or 0.0005% latanoprost and 0.2 mg/mL BAK.

U.S. Pat. No. 6,646,001 B2 discloses compositions comprising 0.03% bimatoprost and 0.01% BAK or "0.01%+5% excess" BAK.

## BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. **1** is a plot showing the aqueous humor concentration of the parent acid of bimatoprost after topical administration of several formulations.

FIG. **2** is a plot showing the membrane permeability of bimatoprost in several different formulations.

## DETAILED DESCRIPTION OF THE INVENTION

A composition comprising from 0.005% to 0.02% bimatoprost by weight and from 100 ppm to 250 ppm benzalkonium

**2**

chloride, wherein said composition is an aqueous liquid which is formulated for ophthalmic administration is disclosed herein.

A method which is useful in treating glaucoma or ocular hypertension related thereto is also disclosed herein.

An aqueous liquid which is formulated for ophthalmic administration is formulated such that it can be administered topically to the eye. The comfort should be maximized as much as possible, although sometimes formulation considerations (e.g. drug stability) may necessitate less than optimal comfort.

In certain compositions the concentration of bimatoprost is from 0.01% to 0.02%. In other compositions the concentration of bimatoprost is from 0.015% to 0.02%.

In certain compositions the concentration of BAK is from 150 ppm to 200 ppm. In other compositions the concentration of BAK is from 150 ppm to 200 ppm. In other compositions the concentration of BAK is from 150 ppm to 250 ppm.

In ophthalmic compositions, a chelating agent may be used to enhance preservative effectiveness. Suitable chelating agents are those known in the art, and, while not intending to be limiting, edetate salts (EDTA) are useful chelating agents.

In certain compositions, concentration of EDTA is at least 0.001%. In other compositions, the concentration of EDTA is at least 0.01%. In other compositions the concentration of EDTA is 0.15% or less. In other compositions the concentration of EDTA is 0.1% or less. In other compositions the concentration of EDTA is 0.05% or less.

Certain compositions comprise from 150 to 250 ppm BAK and an effective amount of EDTA.

As is known in the art, buffers are commonly used to adjust the pH to a desirable range for ophthalmic use. Generally, a pH of around 6-8 is desired, and in certain compositions a pH of 7.4 is desired. Many buffers including salts of inorganic acids such as phosphate, borate, and sulfate are known.

Another commonly used excipient in ophthalmic compositions is a viscosity-enhancing, or a thickening agent. Thickening agents are used for a variety of reasons, ranging from improving the form of the formulation for convenient administration to improving the contact with the eye to improve bioavailability. The viscosity-enhancing agent may comprise a polymer containing hydrophilic groups such as monosaccharides, polysaccharides, ethylene oxide groups, hydroxyl groups, carboxylic acids or other charged functional groups. While not intending to limit the scope of the invention, some examples of useful viscosity-enhancing agents are sodium carboxymethylcellulose, hydroxypropylmethylcellulose, povidone, polyvinyl alcohol, and polyethylene glycol.

In ophthalmic solutions, tonicity agents often are used to adjust the composition of the formulation to the desired isotonic range. Tonicity agents are well known in the art and some examples include glycerin, mannitol, sorbitol, sodium chloride, and other electrolytes.

One composition has a pH of 7.4 and consists essentially of 0.015% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

Another composition has a pH of 7.4 and comprises 0.02% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

Another composition has a pH of 7.4 and consists of 0.01% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

The best mode of making and using the present invention are described in the following examples. These examples are given only to provide direction and guidance in how to make and use the invention, and are not intended to limit the scope of the invention in any way.

US 8,278,353 B2

| 3 | 4 |

One embodiment comprises 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment comprises 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment comprises 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment comprises 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment consists of 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

## EXAMPLE 1

Formulations containing 0.268% sodium phosphate dibasic heptahydrate, 0.014% citric acid, 0.83% sodium chloride, with the pH adjusted to 7.3 in qs water, and the amounts of bimatoprost, BAK, and EDTA listed in Table 1 below were prepared by conventional methods well known in the art.

TABLE 1

| Formulation |
| --- |
| 1. 0.03% Bimatoprost (50 ppm BAK) Control |
| 2. 0.03% Bimatoprost - 200 ppm BAK |
| 3. 0.03% Bimatoprost - 0.015% TPGS (no preservative) |
| 4. 0.03% Bimatoprost - 0.2% TPGS (no preservative) |
| 5. 0.03% Bimatoprost - 0.4% TPGS (no preservative) |
| 6. 0.03% Bimatoprost - 1.0% TPGS (no preservative) |

## EXAMPLE 2

Studies were carried out to determine the effect of benzalkonium chloride (BAK) and d-alpha tocopheryl polyethylene glycol 1000 succinate (TPGS) on ocular absorption of bimatoprost in vivo. For the in vivo study, eighteen female rabbits were given a single 28 µL eyedrop bilaterally and aqueous humor samples were collected (n=3 animals with 6 eyes per formulation) at 60 min postdose. Two rabbits (4 eyes) remained untreated to serve as pre-dose bioanalytical controls. Bimatoprost and its parent carboxylic acid extracted from aqueous humor and in vitro samples were analyzed by a liquid chromatography tandem mass spectrometry (LC-MS/MS) method with a quantitation range of 0.25-60 ng/mL.

Due to extensive metabolism of bimatoprost in rabbit eyes, its parent acid was used as a surrogate for determining ocular absorption of bimatoprost. Concentration of the acid in rabbit aqueous humor following single dose of 6 different bimatoprost formulations are summarized in FIG. 1 and Table 2 below.

TABLE 2

| Formulation | Aqueous Humor[a] (ng/mL) |
| --- | --- |
| 1. 0.03% Bimatoprost (50 ppm BAK) Control | 51.0 ± 9.4 |
| 2. 0.03% Bimatoprost - 200 ppm BAK | 87.2 ± 19.0* |
| 3. 0.03% Bimatoprost - 0.015% TPGS (no preservative) | 26.1 ± 3.3* |
| 4. 0.03% Bimatoprost - 0.2% TPGS (no preservative) | 22.9 ± 3.2* |
| 5. 0.03% Bimatoprost - 0.4% TPGS (no preservative) | 19.3 ± 5.6* |
| 6. 0.03% Bimatoprost - 1.0% TPGS (no preservative) | 15.4 ± 3.3* |

[a]Mean ± SD. Per formulation, N = 3 rabbits (6 eyes).
*Statistically different (p < 0.05) compared to 0.03% Bimatoprost

Test formulations containing 0.015%, 0.2%, 0.4% and 1.0% TPGS resulted in a lower aqueous humor carboxylic acid concentration compared to Bimatoprost by 52%, 59%, 62% and 72%, respectively. In contrast, 0.03% Bimatoprost containing 200 ppm BAK resulted in 57% higher aqueous humor AGN 191522 concentration compared to Bimatoprost (50 ppm BAK).

While not intending to limit the scope of the invention in any way, or be bound by theory, compared to the Bimatoprost control, formulations containing TPGS resulted in decrease bimatoprost permeability. In contrast, formulations with higher BAK resulted in higher permeability.

## EXAMPLE 3

Formulations containing 0.268% sodium phosphate dibasic heptahydrate, 0.014% citric acid, 0.83% sodium chloride, with the pH adjusted to 7.3 in qs water, and the amounts of bimatoprost, BAK, and EDTA listed in Table 3 below were prepared by conventional methods well known in the art.

US 8,278,353 B2

**5**

TABLE 3

Formulation

| | |
|---|---|
| A. | 0.03% Bimatoprost (50 ppm BAK) - Control |
| B. | 0.015% Bimatoprost (50 ppm BAK) |
| C. | 0.015% Bimatoprost (50 ppm BAK) 0.03% EDTA |
| D. | 0.015% Bimatoprost (200 ppm BAK) |
| E. | 0.015% Bimatoprost (200 ppm BAK) 0.03% EDTA |
| F. | 0.015% Bimatoprost (200 ppm BAK) 0.015% EDTA |
| G. | 0.015% Bimatoprost (200 ppm BAK) 0.015% EDTA |
| H. | 0.015% Bimatoprost (125 ppm BAK) |
| I. | 0.015% Bimatoprost (125 ppm BAK) 0.03% EDTA |
| J. | 0.015% Bimatoprost (125 ppm BAK) 0.015% EDTA |
| K. | 0.015% Bimatoprost (150 ppm BAK) |
| L. | 0.015% Bimatoprost (150 ppm BAK) 0.1% EDTA |
| M. | 0.015% Bimatoprost |
| N. | 0.03% Bimatoprost |

EXAMPLE 4

The effect of benzalkonium chloride (BAK) and ethylene-diaminetetraacetic acid (EDTA) on bimatoprost permeability across primary culture of rabbit corneal epithelial cell layers (RCECL). Corneal epithelial cells were harvested from New Zealand White rabbits and cultured on Transwell™ filters until confluency (Day 5). For the transport experiment, cells were first equilibrated in transport buffer for 1 hour at 37° C. Dosing solution containing 0.015% or 0.03% bimatoprost with varying concentrations of BAK and EDTA was then applied to the apical compartment of the Transwell™ (2 cultures; n=3-4 per culture) and the cells were incubated at 37° C. At 30, 60, 90 and 120 minutes postdose, 200 μL samples were taken from the basolateral chamber for apical to basolateral (AB) transport. The samples were analyzed by a liquid chromatography tandem mass spectrometry (LC-MS/MS) method with quantitation range of 1-600 ng/mL.

The results are presented in FIG. 2.

EXAMPLE 5

A drop of formulation J is administered once daily topically to the eye of a person suffering from glaucoma. After a few hours, intraocular pressure drops more and less hyperemia is observed than would be observed for formulation A. Lowered intraocular pressure persists for as long as the treatment continues.

What is claimed is:

**1.** A first composition administered once daily for lowering intraocular pressure in a person with glaucoma or ocular hypertension, the first composition comprising about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride, wherein the first composition lowers intraocular pressure and results in less hyperemia as compared to the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

**2.** The composition of claim **1** wherein the first composition has a pH of about 7.3.

**3.** The composition of claim **1** wherein the first composition comprises 0.01% w/v bimatoprost and 0.02% w/v benzalkonium chloride.

**4.** The composition of claim **1** wherein the first composition has at least one buffering agent selected from the group consisting of dibasic sodium phosphate heptahydrate, citric acid monohydrate and EDTA.

**5.** The composition of claim **1** wherein the first composition is effective in treating glaucoma.

**6**

**6.** The composition of claim **1** wherein the first composition is effective in treating ocular hypertension.

**7.** A first composition administered once daily for lowering intraocular pressure in a person with glaucoma or ocular hypertension, the first composition comprising about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride, wherein the first composition lowers intraocular pressure without a substantial reduction in the intraocular pressure lowering benefit provided by the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

**8.** The composition of claim **7** wherein the once daily administration of the first composition results in less hyperemia as compared to the once daily administration of the second composition.

**9.** The composition of claim **7** wherein the first composition has a pH of about 7.3.

**10.** The composition of claim **7** wherein the first composition comprises 0.01% w/v bimatoprost and 0.02% w/v benzalkonium chloride.

**11.** The composition of claim **7** wherein the first composition has at least one buffering agent selected from the group consisting of dibasic sodium phosphate heptahydrate, citric acid monohydrate and EDTA.

**12.** The composition of claim **7** wherein the first composition is applied topically.

**13.** The composition of claim **7** wherein the first composition is effective in treating glaucoma.

**14.** The composition of claim **7** wherein the first composition is effective in treating ocular hypertension.

**15.** A first composition for reducing the amount of bimatoprost administered to a person in a once daily treatment for glaucoma or ocular hypertension, the first composition comprising about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride, wherein first the composition remains useful in treating glaucoma or ocular hypertension despite a lower concentration of bimatoprost as compared to the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

**16.** The composition of claim **15** wherein the once daily administration of the first composition results in less hyperemia as compared to the once daily administration of the second composition.

**17.** The composition of claim **15** wherein the first composition has a pH of about 7.3.

**18.** The composition of claim **15** wherein the first composition comprises 0.01% w/v bimatoprost and 0.02% w/v benzalkonium chloride.

**19.** The composition of claim **15** wherein the first composition is a solution.

**20.** The composition of claim **15** wherein the first composition is effective in treating glaucoma.

**21.** The composition of claim **20** wherein the glaucoma is open-angle glaucoma.

**22.** The composition of claim **15** wherein the first composition is effective in treating ocular hypertension.

**23.** A first composition for reducing the amount of bimatoprost administered to a person in a once daily treatment for glaucoma or ocular hypertension, wherein the first composition comprises about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride, wherein the benzalkonium chloride concentration of the first composition increases the permeability of bimatoprost across corneal epithelial cell layers as compared to the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

US 8,278,353 B2

7

**24**. The composition of claim **23** wherein the first composition remains useful in treating glaucoma or ocular hypertension despite a lower concentration of bimatoprost as compared to the second composition.

**25**. The composition of claim **23** wherein the first composition results in less hyperemia as compared to the once daily administration of the second composition.

**26**. The composition of claim **23** wherein the first composition is effective in treating glaucoma.

**27**. The composition of claim **23** wherein the composition is effective in treating ocular hypertension.

8

**28**. The composition of claim **23** wherein the first composition has a pH of about 7.3.

**29**. The composition of claim **23** wherein the first composition has at least one buffering agent selected from the group consisting of dibasic sodium phosphate heptahydrate, citric acid monohydrate and EDTA.

**30**. The composition of claim **23** wherein the first composition comprises 0.01% w/v bimatoprost and 0.02% w/v benzalkonium chloride.

*   *   *   *   *



US008299118B2

(12) **United States Patent**
   Chang et al.

(10) **Patent No.:**     **US 8,299,118 B2**
(45) **Date of Patent:**      ***Oct. 30, 2012**

(54) **ENHANCED BIMATOPROST OPHTHALMIC SOLUTION**

(75) Inventors: **Chin-Ming Chang**, Tustin, CA (US); **James N. Chang**, Newport Beach, CA (US); **Rhett M. Schiffman**, Laguna Beach, CA (US); **R. Scott Jordan**, Trabuco Canyon, CA (US); **Joan-En Chang-Lin**, Tustin, CA (US)

(73) Assignee: **Allergan, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/370,529**

(22) Filed: **Feb. 10, 2012**

(65) **Prior Publication Data**

US 2012/0142782 A1     Jun. 7, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/965,514, filed on Dec. 10, 2010, which is a continuation of application No. 11/083,261, filed on Mar. 16, 2005, now Pat. No. 7,851,504.

(51) **Int. Cl.**
   *A61K 31/19*     (2006.01)
   *A61K 31/215*     (2006.01)

(52) **U.S. Cl.** ...................................... 514/530; 514/573

(58) **Field of Classification Search** .................. 514/530, 514/573
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,055,602 | A | 10/1977 | Nelson |
| 4,100,192 | A | 7/1978 | Morozowich |
| 4,122,282 | A | 10/1978 | Nelson |
| 4,123,441 | A | 10/1978 | Johnson |
| 4,128,577 | A | 12/1978 | Nelson |
| 4,171,331 | A | 10/1979 | Biddlecom |
| 4,183,870 | A | 1/1980 | Caton |
| 4,303,796 | A | 12/1981 | Ishii |
| 4,382,953 | A | 5/1983 | Ishii |
| 4,543,353 | A | 9/1985 | Faustini |
| 4,599,353 | A | 7/1986 | Nelson |
| 4,812,457 | A | 3/1989 | Narumiya |
| 4,994,274 | A | 2/1991 | Chan |
| 5,034,413 | A | 7/1991 | Chan |
| 5,281,591 | A | 1/1994 | Burke |
| 5,352,708 | A | 10/1994 | Woodward |
| 5,474,979 | A | 12/1995 | Ding |
| 5,510,383 | A | 4/1996 | Bishop |
| 5,545,665 | A | 8/1996 | Burk |
| 5,587,391 | A | 12/1996 | Burk |
| 5,607,978 | A | 3/1997 | Woodward |
| 5,688,819 | A | 11/1997 | Woodward |
| 6,403,649 | B1 | 6/2002 | Woodward |
| 6,596,765 | B2 | 7/2003 | Ueno |
| 6,646,001 | B2 | 11/2003 | Hellberg |
| 6,743,439 | B1 | 6/2004 | Castillo |
| 6,933,289 | B2 | 8/2005 | Lyons |
| 8,017,655 | B2 | 9/2011 | Woodward |
| 2002/0103255 | A1 | 8/2002 | Hellberg |
| 2004/0029771 | A1 | 2/2004 | Rigdon |
| 2004/0115234 | A1 | 6/2004 | Gewirtz |
| 2005/0004074 | A1 | 1/2005 | Lyons |
| 2005/0276867 | A1 | 12/2005 | Lyons |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2144967 | 3/1994 |
| CA | 2498233 | 3/2004 |
| DE | 2721534 | 12/1977 |
| EP | 0093380 | 11/1983 |
| EP | 0102230 | 3/1984 |
| EP | 0098141 | 11/1984 |
| EP | 0253094 | 1/1988 |
| EP | 0364417 | 4/1990 |
| EP | 0453127 | 10/1991 |
| FR | 2239458 | 2/1975 |
| FR | 2312240 | 12/1976 |
| FR | 2386523 | 11/1978 |
| FR | 2402644 | 4/1979 |
| JP | S49-069636 | 7/1974 |
| JP | S62-215537 | 9/1987 |
| LU | 68940 | 12/1973 |
| WO | WO 90-00255 | 3/1990 |
| WO | 92-008465 | 5/1992 |
| WO | WO 94-006433 | 3/1994 |
| WO | 02-07731 | 1/2002 |
| WO | WO 2004-013119 | 2/2004 |

OTHER PUBLICATIONS

Burstein, Neal L. et al., "Electrophysiologic and Morphologic Effects of Ophthalmic Preparations on Rabbit Cornea Epithelium," Invest. Ophthalmol. Visual Sci., vol. 16, No. 10, 899-911, Oct. 1977.
Eisenberg, Dan et al., "Bimatoprost and Travoprost: A Review of Recent Studies of Two New Glaucoma Drugs", Survey of Ophthalmology, vol. 47, sup. I. SI05-S115, Aug. 2002.
Green, Keith et al., "Prednisolone Phosphate Penetration Into and Through the Cornea," Investigative Ophthalmology, vol. 13, No. 4, 316-319, Apr. 1974.
Lumigan® monograph in the 57th PDR (2003).
Mealy, N.E. et al., "Ophthalmic Drugs," Drugs of he Future, 27(5), 509-523, 2002.
Medical Review, Application No. 21-275. Center for Drug Evaluation and Research, 2001.
Pfister, Roswell R. et al., "The Effects of Ophthalmic Drugs, Vehicles, and Preservatives on Corneal Epithelium: a Scanning Electron Microscope Study," Effects of Ophthalmic Drugs, vol. 15, No. 4, 246-259, Apr. 1976.
Remington, The Science and Practice of Pharmacy, 20th ed. at 831 (2000).
Remington, The Science and Practice of Pharmacy, 21st ed. at 864 (2005).

(Continued)

*Primary Examiner* — Zohreh Fay

(74) *Attorney, Agent, or Firm* — John E. Wurst; Doina G. Ene; Allergan, Inc.

(57) **ABSTRACT**

A composition comprising from 0.005% to 0.02% bimatoprost by weight and from 100 ppm to 250 ppm benzalkonium chloride, wherein said composition is an aqueous liquid which is formulated for ophthalmic administration is disclosed herein. A method which is useful in treating glaucoma or ocular hypertension related thereto is also disclosed herein.

**30 Claims, 2 Drawing Sheets**

US 8,299,118 B2

OTHER PUBLICATIONS

Stewart, William et al., "Corneal Punctate Staining with Latanoprost. Bimatoprost , and Travoprost in Healthy Subjects", J. Glaucoma, vol. 12, No. 6, 475-479, Dec. 2003.

Xalatan ® monograph in the 59th PDR (2005).

Asbjorn Tonjum, Jan. 22, 1975, Permeability of Rabbit Corneal Epithelium to Horseradish Peroxidase After the Influence of Benzalkonium Chloride, Acta Ophthalmologica, 53, 335-347.

Bito, 1985, Biological Protection with Prostanoids, CRC Press, Inc., 1, 231-252, Cohen, M. M., ed., Boca Raton, Fla., CRC Press Inc.

Bito, 1987, Prostaglandins, Old Concepts and New Perspectives, Archives of Ophthalmology, 105, 1036-1039.

C.A. Lawrence, 1955, An Evaluation of Chemical Preservatives for Ophthalmic Solutions, J Am Pharm Assoc, 44 (8), 457.

C.A. Lawrence, 1955, Chemical Preservatives for Ophthalmic Solutions, Am J Ophthal, 39, 385.

C.B. Camras, Dec. 1977, Reduction of Intraocular Pressure by Prostaglandins Applied topically to the Eyes of Conscious Rabbits, Investigative Ophthalmology & Visual Science, 16(12), 1125-1134.

C.B. Camras, 1981, Reduction of Intraocular Pressure in Normal and Glaucomatous Primate (Aotus trivirgatus) Eyes by Topically Applied Prostaglandin Fla, Current Eye Research, 1 (4), 205-209.

C.S. O'Brien, 1941, Doryl in the Treatment of Glaucoma Simplex, Tran Am Ophthal Soc, 39, 175.

C.S. O'Brien, 1942, Carbaminoyl-choline Chloride in the Treatment of Glaucoma Simplex, Arch Ophthal, 27, 253.

Center for Drug Evaluation and Research, Summary Review of Application No. 22-184 (Lumigan 0.01%) (Jul. 2010).

David Maurice, 1995, The Effect of the Low Blink Rate in Rabbits on Topical Drug Penetration, J Ocular Pharmacology and Therapeutics, 11(3), 297-304.

Diane Tang-Liu, 1994, Effects of Four Penetration Enhancers on Corneal Permeability of Drugs in Vitro, Journal of Pharmaceutical Sciences, 83 (1), 85-90.

Dwight Deardorff, 1975, Ophthalmic Preparation, Remington's Pharmaceutical Sciences, 15th ed., 1488.

F.A. Stern, 1982, Comparison of the Hypotensive and Other Ocular Effects of Prostaglandins E2 and F2α on Cat and Rhesus Monkey Eyes, Invest Ophthal Visual Sci, 22, 588-598.

F.N. Martin, 1950, Preparation of Ophthalmic Solutions With Special Reference to Hydrogen Ion Concentration and Tonicity, Arch Ophthal, 44, 561.

George Grass, Jan. 1988, Mechanisms of Corneal Drug Penetration I: In Vivo and in Vitro Kinetics, Journal of Pharmaceutical Sciences, 77 (1), 3-14.

Giuseppe Giuffre, 1985, The Effects of Prostaglandin F2a in the Human Eye, Graefe's Archive Clin. & Exper. Ophthal., 222, 139-141.

H.C. Arndt, 1977, The Synthesis and Biological Activity of Prostaglandin Analogs Containing Spirocyclic Rings, Prostaglandins, 13 (5), 837-843.

Handbook of Pharmaceutical Excipients, Monographs for Water, Sodium Phosphate, Sodium Chloride, and Citric Acid Monohydrate (1994).

Harvey Dubiner, 2001, Efficacy and Safety of Bimatoprost in Patients With Elevated Intraocular Pressure: a 30-Day Comparison With Latanoprost, Surv. Ophthalmol, 45 (4), S353-S560.

Hitoshi Sasaki, 1995, Ocular Permeability of FITC-Dextran with Absorption Promoter for Ocular Delivery of Peptide Drug, J Drug Target, 3, 129.

Hitoshi Sasaki, 1995, Ophthalmic Preservatives As Absorption Promoters for Ocular Drug Delivery, J. Pharm. Pharmacol., 47, 703-707.

Hitoshi Sasaki, 2000, Modification of Ocular Permeability of Peptide Drugs by Absorption Promoters, Biol Pharm Bull, 23(12), 1524.

J. Thygesen, 2000, Short-term Effect of Latanoprost and Timolol Eye Drops on Tear Fluid and the Ocular Surface in Patients with Primary Open-Angle Glaucoma and Ocular Hypertension, Acta Ophthal Scand, 78, 37-41.

Jay Katz, 2010, Twelve-Month, Randomized, Controlled Trial of Bimatoprost 0.03%, 0.0125%, and 0.03% in Patients with Glaucoma or Ocular Hypertension, Am J Ophthalmology, 149(4), 661-671.

Ke-Ping Xu, 2000, Corneal Organ Culture Model for Assessing Epithelial Responses to Surfactants, Tox. Sci., 58, 306.

Keith Green, 1971, Influence of Various Agents on Corneal Permeability, American Journal of Ophthalmology, 72, 897-905.

Martina Scholz, 2002, Pilocarpine Permeability Across Ocular Tissues and Cell Cultures: Influence of Formulation Parameters, Journal of Ocular Pharmacology and Therapeutics, 18 (5), 455-468.

Michael Brown, 1967, Control of Contamination in Ophthalmic Solutions, Proc. R. Soc. Med., 60, 354-357.

Milton Skolaut, 1948, Ophthalmic Medication, Bull Am Soc Hosp Pharm, 5(4), 172.

Modell Walter, 1947, Pharmacologic Action of Some Ophthalmic Drugs, Arch Ophthal, 37, 160.

Neal Burstein, 1980, Preservative Cytotoxic Threshold for Benzalkonium Chloride and Chlorhexidine Digluconate in Cat and Rabbit Corneas, Invest. Ophthal. & Visual Sci., 19 (3), 308-313.

Nilsson, 1987, PGF 2a Increases Uveoscleral Outflow, Invest. Ophthalmol. Vis. Sci, 28 (Suppl), 284.

P. De Clercq, 1976, Cyclopentanones-VXL., Prostaglandin Synthesis Involving Catalytic Hydrogenation of 2,3-Dialky1-4-Hydroxy-2-Cyclopentenones, Tetrahedron, 32, 2747-2752.

Paul Ashton, 1991, Formulation Influence on Conjunctival Penetration of Four Beta Blockers in the Pigmented Rabbit: A Comparison with Corneal Penetration, Pharmaceutical Research, 8 (9), 1166-1174.

Physicians' Desk Reference, 56th ed., pp. 212-13, 543, 553-54, 2864-65 (2002).

Physicians' Desk Reference, 59th ed., pp. 555-556 (2005).

Pierre-Jean Pisella, 2004, Conjunctival Proinflammatory and Proapoptotic Effects of Latanoprost and Preserved and Unpreserved Timolol: An Ex Vivo and in Vitro Study, Investigative Ophthalmology & Visual Science, 45, 1360-1368.

Pieter Van Der Bijl, 2001, Effects of Three Penetration Enhancers on Transcorneal Permeation of Cyclosporine, Cornea, 20 (5), 505-508.

R. Roggeband, 2000, Eye Irritation in Rabbit and Man After Single Applications of Equal Volumes of Undiluted Model Liquid Detergent Products, Food & Chem Toxic, 38, 727.

Richard Parrish, 2003, A Comparison of Latanoprost, Bimatoprost, and Travoprost in Patients With Elevated Intraocular Pressure: A 12-Week, Randomized, Masked Evaluator Multicenter Study, Am J Ophthalmol, 135, 688-703.

Robert Laibovitz, 2001, Comparison of the Ocular Hypotensive Lipid AGN 192024 With Timolol, Arch Ophthal, 119, 994.

Robert Noecker, 2003, Bimatoprost/Latanoprost Study Group. A Six Month Randomized Clinical Trial Comparing the Intraocular Pressure Lowering Efficacy of Bimatoprost and Latanoprost in Patients With Ocular Hypertension or Glaucoma, Am J Ophthal, 135, 55-63.

Samir Podder, 1992, Improving the Safety of Topically Applied Timolol in the Pigmented Rabbit Through Manipulation of Formulation Composition, Exp. Eye Res., 54, 747-757.

Samuel McPherson, 1949, Self-Sterilizing Ophthalmic Solutions, Am J Ophthal, 32, 675.

Starr, 1971, Further Studies on the Effects of Prostagladin on Intraocular Pressure in the Rabbit, Exp. Eye Res., 11, 170-177.

Stefano Gandolfi, 2001, Three-month Comparison of Bimatoprost and Latanoprost in Patients With Glaucoma and Ocular Hypertension, Adv. Ther., 18, 110-121.

Thomas Honohan, 1980, Duration of Activity of the Acid, Methyl Ester and Amide of an Orally Active Platelet Aggregation Inhibitory Prostanoid in the Rat, Prostoglandins, 19, 139.

Thomas Walter, 2004, 24-Hour IOP Control with Once-daily Bimatoprost, Timolol Gel-forming Solution, or Latanoprost: A 1-Month, Randomized, Comparative Clinical Trial, Survey of Ophthalmology, 49(1), S26-S35.

William Mullen, 1973, Ophthalmic Preservatives and Vehicles, Surv Ophthal, 17(6), 469.

Alm, Albert et al., "Uveoscleral Outflow—A Review", Exp. Eye Res., vol. 88(4), pp. 760-768 (Apr. 2009).

Answer, Defenses and Counterclaims of Defendants Apotex Inc. and Apotex Corp., Civil Action No. 10-CV-681, Allergan, Inc. and Duke University v. Apotex Inc. and Apotex Corp., 20 pages (Nov. 22, 2010).

Bean, Gerald et al., "Commercially Available Prostaglandin Analogs for the Reduction of Intraocular Pressure: Similarities and Differences", Survey of Ophthalmology, vol. 53, Suppl. 1, pp. S69-S84 (Nov. 2008).

Berglund, Barbara et al., Investigation of Structural Analogs of Prostaglandin Amides for Binding to and Activation of $CB_1$ and $CB_2$ Cannabinoid Receptors in Rat Brain and Human Tonsils, Adv. Exp. Med. Bio., vol. 469, pp. 527-533 (1999).

Bito, Laszlo et al., The Ocular Pharmacokinetics of Eicosanoids and Their Derivatives. 1. Comparison of Ocular Eicosanoid Penetration and Distribution Following the Topical Application of $PGF_{2\alpha}$, $PGF_{2\alpha}$-1-methyl Ester, and $PGF_{2\alpha}$-1-Isopropyl Ester, Exp. Eye Res., vol. 44, pp. 217-226 (1987).

Bito, Laszlo, "Prostaglandins, Other Eicosanoids, and Their Derivatives as Potential Antiglaucoma Agents", Glaucoma: Applied Pharmacology in Medical Treatment, pp. 477-505 (1984).

Boyd. James, "Quantitative Comparison of Methods of Administering Physostigmine", Archives Ophthalmology, vol. 30(4), pp. 521-525 (1943).

Burstein, Neal, "Preservative Alteration of Corneal Permeability in Humans and Rabbits", Investigative Ophthalmology & Visual Science, vol. 25, No. 12, pp. 1453-1457 (Dec. 1984).

Cadet, Patrick et al., "Molecular identification and Functional Expression of μ 3, a Novel Alternatively Spliced Variant of the Human μ Opiate Receptor Gene", J. Imtnunol., vol. 170(10), pp. 5118-5123 (May 15, 2005).

Camber, Ola et al., "Influence of Some Preservatives on the Corneal Permeability of Pilocarpine and Dexamethasone, in Vitro", International Journal of Pharmaceutics, vol. 39, pp. 229-234 (1987).

Camras, Carl et al., "Detection of the Free Acid of Bimatoprost in Aqueous Humor Samples From Human Eyes Treated with Bimatoprost Before Cataract Surgery", Ophthalmology, vol. 111, No. 12, pp. 2193-2198 (2004).

Camras, Carl et al., "Bimatoprost, the Prodrug of a Prostaglandin Analogue", Br. J. Ophthalmol., vol. 92(6), pp. 862-863 (Jun. 2008).

Cantor, Louis et al., "Levels of Bimatoprost Acid in the Aqueous Humor After Bimatoprost Treatment of Patients With Cataract", Br. J. Ophthalmol., vol. 91, No. 5, pp. 629-632 (2007).

Cantor, Louis, "Reply—Bimatoprost, the Prodrug of a Prostaglandin Analogue", Br. J. Ophthalmol., vol. 92, pp. 863-864 (2008).

Collin, Barry, "Ultrastructural Changes to Corneal Stromal Cells Due to Ophthalmic Preservatives", ACTA Opthalmalogica, vol. 64, pp. 72-78 (1986).

Complaint for Patent Infringment: Civil Action No. 1:10-CV-681; Allergan, Inc. and Duke University v.Apotex Inc. and Apotex Corp., 12 pages, Filed Sep. 8, 2010.

Crowston, Jonathan et al., "Effect of Bimatoprost on Intraocular Pressure in Prostaglandin FP Receptor Knockout Mice", Investigative Ophthalmology & Visual Science, vol. 46, pp. 4571-4577 (2005).

Curri, Joanne (Hi-Tech Pharmacal Co., Inc., Amityville, NY). Paragraph IV Letter to: Allergan, Inc. (Irvine, CA). 12 pages, Dec. 23, 2011.

Davies, Sean et al., "Hydrolysis of Bimatoprost (Lumigan) to its Free Acid by Ocular Tissue in Vitro" J. Ocul. Pharmacol. Ther., vol. 19(1), pp. 45-54 (Feb. 2003).

Declaration of Larry Wheeler, Ph.D., 30 pages, Dec. 14, 2010.

Faulkner, Robert et al., "Aqueous Humor Concentrations of Bimatoprost Free Acid, Bimatoprost and Travoprost Free Acid in Cataract Surgical Patients Administered Multiple Topical Ocular Doses of Lumigan® or Travatan®", Journal of Ocular Pharmacology and Therapeutics. vol. 26, No. 2, pp. 147-156 (2010).

FDA Label for Approved NDA 22-184 of u igan 0.01% and Lumigan 0.03%x, Aug. 31, 2010.

Frenkel, Ronald et al., "Evaluation of Circadian Control of Intraocular Pressure After a Single Drop of Bimatoprost 0.03% or Travoprost 0.004%", Curr. Med Res. Opin., vol. 24(4), pp. 919-923 (2008).

Hellberg, Mark et al., "The Hydrolysis of the Prostaglandin Analog Prodrug Bimatoprost to 17-Phenyl-trinor $PGF_{2\alpha}$ by Human and Rabbit Ocular Tissue", J. Ocular Pharmacol. Ther., vol. 19, No. 2, pp. 97-103 (2003).

Higaki, Kazutaka et al., "Estimation and Enhancement of in Vitro Corneal Transport of S-1033, a Novel Antiglaucoma Medication", International Journal of Pharmaceutics 132, pp. 165-173 (1996).

Ho, Norman et al., "Physical Model Approach to the Design of Drugs with Improved Intestinal Absorption", in Design of Biopharmaceutical Properties Through Prodrugs & Analogs, pp. 136-227 (Edward B. Roche ed., 1977).

Huang, Andrew et al., "Paracellular Permeability of Corneal and Conjunctival Epithelia", Investigative Opthalmology & Visual Sci., vol. 30, No. 4, pp. 684-289 (1989).

Jordan, Bryen et al., "G-Protein-Coupled Receptor Heterodimerization Modulates Receptor Function", Nature, vol. 399(6737), pp. 697-700 (Jun. 17, 1999).

Katz, L. Jay et al., "Comparison of Human Ocular Distribution of Bimatoprost and Latanoprost", Jul. 9, 2010 (manuscript submitted).

Kaur, Indu Pal et al., "Penetration Enhancer and Ocular Bioadhesives: Two New Avenues for Ophthalmic Drug Delivery", Drug Development and Industrial Pharmacy, vol. 28(4), pp. 353-369 (2002).

Keller, N. et al., "Increased Corneal Permeability Induced by the Dual Effects of Transient Tear Film Acidification and Exposure to Benzalkonium Chloride", Exp. Eye Res., vol. 30, pp. 203-210 (1980).

Lee, Vincent et al., "Improved Ocular Drug Delivery with Prodrugs", in Prodrugs, Topical & Ocular Drug Delivery, pp. 221-297 (1992).

Lee, Vincent et al., "Review: Topical Ocular Drug Delivery: Recent Developments and Future Challenges", Journal of Ocular Pharmacology, vol. 2, No. 1, pp. 67-108 (1986).

Liang, Y. et al., "Identification and Pharmacological Characterization of the Prostaglandin FP Receptor and FP Receptor Variant Complexes", Br. J. Pharmacol., vol. 154, pp. 1079-1093 (2008).

Lumigan ®, 6 Pages, Jul. 2003.

Lumigan ® 0,1 mg/ml, 3 pages, Jan. 2010.

Lyle, Donald, "Early Ocular Manifestations in the Laurence-Moon-Biedl Syndrome", Society Proceedings, J. Ophthalmology, vol. 29, pp. 939-946 (1946).

Maxey. Kirk et al., "The Hydrolysis of Bimatoprost in Corneal Tissue Generates a Potent Prostanoid FP Receptor Agonist", Surv. Ophthalmol., vol. 47, Suppl. 1, pp. S34-S40 (Aug. 2002).

Miller, William et al., "B iological Activities of 17-Phenyl-18, 19,20-Trinorprostaglandins", Prostaglandins, vol. 9, No. 1, pp. 9-18 (Jan. 1975).

Noecker, Robert et al., "Corneal and Conjunctival Changes Caused by Commonly Used Glaucoma Medications", Cornea, vol. 23, No. 5, pp. 490-496 (Jul. 2004).

Okabe, Komei et al., "Effect of Benzalkonium Chloride on Transscleral Drug Delivery", Investigative Ophthalmology & Visual Sci., vol. 46, pp. 703-708 (2005).

Pfeiffer, N. et al., "New Development in Glaucoma Drug Therapy", Ophthalmology, vol. 89, pp. W1-W13 (1992).

Poyer, John et al., "Prostaglandin $F_{2\alpha}$Effects on Isolated Rhesus Monkey Ciliary Muscle", Invest. Ophthalml. Vis. Sci., vol. 36(12), pp. 2461-2465 (Nov. 1995).

Remington's Pharmaceutical Sciences 1501 (15th ed. 1975).

Response from the Food and Drug Administration to Pfizer's Citizen Petition and a Supplement at 23 (Exhibit 5), 27 pages (Aug. 31, 2010).

Resul, Bahram et al., "Phenyl-Substituted Prostaglandins: Potent and Selective Antiglaucoma Agents", J. Med. Chem., vol. 36(2), pp. 243-248 (Jan. 22, 1993).

Romano, Maria et al., "Evidence for the Involvement of Cannabinoid $CB_1$ Receptors in the Bimatoprost-Induced Contractions on the Human Isolated Ciliary Muscle", Invest. Ophthalmol. Vis. Sci., vol. 48(8), pp. 3677-3682 (Aug. 2007).

Sandoz Paragraph 4 Letter, 19 pages, dated Jul. 11, 2011.

Schumer, Robert et al., "Medical Treatment of Glaucoma", Ophthalmology, vol. 2, pp. 140-150 (1991).

Sharif, N. A. et al., "Ocular Hypotensive FP Prostaglandin (PG) Analogs: PG Receptor Subtype Binding Affinities and Selectivities, and Agonist Potencies at FP and Other PG Receptors in Cultured Cells", J. Ocul. Pharmacol. Ther., vol. 19(6), vol. 501-15 (Dec. 2003).

Sharif, Najam et al., "Update and Commentary on the Pro-Drug Bimatoprost and a Putative Prostamide Receptor", Expert Rev. Ophthal., vol. 4(5), pp. 477-489 (2009).

Sharif, Najam et al., "Human Trabecular Meshwork Cell Responses Induced by Bimatoprost, Travoprost, Unoprostone, and Other FP

US 8,299,118 B2

Page 4

Prostaglandin Receptor Agonist Analogues". Invest. Ophthalmol. Vis. Sci., vol. 44, pp. 715-721 (2003).

Sharif, Najam et al., Human Ciliary Muscle Cell Responses to FP Class Prostaglandin Analogs: Phosphoinositide Hydrolysis, Intracellular $Ca^{2+}$ Mobilization and MAP Kinase Activation, J. Ocul. Phanuacol. Ther., vol. 19, pp. 437-455 (2003).

Sharif, Najam et al., "Cat Iris Sphincter Smooth-Muscle Contraction: Comparison of FP-Class Prostaglandin Analog Agonist Activities", J. Ocul. Pharmacol. Ther., vol. 24(2), pp. 152-163 (Apr. 2008).

Sjoquist, Birgitta et al., "Pharmacokinetics of Latanoprost in the Cynomolgus Monkey. 3rd Communication: Tissue Distribution After Topical Administration on the Eye Studied by Whole Body Autoradiography", Glaucoma Research Laboratories, Arzneim-Forsch/Drug Res., vol. 49, pp. 240-249 (1999).

Sjoquist, Birgitta et al., "Ocular and Systemic Pharmacokinetics of atanoprost in Humans", Surv. Ophthalmol., vol. 47 (Supp. 1), pp. S6-S12 (2002).

Spada, Clayton et al., "Bimatoprost and Prostaglandin $F_{2\alpha}$Selectively Stimulate Intracellular Calcium Signaling in Different Cat Iris Sphincter Cells", Exp. Eye. Res., vol. 80(1), pp. 135-145 (Jan. 2005).

Stamer, W. Daniel et al., "Cellular Basis for Bimatoprost Effects on Human Conventional Outflow", Invest. Ophthalmol. Vis. Sci., vol. 51(10), pp. 5176-5181 (Oct. 2010).

Stjernschantz, Johan, "Studies on Ocular Inflammation and Development of a Prostaglandin Analogue for Glaucoma Treatment", Exp. Eye Res., vol. 78(4), pp. 759-766 (Apr. 2004).

Stjernschantz, Johan, "From $PGF_{2\alpha}$-Isopropyl Ester to Latanoprost: A Review of the Development of Xalatan: the Proctor Lecture", Invest. Ophthalmol. Vis. Sci., vol. 42(6), pp. 1134-1145 (May 2001).

Van Alphen, G.W.H.M. et al., "The Effect of Prostaglandins on the Isolated Internal Muscles of the Mammalian Eye, Including Man", Documenta Ophthalmologica, vol. 42, No. 2, pp. 397-415 (1977).

Vielhauer, George et al., "Cloning and Localization of hFP$_s$: a Six-Transmembrane mRNA Splice Variant of the Human FP Prostanoid Receptor", Arch. Biochem. Biophys., vol. 421(2), pp. 175-185 (Jan. 15, 2004).

White, Julia et al., "Heterodimerization is Required for the Formation of a Functional GABA$_B$ Receptor", Nature, vol. 396(6712), pp. 679-682 (Dec. 17, 1998).

Wilson, Stephen et al., "Dimerization of the Human Receptors for Prostacyclin and Thromboxane Facilitates Thromboxane Receptor-Mediated cAMP Generation", J. Biol. Chem., vol. 279(51 ), pp. 53036-53047 (Dec. 17, 2004).

Woodford, Roger et al., "Penetration Enhancers and the Percutaneous Absorption of Drugs : An Update", J. Toxicology-Cut. & Ocular Toxicology, vol. 5(3), pp. 167-177 (1986).

Woodward, David et al., "Bimatoprost Effects on Aqueous Humor Dynamics in Monkeys", J. Ophthalmol., 5 pages (2010).

Woodward, David et al., The Pharmacology of Bimatoprost (Lumigan™), Surv. Ophthalmol., vol. 45(Sue 14), pp. S337-S345 (May 2001).

Woodward, David et al., "Bimatoprost: A Novel Antiglaucoma Agent", Cardiovasc. Drug Rev., vol. 22(2), pp. 103-120 (2004).

Woodward. David et al., "Pharmacological Characterization of a Novel Anti-Glaucoma agent", J. Pharmacol. Exp. Ther., vol. 305, pp. 772-785 (2003).

Woodward, David et al., "Identification of an Antagonist That Selectively Blocks the Activity of Prostamides (Prostaglandin Ethanolamides) in the Feline Iris." Br. J. Pharmacol, vol. 150, pp. 342-352 (2007).

Xalatan ® Eye Drops, 3 pages, Retrieval Date : Oct. 2, 2010, http://home.intekom.com/phann/pharmaca/xalatan.html.

Yamaji, Kazutsuna et al., "Prostaglandins $E_1$ and $E_2$, but not $F_{2\alpha}$ or Latanoprost, Inhibit Monkey Ciliary Muscle Contraction", Curr. Eye Res., vol. 30(8), pp. 661-665 (2005).

**Fig. 1**



**Fig. 2**

US 8,299,118 B2

**1**

## ENHANCED BIMATOPROST OPHTHALMIC SOLUTION

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 12/965,514, filed Dec. 10, 2010 which is a continuation of U.S. patent application Ser. No. 11/083,261, filed Mar. 16, 2005, now, U.S. Pat. No. 7,851,504 which is incorporated herein by reference in its entirety.

### FIELD OF THE INVENTION

This invention relates to pharmaceutical compositions comprising bimatoprost.

### BACKGROUND OF THE INVENTION

#### Description of Related Art

Bimatoprost, shown below, is a prostamide marketed commercially for the treatment of glaucoma and ocular hypertension.

Formula I

Benzalkonium chloride (BAK) is a preservative used in many commercial ophthalmic products to prevent microbial contamination in multi-use products. The commercial eye drops (Bimatoprost, Allergan, Inc., Irvine, Calif.) contain 0.03% bimatoprost and 0.005% BAK. Although no other prostamides are currently marketed for the treatment of glaucoma, several prostaglandin analogs are commercially available which use BAK as a preservative. These include latanoprost (Xalatan), travoprost (Travatan), and unoprostone isopropyl (Rescula), which require significantly more BAK, from 150-200 ppm, to meet antimicrobial effectiveness tests in the United States and Europe.

U.S. Pat. No. 6,596,765 B2 discloses a composition comprising 0.005% or 0.0005% latanoprost and 0.2 mg/mL BAK.

U.S. Pat. No. 6,646,001 B2 discloses compositions comprising 0.03% bimatoprost and 0.01% BAK or "0.01%+5% excess" BAK.

### BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. **1** is a plot showing the aqueous humor concentration of the parent acid of bimatoprost after topical administration of several formulations.

FIG. **2** is a plot showing the membrane permeability of bimatoprost in several different formulations.

**2**

### DETAILED DESCRIPTION OF THE INVENTION

A composition comprising from 0.005% to 0.02% bimatoprost by weight and from 100 ppm to 250 ppm benzalkonium chloride, wherein said composition is an aqueous liquid which is formulated for ophthalmic administration is disclosed herein.

A method which is useful in treating glaucoma or ocular hypertension related thereto is also disclosed herein.

An aqueous liquid which is formulated for ophthalmic administration is formulated such that it can be administered topically to the eye. The comfort should be maximized as much as possible, although sometimes formulation considerations (e.g. drug stability) may necessitate less than optimal comfort.

In certain compositions the concentration of bimatoprost is from 0.01% to 0.02%. In other compositions the concentration of bimatoprost is from 0.015% to 0.02%.

In certain compositions the concentration of BAK is from 150 ppm to 200 ppm. In other compositions the concentration of BAK is from 150 ppm to 200 ppm. In other compositions the concentration of BAK is from 150 ppm to 250 ppm.

In ophthalmic compositions, a chelating agent may be used to enhance preservative effectiveness. Suitable chelating agents are those known in the art, and, while not intending to be limiting, edetate salts (EDTA) are useful chelating agents.

In certain compositions, concentration of EDTA is at least 0.001%. In other compositions, the concentration of EDTA is at least 0.01%. In other compositions the concentration of EDTA is 0.15% or less. In other compositions the concentration of EDTA is 0.1% or less. In other compositions the concentration of EDTA is 0.05% or less.

Certain compositions comprise from 150 to 250 ppm BAK and an effective amount of EDTA.

As is known in the art, buffers are commonly used to adjust the pH to a desirable range for ophthalmic use. Generally, a pH of around 6-8 is desired, and in certain compositions a pH of 7.4 is desired. Many buffers including salts of inorganic acids such as phosphate, borate, and sulfate are known.

Another commonly used excipient in ophthalmic compositions is a viscosity-enhancing, or a thickening agent. Thickening agents are used for a variety of reasons, ranging from improving the form of the formulation for convenient administration to improving the contact with the eye to improve bioavailability. The viscosity-enhancing agent may comprise a polymer containing hydrophilic groups such as monosaccharides, polysaccharides, ethylene oxide groups, hydroxyl groups, carboxylic acids or other charged functional groups. While not intending to limit the scope of the invention, some examples of useful viscosity-enhancing agents are sodium carboxymethylcellulose, hydroxypropylmethylcellulose, povidone, polyvinyl alcohol, and polyethylene glycol.

In ophthalmic solutions, tonicity agents often are used to adjust the composition of the formulation to the desired isotonic range. Tonicity agents are well known in the art and some examples include glycerin, mannitol, sorbitol, sodium chloride, and other electrolytes.

One composition has a pH of 7.4 and consists essentially of 0.015% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

Another composition has a pH of 7.4 and comprises 0.02% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

Another composition has a pH of 7.4 and consists of 0.01% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

US 8,299,118 B2

3

The best mode of making and using the present invention are described in the following examples. These examples are given only to provide direction and guidance in how to make and use the invention, and are not intended to limit the scope of the invention in any way.

One embodiment comprises 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment comprises 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment comprises 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment comprises 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment consists of 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

EXAMPLE 1

Formulations containing 0.268% sodium phosphate dibasic heptahydrate, 0.014% citric acid, 0.83% sodium chloride, with the pH adjusted to 7.3 in qs water, and the amounts of bimatoprost, BAK, and EDTA listed in Table 1 below were prepared by conventional methods well known in the art.

4

TABLE 1

| Formulation |
| --- |
| 1. 0.03% Bimatoprost (50 ppm BAK) Control |
| 2. 0.03% Bimatoprost - 200 ppm BAK |
| 3. 0.03% Bimatoprost - 0.015% TPGS (no preservative) |
| 4. 0.03% Bimatoprost - 0.2% TPGS (no preservative) |
| 5. 0.03% Bimatoprost - 0.4% TPGS (no preservative) |
| 6. 0.03% Bimatoprost - 1.0% TPGS (no preservative) |

EXAMPLE 2

Studies were carried out to determine the effect of benzalkonium chloride (BAK) and d-alpha tocopheryl polyethylene glycol 1000 succinate (TPGS) on ocular absorption of bimatoprost in vivo. For the in vivo study, eighteen female rabbits were given a single 28 μL, eyedrop bilaterally and aqueous humor samples were collected (n=3 animals with 6 eyes per formulation) at 60 min postdose. Two rabbits (4 eyes) remained untreated to serve as pre-dose bioanalytical controls. Bimatoprost and its parent carboxylic acid extracted from aqueous humor and in vitro samples were analyzed by a liquid chromatography tandem mass spectrometry (LC-MS/MS) method with a quantitation range of 0.25-60 ng/mL.

Due to extensive metabolism of bimatoprost in rabbit eyes, its parent acid was used as a surrogate for determining ocular absorption of bimatoprost. Concentration of the acid in rabbit aqueous humor following single dose of 6 different bimatoprost formulations are summarized in FIG. 1 and Table 2 below.

TABLE 2

| Formulation | Aqueous Humor[a] (ng/mL) |
| --- | --- |
| 1. 0.03% Bimatoprost (50 ppm BAK) Control | 51.0 ± 9.4 |
| 2. 0.03% Bimatoprost - 200 ppm BAK | 87.2 ± 19.0* |
| 3. 0.03% Bimatoprost - 0.015% TPGS (no preservative) | 26.1 ± 3.3* |
| 4. 0.03% Bimatoprost - 0.2% TPGS (no preservative) | 22.9 ± 3.2* |
| 5. 0.03% Bimatoprost - 0.4% TPGS (no preservative) | 19.3 ± 5.6* |
| 6. 0.03% Bimatoprost - 1.0% TPGS (no preservative) | 15.4 ± 3.3* |

[a]Mean ± SD. Per formulation, N = 3 rabbits (6 eyes).
*Statistically different (p < 0.05) compared to 0.03% Bimatoprost

Test formulations containing 0.015%, 0.2%, 0.4% and 1.0% TPGS resulted in a lower aqueous humor carboxylic acid concentration compared to Bimatoprost by 52%, 59%, 62% and 72%, respectively. In contrast, 0.03% Bimatoprost containing 200 ppm BAK resulted in 57% higher aqueous humor AGN 191522 concentration compared to Bimatoprost (50 ppm BAK).

While not intending to limit the scope of the invention in any way, compared to the Bimatoprost control, formulations containing TPGS resulted in decrease bimatoprost permeability. In contrast, formulations with higher BAK resulted in higher permeability.

EXAMPLE 3

Formulations containing 0.268% sodium phosphate dibasic heptahydrate, 0.014% citric acid, 0.83% sodium chloride, with the pH adjusted to 7.3 in qs water, and the amounts of bimatoprost, BAK, and EDTA listed in Table 3 below were prepared by conventional methods well known in the art.

US 8,299,118 B2

5

TABLE 3

| Formulation |
| --- |
| A. 0.03% Bimatoprost (50 ppm BAK) - Control |
| B. 0.015% Bimatoprost (50 ppm BAK) |
| C. 0.015% Bimatoprost (50 ppm BAK) 0.03% EDTA |
| D. 0.015% Bimatoprost (200 ppm BAK) |
| E. 0.015% Bimatoprost (200 ppm BAK) 0.03% EDTA |
| F. 0.015% Bimatoprost (50 ppm BAK) 0.015% EDTA |
| G. 0.015% Bimatoprost (200 ppm BAK) 0.015% EDTA |
| H. 0.015% Bimatoprost (125 ppm BAK) |
| I. 0.015% Bimatoprost (125 ppm BAK) 0.03% EDTA |
| J. 0.015% Bimatoprost (125 ppm BAK) 0.015% EDTA |
| K. 0.015% Bimatoprost (150 ppm BAK) |
| L. 0.015% Bimatoprost (150 ppm BAK) 0.1% EDTA |
| M. 0.015% Bimatoprost |
| N. 0.03% Bimatoprost |

### EXAMPLE 4

The effect of benzalkonium chloride (BAK) and ethylene-diaminetetraacetic acid (EDTA) on bimatoprost permeability across primary culture of rabbit corneal epithelial cell layers (RCECL). Corneal epithelial cells were harvested from New Zealand White rabbits and cultured on Transwell™ filters until confluency (Day 5). For the transport experiment, cells were first equilibrated in transport buffer for 1 hour at 37° C. Dosing solution containing 0.015% or 0.03% bimatoprost with varying concentrations of BAK and EDTA was then applied to the apical compartment of the Transwell™ (2 cultures; n=3-4 per culture) and the cells were incubated at 37° C. At 30, 60, 90 and 120 minutes postdose, 200 μL samples were taken from the basolateral chamber for apical to basolateral (AB) transport. The samples were analyzed by a liquid chromatography tandem mass spectrometry (LC-MS/MS) method with quantitation range of 1-600 ng/mL.

The results are presented in FIG. 2.

### EXAMPLE 5

A drop of formulation J is administered once daily topically to the eye of a person suffering from glaucoma. After a few hours, intraocular pressure drops more and less hyperemia is observed than would be observed for formulation A. Lowered intraocular pressure persists for as long as the treatment continues.

What is claimed is:

**1**. A method of lowering intraocular pressure in a person with glaucoma or ocular hypertension, the method comprising administering once daily to an eye of the person a first composition comprising about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride, wherein the method lowers intraocular pressure and results in less hyperemia as compared to the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

**2**. The method of claim **1** wherein the first composition has a pH of about 7.3.

**3**. The method of claim **1** wherein the first composition comprises 0.01% w/v bimatoprost and 0.02% w/v benzalkonium chloride.

**4**. The method of claim **1** wherein the first composition has at least one buffering agent selected from the group consisting of dibasic sodium phosphate heptahydrate, citric acid monohydrate and EDTA.

**5**. The method of claim **1** wherein the method is effective in treating glaucoma.

6

**6**. The method of claim **1** wherein the method is effective in treating ocular hypertension.

**7**. A method of lowering intraocular pressure in a person with glaucoma or ocular hypertension, the method comprising administering once daily to an eye of the person a first composition comprising about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride, wherein the method lowers intraocular pressure without a substantial reduction in the intraocular pressure lowering benefit provided by the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

**8**. The method of claim **7** wherein the once daily administration of the first composition results in less hyperemia as compared to the once daily administration of the second composition.

**9**. The method of claim **7** wherein the first composition has a pH of about 7.3.

**10**. The method of claim **7** wherein the first composition is a solution.

**11**. The method of claim **7** wherein the first composition comprises 0.01% w/v bimatoprost and 0.02% w/v benzalkonium chloride.

**12**. The method of claim **7** wherein the first composition has at least one buffering agent selected from the group consisting of dibasic sodium phosphate heptahydrate, citric acid monohydrate and EDTA.

**13**. The method of claim **7** wherein the method is effective in treating glaucoma.

**14**. The method of claim **7** wherein the method is effective in treating ocular hypertension.

**15**. A method of reducing the amount of bimatoprost administered to a person in a treatment for glaucoma or ocular hypertension, comprising administering once daily to an eye of the person a first composition comprising about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride, wherein the composition remains useful in treating glaucoma or ocular hypertension despite a lower concentration of bimatoprost as compared to the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

**16**. The method of claim **15** wherein the once daily administration of the first composition results in less hyperemia as compared to the once daily administration of the second composition.

**17**. The method of claim **15** wherein the first composition has a pH of about 7.3.

**18**. The method of claim **15** wherein the first composition comprises 0.01% w/v bimatoprost and 0.02% w/v benzalkonium chloride.

**19**. The method of claim **15** wherein the first composition is applied topically.

**20**. The method of claim **15** wherein the method is effective in treating glaucoma.

**21**. The method of claim **20** wherein the glaucoma is open-angle glaucoma.

**22**. The method of claim **15** wherein the method is effective in treating ocular hypertension.

**23**. A method of reducing the amount of bimatoprost administered to a person in a treatment for glaucoma or ocular hypertension, comprising administering once daily to an eye of the person a first composition comprising about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride, wherein the benzalkonium chloride concentration of the first composition increases the permeability of bimatoprost across corneal epithelial cell layers as compared to once daily

US 8,299,118 B2

**7**

administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.

**24**. The method of claim **23** wherein the first composition remains useful in treating glaucoma or ocular hypertension despite a lower concentration of bimatoprost as compared to the second composition.

**25**. The method of claim **23** wherein the once daily administration of the first composition results in less hyperemia as compared to the once daily administration of the second composition.

**26**. The method of claim **23** wherein the method is effective in treating glaucoma.

**8**

**27**. The method of claim **23** wherein the method is effective in treating ocular hypertension.

**28**. The method of claim **23** wherein the first composition has a pH of about 7.3.

**29**. The method of claim **23** wherein the first composition has at least one buffering agent selected from the group consisting of dibasic sodium phosphate heptahydrate, citric acid monohydrate and EDTA.

**30**. The method of claim **23** wherein the first composition comprises 0.01% w/v bimatoprost and 0.02% w/v benzalkonium chloride.

* * * * *



US008309605B2

(12) **United States Patent**

Chang et al.

(10) **Patent No.:** **US 8,309,605 B2**

(45) **Date of Patent:** *Nov. 13, 2012

(54) **ENHANCED BIMATOPROST OPHTHALMIC SOLUTION**

(75) Inventors: **Chin-Ming Chang**, Tustin, CA (US); **James N. Chang**, Newport Beach, CA (US); **Rhett M. Schiffman**, Laguna Beach, CA (US); **R. Scott Jordan**, Trabuco Canyon, CA (US); **Joan-En Chang-Lin**, Tustin, CA (US)

(73) Assignee: **Allergan, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/965,514**

(22) Filed: **Dec. 10, 2010**

(65) **Prior Publication Data**

US 2011/0124737 A1     May 26, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/083,261, filed on Mar. 16, 2005, now Pat. No. 7,851,504.

(51) **Int. Cl.**
*A61K 31/19* (2006.01)
*A61K 31/215* (2006.01)

(52) **U.S. Cl.** ........................................ 514/530; 514/573

(58) **Field of Classification Search** .................. 514/530, 514/573
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,055,602 A | 10/1977 | Nelson | |
| 4,100,192 A | 7/1978 | Morozowich | |
| 4,122,282 A | 10/1978 | Nelson | |
| 4,123,441 A | 10/1978 | Johnson | |
| 4,128,577 A | 12/1978 | Nelson | |
| RE29,926 E | 3/1979 | Nelson | |
| 4,171,331 A | 10/1979 | Biddlecom | |
| 4,183,870 A | 1/1980 | Caton | |
| 4,303,796 A | 12/1981 | Nelson | |
| 4,382,953 A | 5/1983 | Ishii | |
| 4,543,353 A | 9/1985 | Faustini | |
| 4,599,353 A | 7/1986 | Bito | |
| 4,812,457 A | 3/1989 | Narumiya | |
| 4,994,274 A | 2/1991 | Chan | |
| 5,034,413 A | 7/1991 | Chan | |
| 5,281,591 A | 1/1994 | Burke | |
| 5,352,708 A | 10/1994 | Woodward et al. | |
| 5,474,979 A | 12/1995 | Ding | |
| 5,510,383 A | 4/1996 | Bishop | |
| 5,545,665 A | 8/1996 | Burk | |
| 5,587,391 A | 12/1996 | Burk | |
| 5,607,978 A | 3/1997 | Woodward | |
| 5,688,819 A | 11/1997 | Woodward | |
| 6,403,649 B1 | 6/2002 | Woodward | |
| 6,596,765 B2 | 7/2003 | Ueno | |
| 6,646,001 B2 | 11/2003 | Hellberg | |
| 6,743,439 B1 | 6/2004 | Castillo | |

| | | | |
|---|---|---|---|
| 6,933,289 B2 | 8/2005 | Lyons | |
| 8,017,655 B2 | 9/2011 | Woodward | |
| 2002/0103255 A1 | 8/2002 | Hellberg | |
| 2004/0029771 A1 | 2/2004 | Rigdon | |
| 2004/0115234 A1 | 6/2004 | Gewirtz | |
| 2005/0004074 A1 | 1/2005 | Lyons | |
| 2005/0276867 A1 | 12/2005 | Lyons | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2144967 | 3/1994 |
| CA | 2498233 | 3/2004 |
| DE | 2 721 534 | 12/1977 |
| EP | 0 093 380 | 11/1983 |
| EP | 0 102 230 | 3/1984 |
| EP | 0098141 | 11/1984 |
| EP | 0 253 094 | 1/1988 |
| EP | 0 453 127 | 10/1991 |
| EP | 0 364 417 | 4/2004 |
| FR | 2239458 | 2/1975 |
| FR | 2 312 240 | 12/1976 |
| FR | 2 386 523 | 11/1978 |
| FR | 2 402 644 | 4/1979 |
| JP | S49-069636 | 7/1974 |
| JP | S62-215537 | 9/1987 |
| LU | 68 940 | 12/1973 |
| WO | WO90/02553 | 3/1990 |
| WO | WO 92-08465 | 5/1992 |
| WO | WO 94-006433 | 3/1994 |
| WO | WO 02-07731 | 1/2002 |
| WO | WO 2004-013119 | 2/2004 |

OTHER PUBLICATIONS

Higaki, Kazutaka; et al.: Estimation and Enhancement of In Vitro Corneal Transport of S-1033, a Novel Antiglaucoma Medication, International Journal of Pharmaceutics 132, 165-173 (1996).

Kaur, Indu Pal: et al.: Penetration Enhancer and Ocular Bioadhesives: Two New Avenues for Ophthalmic Drug Delivery. Drug Development and Industrial Pharmacy, 28 (4), 353-369 (2002).

Lumigan ®, 6 Pages, Jul. 2003.

Lumigan ® 0,1 mg/ml, 3 pages, Jan. 2010.

Xalatan ® Eye Drops, 3 pages, Retrieval Date : Oct. 2, 2010, http://home.intekom.com/pharm/pharmaca/xalatan.html.

Burstein, Neal; Preservative Alteration of Corneal Permeability in Humans and Rabbits, Investigative Ophthalmology & Visual Science, vol. 25, No. 12, Dec. 1984, pp. 1453-1457.

Curri, Joanne (Hi-Tech Pharmacal Co., Inc., Amityville, NY). Paragraph IV Letter to: Allergan, Inc. (Irvine, CA). 12 pages, Dec. 23, 2011.

Keller, N.; et al.: Increased Corneal Permeability Induced by the Dual Effects of Transient Tear Film Acidification and Exposure to Benzalkonium Chloride, Exp. Eye Res., vol. 30, 1980, pp. 203-210.

Lumigan® Label, Jul. 2003.

(Continued)

*Primary Examiner* — Zohreh Fay

(74) *Attorney, Agent, or Firm* — John E. Wurst; Doina G. Ene; Allergan, Inc.

(57) **ABSTRACT**

A composition comprising from 0.005% to 0.02% bimatoprost by weight and from 100 ppm to 250 ppm benzalkonium chloride, wherein said composition is an aqueous liquid which is formulated for ophthalmic administration is disclosed herein.

A method which is useful in treating glaucoma or ocular hypertension related thereto is also disclosed herein.

**21 Claims, 2 Drawing Sheets**

OTHER PUBLICATIONS

Bito, Laszlo et al., The Ocular Pharmacokinetics of Eicosanoids and Their Derivatives. 1. Comparison of Ocular Eicosanoid Penetration and Distribution Following the Topical Application of $PGF_{2\alpha}$, $PGF_{2\alpha}$-1-methyl Ester, and $PGF_{2\alpha}$-1-Isopropyl Ester, Exp. Eye Res., vol. 44, pp. 217-226 (1987).

Noecker, Robert et al., "Corneal and Conjunctival Changes Caused by Commonly Used Glaucoma Medications", Cornea, vol. 23, No. 5, pp. 490-496 (Jul. 2004).

Pfeiffer, N. et al., "New Development in Glaucoma Drug Therapy", Ophthalmology, vol. 89, pp. W1-W13 (1992).

Schumer, Robert et al., "Medical Treatment of Glaucoma", Ophthalmology, vol. 2, pp. 140-150 (1991).

Woodford, Roger et al., "Penetration Enhancers and the Percutaneous Absorption of Drugs : An Update", J. Toxicology-Cut. & Ocular Toxicology, vol. 5(3), pp. 167-177 (1986).

Burstein, Neal L. et al., "Electrophysiologic and Morphologic Effects of Ophthalmic Preparations on Rabbit Cornea Epithelium," Invest. Ophthalmol. Visual Sci., vol. 16, No. 10, 899-911, Oct. 1977.

Camber, Ola et al., "Influence of Some Preservatives on the Corneal Permeability of Pilocarpine and Dexamethasone, in Vitro", International Journal of Pharmaceutics, vol. 39, pp. 229-234 (1987).

Eisenberg, Dan et al., "Bimatoprost and Travoprost: A Review of Recent Studies of Two New Glaucoma Drugs", Survey of Ophthalmology, vol. 47, sup. 1, SI05-S115, Aug. 2002.

Green, Keith et al.. "Prednisolone Phosphate Penetration Into and Through the Cornea," Investigative Ophthalmology, vol. 13, No. 4, 316-319, Apr. 1974.

Lumigan® monograph in the 57th PDR (2003).

Mealy, N.E. et al., "Ophthalmic Drugs," Drugs of the Future, 27(5), 509-523, 2002.

Medical Review, Application No. 21-275, Center for Drug Evaluation and Research, 2001.

Pfister, Roswell R. et al., "The Effects of Ophthalmic Drugs, Vehicles, and Preservatives on Corneal Epithelium: a Scanning Electron Microscope Study," Effects of Ophthalmic Drugs, vol. 15, No. 4, 246-259, Apr. 1976.

Remington, The Science and Practice of Pharmacy, 20th ed. at 831 (2000).

Remington, The Science and Practice of Pharmacy, 21st ed. at 864 (2005).

Stewart, William et al., "Corneal Punctate Staining with Latanoprost, Bimatoprost, and Travoprost in Healthy Subjects", J. Glaucoma, vol. 12, No. 6.475'479, Dec. 2003.

Xalatan ® monograph in the 59th PDR (2005).

Arndt, H.C. et al., "The Synthesis and Biological Activity of Prostaglandins Analogs Containing Spirocyclic Rings," Prostaglandins, vol. 13, No. 5, Stoneham, MA, pp. 837-843 (May 1977).

Bito, I.Z, Prostaglandins and Related Compounds as Potential Ocular Therapeutic Agents, Biological Protection with Prostaglandins, CRC Press Inc., pp. 231-252 (1985).

Bito, I.Z, "Prostaglandins, Old Concepts and New Perspectives," Arch Oph., vol. 105, pp. 1036-1039 (Aug. 1987).

Brown, Michael, "Control of Contamination in Ophthalmic Solutions," 60 Proc. R. Soc. Med. 354 (1967).

Burstein, Neal, "Preservative Cytotoxic Threshold for Benzalkonium Chloride and Chlorhexidine Digluconate in Cat and Rabbit Corneas," 19(3) Invest. Opthal. & Visual Sci. 308 (1980).

Camras, Carl et al., "Reduction of Intraocular Pressure by Prostaglandins Applied Topically to the Eyes of Conscious Rabbits," 16 Invest. Ophthal. Visual Sci. 1125 (1977).

Camras, C.B. et al., "Reduction of Intraocular Pressure in Normal and Glaucomatous Primate (Aotus trivirgatus) Eyes by Topically Applied Prostaglandin $F2\alpha$," 1 Current Eye Research 205-09, vol. 1, No. 4 (1981).

Center for Drug Evaluation and Research, Summary Review of Application No. 22-184 (Lumigan@ 0.01%) (Jul. 2010).

De Clercq, P. et al., "Cyclopentanones-VXI.., Prostaglandin Synthesis Involving Catalytic Hydrogenation of 2,3-Dialkyl-4-Hydroxy-2-Cyclopentenones," Tetrahedron: vol. 32, pp. 2747-2752 (1976).

Deardorff, Dwight et al., "Ophthalmic Preparation," in Remington's Pharmaceutical Sciences 1488 (15th ed. 1975).

Dubiner, Harvey et al., "Efficacy and Safety of Bimatoprost in Patients With Elevated Intraocular Pressure: a 30-Day Comparison With Latanoprost," 45 (4) Surv. Ophthalmol S353-60 (2001).

Gandolfi, Stefano et al., "Three-month Comparison of Bimatoprost and Latanoprost in Patients With Glaucoma and Ocular Hypertension," 18 Adv Ther 110-21 (2001).

Giuffrè, Giuseppe, "The Effects of Prostaglandin F2α in the Human Eye," 222 Graefe's Archive Clin. & Exper. Ophthal. 139 (1985).

Handbook of Pharmaceutical Excipients, Monographs for Water, Sodium Phosphate, Sodium Chloride, and Citric Acid Monohydrate (1994).

Honohan, Thomas et al., "Duration of Activity of the Acid, Methyl Ester and Amide of an Orally Active Platelet Aggregation Inhibitory Prostanoid in the Rat," 19 Prostoglandins 139 (1980).

Katz, Jay et al., "Twelve-Month, Randomized, Controlled Trial of Bimatoprost 0.01%, 0.0125%, and 0.03% in Patients with Glaucoma or Ocular Hypertension," 149(4) Am J. Ophthalmology 661-671 (2010).

Laibovitz, Robert et al., "Comparison of the Ocular Hypotensive Lipid AGN 192024 With Timolol," 119 Arch. Ophthal. 994 (2001).

Lawrence, C.A., "An Evaluation of Corneal Preservatives for Ophthalmic Solutions," 44(8) J. Am. Pharm. Assoc. 457 (1955).

Lawrence, C.A., "Chemical Preservatives for Ophthalmic Solutions," 39 Am. J. Ophthal. 385 (1955).

Martin, F.N. et al., "Preparation of Ophthalmic Solutions With Special Reference to Hydrogen Ion Concentration and Tonicity," 44 Arch. Ophthal. 561 (1950).

Maurice, David, "The Effect of the Low Blink Rate in Rabbits on Topical Drug Penetration," 11(3) J. Ocular Pharmacology and Therapeutics 297-304 (1995).

McPherson, Samuel et al., "Self-Sterilizing Ophthalmic Solutions," 32 Am. J. Ophthalmol. 675 (1949).

Mullen, William et al., "Ophthalmic Preservatives and Vehicles," 17(6) Surv. Ophthal. 469 (1973).

Nilsson, Siv et al., "PGF2α Increases Uveoscleral Outflow," ARVO Abstract, p. 284, Invest. Ophthalmol. Vis. Sci. 28 (1987).

Noecker, Robert et al., "Bimatoprost/Latanoprost Study Group. A Six Month Randomized Clinical Trial Comparing the Intraocular Pressure Lowering Efficacy of Bimatoprost and Latanoprost in Patients With Ocular Hypertension or Glaucoma," 135 Am J. Ophthalmol 55-63 (Jan. 2003).

O'Brien, C.S. et al., "Carbaminoyl-choline Chloride in the Treatment of Glaucoma Simplex," 27 Arch. Ophthal. 253 (1942).

O'Brien, C.S. et al., "Doryl in the Treatment of Glaucoma Simplex," 39 Tran. Am. Ophthal. Soc. 175 (1941).

Parrish, Richard et al., "A Comparison of Latanoprost, Bimatoprost, and Travoprost in Patients With Elevated Intraocular Pressure: A 12-Week, Randomized, Masked Evaluator Multicenter Study," 135 Am J. Ophthalmol 688-703 (2003).

Physicians' Desk Reference, 59th ed., pp. 555-556 (2005).

Physicians' Desk Reference, 56th ed., pp. 212-13, 543, 553-54, 2864-65 (2002).

Roggeband, R. et al., "Eye Irritation in Rabbit and Man After Single Applications of Equal Volumes of Undiluted Model Liquid Detergent Products," 38 Food & Chem. Toxic. 727 (2000).

Sasaki, Hitoshi et al., "Modification of Ocular Permeability of Peptide Drugs by Absorption Promoters," 23(12) Biol. Pharm. Bull. 1524 (2000).

Sasaki, Hitoshi et al., "Ophthalmic Preservatives as Absorption Promoters for Ocular Drug Delivery," 47 J. Pharm. Pharmacol. 703 (1995).

Sasaki, Hitoshi et al., "Ocular Permeability of FITC-Dextran with Absorption Promoter for Ocular Delivery of Peptide Drug," 3 J. Drug Target. 129 (1995).

Skolaut, Milton, "Ophthalmic Medication," 5(4) Bull. Am. Soc. Hosp. Pharm. 172 (1948).

Starr, M.S., "Further Studies on the Effect of Prostaglandin on Intraocular Pressure in the Rabbit," Exp. Eye. Res., 11 179-191 (1971).

Stern, F.A. et al., "Comparison of the Hypotensive and Other Ocular Effects of Prostaglandins E2 and F2α on Cat and Rhesus Monkey Eyes," 22 Invest. Ophthalmology Visual Sci. 588-98 (1982).

Thygesen, J. et al., "Short-term Effect of Latanoprost and Timolol Eye Drops on Tear Fluid and the Ocular Surface in Patients with

US 8,309,605 B2

Page 3

Primary Open-Angle Glaucoma and Ocular Hypertension," 78 Acta Ophthalmol. Scand. 37-41 (2000).

Walter, Thomas et al., "24-Hour IOP Control with Once-daily Bimatoprost, Timolol Gel-forming Solution, or Latanoprost: A 1-Month, Randomized, Comparative Clinical Trial," 49 (Supp. 1) Survey of Ophthalmology S26-S35 (2004).

Walter, Modell, "Pharmacologic Action of Some Ophthalmic Drugs," 37 Arch. Opthal. 160 (1947).

Xu, Ke-Ping et al., "Corneal Organ Culture Model for Assessing Epithelial Responses to Surfactants," 58 Tox. Sci. 306 (2000).

Neal L. Dursrein, "Alteration of Corneal Permeability in Humans and Rabbits" Investigative Ophthalmology & Visual Science / Dec. 1984.

Vincent H.L. Lee, "Review: Topical Ocular Drug Delivery: Recent Developments and Future Challenges", Journal of Ocular Pharmacology, vol. 2, No. 1, 1986, pp. 67-108.

Ola Camber, "Influence of some preservatives on the corneal permeability of pilocarpine and dexamethasone, in vitro", International Journal of Phatmaceurics. 39 (1987) 229-234.

Kazutaka Higaki, "Estimation and enhancement of in vitro corneal transport S-1033, a novel antiglaucoma medication", International Journal of Pharmaceutics 132 (1996) 165 173.

SANDOZ Paragraph4 letter dated Jul. 11, 2011.

Remington's Pharmaceutical Sciences 1501 (15th ed. 1975).

James Leslie Boyd, Quantitative Comparison of Methods of Administering Phvsostigmine, 30 (4) Archives Ophthalmology 521-525 (1943).

H. Barry Collin. Ultrastructural Changes to Corneal Stromal Cells Due to Ophthalmic Preservatives. 64 ACTA Opthalmalogica 72-78 (1986).

Andrew J.W. Huang et al., Paracellular Permeability of Corneal and Conjunctival Epithelia, 30(4) Investigative Opthalmology & Visual Sci., 684-689 (1989).

Komei Okabe et al., Effect of Benzalkonium Chloride on Transscleral Drug Delivery, 46 Investigative Ophthalmology & Visual Sci. 703-708 (2005).

Donald J. Lyle, M.D., Early Ocular Manifestations in the Laurence-Moon-Biedl Syndrome, 29 Am J. Ophthalmology 939-946 (1946).

Vincent H. L. Lee & Hans Bundgaard, Improved Ocular Drug Delivery with Prodrugs, in Prodrugs, Topical & Ocular Drug Delivery 221-297 (1992).

Norman F.H. Ho et al., Physical Model Approach to the Design of Drugs with Improved Intestinal Absorption, in Design of Biopharmaceutical Properties through Prodrugs & Analogs, 136-227 (Edward B. Roche ed., 1977).

Laszlo Z. Bito, Prostaglandins, Other Eicosanoids, and Their Derivatives as Potential Antiglaucoma Agents, in Glaucoma: Applied Pharmacology in Medical Treatment 477-505 (1984).

William L. Miller et al.. Biological Activities of 17-Phenyl-18, 19,20-Trinorprostaglandins, 9 Prostaglandins 9 -18 (1975).

Declaration of Larry Wheeler, Ph.D.; Dec. 14, 2010.

Cantor LB, Hoop J, Wudunn D, Yung CW, Catoira Y, Valluri S, Cortes A, Acheampong A, Woodward DF, Wheeler LA. Levels of bimatoprost acid in the aqueous humour after bimatoprost treatment of patients with cataract. Br J Ophthalmol. May 2007;91(5):629-32. Epub Nov. 29, 2006.

Davies SS, Ju WK, Neufeld AH, Abran D, Chemtob S, Roberts LJ II. Hydrolysis of bimatoprost (Lumigan) to its free acid by ocular tissue in vitro. J Ocul Pharmacol Ther. Feb. 2003;19(1):45-54.

Camras CB, Toris CB, Sjoquist B, Milleson M, Thorngren JO, Hejkal TW, Patel N, Barnett EM, Smolyak R, Hasan SF, Hellman C, Meza JL., Wax MB, Stjernschantz J. Detection of the free acid of bimatoprost in aqueous humor samples from human eyes treated with bimatoprost before cataract surgery. Ophthalmology. Dec. 2004;111(12):2193-8.

Faulkner R, Sharif NA, Orr S, Sall K, Dubiner H, Whitson JT, Moster M, Craven ER, Curtis M, Pailliotet C, Martens K, Dahlin D. Aqueous humor concentrations of bimatoprost free acid, bimatoprost and travoprost free acid in cataract surgical patients administered multiple topical ocular doses of Lumigan or Travatan. J Ocul Pharmacol Ther. Apr. 2010;26(2):147-56.

Maxey KM, Johnson JL, Labrecque J. The hydrolysis of bimatoprost in corneal tissue generates a potent prostanoid FP receptor agonist. Surv Ophthalmol. Aug. 2002;47 Suppl 1:S34-40.

Bean GW, Camras CB. Commercially available prostaglandin analogs for the reduction of intraocular pressure: similarities and differences. Surv Ophthalmol. Nov. 2008;53 Suppl1:S69-84.

Camras CB, Sharif NA, Wax MB, Stjernschantz J. Bimatoprost, the prodrug of a prostaglandin analogue. Br J Ophthalmol. Jun. 2008;92(6):862-3.

Romano MR, Lograno MD. Evidence for the involvement of cannabinoid CB1 receptors in the bimatoprost-induced contractions on the human isolated ciliary muscle. Invest Ophthalmol Vis Sci. Aug. 2007;48(8):3677-82.

Sharif NA, Kelly CR, Crider JY, Williams GW, Xu SX. Ocular hypotensive FP prostaglandin (PG) analogs: PG receptor subtype binding affinities and selectivities, and agonist potencies at FP and other PG receptors in cultured cells. J Ocul Pharmacol Ther. Dec. 2003;19(6):501-15.

Sharif NA, Klimko, P. Update and commentary on the pro-drug bimatoprost and a putative 'prostamide receptor'. Expert Review of Ophthalmology. Oct. 2009;4(5):477-489.

Alm A, Nilsson SF. Uveoscleral Outflow—A Review. Exp Eye Res. Apr. 2009: 88(4) 760-8. Epub Jan. 3, 2009.

Woodward DF, Krauss AH, Nilsson SFE. Bimatoprost Effects on Aqueous Humor Dynamics in Monkeys. J Ophthalmol. 2010: Article ID 926192, 5 pages.

Sjöquist B, Johansson A, Stjernschantz J. Pharmacokinetics of latanoprost in the cynomolgus monkey. 3rd communication: tissue distribution after topical administration on the eye studied by whole body autoradiography, Glaucoma research laboratories. Arzneim-Forsch/Drug Res 1999:49:240-249.

Woodward DF, Krauss AH, Chen J, et al: The pharmacology of bimatoprost (Lumigan). Surv Ophthalmol 45(Suppl 4): S337-45, 2001.

Woodward DF, Phelps RL, Krauss AH, Weber A, Short B, Chen J, Liang Y, Wheeler LA. Bimatoprost: a novel antiglaucoma agent. Cardiovasc Drug Rev. 2004 Summer;22(2):103-20.

Katz LJ, Ichhpujani P, Hollo G et al. Comparison of Human Ocular Distribution of Bimatoprost and Latanoprost. 2010 (manuscript submitted).

Woodward DF, Krauss AH, Chen J, et al. Pharmacological characterization of a novel anti-glaucoma agent. J. Pharmacol. Exp. Ther. 305:772-85, 2003.

Frenkel RE, Noecker RJ, Craven ER. Evaluation of circadian control of intraocular pressure after a single drop of bimatoprost 0.03% or travoprost 0.004%. Curr Med Res Opin. Apr. 2008;24(4):919-23. Epub Feb. 8, 2008.

Hellberg MR, KE T-L., Haggard K, et al: The hydrolysis of the prostaglandin analog prodrug bimatoprost to 17-phenyltrinor PGF2a by human and rabbit ocular tissue. J Ocular Pharmacol Ther 19:97-103, 2003.

Sjöquist B, Stjernschantz J. Ocular and systemic pharmacokinetics of latanoprost in humans. Surv Ophthalmol. Aug. 2002;47 (Supp 1):S6-12.

Cantor LB. Reply—Bimatoprost, the prodrug of a prostaglandin analogue. Br J Ophthalmol 2008;92:863-864.

Sharif NA, Kelly CR, Crider JY. Human trabecular meshwork cell responses induced by bimatoprost, travoprost, unoprostone, and other FP prostaglandin receptor agonist analogues. Invest Ophthalmol Vis Sci 2003;44:715-21.

Sharif NA, Crider JY, Husain S, et al. Human ciliary muscle cell responses to FP-class prostaglandin analogs: phosphoinositide hydrolysis, intracellular Ca2+ mobilization and MAP kinase activation. J Ocul Pharmacol Ther 2003;19:437-55.

Stamer WD, Piwnica D, Jolas T, Carling RW, Cornell CL, Fliri H, Martos J, Pettit SN, Wang JW, Woodward DF. Cellular basis for bimatoprost effects on human conventional outflow. Invest Ophthalmol Vis Sci. Oct. 2010;51(10):5176-81. Epub Apr. 30, 2010.

Resul B, Stjernschantz J, No K, Liljebris C, Selén G, Astin M, Karlsson M, Bito LZ. Phenyl-substituted prostaglandins: potent and selective antiglaucoma agents. J Med Chem. Jan. 22, 1993;36(2):243-8.

Stjernschantz J. Studies on ocular inflammation and development of a prostaglandin analogue for glaucoma treatment. Exp Eye Res. Apr. 2004;78(4):759-66.

Stjernschantz JW. From PGF2α-isopropyl ester to latanoprost: a review of the development of Xalatan: the Proctor Lecture. Invest Ophthalmol Vis Sci. May 2001;42(6):1134-45.

FDA Label for Approved NDA 22-184 of Lumigan 0.01% and Lumigan 0.03%, Aug. 31, 2010.

Sharif NA, Kaddour-Djebbar I, Abdel-Latif AA. Cat iris sphincter smooth-muscle contraction: comparison of FP-class prostaglandin analog agonist activities. J Ocul Pharmacol Ther. Apr. 2008;24(2):152-63.

Spada CS, Krauss AH, Woodward DF, Chen J, Protzman CE, Nieves AL, Wheeler LA, Scott DF, Sachs G. Bimatoprost and prostaglandin F(2 alpha) selectively stimulate intracellular calcium signaling in different cat iris sphincter cells. Exp Eye Res. Jan. 2005;80(1):135-45.

Woodward, D.F., Krauss, A.H., Wang, J.W., Protzman, C.E., Nieves, A.L., Liang, Y., Donde, Y., Burk, R.M., Landsverk, K., Struble, C. "Identification of an antagonist that selectively blocks the activity of prostamides (prostaglandin ethanolamides) in the feline iris." Br. J. Pharmacol. 150:342-352 (2007).

Liang, Y., Woodward, D.F., Guzman, V.M., Li, C., Scott, D.F., Wang, J.W., et al. (2008). "Identification and pharmacological characterization of the prostaglandin FP receptor and FP receptor variant complexes." Br. J. Pharmacol. 154: 1079-1093.

Van Alphen Gwhm, Wilhelm PB, Elsenfeld PW. The effect of prostaglandins on the isolated internal muscles of the mammalian eye, including man. Documenta Ophthalmologica, 1976, vol. 42, No. 2, pp. 397-415.

Poyer JF, Millar C, Kaufman PL. Prostaglandin F2 alpha effects on isolated rhesus monkey ciliary muscle. Invest Ophthalmol Vis Sci. Nov. 1995;36(12):2461-5.

Yamaji K, Yoshitomi T, Ishikawa H, Usui S. Prostaglandins E1 and E2, but not F2alpha or latanoprost, inhibit monkey ciliary muscle contraction. Curr Eye Res. Aug. 2005;30(8):661-5.

Berglund BA, Boring DL, Howlett AC. Investigation of structural analogs of prostaglandin amides for binding to and activation of CB1 and CB2 cannabinoid receptors in rat brain and human tonsils. Adv Exp Med Biol. 1999;469:527-33.

Cadet P, Mantione KJ, Stefano GB. Molecular identification and functional expression of mu 3, a novel alternatively spliced variant of the human mu opiate receptor gene. J Immunol. May 15, 2003;170(10):5118-23.

Vielhauer GA, Fujino H, Regan JW. Cloning and localization of hFP(S): a six-transmembrane mRNA splice variant of the human FP prostanoid receptor. Arch Biochem Biophys. Jan. 15, 2004;421(2):175-85.

Jordan BA, Devi LA. G-protein-coupled receptor heterodimerization modulates receptor function. Nature. Jun. 17, 1999;399(6737):697-700.

White JH, Wise A, Main MJ, Green A, Fraser NJ, Disney GH, Barnes AA, Emson P, Foord SM, Marshall FH. Heterodimerization is required for the formation of a functional GABA(B) receptor. Nature. Dec. 17, 1998;396(6712):679-82.

Wilson SJ, Roche AM, Kostetskaia E, Smyth EM. Dimerization of the human receptors for prostacyclin and thromboxane facilitates thromboxane receptor-mediated Camp generation. J Biol Chem. Dec. 17, 2004;279(51):53036-47. Epub Oct. 7, 2004.

Crowston et al. Effect of Bimatoprost on Intraocular Pressure in Prostaglandin FP Receptor Knockout Mice. Investigative Ophthalmology and Visual Science, 46:4571-77 (2005).

Response from the Food and Drug Administration to Pfizer's Citizen Petition and a Supplement (Aug. 31, 2010) at 23 (Exhibit 5).

Complaint for Patent Infringment: Civil Action No. 1:10-Cv-681; Allergan, Inc. and Duke University V. Apotex Inc. and Apotex Corp.; Filed Sep. 8, 2010.

Answer, Defences and Counterclaims of Defendants Apotex Inc. and Apotex Corp, Civil Action No. 10-Cv-681; Allergan, Inc. and Duke University v. Apotex Inc. and Apotex Corp.

Asbjorn Tonjum, Permeability of Rabbit Corneal Epithelium to Horseradish Peroxidase After the Influence of Benzalkonium Chloride, Acta Ophthalmologica, Jan. 22, 1975, vol. 53, p. 335-347.

Diane Tang-Liu, Effects of Four Penetration Enhancers on Corneal Permeability of Drugs in Vitro, Journal of Pharmaceutical Sciences, 1994, vol. 83(1), p. 85-90.

George Grass, Mechanisms of Corneal Drug Penetration I: In Vivo and In Vitro Kinetics, Journal of Pharmaceutical Sciences, Jan. 1988, vol. 77(1), p. 3-14.

Keith Green, Influence of Various Agents on Corneal Permeability, American Journal of Ophthalmology, 1971, vol. 72, p. 897-905.

Martina Scholz, Pilocarpine Permeability Across Ocular Tissues and Cell Cultures: Influence of Formulation Parameters, Journal of Ocular Pharmacology and Therapeutics, 2002, vol. 18(5), p. 455-468.

Paul Ashton, Formulation Influence on Conjunctival Penetration of Four Beta Blockers in the Pigmented Rabbit: A Comparison with Corneal Penetration, Pharmaceutical Research, 1991, vol. 8(9), p. 1166-1174.

Pierre-Jean Pisella, Conjunctival Proinflammatory and Proapoptotic Effects of Latanoprost and Preserved and Unpreserved Timolol: An Ex Vivo and In Vitro Study, Investigative Ophthalmology & Visual Science, 2004, vol. 45, p. 1360-1368.

Pieter Van Der Bijl, Effects of Three Penetration Enhancers on Transcorneal Permeation of Cyclosporine, 2001, vol. 20(5), p. 505-508.

Samir Podder, Improving the Safety of Topically Applied Timolol in the Pigmented Rabbit Through Manipulation of Formulation Composition, Exp. Eye Res., 1992, vol. 54, p. 747-757.



Fig. 1



**Fig. 2**

US 8,309,605 B2

**1**

# ENHANCED BIMATOPROST OPHTHALMIC SOLUTION

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 11/083,261, filed Mar. 16, 2005, which is incorporated herein by reference in its entirety.

## FIELD OF THE INVENTION

This invention relates to pharmaceutical compositions comprising bimatoprost.

## BACKGROUND OF THE INVENTION

### Description of Related Art

Bimatoprost, shown below, is a prostamide marketed commercially for the treatment of glaucoma and ocular hypersion.



Formula I

Benzalkonium chloride (BAK) is a preservative used in many commercial ophthalmic products to prevent microbial contamination in multi-use products. The commercial eye drops (Bimatoprost, Allergan, Inc., Irvine, Calif.) contain 0.03% bimatoprost and 0.005% BAK. Although no other prostamides are currently marketed for the treatment of glaucoma, several prostaglandin analogs are commercially available which use BAK as a preservative. These include latanoprost (Xalatan), travoprost (Travatan), and unoprostone isopropyl (Rescula), which require significantly more BAK, from 150-200 ppm, to meet antimicrobial effectiveness tests in the United States and Europe.

U.S. Pat. No. 6,596,765 B2 discloses a composition comprising 0.005% or 0.0005% latanoprost and 0.2 mg/mL BAK.

U.S. Pat. No. 6,646,001 B2 discloses compositions comprising 0.03% bimatoprost and 0.01% BAK or "0.01%+5% excess" BAK.

## BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. **1** is a plot showing the aqueous humor concentration of the parent acid of bimatoprost after topical administration of several formulations.

FIG. **2** is a plot showing the membrane permeability of bimatoprost in several different formulations.

## DETAILED DESCRIPTION OF THE INVENTION

A composition comprising from 0.005% to 0.02% bimatoprost by weight and from 100 ppm to 250 ppm benzalkonium

**2**

chloride, wherein said composition is an aqueous liquid which is formulated for ophthalmic administration is disclosed herein.

A method which is useful in treating glaucoma or ocular hypertension related thereto is also disclosed herein.

An aqueous liquid which is formulated for ophthalmic administration is formulated such that it can be administered topically to the eye. The comfort should be maximized as much as possible, although sometimes formulation considerations (e.g. drug stability) may necessitate less than optimal comfort.

In certain compositions the concentration of bimatoprost is from 0.01% to 0.02%. In other compositions the concentration of bimatoprost is from 0.015% to 0.02%.

In certain compositions the concentration of BAK is from 150 ppm to 200 ppm. In other compositions the concentration of BAK is from 150 ppm to 200 ppm. In other compositions the concentration of BAK is from 150 ppm to 250 ppm.

In ophthalmic compositions, a chelating agent may be used to enhance preservative effectiveness. Suitable chelating agents are those known in the art, and, while not intending to be limiting, edetate salts (EDTA) are useful chelating agents.

In certain compositions, concentration of EDTA is at least 0.001%. In other compositions, the concentration of EDTA is at least 0.01%. In other compositions the concentration of EDTA is 0.15% or less. In other compositions the concentration of EDTA is 0.1% or less. In other compositions the concentration of EDTA is 0.05% or less.

Certain compositions comprise from 150 to 250 ppm BAK and an effective amount of EDTA.

As is known in the art, buffers are commonly used to adjust the pH to a desirable range for ophthalmic use. Generally, a pH of around 6-8 is desired, and in certain compositions a pH of 7.4 is desired. Many buffers including salts of inorganic acids such as phosphate, borate, and sulfate are known.

Another commonly used excipient in ophthalmic compositions is a viscosity-enhancing, or a thickening agent. Thickening agents are used for a variety of reasons, ranging from improving the form of the formulation for convenient administration to improving the contact with the eye to improve bioavailability. The viscosity-enhancing agent may comprise a polymer containing hydrophilic groups such as monosaccharides, polysaccharides, ethylene oxide groups, hydroxyl groups, carboxylic acids or other charged functional groups. While not intending to limit the scope of the invention, some examples of suitable viscosity-enhancing agents are sodium carboxymethylcellulose, hydroxypropylmethylcellulose, povidone, polyvinyl alcohol, and polyethylene glycol.

In ophthalmic solutions, tonicity agents often are used to adjust the composition of the formulation to the desired isotonic range. Tonicity agents are well known in the art and some examples include glycerin, mannitol, sorbitol, sodium chloride, and other electrolytes.

One composition has a pH of 7.4 and consists essentially of 0.015% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

Another composition has a pH of 7.4 and comprises 0.02% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

Another composition has a pH of 7.4 and consists of 0.01% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

The best mode of making and using the present invention are described in the following examples. These examples are given only to provide direction and guidance in how to make and use the invention, and are not intended to limit the scope of the invention in any way.

US 8,309,605 B2

**3**

One embodiment comprises 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment comprises 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment comprises 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment comprises 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment consists of 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

## EXAMPLE 1

Formulations containing 0.268% sodium phosphate dibasic heptahydrate, 0.014% citric acid, 0.83% sodium chloride, with the pH adjusted to 7.3 in qs water, and the amounts of bimatoprost, BAK, and EDTA listed in Table 1 below are prepared by conventional methods well known in the art.

**4**

TABLE 1

| Formulation |
| --- |
| 1. 0.03% Bimatoprost (50 ppm BAK) Control |
| 2. 0.03% Bimatoprost - 200 ppm BAK |
| 3. 0.03% Bimatoprost - 0.015% TPGS (no preservative) |
| 4. 0.03% Bimatoprost - 0.2% TPGS (no preservative) |
| 5. 0.03% Bimatoprost - 0.4% TPGS (no preservative) |
| 6. 0.03% Bimatoprost - 1.0% TPGS (no preservative) |

## EXAMPLE 2

Studies were carried out to determine the effect of benzalkonium chloride (BAK) and d-alpha tocopheryl polyethylene glycol 1000 succinate (TPGS) on ocular absorption of bimatoprost in vivo. For the in vivo study, eighteen female rabbits were given a single 28 μL eyedrop bilaterally and aqueous humor samples were collected (n=3 animals with 6 eyes per formulation) at 60 min postdose. Two rabbits (4 eyes) remained untreated to serve as pre-dose bioanalytical controls. Bimatoprost and its parent carboxylic acid extracted from aqueous humor and in vitro samples were analyzed by a liquid chromatography tandem mass spectrometry (LC-MS/MS) method with a quantitation range of 0.25-60 ng/mL.

Due to extensive metabolism of bimatoprost in rabbit eyes, its parent acid was used as a surrogate for determining ocular absorption of bimatoprost. Concentration of the acid in rabbit aqueous humor following single dose of 6 different bimatoprost formulations are summarized in FIG. **1** and Table 2 below.

TABLE 2

| Formulation | Aqueous Humor[a] (ng/mL) |
| --- | --- |
| 1. 0.03% Bimatoprost (50 ppm BAK) Control | 51.0 ± 9.4 |
| 2. 0.03% Bimatoprost - 200 ppm BAK | 87.2 ± 19.0* |
| 3. 0.03% Bimatoprost - 0.015% TPGS (no preservative) | 26.1 ± 3.3* |
| 4. 0.03% Bimatoprost - 0.2% TPGS (no preservative) | 22.9 ± 3.2* |
| 5. 0.03% Bimatoprost - 0.4% TPGS (no preservative) | 19.3 ± 5.6* |
| 6. 0.03% Bimatoprost - 1.0% TPGS (no preservative) | 15.4 ± 3.3* |

[a]Mean ± SD. Per formulation, N = 3 rabbits (6 eyes).
*Statistically different (p < 0.05) compared to 0.03% Bimatoprost

Test formulations containing 0.015%, 0.2%, 0.4% and 1.0% TPGS resulted in a lower aqueous humor carboxylic acid concentration compared to Bimatoprost by 52%, 59%, 62% and 72%, respectively. In contrast, 0.03% Bimatoprost containing 200 ppm BAK resulted in 57% higher aqueous humor AGN 191522 concentration compared to Bimatoprost (50 ppm BAK).

While not intending to limit the scope of the invention in any way, or be bound by theory, compared to the Bimatoprost control, formulations containing TPGS resulted in decrease bimatoprost permeability. In contrast, formulations with higher BAK resulted in higher permeability.

## EXAMPLE 3

Formulations containing 0.268% sodium phosphate dibasic heptahydrate, 0.014% citric acid, 0.83% sodium chloride, with the pH adjusted to 7.3 in qs water, and the amounts of bimatoprost, BAK, and EDTA listed in Table 3 below are prepared by conventional methods well known in the art.

US 8,309,605 B2

| 5 | 6 |

**TABLE 3**

| Formulation |
| --- |
| A. 0.03% Bimatoprost (50 ppm BAK) - Control |
| B. 0.015% Bimatoprost (50 ppm BAK) |
| C. 0.015% Bimatoprost (50 ppm BAK) 0.03% EDTA |
| D. 0.015% Bimatoprost (200 ppm BAK) |
| E. 0.015% Bimatoprost (200 ppm BAK) 0.03% EDTA |
| F. 0.015% Bimatoprost (50 ppm BAK) 0.015% EDTA |
| G. 0.015% Bimatoprost (200 ppm BAK) 0.015% EDTA |
| H. 0.015% Bimatoprost (125 ppm BAK) |
| I. 0.015% Bimatoprost (125 ppm BAK) 0.03% EDTA |
| J. 0.015% Bimatoprost (125 ppm BAK) 0.015% EDTA |
| K. 0.015% Bimatoprost (150 ppm BAK) |
| L. 0.015% Bimatoprost (150 ppm BAK) 0.1% EDTA |
| M. 0.015% Bimatoprost |
| N. 0.03% Bimatoprost |

### EXAMPLE 4

The effect of benzalkonium chloride (BAK) and ethylene-diaminetetraacetic acid (EDTA) on bimatoprost permeability across primary culture of rabbit corneal epithelial cell layers (RCECL). Corneal epithelial cells were harvested from New Zealand White rabbits and cultured on Transwell™ filters until confluency (Day 5). For the transport experiment, cells were first equilibrated in transport buffer for 1 hour at 37° C. Dosing solution containing 0.015% or 0.03% bimatoprost with varying concentrations of BAK and EDTA was then applied to the apical compartment of the Transwell™ (2 cultures; n=3-4 per culture) and the cells were incubated at 37° C. At 30, 60, 90 and 120 minutes postdose, 200 μL samples were taken from the basolateral chamber for apical to basolateral (AB) transport. The samples were analyzed by a liquid chromatography tandem mass spectrometry (LC-MS/MS) method with quantitation range of 1-600 ng/mL.

The results are presented in FIG. 2.

### EXAMPLE 5

A drop of formulation J is administered once daily topically to the eye of a person suffering from glaucoma. After a few hours, intraocular pressure drops more and less hyperemia is observed than would be observed for formulation A. Lowered intraocular pressure persists for as long as the treatment continues.

What is claimed is:

**1**. A method of lowering elevated intraocular pressure in a patient with open-angle glaucoma or ocular hypertension which comprises applying to the eyes of the patient an aqueous solution comprised of:

about 0.01% w/v bimatoprost;

about 200 ppm benzalkonium chloride;

the solution having a pH of about 7.3;

a phosphate buffer; and,

water.

**2**. The method of claim **1** wherein the bimatoprost is present in a concentration of 0.01% w/v and the phosphate buffer is dibasic sodium phosphate.

**3**. The method of claim **1** further comprising 0.03% EDTA.

**4**. The method of claims **1** or **2** wherein the patient applies the aqueous solution at least once a day.

**5**. The method of claim **4** wherein the patient applies the aqueous solution once a day.

**6**. A method of lowering intraocular pressure in a patient suffering from elevated intraocular pressure which comprises applying to the eyes of the patient an aqueous solution comprising:

0.01% w/v bimatoprost;

about 200 ppm benzalkonium chloride;

the solution having a pH of about 7.3;

a citric acid buffer; and,

water.

**7**. The method of claim **6** wherein the method is applied to patients suffering from glaucoma.

**8**. The method of claim **6** wherein the citric acid buffer is present in a concentration of about 0.01% w/v.

**9**. The method of claim **6** wherein the method is applied once a day.

**10**. The method of claim **7** wherein the glaucoma is open angle glaucoma.

**11**. The method of claim **6** wherein the solution comprises 200 ppm benzalkonium chloride.

**12**. A method of treating glaucoma in a patient comprising the following steps:

applying at least once a day a formulation comprising:

about 0.01% w/v bimatoprost;

benzalkonium chloride in the amount of about 200 ppm;

at least one buffering agent selected from the group consisting of dibasic sodium phosphate heptahydrate, citric acid monohydrate and EDTA;

and wherein the formulation has a pH of about 7.3.

**13**. The method of claim **12** wherein the formulation is an aqueous solution.

**14**. The method of claim **12** wherein the buffering agent is dibasic sodium phosphate heptahydrate.

**15**. The method of claim **12** wherein the buffering agent is citric acid monohydrate.

**16**. The method of claim **12** wherein the buffering agent is EDTA.

**17**. The method of claim **13** further comprising purified water.

**18**. A method of lowering elevated intraocular pressure in a patient with open-angle glaucoma or ocular hypertension which comprises applying to the eyes of the patient an aqueous solution comprising:

0.01% w/v bimatoprost;

0.02% w/v benzalkonium chloride;

at least two buffering agents selected from the group consisting of dibasic sodium phosphate heptahydrate, citric acid monohydrate and EDTA;

hydrochloric acid and sodium hydroxide to adjust the solution to a pH of about 7.3;

sodium chloride; and,

purified water.

**19**. The method of claim **18** wherein one of the buffering agents is citric acid monohydrate.

**20**. The method of claim **18** wherein the solution is applied to the patient's eyes at least once a day.

**21**. The method of claim **18** wherein one of the buffering agents is dibasic sodium phosphate heptahydrate.

*    *    *    *    *



US008338479B2

(12) **United States Patent**
Chang et al.

(10) **Patent No.:** US 8,338,479 B2
(45) **Date of Patent:** *Dec. 25, 2012

(54) **ENHANCED BIMATOPROST OPHTHALMIC SOLUTION**

(75) Inventors: **Chin-Ming Chang**, Tustin, CA (US); **James N. Chang**, Newport Beach, CA (US); **Rhett M. Schiffman**, Laguna Beach, CA (US); **R. Scott Jordan**, Trabuco Canyon, CA (US); **Joan-En Chang-Lin**, Tustin, CA (US)

(73) Assignee: **Allergan, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/351,383**

(22) Filed: **Jan. 9, 2009**

(65) **Prior Publication Data**

US 2009/0149546 A1    Jun. 11, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 11/083,261, filed on Mar. 16, 2005, now Pat. No. 7,851,504.

(51) **Int. Cl.**
*A61K 31/19* (2006.01)
*A61K 31/215* (2006.01)

(52) **U.S. Cl.** ........................................ 514/530; 514/573

(58) **Field of Classification Search** .................. 514/530, 514/573
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,055,602 A | 10/1977 | Nelson |
| 4,100,192 A | 7/1978 | Morozowich |
| 4,122,282 A | 10/1978 | Nelson |
| 4,123,441 A | 10/1978 | Johnson |
| 4,128,577 A | 12/1978 | Nelson |
| RE29,926 E | 3/1979 | Nelson |
| 4,171,331 A | 10/1979 | Biddlecom |
| 4,183,870 A | 1/1980 | Caton |
| 4,303,796 A | 12/1981 | Nelson |
| 4,382,953 A | 5/1983 | Ishii |
| 4,543,353 A | 9/1985 | Faustini |
| 4,599,353 A | 7/1986 | Bito |
| 4,812,457 A | 3/1989 | Narumiya |
| 4,994,274 A | 2/1991 | Chan |
| 5,034,413 A | 7/1991 | Chan |
| 5,281,591 A | 1/1994 | Burke |
| 5,352,708 A | 10/1994 | Woodward et al. |
| 5,474,979 A | 12/1995 | Ding et al. |
| 5,510,383 A | 4/1996 | Bishop |
| 5,545,665 A | 8/1996 | Burk |
| 5,587,391 A | 12/1996 | Burk |
| 5,607,978 A | 3/1997 | Woodward |
| 5,688,819 A | 11/1997 | Woodward |
| 6,403,649 B1 | 6/2002 | Woodward |
| 6,596,765 B2 | 7/2003 | Ueno |
| 6,646,001 B2 | 11/2003 | Hellberg |
| 6,743,439 B1 | 6/2004 | Castillo |

| | | |
|---|---|---|
| 6,933,289 B2 | 8/2005 | Lyons |
| 8,017,655 B2 | 9/2011 | Woodward |
| 2002/0103255 A1 | 8/2002 | Hellberg |
| 2004/0029771 A1 | 2/2004 | Rigdon |
| 2004/0115234 A1 | 6/2004 | Gewirtz |
| 2005/0004074 A1 | 1/2005 | Lyons |
| 2005/0276867 A1 | 12/2005 | Lyons |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2144967 | 3/1994 |
| CA | 2498233 | 3/2004 |
| DE | 2721534 | 12/1977 |
| EP | 0093380 | 11/1983 |
| EP | 0102230 | 3/1984 |
| EP | 0098141 | 11/1984 |
| EP | 0253094 | 1/1988 |
| EP | 0364417 | 4/1990 |
| EP | 0453127 | 10/1991 |
| FR | 2239458 | 7/1973 |
| FR | 2312240 | 12/1976 |
| FR | 2386523 | 11/1978 |
| FR | 2402644 | 4/1979 |
| JP | S49-69636 | 7/1974 |
| JP | S62215537 | 9/1987 |
| LU | 68940 | 12/1973 |
| WO | WO90/02553 | 3/1990 |
| WO | 92-08465 | 5/1992 |
| WO | WO94/06433 | 3/1994 |
| WO | 02-07731 | 1/2002 |
| WO | WO2004/013119 | 2/2004 |
| WO | WO2004/133119 | 2/2004 |

OTHER PUBLICATIONS

Declaration of Larry Wheeler, Ph.D.; Dec. 14, 2010.
Cantor LB, Hoop J, Wudunn D, Yung CW, Catoira Y, Valluri S, Cortes A, Acheampong A, Woodward DF, Wheeler LA. Levels of bimatoprost acid in the aqueous humour after bimatoprost treatment of patients with cataract. Br J Ophthalmol. May 2007;91(5):629-32. Epub Nov. 29, 2006.
Davies SS, Ju WK, Neufeld AH, Abran D, Chemtob S, Roberts Lj II. Hydrolysis of bimatoprost (Lumigan) to its free acid by ocular tissue in vitro. J Ocul Pharmacol Ther. Feb 2003;19(1):45-54.
Camras CB, Toris CB, Sjoquist B, Milleson M, Thorngren JO, Hejkal TW, Patel N, Barnett EM, Smolyak R, Hasan SF, Hellman C, Meza JL, Wax MB, Stjernschantz J. Detection of the free acid of bimatoprost in aqueous humor samples from human eyes treated with bimatoprost before cataract surgery. Ophthalmology. Dec. 2004;111(12):2193-8.
Faulkner R, Sharif NA, Orr S, Sall K, Dubiner H, Whitson JT, Moster M, Craven ER, Curtis M, Pailliotet C, Martens K, Dahlin D. Aqueous humor concentrations of bimatoprost free acid, bimatoprost and travoprost free acid in cataract surgical patients administered multiple topical ocular doses of Lumigan or Travatan. J Ocul Pharmacol Ther. Apr. 2010;26(2):147-56.
Maxey KM, Johnson JL, Labrecque J. The hydrolysis of bimatoprost in corneal tissue generates a potent prostanoid FP receptor agonist. Surv Ophthalmol. Aug. 2002;47 Suppl 1:S34-40.

(Continued)

*Primary Examiner* — Zohreh Fay
(74) *Attorney, Agent, or Firm* — John E. Wurst; Doina G. Ene; Allergan, Inc.

(57) **ABSTRACT**

A composition comprising from 0.005% to 0.02% bimatoprost by weight and from 100 ppm to 250 ppm benzalkonium chloride, wherein said composition is an aqueous liquid which is formulated for ophthalmic administration is disclosed herein.
A method which is useful in treating glaucoma or ocular hypertension related thereto is also disclosed herein.

**16 Claims, 2 Drawing Sheets**

US 8,338,479 B2

Page 2

## OTHER PUBLICATIONS

Bean GW, Camras CB. Commercially available prostaglandin analogs for the reduction of intraocular pressure: similarities and differences. Surv Ophthalmol. Nov. 2008;53 Suppl1:S69-84.

Camras CB, Sharif NA, Wax MB, Stjernschantz J. Bimatoprost, the prodrug of a prostaglandin analogue. Br J Ophthalmol. Jun. 2008;92(6):862-3.

Romano MR, Lograno MD. Evidence for the involvement of cannabinoid CB1 receptors in the bimatoprost-induced contractions on the human isolated ciliary muscle. Invest Ophthalmol Vis Sci. Aug. 2007;48(8):3677-82.

Sharif NA, Kelly CR, Crider JY, Williams GW, Xu SX. Ocular hypotensive FP prostaglandin (PG) analogs: PG receptor subtype binding affinities and selectivities, and agonist potencies at FP and other PG receptors in cultured cells. J Ocul Pharmacol Ther. Dec. 2003;19(6):501-15.

Sharif NA, Klimko, P. Update and commentary on the pro-drug bimatoprost and a putative 'prostamide receptor'. Expert Review of Ophthalmology. Oct. 2009;4(5):477-489.

Alm A, Nilsson SF. Uveoscleral Outflow—A Review. Exp Eye Res. Apr. 2009: 88(4) 760-8. Epub Jan. 3, 2009.

Woodward DF, Krauss AH, Nilsson SFE. Bimatoprost Effects on Aqueous Humor Dynamics in Monkeys. J Ophthalmol. 2010: Article ID 926192, 5 pages.

Sjöquist B, Johansson A, Stjernschantz J. Pharmacokinetics of latanoprost in the cynomolgus monkey. 3rd communication: tissue distribution after topical administration on the eye studied by whole body autoradiography, Glaucoma research laboratories. Arzneim-Forsch/Drug Res 1999:49:240-249.

Woodward DF, Krauss AH, Chen J, et al: The pharmacology of bimatoprost (Lumigan). Surv Ophthalmol 45(Suppl 4): S337-45, 2001.

Woodward DF, Phelps RL, Krauss AH, Weber A, Short B, Chen J, Liang Y, Wheeler LA. Bimatoprost: a novel antiglaucoma agent. Cardiovasc Drug Rev. 2004 Summer;22(2):103-20.

Katz LJ, Ichhpujani P, Hollo G et al. Comparison of Human Ocular Distribution of Bimatoprost and Latanoprost. 2010 (manuscript submitted).

Woodward DF, Krauss AH, Chen J, et al. Pharmacological characterization of a novel anti-glaucoma agent. J. Pharmacol. Exp. Ther. 305:772-85, 2003.

Frenkel RE, Noecker RJ, Craven ER. Evaluation of circadian control of intraocular pressure after a single drop of bimatoprost 0.03% or travoprost 0.004%. Curr Med Res Opin. Apr. 2008;24(4):919-23. Epub Feb. 8, 2008.

Hellberg MR, Ke T-L, Haggard K, et al: The hydrolysis of the prostaglandin analog prodrug bimatoprost to 17-phenyltrinor PGF2a by human and rabbit ocular tissue. J Ocular Pharmacol Ther 19:97-103, 2003.

Sjöquist B, Stjernschantz J. Ocular and systemic pharmacokinetics of latanoprost in humans. Surv Ophthalmol. Aug. 2002;47 (Supp 1):S6-12.

Cantor LB. Reply—Bimatoprost, the prodrug of a prostaglandin analogue. Br J Ophthalmol 2008;92:863-864.

Sharif NA, Kelly CR, Crider JY. Human trabecular meshwork cell responses induced by bimatoprost, travoprost, unoprostone, and other FP prostaglandin receptor agonist analogues. Invest Ophthalmol Vis Sci 2003;44:715-21.

Sharif NA, Crider JY, Husain S, et al. Human ciliary muscle cell responses to FP-class prostaglandin analogs: phosphoinositide hydrolysis, intracellular Ca2+ mobilization and MAP kinase activation. J Ocul Pharmacol Ther 2003;19:437-55.

Stamer WD, Piwnica D, Jolas T, Carling RW, Cornell CL, Fliri H, Martos J, Pettit SN, Wang JW, Woodward DF. Cellular basis for bimatoprost effects on human conventional outflow. Invest Ophthalmol Vis Sci. Oct. 2010;51(10):5176-81. Epub Apr. 30, 2010.

Resul B, Stjernschantz J, No K, Liljebris C, Selén G, Astin M, Karlsson M, Bito LZ. Phenyl-substituted prostaglandins: potent and selective antiglaucoma agents. J Med Chem. Jan. 22, 1993;36(2):243-8.

Stjernschantz J. Studies on ocular inflammation and development of a prostaglandin analogue for glaucoma treatment. Exp Eye Res. Apr. 2004;78(4):759-66.

Stjernschantz JW. From PGF2α-isopropyl ester to latanoprost: a review of the development of Xalatan: the Proctor Lecture. Invest Ophthalmol Vis Sci. May 2001;42(6):1134-45.

FDA Label for Approved NDA 22-184 of Lumigan 0.01% and Lumigan 0.03%, Aug. 31, 2010.

Sharif NA, Kaddour-Djebbar I, Abdel-Latif AA. Cat iris sphincter smooth-muscle contraction: comparison of FP-class prostaglandin analog agonist activities. J Ocul Pharmacol Ther. Apr. 2008;24(2):152-63.

Spada CS, Krauss AH, Woodward DF, Chen J, Protzman CE, Nieves AL, Wheeler LA, Scott DF, Sachs G. Bimatoprost and prostaglandin F(2 alpha) selectively stimulate intracellular calcium signaling in different cat iris sphincter cells. Exp Eye Res. Jan. 2005;80(1):135-45.

Woodward, D.F., Krauss, A.H., Wang, J.W., Protzman, C.E., Nieves, A.L., Liang, Y., Donde, Y., Burk, R.M., Landsverk, K., Struble, C. "Identification of an antagonist that selectively blocks the activity of prostamides (prostaglandin ethanolamides) in the feline iris." Br. J. Pharmacol. 150:342-352 (2007).

Liang, Y., Woodward, D.F., Guzman, V.M., Li, C., Scott, D.F., Wang, J.W., et al. (2008). "Identification and pharmacological characterization of the prostaglandin FP receptor and FP receptor variant complexes." Br. J. Pharmacol. 154: 1079-1093.

Van Alphen Gwhm, Wilhelm PB, Elsenfeld PW. The effect of prostaglandins on the isolated internal muscles of the mammalian eye, including man. Documenta Ophthalmologica, 1976, vol. 42, No. 2, pp. 397-415.

Poyer JF, Millar C, Kaufman PL. Prostaglandin F2 alpha effects on isolated rhesus monkey ciliary muscle. Invest Ophthalmol Vis Sci. Nov. 1995;36(12):2461-5.

Yamaji K, Yoshitomi T, Ishikawa H, Usui S. Prostaglandins E1 and E2, but not F2alpha or latanoprost, inhibit monkey ciliary muscle contraction. Curr Eye Res. Aug. 2005;30(8):661-5.

Berglund BA, Boring DL, Howlett AC. Investigation of structural analogs of prostaglandin amides for binding to and activation of CB1 and CB2 cannabinoid receptors in rat brain and human tonsils. Adv Exp Med Biol. 1999;469:527-33.

Cadet P, Mantione KJ, Stefano GB. Molecular identification and functional expression of mu 3, a novel alternatively spliced variant of the human mu opiate receptor gene. J Immunol. May 15, 2003;170(10):5118-23.

Vielhauer GA, Fujino H, Regan JW. Cloning and localization of hFP(S): a six-transmembrane mRNA splice variant of the human FP prostanoid receptor. Arch Biochem Biophys. Jan. 15, 2004;421(2):175-85.

Jordan BA, Devi LA. G-protein-coupled receptor heterodimerization modulates receptor function. Nature. Jun. 17, 1999;399(6737):697-700.

White JH, Wise A, Main MJ, Green A, Fraser NJ, Disney GH, Barnes AA, Emson P, Foord SM, Marshall FH. Heterodimerization is required for the formation of a functional GABA(B) receptor. Nature. Dec. 17, 1998;396(6712):679-82.

Wilson SJ, Roche AM, Kostetskaia E, Smyth EM. Dimerization of the human receptors for prostacyclin and thromboxane facilitates thromboxane receptor-mediated cAMP generation. J Biol Chem. Dec. 17, 2004;279(51):53036-47. Epub Oct. 7, 2004.

Crowston et al. Effect of Bimatoprost on Intraocular Pressure in Prostaglandin FP Receptor Knockout Mice. Investigative Ophthalmology and Visual Science, 46:4571-77, (2005).

Response from the Food and Drug Administration to Pfizer's Citizen Petition and a Supplement (Aug. 31, 2010) at 23 (Exhibit 5).

Complaint for Patent Infringement: Civil Action No. 1:10-CV-681; Allergan, Inc. and Duke University V. Apotex Inc. and Apotex Corp.; Filed Sep. 8, 2010.

Answer, Defences and Counterclaims of Defendants Apotex Inc. and Apotex Corp., Civil Action No. 10-CV-681; Allergan, Inc. and Duke University v. Apotex Inc. and Apotex Corp.

Lumigan® Label, Jul. 2003.

Remington's Pharmaceutical Sciences 1501 (15th ed. 1975).

James Leslie Boyd, Quantitative Comparison of Methods of Administering Physostigmine, 30 (4) Archives Ophthalmology 521-525 (1943).

US 8,338,479 B2

Page 3

H. Barr Collin. Ultrastructural Changes to Corneal ,Stromal Cells Due to Ophthalmic Preservatives. 64 ACTA Opthalmalogica 72 (1986).

Andrew J.W. Huang et al., Paracellular Permeability of Corneal and Conjunctival Epithelia, 30(4) Investigative opthalmology & Visual Sci., 684 (1989).

Komei Okabe et al, Effect of Benzaikoniurn Chloride on Transscleral Drug Delivery, 46 Investigative Ophthalmology & Visual Sci. 703 (2005).

Donald J. Lyle, Society Proceedings, 29 AM, J. Ophthalmology 1451 (1946).

Vincent H. L. Lee & Hans Bundgaard, Improved Ocular Drug Delivery with Prodrugs, in Prodrugs, Topical & Ocular Drug Delivery 221, 232 (1992).

Norman F.H. Ho et al., Physical Model Approach to the Design of Drugs with Improved Intestinal Absorption, in Design of Biopharmaceutical Properties Through Prodrugs & Analogs, 136 (Edward B. Roche ed., 1977).

Laszlo Z. Bito, Prosraglandins, Other Eicosanoids, and Their Derivatives as Potential Antiglaucoma Agents, in Glaucoma: Applied Pharmacology in Medical Treatment 477 (1984).

William L. Miller et al.. Biological Activities of 17-Phenyl-18, 19,20-—Trinorprostaglandins, 9 Prostaglandins 9-18 (1975).

Higaki, Kazutauka, et al., Estimation and Enhancement of in Vitro Corneal Transport of S-1033, a Novel Antiglaucoma Medication, International Journal of Pharmaceutics 132, 165-173 (1996).

Kaur, Indu Pal, et al, Penetration Enhancer and Ocular Bioadhesives: Two New Avenues for Ophthalmic Drug Delivery, Drug Development and Industrial Pharmacy, 28 (4), 353-369 (2002).

Lumigan®, 0,1 mg/ml, Jan. 2010.

Xalatan® Eye Drops, Retrieval Date: Oct. 2, 2010 ; http://home.intekom.com/pharm/pharmaca/xalatan.html.

Neal L. Dursrein, "Alteration of Corneal Permeability in Humans and Rabbits" Investigative Ophthalmology & Visual Science / Dec. 1984.

Vincent H.L. Lee, "Review: Topical Ocular Drug Delivery: Recent Developments and Future Challenges", Journal of Ocular Pharmacology, vol. 2, No. 1, 1986, pp. 67-108.

Ola Camber, "Influence of some preservatives on the corneal permeability of pilocarpine and dexamethasone, in vitro", International Journal of Phatmaceurics. 39 (1987) 229-234.

Kazutaka Higaki, "Estimation and enhancement of in vitro corneal transport S-1033, a novel antiglaucoma medication", International Journal of Pharmaceutics 132 (1996) 165 173.

SANDOZ Paragraph4 letter dated Jul. 11, 2011.

Burstein, Neal; Preservative Alteration of Corneal Permeability in Humans and Rabbits, Investigative Ophthalmology & Visual Science, vol. 25, No. 12, Dec. 1984, pp. 1453-1457.

Curri, Joanne (Hi-Tech Pharmacal Co., Amityville, NY). Paragraph IV Letter to: Allergan, Inc. (Irvine, CA). 12 pages, Dec. 23, 2011.

Keller, N.; et al.: Increased Corneal Permeability Induced by the Dual Effects of Transient Tear Film Acidification and Exposure to Benzalkonium Chloride, Exp. Eye Res., vol. 30, 1980, pp. 203-210.

Bito, L.Z. & Baroody, R.A., The Ocular Pharmacokinetics of Eicosanoids and Their Derivatives . . . , 44 Exp. Eye Res. 217-26 (1987).

Pfeiffer, N., New Development in Glaucoma Drug Therapy, 98 Ophthalmologe W1-W13 (1992).

Schumer, Robert A., MD, PhD & Podos, Steven M.,MD, Medical Treatment of Glaucoma, 2 Ophthalmology 140-50 (1991).

Woodford Roger, PhD & Barry, Brian W., PhD, Penetration Enhancers and the Percutaneous Absorption of Drugs: An Update, 5(3) J. Toxicology.—Cut. & Ocular Toxicology 167-77.

Faulkner, R., Aqueous Humor Concentrations of Bimatoprost Free Acid, Bimatoprost and Travoprost . . . , 26 Journal of Ocular Pharmacology and Therapeutics, 147-156 (2010).

Camras, Carl B., Detection of the Free Acid of Bimatoprost in Aqueous Humor Samples from Human Eyes . . . , 111 Ophthamology 2193-2198 (2004).

Cantor, Louis B., Levels of bimatoprost acid in the aqueous humor after bimatoprost treatment . . . , 91 Br J Ophthalmol 629-632 (2007).

Kaur, I.P., Penetration enhancers and ocular bioadhesives: Two new avenues for ophthalmic drug delivery, Drug Development and Industrial Pharmacy, 28(4), 353-369 (2002).

Noecker, Robert J., Corneal and Conjunctival Changes Caused by Commonly Used Glaucoma Medications, Cornea, vol. 23, No. 5, 490-496 (Jul. 2004).

Asbjorn Tonjum, Jan. 22, 1975, Permeability of Rabbit Corneal Epithelium to Horseradish Peroxidase After the Influence of Benzalkonium Chloride, Acta Ophthalmologica, 53, 335-347.

Bito, 1985, Biological Protection with Prostanoids, CRC Press, Inc., 1, 231-252, Cohen, M. M., ed., Boca Raton, Fla., CRC Press Inc.

Bito, 1987, Prostaglandins, Old Concepts and New Perspectives, Archives of Opthalmology, 105, 1036-1039.

C.A. Lawrence, 1955, An Evaluation of Chemical Preservatives for Ophthalmic Solutions, J Am Pharm Assoc, 44 (8), 457.

C.A. Lawrence, 1955, Chemical Preservatives for Ophthalmic Solutions, Am J Ophthal, 39, 385.

C.B. Camras, Dec. 1977, Reduction of Intraocular Pressure by Prostaglandins Applied topically To The Eyes Of Conscious Rabbits, Investigative Ophthalmology & Visual Science, 16(12), 1125-1134.

C.B. Camras, 1981, Reduction of Intraocular Pressure in Normal and Glaucomatous Primate (Aotus Trivirgatus) Eyes By Topically Applied Prostaglandin F2a, Current Eye Research, 1 (4), 205-209.

C.S. O'Brien, 1941, Doryl In The Treatment of Glaucoma Simplex, Tran Am Ophthal Soc, 39, 175.

C.S. O'Brien, 1942, Carbaminoyl-choline Chloride in the Treatment of Glaucoma Simplex, Arch Ophthal, 27, 253.

Center for Drug Evaluation and Research, Summary Review of Application No. 22-184 (Lumigan 0.01%) (Jul. 2010).

Dan Eisenberg, 2002, Bimatoprost and Travoprost: A Review of Recent Studies of Two New Glaucoma Drugs, Survey of Ophthalmology, 47 (1), S105-S115.

David Maurice, 1995, The Effect of the Low Blink Rate in Rabbits on Topical Drug Penetration, J Ocular Pharmacology and Therapeutics, 11(3), 297-304.

Diane Tang-Liu, 1994, Effects of Four Penetration Enhancers on Corneal Permeability of Drugs in Vitro, Journal of Pharmaceutical Sciences, 83 (1), 85-90.

Dwight Deardorff, 1975, Ophthalmic Preparation, Remington's Pharmaceutical Sciences, 15th ed., 1488.

F.A. Stern, 1982, Comparison of the Hypotensive and Other Ocular Effects of Prostaglandins E2 and F2a on Cat and Rhesus Monkey Eyes, Invest Ophthal Visual Sci, 22, 588-598.

F.N. Martin, 1950, Preparation of Ophthalmic Solutions With Special Reference to Hydrogen Ion Concentration and Tonicity, Arch Ophthal, 44, 561.

George Grass, Jan. 1988, Mechanisms of Corneal Drug Penetration I: In Vivo and In Vitro Kinetics, Journal of Pharmaceutical Sciences, 77 (1), 3-14.

Giuseppe Giuffre, 1985, The Effects of Prostaglandin F2a in the Human Eye, Graefe's Archive Clin. & Exper. Ophthal., 222, 139-141.

H.C. Arndt, 1977, The Synthesis and Biological Activity of Prostaglandin Analogs Containing Spirocyclic Rings, Prostaglandins, 13 (5), 837-843.

Handbook of Pharmaceutical Excipients, Monographs for Water, Sodium Phosphate, Sodium Chloride, and Citric Acid Monohydrate (1994).

Harvey Dubiner, 2001, Efficacy and Safety of Bimatoprost in Patients With Elevated Intraocular Pressure: a 30-Day Comparison With Latanoprost, Surv. Ophthalmol, 45 (4), S353-S560.

Hitoshi Sasaki, 1995, Ocular Permeability of FITC-Dextran with Absorption Promoter for Ocular Delivery of Peptide Drug, J Drug Target, 3, 129.

Hitoshi Sasaki, 1995, Ophthalmic Preservatives As Absorption Promoters For Ocular Drug Delivery, J. Pharm. Pharmacol., 47, 703-707.

Hitoshi Sasaki, 2000, Modification of Ocular Permeability of Peptide Drugs by Absorption Promoters, Biol Pharm Bull, 23(12), 1524.

J. Thygesen, 2000, Short-term Effect of Latanoprost and Timolol Eye Drops on Tear Fluid and the Ocular Surface in Patients with Primary Open-Angle Glaucoma and Ocular Hypertension, Acta Ophthal Scand, 78, 37-41.

US 8,338,479 B2

Page 4

Jay Katz, 2010, Twelve-Month, Randomized, Controlled Trial of Bimatoprost 0.01%, 0.0125%, and 0.03% in Patients with Glaucoma or Ocular Hypertension, Am J Ophthalmology, 149(4), 661-671.

Ke-Ping Xu, 2000, Corneal Organ Culture Model for Assessing Epithelial Responses to Surfactants, Tox. Sci., 58, 306.

Keith Green, 1971, Influence of Various Agents on Corneal Permeability, American Journal of Ophthalmology, 72, 897-905.

Keith Green, 1974, Prednisolone Phosphate Penetration Into and Through the Cornea, Investigative Ophthalmology, 13 (4), 316-319.

Lumigan® monograph in the 57th PDR (2003).

Martina Scholz, 2002, Pilocarpine Permeability Across Ocular Tissues and Cell Cultures: Influence of Formulation Parameters, Journal of Ocular Pharmacology and Therapeutics, 18 (5), 455-468.

Medical Review, Application No. 21-275, Center for Drug Evaluation and Research, 2001.

Michael Brown, 1967, Control of Contamination in Ophthalmic Solutions, Proc. R. Sco. Med., 60, 354-357.

Milton Skolaut, 1948, Ophthalmic Medication, Bull Am Soc Hosp Pharm, 5(4), 172.

Modell Walter, 1947, Pharmacologic Action of Some Ophthalmic Drugs, Arch Ophthal, 37, 160.

N. E. Mealy, 2002, Ophthalmic Drugs, Drugs of the Future, 27 (5), 509-523.

Neal Burstein, 1977, Electrophysiologic and Morphologic Effects of Ophthalmic Preparations on Rabbit Cornea Epithelium, Invest Ophthalmol Visual Sci, 16 (10), 899-911.

Neal Burstein, 1980, Preservative Cytotoxic Threshold for Benzalkonium Chloride and Chlorhexidine Digluconate in Cat and Rabbit Corneas, Invest. Ophthal. & Visual Sci., 19 (3), 308-313.

Nilsson, 1987, PGF 2a Increases Uveoscleral Outflow, Invest. Ophthalmol. Vis. Sci, 28 (Suppl), 284.

P. De Clercq, 1976, Cyclopentanones-VXL., Prostaglandin Synthesis Involving Catalytic Hydrogenation of 2,3- Dialkyl-4-Hydroxy-2-Cyclopentenones, Tetrahedron, 32, 2747-2752.

Paul Ashton, 1991, Formulation Influence on Conjunctival Penetration of Four Beta Blockers in the Pigmented Rabbit: A Comparison with Corneal Penetration, Pharmaceutical Research, 8 (9), 1166-1174.

Physicians' Desk Reference, 56th ed., pp. 212-13, 543, 553-54, 2864-65 (2002).

Physicians' Desk Reference, 59th ed., pp. 555-56 (2005).

Pierre-Jean Pisella, 2004, Conjunctival Proinflammatory and Proapoptotic Effects of Latanoprost and Preserved and Unpreserved Timolol: An Ex Vivo and In Vitro Study, Investigative Ophthalmology & Visual Science, 45, 1360-1368.

Pieter Van Der Bijl, 2001, Effects of Three Penetration Enhancers on Transcorneal Permeation of Cyclosporine, Cornea, 20 (5), 505-508.

R. Roggeband, 2000, Eye Irritation in Rabbit and Man After Single Applications of Equal Volumes of Undiluted Model Liquid Detergent Products, Food & Chem Toxic, 38, 727.

Remington, The Science and Practice of Pharmacy, 20th ed. at 831 (2000).

Remington, The Science and Practice of Pharmacy, 21st ed. at 864 (2005).

Richard Parrish, 2003, A Comparison of Latanoprost, Bimatoprost, and Travoprost In Patients With Elevated Intraocular Pressure: A 12-Week, Randomized, Masked Evaluator Multicenter Study, Am J Ophthalmol, 135, 688-703.

Robert Laibovitz, 2001, Comparison of the Ocular Hypotensive Lipid AGN 192024 With Timolol, Arch Ophthal, 119, 994.

Robert Noecker, 2003, Bimatoprost/Latanoprost Study Group. A Six Month Randomized Clinical Trial Comparing The Intraocular Pressure Lowering Efficacy of Bimatoprost and Latanoprost in Patients With Ocular Hypertension or Glaucoma, Am J Ophthal, 135, 55-63.

Roswell Pfister, 1976, The Effects of Ophthalmic Drugs, Vehicles, and Preservatives on Corneal Epithelium: a Scanning Electron Microscope Study, Effects of Opthalmic Drugs, 15 (4), 246-259.

Samir Podder, 1992, Improving the Safety of Topically Applied Timolol in the Pigmented Rabbit Through Manipulation of Formulation Composition, Exp. Eye Res., 54, 747-757.

Samuel McPherson, 1949, Self-Sterilizing Ophthalmic Solutions, Am J Ophthal, 32, 675.

Starr, 1971, Further Studies on the Effects of Prostagladin on Intraocular Pressure in the Rabbit, Exp. Eye Res., 11, 170-177.

Stefano Gandolfi, 2001, Three-month Comparison of Bimatoprost and Latanoprost in Patients With Glaucoma and Ocular Hypertension, Adv. Ther., 18, 110-121.

Thomas Honohan, 1980, Duration of Activity of the Acid, Methyl Ester and Amide of an Orally Active Platelet Aggregation Inhibitory Prostanoid in the Rat, Prostoglandins, 19, 139.

Thomas Walter, 2004, 24-Hour IOP Control with Once-daily Bimatoprost, Timolol Gel-forming Solution, or Latanoprost: A 1-Month, Randomized, Comparative Clinical Trial, Survey of Ophthalmology, 49(1), S26-S35.

William Mullen, 1973, Ophthalmic Preservatives and Vehicles, Sury Ophthal, 17(6), 469.

William Stewart, 2003, Corneal Punctate Staining with Latanoprost, Bimatoprost, and Travoprost in Healthy Subjects, J Glaucoma, 12 (6), 475-479.

Xalatan ® monograph in the 59th PDR (2005).

**Fig. 1**



**Fig. 2**



**1**

# ENHANCED BIMATOPROST OPHTHALMIC SOLUTION

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application. Ser. No. 11/083,261, filed Mar. 16, 2005 now U.S. Pat. No. 7,851,504, which is incorporated herein by reference in its entirety.

## FIELD OF THE INVENTION

This invention relates to pharmaceutical compositions comprising bimatoprost.

## BACKGROUND OF THE INVENTION

### Description of Related Art

Bimatoprost, shown below, is a prostamide marketed commercially for the treatment of glaucoma and ocular hypertension.



Formula I

Benzalkonium chloride (BAK) is a preservative used in many commercial ophthalmic products to prevent microbial contamination in multi-use products. The commercial eye drops (Bimatoprost, Allergan, Inc., Irvine, Calif.) contain 0.03% bimatoprost and 0.005% BAK. Although no other prostamides are currently marketed for the treatment of glaucoma, several prostaglandin analogs are commercially available which use BAK as a preservative. These include latanoprost (Xalatan), travoprost (Travatan), and unoprostone isopropyl (Rescula), which require significantly more BAK, from 150-200 ppm, to meet antimicrobial effectiveness tests in the United States and Europe.

U.S. Pat. No. 6,596,765 B2 discloses a composition comprising 0.005% or 0.0005% latanoprost and 0.2 mg/mL BAK.

U.S. Pat. No. 6,646,001 B2 discloses compositions comprising 0.03% bimatoprost and 0.01% BAK or "0.01%+5% excess" BAK.

## BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. **1** is a plot showing the aqueous humor concentration of the parent acid of bimatoprost after topical administration of several formulations.

FIG. **2** is a plot showing the membrane permeability of bimatoprost in several different formulations.

## DETAILED DESCRIPTION OF THE INVENTION

A composition comprising from 0.005% to 0.02% bimatoprost by weight and from 100 ppm to 250 ppm benzalkonium

**2**

chloride, wherein said composition is an aqueous liquid which is formulated for ophthalmic administration is disclosed herein.

A method which is useful in treating glaucoma or ocular hypertension related thereto is also disclosed herein.

An aqueous liquid which is formulated for ophthalmic administration is formulated such that it can be administered topically to the eye. The comfort should be maximized as much as possible, although sometimes formulation considerations (e.g. drug stability) may necessitate less than optimal comfort.

In certain compositions the concentration of bimatoprost is from 0.01% to 0.02%. In other compositions the concentration of bimatoprost is from 0.015% to 0.02%.

In certain compositions the concentration of BAK is from 150 ppm to 200 ppm. In other compositions the concentration of BAK is from 150 ppm to 200 ppm. In other compositions the concentration of BAK is from 150 ppm to 250 ppm.

In ophthalmic compositions, a chelating agent may be used to enhance preservative effectiveness. Suitable chelating agents are those known in the art, and, while not intending to be limiting, edetate salts (EDTA) are useful chelating agents.

In certain compositions, concentration of EDTA is at least 0.001%. In other compositions, the concentration of EDTA is at least 0.01%. In other compositions the concentration of EDTA is 0.15% or less. In other compositions the concentration of EDTA is 0.1% or less. In other compositions the concentration of EDTA is 0.05% or less.

Certain compositions comprise from 150 to 250 ppm BAK and an effective amount of EDTA.

As is known in the art, buffers are commonly used to adjust the pH to a desirable range for ophthalmic use. Generally, a pH of around 6-8 is desired, and in certain compositions a pH of 7.4 is desired. Many buffers including salts of inorganic acids such as phosphate, borate, and sulfate are known.

Another commonly used excipient in ophthalmic compositions is a viscosity-enhancing, or a thickening agent. Thickening agents are used for a variety of reasons, ranging from improving the form of the formulation for convenient administration to improving the contact with the eye to improve bioavailability. The viscosity-enhancing agent may comprise a polymer containing hydrophilic groups such as monosaccharides, polysaccharides, ethylene oxide groups, hydroxyl groups, carboxylic acids or other charged functional groups. While not intending to limit the scope of the invention, some examples of viscosity-enhancing agents are sodium carboxymethylcellulose, hydroxypropylmethylcellulose, povidone, polyvinyl alcohol, and polyethylene glycol.

In ophthalmic solutions, tonicity agents often are used to adjust the composition of the formulation to the desired isotonic range. Tonicity agents are well known in the art and some examples include glycerin, mannitol, sorbitol, sodium chloride, and other electrolytes.

One composition has a pH of 7.4 and consists essentially of 0.015% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

Another composition has a pH of 7.4 and comprises 0.02% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

Another composition has a pH of 7.4 and consists of 0.01% bimatoprost, 200 ppm benzalkonium chloride, from 0 to 0.03% EDTA, a phosphate buffer, NaCl, and water.

The best mode of making and using the present invention are described in the following examples. These examples are given only to provide direction and guidance in how to make and use the invention, and are not intended to limit the scope of the invention in any way.

US 8,338,479 B2

**3**

One embodiment comprises 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment comprises 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment comprises 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment comprises 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment consists essentially of 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.01% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

Another embodiment consists of 0.015% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, 0.03%, EDTA, and water, wherein the pH is 7.3.

Another embodiment consists of 0.02% Bimatoprost, 0.02% Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate, 0.014% Citric Acid, Monohydrate, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

## EXAMPLE 1

Formulations containing 0.268% sodium phosphate dibasic heptahydrate, 0.014% citric acid, 0.83% sodium chloride, with the pH adjusted to 7.3 in qs water, and the amounts of bimatoprost, BAK, and EDTA listed in Table 1 below are prepared by conventional methods well known in the art.

**4**

### TABLE 1

| | Formulation |
|---|---|
| 1. | 0.03% Bimatoprost (50 ppm BAK) Control |
| 2. | 0.03% Bimatoprost - 200 ppm BAK |
| 3. | 0.03% Bimatoprost - 0.015% TPGS (no preservative) |
| 4. | 0.03% Bimatoprost - 0.2% TPGS (no preservative) |
| 5. | 0.03% Bimatoprost - 0.4% TPGS (no preservative) |
| 6. | 0.03% Bimatoprost - 1.0% TPGS (no preservative) |

## EXAMPLE 2

Studies were carried out to determine the effect of benzalkonium chloride (BAK) and d-alpha tocopheryl polyethylene glycol 1000 succinate (TPGS) on ocular absorption of bimatoprost in vivo. For the in vivo study, eighteen female rabbits were given a single 28 μL eyedrop bilaterally and aqueous humor samples were collected (n=3 animals with 6 eyes per formulation) at 60 min postdose. Two rabbits (4 eyes) remained untreated to serve as pre-dose bioanalytical controls. Bimatoprost and its parent carboxylic acid extracted from aqueous humor and in vitro samples were analyzed by a liquid chromatography tandem mass spectrometry (LC-MS/MS) method with a quantitation range of 0.25-60 ng/mL.

Due to extensive metabolism of bimatoprost in rabbit eyes, its parent acid was used as a surrogate for determining ocular absorption of bimatoprost. Concentration of the acid in rabbit aqueous humor following single dose of 6 different bimatoprost formulations are summarized in FIG. **1** and Table 2 below.

### TABLE 2

| | Formulation | Aqueous Humor[a] (ng/mL) |
|---|---|---|
| 1. | 0.03% Bimatoprost (50 ppm BAK) Control | 51.0 ± 9.4 |
| 2. | 0.03% Bimatoprost - 200 ppm BAK | 87.2 ± 19.0* |
| 3. | 0.03% Bimatoprost - 0.015% TPGS (no preservative) | 26.1 ± 3.3* |
| 4. | 0.03% Bimatoprost - 0.2% TPGS (no preservative) | 22.9 ± 3.2* |
| 5. | 0.03% Bimatoprost - 0.4% TPGS (no preservative) | 19.3 ± 5.6* |
| 6. | 0.03% Bimatoprost - 1.0% TPGS (no preservative) | 15.4 ± 3.3* |

[a]Mean ± SD. Per formulation, N = 3 rabbits (6 eyes).
*Statistically different (p < 0.05) compared to 0.03% Bimatoprost

Test formulations containing 0.015%, 0.2%, 0.4% and 1.0% TPGS resulted in a lower aqueous humor carboxylic acid concentration compared to Bimatoprost by 52%, 59%, 62% and 72%, respectively. In contrast, 0.03% Bimatoprost containing 200 ppm BAK resulted in 57% higher aqueous humor AGN 191522 concentration compared to Bimatoprost (50 ppm BAK).

While not intending to limit the scope of the invention in any way, or be bound by theory, compared to the Bimatoprost control, formulations containing TPGS resulted in decrease bimatoprost permeability. In contrast, formulations with higher BAK resulted in higher permeability.

## EXAMPLE 3

Formulations containing 0.268% sodium phosphate dibasic heptahydrate, 0.014% citric acid, 0.83% sodium chloride, with the pH adjusted to 7.3 in qs water, and the amounts of bimatoprost, BAK, and EDTA listed in Table 3 below are prepared by conventional methods well known in the art.

US 8,338,479 B2

| 5 | 6 |

## TABLE 3

| | Formulation |
|---|---|
| A. | 0.03% Bimatoprost (50 ppm BAK) - Control |
| B. | 0.015% Bimatoprost (50 ppm BAK) |
| C. | 0.015% Bimatoprost (50 ppm BAK) 0.03% EDTA |
| D. | 0.015% Bimatoprost (200 ppm BAK) |
| E. | 0.015% Bimatoprost (200 ppm BAK) 0.03% EDTA |
| F. | 0.015% Bimatoprost (50 ppm BAK) 0.015% EDTA |
| G. | 0.015% Bimatoprost (200 ppm BAK) 0.015% EDTA |
| H. | 0.015% Bimatoprost (125 ppm BAK) |
| I. | 0.015% Bimatoprost (125 ppm BAK) 0.03% EDTA |
| J. | 0.015% Bimatoprost (125 ppm BAK) 0.015% EDTA |
| K. | 0.015% Bimatoprost (150 ppm BAK) |
| L. | 0.015% Bimatoprost (150 ppm BAK) 0.1% EDTA |
| M. | 0.015% Bimatoprost |
| N. | 0.03% Bimatoprost |

### EXAMPLE 4

The effect of benzalkonium chloride (BAK) and ethylene-diaminetetraacetic acid (EDTA) on bimatoprost permeability across primary culture of rabbit corneal epithelial cell layers (RCECL). Corneal epithelial cells were harvested from New Zealand White rabbits and cultured on Transwell™ filters until confluency (Day 5). For the transport experiment, cells were first equilibrated in transport buffer for 1 hour at 37° C. Dosing solution containing 0.015% or 0.03% bimatoprost with varying concentrations of BAK and EDTA was then applied to the apical compartment of the Transwell™ (2 cultures; n=3-4 per culture) and the cells were incubated at 37° C. At 30, 60, 90 and 120 minutes postdose, 200 μL samples were taken from the basolateral chamber for apical to basolateral (AB) transport. The samples were analyzed by a liquid chromatography tandem mass spectrometry (LC-MS/MS) method with quantitation range of 1-600 ng/mL.

The results are presented in FIG. 2.

### EXAMPLE 5

A drop of formulation J is administered once daily topically to the eye of a person suffering from glaucoma. After a few hours, intraocular pressure drops more and less hyperemia is observed than would be observed for formulation A. Lowered intraocular pressure persists for as long as the treatment continues.

What is claimed is:

1. A composition for the treatment of elevated intraocular pressure comprising about 0.01% w/v bimatoprost and about 200 ppm benzalkonium chloride, at least one buffer and having a pH of about 7.3 wherein said composition is an aqueous liquid which is formulated for ophthalmic administration.

2. The composition of claim 1 wherein the composition is for the treatment of elevated intraocular pressure in patients suffering from glaucoma or ocular hypertension.

3. The composition of claim 1 wherein the concentration of benzalkonium chloride is 200 ppm.

4. The composition of claim 1 which consists essentially of about 0.01% w/v bimatoprost, about 200 ppm benzalkonium chloride, a phosphate buffer, NaCl, citric acid monohydrate, hydrochloric acid, sodium hydroxide and water.

5. The composition of claim 1 wherein the concentration of bimatoprost is 0.01% w/v and the composition is applied once a day.

6. The composition of claim 4 wherein the concentration of citric acid monohydrate is about 0.014% w/v.

7. The composition of claim 4 wherein the concentration of benzalkonium chloride is 200 ppm.

8. The composition of claim 6 which further comprises an effective amount of EDTA.

9. The composition of claim 1 which comprises about 0.01% w/v bimatoprost, about 200 ppm benzalkonium chloride, 0.014% w/v citric acid monohydrate, a phosphate buffer, and NaCl and having a pH of 7.3.

10. The composition of claim 1 which comprises 0.01 w/v bimatoprost, 200 ppm benzalkonium chloride, a phosphate buffer, NaCl, and water.

11. A method comprising administering to a human suffering from glaucoma or intraocular hypertension a composition comprising about 0.01% w/v bimatoprost and about 200 ppm benzalkonium chloride, sodium phosphate dibasic, and having a pH of 7.3.

12. The method of claim 11 wherein the composition comprises 0.01% w/v bimatoprost and is topically administered to an affected eye once a day.

13. The method of claim 11 wherein the composition further comprises about 0.26% w/v sodium phosphate dibasic.

14. The method of claim 11 wherein the composition further comprises NaCl.

15. The composition of claim 1 comprising about 0.01% w/v bimatoprost, about 0.02% w/v benzalkonium chloride, about 0.26% w/v sodium phosphate dibasic heptahydrate, about 0.014% w/v citric acid monohydrate, about 0.8% w/v sodium chloride, and water.

16. The method of claim 11 further comprising citric acid monohydrate, about 0.8% w/v sodium chloride, and water.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.       : 8,338,479 B2                                     Page 1 of 1
APPLICATION NO.  : 12/351383
DATED             : December 25, 2012
INVENTOR(S)      : Chin-Ming Chang et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In column 6, line 25, in claim 10, after 0.01 insert -- % --, therefor.

Signed and Sealed this
Nineteenth Day of February, 2013

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed with the Clerk of the United States Court of Appeals for the Federal Circuit by CM/ECF on May 5, 2014.   The undersigned further certifies that counsel of record are registered CM/ECF users and will be served by the CM/ECF system.


Dated:  May 5, 2014                          /s/ Deanne E. Maynard
                                             Deanne E. Maynard

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This Opening Brief For Appellants Sandoz Inc., Watson Laboratories, Inc., Watson Pharmaceuticals, Inc., and Watson Pharma, Inc. complies with the type-volume limitation of Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure, because it contains 13,456 words and is therefore below the limit of 14,000 words.

Dated: May 5, 2014                                        /s/ Deanne E. Maynard
                                                               Deanne E. Maynard