2014-1275

# United States Court Of Appeals for the Federal Circuit

**ALLERGAN, INC.,**

*Plaintiff/Appellee,*

v.

**SANDOZ, INC., LUPIN LTD., LUPIN PHARMACEUTICALS, INC., HI-TECH PHARMACAL CO., INC., WATSON LABORATORIES, INC., WATSON PHARMACEUTICALS, INC., nka Actavis, Inc., and WATSON PHARMA, INC., nka Actavis Pharma, Inc.,**

*Defendants/Appellants,*

APPEAL FROM THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS IN CASE NO. 6:11-CV-00441-MHS, JUDGE MICHAEL H. SCHNEIDER

## ALLERGAN'S RESPONSIVE BRIEF

Juanita R. Brooks
Craig E. Countryman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130

Jonathan E. Singer
Deanna J. Reichel
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402

Douglas E. McCann
Susan M. Coletti
222 Delaware Avenue
P.O. Box 1114
Wilmington, DE 19899

August 18, 2014

## CERTIFICATE OF INTEREST

Counsel for Allergan, Inc., certifies the following:

1.      The full name of every party represented by me is:  Allergan, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  N/A.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:  N/A.

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court are:

> Fish & Richardson P.C.:  Juanita R. Brooks, Jonathan E. Singer, Douglas E. McCann, Roger A. Denning, Susan M. Coletti, Craig E. Countryman; Elizabeth M. Flanagan, Deanna J. Reichel, Rebecca Charnas Grant, Irene E. Hudson, Trevor J. Woodage, and Grace L. (Wang) St. Vincent;

> Gibson Dunn & Crutcher:  Jeffrey T. Thomas; and

> Ward & Smith:  T. John Ward, Jr., Wesley Hill, and Claire Abernathy Henry.

Dated:  August 18, 2014

/s/ *Craig E. Countryman*
Craig E. Countryman

# TABLE OF CONTENTS

**Page**

Certificate of Interest ................................................................................. i

Statement of Related Cases .................................................................. viii

Statement of the Issues ............................................................................ x

Introduction ............................................................................................ 1

Statement of the Facts ............................................................................. 3

    I.      The Problem:  Lumigan® 0.03% Was the Most Effective Glaucoma Drug But A Side Effect Caused Patients to Stop Therapy. .......................................................................... 3

    II.    The Solution:  Lumigan® 0.01% Cuts the Bimatoprost by Two-Thirds While Quadrupling the BAK. ......................... 5

        A.    The Project Begins With Two Years of Failures. ... 5

        B.    The Turning Point:  The TPGS Formulations Fail, But a Control with 200 ppm BAK Increases Bimatoprost Absorption. .......................................... 7

        C.    The Inventors Demonstrate That Lumigan 0.01% Maintains Efficacy While Reducing Hyperemia. .... 9

    III.   The Patents-in-Suit Claim the Composition and Use of Lumigan 0.01%. ................................................................. 10

    IV.   The Prior Art Discouraged Both 0.01% Bimatoprost and 200 ppm BAK. .................................................................... 12

        A.    Ophthalmic Formulation Is "Very Unpredictable." ........................................................ 12

        B.    The Prior Art Taught 0.03% Bimatoprost Had "Far Superior" Efficacy to 0.01%. .......................... 13

C. The Prior Art Taught That Decreasing Bimatoprost Concentration from 0.03% to 0.01% Would Not Reduce Hyperemia. ............................. 14

D. The Prior Art Taught BAK Would Not Increase Penetration of Bimatoprost and Other Neutral Prostaglandins. ........................................................ 16

E. The Prior Art Taught the Amount of BAK Should Be Minimized and Cautioned Against 200 ppm. ............................................................................ 19

V. Proceedings in the District Court. ..................................... 23

A. Obviousness. ........................................................... 23

B. Written Description and Enablement. ................... 24

C. Hi-Tech's Infringement. .......................................... 24

Summary of the Argument ....................................................... 25

Argument ....................................................................................... 27

I. Appellants Failed to Prove the Claims Were Obvious. .... 27

A. The Invention Is Significantly Different from the Prior Art. .................................................................. 27

B. The Prior Art Taught Away From the Invention. 32

C. The Invention Has Unexpected Differences in Kind and "Marked Superiority" Over the Prior Art. ........................................................................... 40

D. The Objective Indicia Show Appellants' Arguments Are Hindsight. ........................................ 43

II. The '353 and '118 Patents Have Adequate Written Description. ......................................................................... 49

III. The '353 and '118 Patents Are Enabled. ........................... 53

TABLE OF CONTENTS (continued)

IV.    Hi-Tech Infringes the '504, '605, and '479 Patents.......... 56

    A.    Hi-Tech's ANDA Product Has a pH of 7.2,
Which Is Literally "about 7.3."................................ 56

    B.    Hi-Tech Infringes the pH Limitation by
Equivalents. .............................................. 59

Conclusion................................................................. 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re '318 Patent Infringement Litigation (Janssen),*
583 F.3d 1317 (Fed. Cir. 2009) .................................................................. 55, 56

*Alcon Res. Ltd. v. Barr Labs., Inc.,*
745 F.3d 1180 (Fed. Cir. 2014) ................................................ 49, 51, 52, 53

*Allergan, Inc. v. Sandoz Inc.,*
726 F.3d 1286 (Fed. Cir. 2013) ........................................................................ 45

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.,*
752 F.3d 967 (Fed. Cir. 2014) ......................................................................... 42

*Broadcom Corp. v. Emulex Corp.,*
732 F.3d 1325 (Fed. Cir. 2013) ................................................................. 57, 59

*Cephalon, Inc. v. Watson Pharms., Inc.,*
707 F.3d 1330 (Fed. Cir. 2013) ...................................................................... 53

*Chemical Eng'g Corp. v. Essef Indus., Inc.,*
795 F.2d 1565 (Fed. Cir. 1986) ...................................................................... 31

*In re Cyclobenzaprine,*
676 F.3d 1063 (Fed. Cir. 2012) ................................................................ 27, 43

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
567 F.3d 1314 (Fed. Cir. 2009) ............................................................ 33, 34, 35

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.,*
672 F.3d 1270 (Fed. Cir. 2012) ...................................................................... 57

*Eli Lilly v. Actavis Elizabeth,*
435 F. App'x 917 (Fed. Cir. 2011) ................................................................ 54

*Eli Lilly v. Teva Pharms.,*
619 F.3d 1329 (Fed. Cir. 2010) ................................................................. 54, 55

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
344 F.3d 1359 (Fed. Cir. 2003) (*en banc*).................................................... 60

*Funai Elec. v. Daewoo Elecs.*,
    616 F.3d 1357 (Fed. Cir. 2010) ................................................................ 60

*Galderma Labs. v. Tolmar*,
    737 F.3d 731 (Fed. Cir. 2013) ..........................................................*passim*

*In re Hoch*,
    428 F.2d 1341 (C.C.P.A. 1970) .............................................................. 41

*Interconnect Planning Corp. v. Feil*,
    774 F.2d 1132 (Fed. Cir. 1985) .............................................................. 44

*Intervet, Inc v. Merial Ltd.*,
    617 F.3d 1282 (Fed. Cir. 2010) .............................................................. 60

*In re Lee*,
    277 F.3d 1338 (Fed. Cir. 2002) .............................................................. 36

*Merck KGAA v. Integra Lifesciences I, Ltd.*,
    545 U.S. 193 (2005) ............................................................................... 48

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
    103 F.3d 1538 (Fed. Cir. 1997) .............................................................. 45

*Mintz v. Dietz & Watson, Inc.*,
    679 F.3d 1372 (Fed. Cir. 2012) .............................................................. 46

*In re Mouttet*,
    686 F.3d 1322 (Fed. Cir. 2012) .............................................................. 37

*Novozymes A/S v. DuPont Nutrition Biosceinces APS*,
    723 F.3d 1336 (Fed. Cir. 2013) .............................................................. 51

*In re NTP*,
    654 F.3d 1279 (Fed. Cir. 2011) ......................................................... 31, 32

*Rasmusson v. SmithKline Beecham Corp.*,
    413 F.3d 1318 (Fed. Cir. 2005), affirmed.............................................. 55

*Spectralytics, Inc. v. Cordis Corp.*,
    649 F.3d 1336 (Fed. Cir. 2011) .............................................................. 32

*Sunovion Pharms, Inc. v. Teva Pharms. USA, Inc.*,
    731 F.3d 1271 (Fed. Cir. 2013) .............................................................. 57

*Teva Pharms, USA, Inc. v. Sandoz, Inc.,*
    723 F.3d 1363 (Fed. Cir. 2013) ............................................................ 56, 57

*Tokai Corp. v. Easton Enterprises, Inc.,*
    632 F.3d 1358 (Fed. Cir. 2011) .........................................................27, 28, 29

*Tyco Healthcare v. Mutual Pharm,*
    642 F.3d 1370 (Fed. Cir. 2011) .........................................................31, 32, 42

*Univ. of Cal. v. Dakocytomation Cal., Inc.,*
    517 F.3d 1364 (Fed. Cir. 2008) ............................................................ 60, 61

*W.L. Gore & Assoc., Inc. v. Garlock, Inc.,*
    721 F.2d 1540 (Fed. Cir. 1983) ............................................................ 43, 47

## Statutes

35 U.S.C. §271(e) ...................................................................................... 48

## Other Authorities

Fed. R. Civ. P. 52(a)(6) ............................................................................ 27

MPEP § 2107.03 ........................................................................................ 54

<u>**STATEMENT OF RELATED CASES**</u>

Pursuant to Fed. R. App. P. 47.5, counsel for Allergan, Inc. states that there have been no prior appeals in or from the same civil action or proceeding in the lower court previously before this or any other appellate court.  No case in this or any court will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over these patent infringement cases under 28 U.S.C. §§ 1331 and 1338. (A7.) The district court entered its final judgment and permanent injunction on January 13, 2014. (A1-5.) Appellants filed their notices of appeal on February 11, 2014, (A7899-7903), within 30 days of the final judgment, making them timely under Federal Rule of Appellate Procedure 4(a)(1).

This Court thus has jurisdiction over the appeal under 28 U.S.C. § 1295(a)(1).

<u>S</u><small>TATEMENT OF THE</small> <u>I</u><small>SSUES</small>

1.      Whether the district court correctly found the asserted claims were non-obvious based on its well-supported factual findings.

2.      Whether the district court clearly erred by finding the '353 and '118 claims have adequate written description.

3.      Whether the district court correctly rejected Lupin's argument the '353 and '118 claims are not enabled.

4.      Whether the district court clearly erred in rejecting Hi-Tech's argument it does not literally infringe the '504, '605, and '479 patents and, alternatively, erred in finding infringement by equivalents.

## INTRODUCTION

This case is about Allergan's sight-saving drug Lumigan® 0.01%, the inventors' years of struggle to develop it, the prior art that taught away from every aspect of it, and the millions of glaucoma patients whose lives are better because of it.  Appellants' defenses all turn on the underlying facts.  The district court resolved those facts against them, and Appellants show no clear error in the court's well-supported findings.  That should be the end of their appeal.

Instead, Appellants struggle to convert their factual gripes into legal errors.  But Appellants told the district court their obviousness case depended on "three facts," (A5099-100, A6324-25), and indeed it does.  The prior art taught 0.03% bimatoprost was "far superior" to 0.01% bimatoprost because it was 50% more effective yet had similar levels of hyperemia (red eye).  The prior art taught that BAK—the ingredient whose concentration Appellants said it would be obvious to increase to compensate for this chasm in efficacy—would not increase bimatoprost's ocular penetration but would, in fact, inhibit it.  And the prior art warned that the amount of BAK used in the invention (200 ppm) would exacerbate glaucoma and red eye, while causing many other kinds of ocular damage.  Appellants' own expert summed up the prior art view best when he said that BAK was "from Satan."  By correctly finding those facts, and rejecting Appellants' contrary tale, the district court eliminated any potential legal challenges to a finding of non-obviousness.

Appellants' response is to chastise the district court for approaching the obviousness question in the way they invited it to during trial, an approach they now (wrongly) call legal error. But their theory on appeal—that the invention was an obvious choice within the broad prior art ranges for bimatoprost and BAK—was something they never argued at trial, never had their experts address, and never raised with the district court until months after trial. No matter. The district court's opinion addressed and rejected both theories, and its findings of teaching away, unexpected results, lack of motivation to combine, and significant objective indicia demonstrate non-obviousness either way.

Appellants' remaining defenses fare no better. Their written description defense fails because the patents disclose the Lumigan 0.01% formulation, which has the clinical results recited in the claims. And Lupin's enablement defense fails because its expert admitted the patents ***do*** disclose testing data that demonstrates Lumigan 0.01%'s claimed efficacy and reduced hyperemia—data Lupin's brief ignores. There is not, as Appellants would have it, any conflict between rejecting their obviousness and § 112 defenses. The patent discloses key knowledge missing from the prior art—that BAK enhances bimatoprost's penetration. The invention was non-obviousness because the prior art taught the opposite. It was adequately described and enabled after the patents-in-suit set the record straight.

Finally, Hi-Tech's pH defense can be dispensed with because the district court correctly resolved conflicting evidence on literal infringement in Allergan's favor.

2

<u>S<small>TATEMENT OF THE</small> F<small>ACTS</small></u>

**I.    <u>The Problem</u>: Lumigan® 0.03% Was the Most Effective Glaucoma Drug But A Side Effect Caused Patients to Stop Therapy.**

Glaucoma is an incurable disease that afflicts millions worldwide. It is associated with elevated intraocular pressure (IOP), which irreversibly damages optic nerve cells, and, if left untreated, causes blindness. (A5443-49.) Glaucoma treatments seek to reduce IOP. (*Id.*)

The late 1990s and early 2000s brought a revolution in glaucoma therapy—a new class of drugs called "prostaglandin analogs." (A5449-50.) Prostaglandin analogs reduced IOP much more than prior therapies. (*Id.*) Allergan introduced its prostaglandin analog, bimatoprost, in 2001 as Lumigan® 0.03%. (*Id.*) Others were Xalatan® (latanoprost) and Travatan® (travoprost). (*Id.*) These prostaglandins share many structural similarities, but bimatoprost had a key difference—a nitrogen-containing "amide," instead of an oxygen-containing "ester":



| Bimatoprost | Latanoprost | Travoprost |

(A6098-99.) This difference has two consequences relevant here.

3

First, bimatoprost lowers IOP through a different mechanism—acting on a different receptor and as an intact molecule. (A6098-6111.) These differences have real-world consequences: studies showed that Lumigan® 0.03% lowered IOP more than Xalatan® and worked in patients unresponsive to Xalatan®. (A44167; A44217; A5241-43; A6253-55.) Appellants' claim (at 24) that Xalatan® was "just as efficacious" as Lumigan® 0.03% was rightly rejected by the district court. (A13.)

Second, bimatoprost interacts differently with other ingredients. Ophthalmic drugs are delivered in water-based eyedrops that include the active ingredient, a preservative to kill bacteria, and other components for comfort and to adjust pH. A common preservative is benzalkonium chloride (BAK). But, unlike bimatoprost, latanoprost and travoprost form a "complex" with BAK that reduces the amount of "free" BAK available to kill bacteria and causes solubility problems. (A6180-85, A6284-85, A6163, A5152-53; A92 at 1:32-42, A6249-51.) So Xalatan® and Travatan® need unusually high amounts of BAK—200 and 150 parts per million (ppm) respectively—while Lumigan® 0.03% used 50 ppm. (*Id.*)

Although Lumigan® 0.03%'s efficacy surpassed all other drugs, there was a problem—it caused more frequent and severe hyperemia (red eye):



(A9373; A44178; A5243-45; A6251-52; A5739-40; A5451-52.)

The problem was not just cosmetic.  Hyperemia caused many patients to stop taking Lumigan® 0.03%.  (A5452-55; A5736-37, A5802; A5826, A5245.)  Although this eliminated hyperemia, their IOP was uncontrolled and they were irreversibly losing vision, often without noticing until it was too late.  (*Id*.)

## II.   The Solution:  Lumigan® 0.01% Cuts the Bimatoprost by Two-Thirds While Quadrupling the BAK.

### A.   The Project Begins With Two Years of Failures.

Allergan immediately sought a solution, starting in early 2002.  But the problem was formidable—it had to reduce hyperemia while maintaining Lumigan® 0.03%'s superior efficacy.  (A5123-26; A42988-93, A14.)  Inventor Chin-Ming Chang, the lead formulator, described it as "one of the most challenging projects I ever worked on," (A5171-72), and contemporaneous documents described it as a "[d]ifficult assignment due to Lumigan's inherent pharmacology."  (A44661.)  The difficulty was that bimatoprost causes both IOP-lowering and hyperemia, requiring the team to somehow decouple the two.  (A5134, A5171-72; A6162.)

Initial attempts kept the bimatoprost concentration at 0.03% while changing other aspects of the formulation because the team thought less bimatoprost would yield a "less effective drug."  (A5124-30; A44675-77, A14.)  One strategy involved adding a "cyclodextrin" to remove "free" bimatoprost from the eye's surface and a viscosity enhancer to keep the drop on the eye longer.  (A5124-25; A44676.)  This work led to the prior art Lyons patent but ultimately failed.  (A8340-50.)  Other

studies examined whether a gel, emulsion, or gum—rather than a water-based solution—might solve the problem.  (A5126-30; A44675-77, A15.)  None did.  (*Id.*)

Another approach, pursued in parallel, tried to replace BAK with Purite®, a gentler preservative.  (A5126-27; A42993; A44676.)  BAK was associated with hyperemia, so these efforts were a direct attempt to solve the problem but failed because the resulting formulations were unstable.  (*Id.*)

The team also explored adding other ingredients to reduce hyperemia.  For example, they replaced the citrate/phosphate buffer of Lumigan® 0.03% with a calcium/borate buffer, thinking calcium would reduce hyperemia by constricting optic blood vessels.  (A44677; A5127-30.)  It didn't.  (*Id.*)  They also tried adding "nitric oxide scavengers," thinking this might stop the process by which bimatoprost was triggering hyperemia.  (A43189, A43269, A5131-32.)  The team considered 150 scavengers, created two 0.03% "cocktail" formulations with several scavengers, (*id.*), and tested their impact on hyperemia in dogs.  (A44672-74; A5137.)

The dog testing gave the team its first lead, and the first of several surprises.  (A16.)  Everyone expected the "cocktail" formulations would exhibit similar IOP-lowering to Lumigan® 0.03% but might reduce hyperemia.  (A5137.)  Instead, they observed "a really surprising result"—neither reduced hyperemia, but one cocktail "showed a higher IOP-lowering effect."  (*Id.*)  This prompted them to investigate what ingredient could be responsible.  (A5138-39, A5132-33.)  It turned out that TPGS—an ingredient included to ensure the scavengers were soluble—might be

6

increasing bimatoprost's penetration through the cornea, which might increase efficacy. (*Id.*)

The inventors thus prepared new TPGS formulations in November 2003. (A43302; A43523; A5139-41; A43532.) The initial TPGS formulations included 50 or 100 ppm BAK as a preservative, but they surprisingly failed the preservative effectiveness tests required by regulators. (*Id.*) The inventors thus concluded that "TPGS reduces [the] effectiveness of BAK," and prepared a new formulation with more BAK (200 ppm) to pass those tests. (A43532, A5140-42, A43562-94.)

### B. The Turning Point: The TPGS Formulations Fail, But a Control with 200 ppm BAK Increases Bimatoprost Absorption.

By early 2004, the inventors were ready to test their lead TPGS formulation in rabbits. (A44678-84; A5142-45.) The tests included several formulations with 0.03% bimatoprost, different amounts of TPGS, and 200 ppm BAK. (*Id.*) They also included two controls—Lumigan® 0.03% and a Lumigan® 0.03% with 200 ppm BAK. (A5143-44, A5199, A5202-03, A5211, A5221-27; A43703, A43724; A43025.) The latter control was necessary for an apples-to-apples comparison with the TPGS formulations that needed 200 ppm BAK. (*Id.*)

That experiment's surprising result changed the project's direction. The TPGS formulations failed—they either led to no change or decreased bimatoprost absorption. (A44680-81; A5144.) But the 200 ppm BAK "control" dramatically increased absorption. (*Id.*) Figure 1 of the patents-in-suit shows these results:



Fig. 1

(A90.)  Inventor Jordan's subsequent email summarized their surprise:  "the lead formulation, ***believe it or not***, is Lumigan with the 200 ppm BAK."  (A44451.)

Even with this result, the inventors still doubted they had the answer.  Safety was a major concern.  Their experiment revealed that BAK increased bimatoprost absorption "by compromising cell layer integrity and toxicity."  (A44684; A5145.) Inventor Chin-Ming Chang wondered if it would "ever be a good idea to move forward with 200 ppm BAK, knowing all the baggage" it carried.  (A5154-55.) Likewise, inventor James Chang described using 200 ppm BAK as a "bold move" because BAK "damages your cells on the ocular surface," adding that "[y]ou try not to use it if you can," and "we all try to replace it if we could."  (A5692.)  Inventor Lin testified that, after the team "stumbled on" to 200 ppm BAK, it was a "last resort" because they were "trying to stay away from BAK as much as possible."  (A5681.) They thus organized another rabbit study on BAK's effects while continuing to pursue other options.  (A5154-57; A43922; A44451-52.)

### C. The Inventors Demonstrate That Lumigan 0.01% Maintains Efficacy While Reducing Hyperemia.

The inventors' second rabbit study sought to confirm BAK's effect while examining ways to minimize the amount. It compared formulations with various amounts of bimatoprost, BAK, and another potential penetration enhancer (EDTA), hoping that EDTA might boost bimatoprost absorption and permit reducing BAK. (A43994-44004; A5155-60, A43869.) The results confirmed BAK's effect while showing that EDTA did little. (*Id.*) Figure 2 of the patents-in-suit reflects that data:

**Fig. 2**



(A91.)

Despite these results, the inventors remained skeptical. Inventor Jordan had "some concern that the BAK penetration approach might not carry over into humans." (A44491, A5160-62, A41-43; A44314-438.) The prior art taught there was **no** change in IOP-lowering when the BAK in a 0.03% bimatoprost formulation was increased from 0 to 50 ppm. (*Id.*) That conflicted with the inventors' data, which suggested there should be a difference (see far left and far right bars). (*Id.*)

9

The inventors were also skeptical that 0.01% bimatoprost would retain efficacy, even with 200 ppm BAK. Inventor Schiffman felt "it is very unlikely that 0.01% would be successful" at maintaining comparable efficacy to Lumigan® 0.03%. (A44449.) Inventor James Chang likewise thought the data "seem[ed] to suggest that 0.01% may be too low" to maintain efficacy. (A44447; A5165-66.) The inventors questioned even trying 0.01% bimatoprost. (A5697-98; A5159-65.)

Nevertheless, the inventors overcame their doubts included Lumigan® 0.01% in Phase II human testing. (A42996; A5156.) The November 2004 testing protocol reflected their belief that Lumigan® 0.01% would maintain comparable efficacy to Lumigan® 0.03% but with less hyperemia. (A5167-68; A41934-35.) Testing began in January 2005, (A41840), and, in March 2005, the inventors filed their patent application. (A89.) The Phase II results were encouraging, (A41890-92, A41911-15, A41921; A5258-60), and Phase III trials confirmed that Lumigan® 0.01% has less hyperemia than Lumigan® 0.03%, while maintaining nearly equivalent efficacy. (A5261-62; A44114-24.) After over 3 years of experimentation and after trying hundreds of formulations, the inventors had finally succeeded.

## III. The Patents-in-Suit Claim the Composition and Use of Lumigan 0.01%.

The inventors' work resulted in the five patents-in-suit. The common specification describes the rabbit studies that showed the BAK's unexpected impact on bimatoprost's corneal permeability and absorption and recites Lumigan® 0.01%'s exact formulation. (A90-94.)

Three patents (Nos. 7,851,504; 8,309,605; and 8,338,479) claim Lumigan®

0.01% and methods of using it.  Claim 2 of the '504 is representative:

> A composition having a pH of about 7.3 which comprises
>
>> about 0.01% bimatoprost,
>>
>> about 200 ppm benzalkonium chloride,
>>
>> citric acid monohydrate, a phosphate buffer, and NaCl
>>
>> wherein said composition is an aqueous liquid which is formulated for ophthalmic administration.

(A94 at 6:21-25.)

The claims of the other two patents (Nos. 8,278,353 and 8,299,118) recite the

key aspects of the Lumigan® 0.01% formulation—the bimatoprost and BAK

concentrations—and the unexpected clinical performance it achieves relative to

Lumigan® 0.03%.  Claims 7 and 8 of the '353 patent are representative:

> 7.  A first composition administered once daily for lowering intraocular pressure in a person with glaucoma or ocular hypertension,
>
>> the first composition comprising about 0.01% w/v bimatoprost and about 0.02% w/v benzalkonium chloride,
>>
>> wherein the first composition lowers intraocular pressure without a substantial reduction in the intraocular pressure lowering benefit provided by the once daily administration of a second composition comprising 0.03% w/v bimatoprost and 0.005% w/v benzalkonium chloride.
>
> 8.  The composition of claim 7 wherein the once daily administration of the first composition results in less hyperemia as compared to the once daily administration of the second composition.

(A103 at 5:48-6:15.)

The PTO thoroughly evaluated these claims before issuance. The '504 went to the Board of Patent Appeals, which found the prior art taught away from 200 ppm BAK. (A24698-99.) And the PTO considered all but one of Appellants' references before granting the other patents. (A34.)

## IV. The Prior Art Discouraged Both 0.01% Bimatoprost and 200 ppm BAK.

Appellants told the district court their obviousness defense turned on "three *facts*" about the prior art. (A5099-100.) The court resolved each fact—and many others—against them, finding the prior art taught: (1) ophthalmic formulation is "very unpredictable"; (2) 0.01% bimatoprost was significantly less effective than 0.03%; (3) it was unknown whether 0.01% bimatoprost would have less hyperemia than 0.03%; (4) BAK would not increase corneal penetration of bimatoprost and other non-charged prostaglandins; and (5) BAK should be minimized. (A33-64.)

### A. Ophthalmic Formulation Is "Very Unpredictable."

Ophthalmic formulation poses many challenges that led the court to find it "very unpredictable." (A33; A5119-22; A5938-40; A6159-62.) One is the eye's anatomy—it is designed to keep out foreign substances and has a small area for drug absorption. (*Id.*) Another "very difficult" challenge is when the drug causes both the desired and undesired results. (A5134, A5171-72; A6215.) Allergan's expert, Dr. Loftsson, who had over 20 years experience with ophthalmic formulation, explained in unrebutted testimony that, "it can be really difficult or sometimes impossible to get rid of the side effect and keep the pharmacological effect." (A6162; A6153-57.)

12

Although there are many general approaches to try and decouple efficacy and side effects, each has a vast range of possibilities within it. (A5123-27, A6162-64, A6186-87, A9156-61.) For example, in just one avenue the inventors explored, they considered 150 possibilities. (A43189, A43269.) The court thus rightly found this is not "a field with a finite number of identified or predictable solutions." (A36.)

### B. The Prior Art Taught 0.03% Bimatoprost Had "Far Superior" Efficacy to 0.01%.

Only two prior art references—Laibovitz and Lyons—discussed the relationship between bimatoprost concentration and IOP-lowering. (A8832-38; A8340-50.) Both taught away from the invention. (A36-39; A6168-73; A6239-45; A5247-48.)

Laibovitz compared 0.01% and 0.03% bimatoprost and taught 0.03% had "significantly better efficacy." (A36; A8835; A6238-42; A5246-48.) For example, Laibovitz disclosed that 0.03% bimatoprost resulted in ~50% more IOP-reduction than 0.01% bimatoprost, showing that 0.03% was "far superior":



(A8835; A6239-41, A5247-58.) Moreover, 0.03% bimatoprost reduced IOP by 2 mm-Hg more than 0.01%. (*Id.*) Allergan's ophthalmologist expert, Dr. Noecker, who has

13

treated thousands of glaucoma patients, explained that this gap is "clinically significant" and that a National Eye Institute study found that every extra millimeter of IOP-lowering cuts the risk of glaucoma worsening by 10%. (A6240-41.) He added that Lumigan 0.03%'s efficacy "saved us, a lot of times, from going to surgery," (A5450), while the IOP-reduction Laibovitz reported for 0.01% bimatoprost was comparable to existing treatments. (A6239-41.) Appellants' claim (at 20) that Laibovitz taught 0.01% bimatoprost was "nearly as effective" as 0.03% not only ignores the court's contrary finding, (A36), but is wrong, as Dr. Noecker explained.

Lyons was similarly discouraging. It observed that "clinical trials have shown that 0.02% bimatoprost shows little hyperemia, but also ***loses efficacy***." (A8348 at 12:30–31.) Lyons thus stressed that "most preferably the concentration is about 0.03%," and included 0.03% in all examples. (A8346-49 at 7:25–27, 8:59-14:30.) The court rightly rejected Appellants' suggestions (at 19-20) that Lyons taught that 0.01% bimatoprost had sufficient efficacy, finding the passages they rely upon either (1) do not refer to total bimatoprost (which was still 0.03%) or (2) require additional ingredients to keep the drop on the eye longer. (A38; A6171-73, A6273.)

### C. The Prior Art Taught That Decreasing Bimatoprost Concentration from 0.03% to 0.01% Would Not Reduce Hyperemia.

The district court found that "[n]owhere in the prior art is it disclosed that a concentration reduction in bimatoprost causes a reduction in the frequency or severity of hyperemia." (A39.) In fact, Laibovitz "teaches that a reduction in bimatoprost

concentration from 0.03% to 0.01% does not result in reduced hyperemia," and the skilled artisan knew it "is not uncommon for a reduction in dose concentration to have no impact on side-effect reduction." (*Id.*) The court rejected Appellants' claim (at 23) that "a number of prior art references (Laibovitz, Lyons, and Lee) disclosed that 0.01% was expected to produce 'less hyperemia' than 0.03%." (A39-41.)

The court was right. As Dr. Loftsson testified, and as Appellants studiously ignore, every drug has a unique "dose response curve" that defines the relationship between drug concentration and a given effect, like the exemplary curves below for a side effect (blue) and efficacy (green). (A6165-71.)



Some dosage reductions have little effect, and the curves for efficacy and side effects are "most often" different, so dosage changes often alter one but not the other. (*Id.*)

Laibovitz exemplified these challenges. It taught that moving from 0.03% to 0.01% bimatoprost substantially reduced efficacy but did not seem to impact hyperemia. (A8836; A6245-49; A6169-71; A5248-50.) In fact, **more** people taking 0.01% experienced hyperemia. (*Id.*) Allergan's experts testified the skilled artisan would thus conclude that Laibovitz taught "it is not possible to reduce the

15

concentration of the drug to maintain the efficacy and get rid of the side effect," (A6171), and would not lead the skilled artisan to think reducing bimatoprost from 0.03% to 0.01% would reduce hyperemia. (A6249; A5250.) Even Appellants' own expert conceded that Laibovitz taught there was "no significant difference" in hyperemia between groups. (A5947.)

The court rejected Appellants' erroneous argument that the prior art taught 0.01% bimatoprost would have less hyperemia than 0.03%. (A40.) It correctly credited a Laibovitz co-author's testimony that the "dose-related mild increase" in hyperemia noted in Laibovitz referred to once- and twice-daily dosages of 0.03%, not to a difference between 0.01% and 0.03%. (A8832; A5753; A5948-49, A5302.) And it found that, given the Laibovitz data, the artisan would conclude Lyons gave "no guidance as to whether a reduction from 0.03% to 0.01% would result in decreased frequency or severity of hyperemia" because Lyons had no supporting data. (A40.)

### D. The Prior Art Taught BAK Would Not Increase Penetration of Bimatoprost and Other Neutral Prostaglandins.

Appellants' assertion (at 12) that BAK "was well-known to enhance the penetration of drugs into the eye" ignores the court's findings and misinterprets the prior art, which taught that BAK's effect differed for each drug, that BAK had no impact on bimatoprost, and that it *inhibited* penetration of other neutral prostaglandins like bimatoprost. (A40.)

16

The only prior art addressing whether BAK impacted bimatoprost's IOP-lowering—a public FDA document—taught it had no effect. (A44419-25; A5251-55, A5240; A5267-69; A44471-76, A44343, A44491; A5160-62; A5666-68, A5675-76; A5683; A6176-77; A41.) The study compared "preserved" bimatoprost 0.03% and "non-preserved" bimatoprost 0.03%, and, as Allergan's witnesses explained, it included identifying information indicating these had 50 and 0 ppm BAK, respectively. (*Id.*) The two had equivalent IOP-lowering overall, and the non-BAK formulation performed ***better*** at the last timepoint. (A44424-25; A5255, A5279-80; A6176-77.) The court found this "taught away from increasing the concentration of BAK as a permeation enhancer for bimatoprost." (A43.) As Dr. Loftsson explained, it "wouldn't be worthwhile to try." (A6177.)

The next closest art was similarly discouraging. Two references—Higaki and Camber—taught BAK ***inhibited*** penetration of uncharged prostaglandins like bimatoprost. (A43-46.) Higaki examined BAK's impact on the charged prostaglandin "S-1033" and the uncharged prostaglandin "S-1033 methyl ester." (A9126-34.) BAK decreased the uncharged ester's penetration, as shown by the two rightmost bars:



(A9130-31; A6116-18; A6177-78; A5969-70.) Therefore, the court found that the skilled artisan would have concluded "that BAK would inhibit—not promote—corneal penetration of bimatoprost," another uncharged prostaglandin. (A43.)

Likewise, Camber reported that BAK **reduced** the permeability of another uncharged prostaglandin ($PGF_{2\alpha}$ isopropyl ester) by nearly 50%, as shown below:

| Compound | Perfusion condition | Permeability coefficient $(cm\ S^{-1}) \times 10^6$, mean $\pm$ S.E.M. $n = 6$ |
|---|---|---|
| $PGF_{2\alpha}$ | intact cornea | $0.13 \pm 0.03$ |
| $PGF_{2\alpha}$ | 0.01% BAC | $0.93 \pm 0.43$ |
| $PGF_{2\alpha}$ | deepithelized cornea | $8.23 \pm 0.92$ |
| $PGF_{2\alpha}$ isopropyl ester | intact cornea | $29.43 \pm 1.25$ |
| $PGF_{2\alpha}$ isopropyl ester | 0.01% BAC | $15.91 \pm 1.36$ |
| $PGF_{2\alpha}$ isopropyl ester | deepithelized cornea | $3.25 \pm 0.57$ |

(A44079-84; A6119-20; A6177-78.) The court thus found that Camber "teaches that BAK would not increase permeability for neutral molecules (including bimatoprost)." (A45.) Both taught away from using BAK by "strongly indicat[ing] it will not work, that it will actually reduce the amount going into the eye," thereby "decreasing the clinical efficacy of the drug." (A6179.)

By contrast, Appellants relied on prior art—like Lee and Abelson—that addressed BAK's impact on molecules that were dissimilar to bimatoprost. (A46-52.) That art dealt with molecules that were charged, much larger than bimatoprost, or much more hydrophilic (water-loving). (*Id.*; A6121-27; A45015.) The court correctly found that none of it "teaches or suggests that BAK would enhance the penetration of bimatoprost" or the skilled artisan "should try such an approach." (A52.)

18

### E. The Prior Art Taught the Amount of BAK Should Be Minimized and Cautioned Against 200 ppm.

#### 1. BAK Was Cytotoxic, Increased IOP, and Caused Hypermia.

The parties' witnesses agreed, and the court found, that the skilled artisan knew it was best to eliminate or minimize the amount of BAK in ophthalmic formulations. (A5803-07; A6224-29; A5142, A5150, A5233.) Indeed, Appellants' expert, Dr. Samples, had previously written that "limitation of BAK load, or the total amount being given, in glaucoma drops is a desirable goal and one that is being actively pursued by the industry." (A5807) There were several reasons why.

First, BAK was known to be cytotoxic and to cause increased IOP, exacerbating the very condition glaucoma drugs seek to treat. (A53.) BAK's toxicity is why it works as a bacteria-killing preservative, but it also harms ocular tissue. Appellants' own expert described BAK as "a natural-born killer that targets corneal epithelium and endothelium, and trabecular meshwork cells" and has "ocular-wide manifestations." (A5793-94.) By damaging the trabecular meshwork, BAK interferes with the eye's fluid drainage, which can cause increased IOP and "mimic" glaucoma itself. (A5786-87, A53.) The problem is so bad that Appellants' expert was quoted as saying that "BAK is from Satan." (A5766-77, A5792-93.)

Second, BAK was a known irritant linked to hyperemia. (A55.) Allergan's formulation expert explained that, based on the problem to be solved (i.e., reducing hyperemia while maintaining efficacy), the skilled artisan would not have chosen to

19

use more BAK because "[y]ou would run into difficulties of more red eyes."  (A6174-75.)  Moreover, Appellants' expert (Samples) admitted that removing BAK from other glaucoma medications reduced hyperemia.  (A5832-36.)

Third, BAK aggravates other conditions from which glaucoma patients suffer.  (A53.)  Appellants' expert conceded that 40-58% of glaucoma patients have ocular surface disease, and that "BAK contributes greatly" to its symptoms.  (A5819-20, A5801-02.)  He also admitted that "another concern with BAK is its role in and contribution to dry eye," which is "particularly common in glaucoma patients."  (A5789-90.)

Given these problems, the court rightly found the skilled artisan would be discouraged from increasing the BAK in a glaucoma medication.  (A53-59.)  After all, skilled artisans knew that BAK's problems were dose-dependent—the more BAK, the worse they were.  (A53-54; A5794-96; A6226-28.)  Skilled artisans also knew they had to limit the amount of BAK in any formulation because glaucoma patients often take multiple BAK-containing medications.  (*Id.*)  Indeed, the prior art trend was away from the invention—4 other drugs had been reformulated to reduce or eliminate BAK, while none had been modified to increase it.  (A6237-38; A5835.)

Appellants' own experts had cautioned those skilled in the art against using BAK as a penetration enhancer.  Dr. Samples previously wrote that "it has been argued that BAK is somehow desirable to perform penetration of antibiotics," but that "such arguments ignore the cellular consequences associated with the use of

preservatives." (A5820.) And Appellants' formulation expert wrote that, although using surfactants like BAK for penetration enhancement "was initially received with a lot of enthusiasm, cytotoxic and membrane damage properties at the concentrations necessary to produce sufficient permeability enhancement has limited their utility in drug delivery." (A5987-88, A56-57.)  These articles were in accord with the other prior art.  A 2002 review cautioned that 100 ppm BAK "has been reported to cause cells of the corneal epithelium to peel at their borders." (A22171-72.)

### 2.    The Court Rejected Appellants' BAK Arguments.

Ignoring their own experts' concessions, Appellants renew (at 10-11) their fact-based argument that the skilled artisan would have thought 200 ppm BAK would be safe because "BAK was the most-used preservative in ophthalmic formulations" and other ophthalmic drugs had used 200 ppm BAK.  The court correctly rejected these arguments.  (A57-59.)

Most ophthalmic drugs used less than 200 ppm BAK, and usually far less. (A25815; A5231.)  The few that did use 200 ppm BAK were materially different than Lumigan®.  Most were not for glaucoma—Natacyn was an "extremely toxic" anti-fungal, while decadron phosphate and Neodecadron were "steroid preparations used for short-term treatment of inflammation." (A58.)  By contrast, glaucoma patients take their drugs for life, causing far greater cumulative exposure.  (A6230-33.)

The only prior FDA-approved glaucoma drug with 200 ppm BAK was Xalatan®.  But Dr. Loftsson explained that the skilled artisan knew Xalatan®'s active

ingredient (latanoprost) forms a "complex" with BAK that reduces the "free" BAK available to damage corneal cells, unlike bimatoprost. (A57-58; A6179-82; A5152-53; A5230; A8180; A6249-51; A92 at 1:38-42.) As a result, Xalatan® shed little light on whether 200 ppm BAK would be safe with bimatoprost. (*Id.*) The same is true of the non-FDA-approved Xalacom®, which also includes latanoprost. (A58-59.) Appellants never introduced any contrary evidence, either through their own experts or otherwise, despite having the clear and convincing burden to prove obviousness.

What is more, skilled artisans were concerned about Xalatan®'s safety. (A57.) Appellants' own expert had actually written about Xalatan®, teaching those skilled in the art that Xalatan® "showed a decrease in cell membrane integrity and a significant increase in apoptosis [cell death]" when compared with the 50 ppm BAK in Lumigan® 0.03%. (A57; A5808-09.) Another study found "[b]imatoprost, which contains the lowest concentrations of the evaluating medications (0.005% [BAK]), was also associated with significantly less damage than latanoprost." (A44168; A6233-35; A57.) Others tried to reduce the BAK in Xalatan® to 30-100 ppm, stressing that "BAK may cause corneal disorders when used at high concentration," so "it is desirable to lower its concentration as low as possible." (A8181-83.) Both the district court and the Board of Patent Appeals found these statements taught away. (A45, A57-58; A24698-99.) Appellants' brief ignores them.

## V.   Proceedings in the District Court.

Allergan filed these consolidated cases after Appellants sought FDA approval to make generic versions of Lumigan® 0.01%.  The district court held a five-day bench trial, after which it made 83-pages of findings, concluding the patents-in-suit were infringed and not invalid.  (A6-88.)

### A.   Obviousness.

Appellants' only validity defense at trial was obviousness, which the court correctly rejected.  (A33-82.)  It explained that "[i]n light of the Court's factual findings," described above, "Defendants have failed to prove by clear and convincing evidence that any asserted claim would have been obvious."  (A79.)

The court first noted the "significant differences between the prior art and the asserted claims."  (A79.)  No prior art disclosed a composition with 0.01% bimatoprost and 200 ppm BAK.  (A59.)  Rather, it disclosed broad ranges of bimatoprost (0.001%-1%) and a preservative (0-1000 ppm), and Lumigan® 0.03% with 50 ppm BAK.  (A80.)  The skilled artisan had no motivation to select the invention from that range or modify Lumigan® 0.03% to arrive at it because the prior art taught (1) 0.01% was significantly less effective and (2) increasing BAK would not enhance bimatoprost's penetration.  (A60.)  These facts also negated any reasonable expectation of success.  (A60-61.)  Indeed, the prior art taught away because it taught BAK would not work as a penetration enhancer for bimatoprost, warned that BAK could exacerbate elevated IOP and hyperemia while damaging cells, and taught that

0.01% bimatoprost would have significantly less efficacy while not reducing

hyperemia.  (A52-59, A36-39.)  Finally, significant objective indicia supported non-

obviousness.  (A61-64.)

### B.    Written Description and Enablement.

Appellants never mentioned any §112 defenses during trial.  (A82, A84.)  The

court nevertheless considered Appellants' post-trial argument that the '353 and '118

patents were invalid for lack of written description and Lupin's post-trial enablement

defense.  (A82-86.)  It correctly rejected them because the specification discloses the

Lumigan 0.01% formulation, which has the claimed efficacy and reduced hyperemia.

(A82-86.)  In addition, the Court noted the patents have *in vitro* and *in vivo* data

showing the impact of 200 ppm BAK on bimatoprost's absorption, (*id.*), which

Lupin's expert admitted would permit the skilled artisan to predict the claimed

efficacy and reduced hyperemia.  (A6652-54.)

### C.    Hi-Tech's Infringement.

Hi-Tech challenged infringement of only the '504, '605, and '479 patents,

which require a "pH of about 7.3."  (A69.)  The parties agreed to a construction,

(A1635), which the court applied to find that Hi-Tech's literally infringes because its

ANDA specifies a pH of up to 7.2.  (*Id.*)  The court alternatively found infringement

by equivalents, rejecting Hi-Tech's prosecution history estoppel arguments because

patentability did not turn on the pH limitation  (A69-71.)  The court also found Hi-

Tech infringes the '353 and '118 patents, (A72-73), a finding unchallenged on appeal.

## SUMMARY OF THE ARGUMENT

**Obviousness.** Appellants' case rises or falls with the underlying facts. The question is whether it would have been obvious to arrive at Lumigan® 0.01% by either selecting it from broad prior art ranges or modifying Lumigan® 0.03%. The answer turns on disputed facts, including what the prior art taught regarding (1) the efficacy of 0.03% and 0.01% bimatoprost, (2) whether BAK would increase or decrease corneal penetration of an uncharged prostaglandin analog like bimatoprost, and (3) whether 200 ppm BAK would be considered safe with bimatoprost given that skilled artisans thought BAK was "from Satan" and linked to increased IOP, hyperemia, corneal damage, and other conditions.

The district court correctly found against Appellants on each issue, determining the prior art taught that (1) 0.03% was "far superior" to 0.01% bimatoprost and ~50% more effective, (2) BAK inhibited penetration of neutral prostaglandin analogs like bimatoprost, and (3) 200 ppm BAK posed serious risks with an active ingredient like bimatoprost. These facts demonstrate the absence of any motivation to arrive at the invention or any reasonable expectation of success, teaching away, unexpected results, and other significant objective indicia. Appellants demonstrate no clear error in any of those findings and thus failed to meet their clear and convincing burden.

**Written Description.** The court did not clearly err in finding claims to Lumigan 0.01% that recite its efficacy and reduced hyperemia were adequately described. The specification discloses the Lumigan 0.01% formulation, which has the

25

claimed results, and Appellants' expert admitted the specification's data would permit the skilled artisan to predict Lumigan® 0.01% has those results.

**Enablement.** The court correctly rejected Lupin's enablement arguments. Lupin's expert admitted the patent discloses *in vivo* and *in vitro* data that would permit the skilled artisan to predict the Lumigan® 0.01% formulation maintained Lumigan® 0.03%'s efficacy but with less hyperemia, as claimed. There is no conflict between enablement and non-obviousness—the former is assessed with the inventors' specification that discloses their surprising results with BAK, while the latter is assessed using prior art that taught the opposite.

**Hi-Tech's Infringement.** The district court did not clearly err in concluding Hi-Tech's pH of 7.2 is literally "about 7.3." Hi-Tech stipulated to the claim construction below, so this is a garden-variety fact dispute. The district court, which was best situated to weigh the conflicting evidence, correctly credited Allergan's expert and Hi-Tech's admissions to the FDA. Moreover, the court correctly found infringement by equivalents where Hi-Tech's estoppel argument focused on a pH limitation that neither Allergan nor the examiner suggested was a basis for patentability.

<u>ARGUMENT</u>

## I.   Appellants Failed to Prove the Claims Were Obvious.

The non-obviousness judgment should be affirmed. Obviousness is a legal determination based on underlying facts, including "(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of nonobviousness." *In re Cyclobenzaprine*, 676 F.3d 1063, 1068 (Fed. Cir. 2012). A "party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *Id.* at 1068-69.

This Court reviews these underlying facts for "clear error." FED. R. CIV. P. 52(a)(6). Where, as here, the PTO considered the relevant art, Appellants' clear and convincing burden is harder to meet. *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011).

### A.   The Invention Is Significantly Different from the Prior Art.

#### 1.   The Prior Art Taught 0.01% Bimatoprost Was Less Effective, While 200 ppm BAK Was Not Only Ineffective, But Dangerous.

The court correctly found there were "meaningful differences" between the prior art and the invention. (A59-60.) The prior art did not teach the claimed 0.01% bimatoprost/200 ppm BAK formulation. (*Id.*) Instead, it contained (1) broad ranges

27

for bimatoprost (0.001%-1%) and a preservative (0-1,000 ppm), (2) Lumigan® 0.03% (with 50 ppm BAK), (3) warnings that 0.01% bimatoprost was significantly less effective than 0.03%, and (4) warnings against increasing BAK. Given these teachings, the court correctly found there was no "reason or motivation for a person of ordinary skill in the art to combine the prior art or choose specific concentrations of bimatoprost and BAK to arrive at the claimed invention," (A60), "there was no reasonable expectation of success," (*id.*), and "Defendants have failed to produce any evidence as to why one of ordinary skill in the art would select a BAK concentration of 200 ppm given that the prior art was explicitly disparaging of BAK." (A80.)

On appeal, Appellants fail to show the district court clearly erred in finding that the skilled artisan would not have selected either 0.01% bimatoprost or 200 ppm BAK, much less have combined them. To begin, the prior art warned against 0.01% bimatoprost. Laibovitz and Lyons taught it would have unacceptably low efficacy, especially compared with the closest prior art (Lumigan® 0.03%). (A36-39; A6168-73; A6239-45; A5247-48; A8835; A8348.) Neither taught that 0.01% bimatoprost would reduce hyperemia—Laibovitz actually reported that 0.01% caused hyperemia in more patients. (A30-40; A8836; A6245-49; A6169-71; A6248-50.) Therefore, without hindsight, there was no reason to select 0.01%, much less a reasonable expectation it would succeed.

The prior art case for 200 ppm BAK was similarly dismal. As Appellants' own expert had repeatedly taught, the general principle was to use as little BAK as possible.

(A5803-07.)  The skilled artisan knew from Lumigan® 0.03% that 50 ppm BAK was a sufficient preservative.  (A6181-82; A92 at 1:32-42.)  The skilled artisan also thought that BAK would not enhance penetration of bimatoprost or other neutral prostaglandin analogs.  (A40-52; A6116-20; A6176-79; A5255; A5279-80; A5969-70; A9130-31; A44079-84.)  The skilled artisan would also have been concerned that higher BAK concentrations would exacerbate elevated IOP, aggravate hyperemia, and damage the cornea.  (A52-57; A5793-94, A5786-90, A5819-20, A5832-36, A6174-75.)  The existence of other drugs with 200 ppm BAK was irrelevant—Xalatan® did not have 200 ppm "free" BAK because it complexed with latanoprost, and, regardless, was known to inflict more corneal damage than Lumigan® 0.03%.  (A57-59; A6179-85, A6284-85, A6163, A5152-53; A5230; A92 at 1:32-42, A6249-51; A5808-09; A44168; A6233-35; A8181-83; A24698-99.)

Given these issues, the skilled artisan had no reason to put 0.01% bimatoprost and 200 ppm BAK together or think such a combination would ever succeed.  (A60-61; A6255-56.)  Indeed, the skilled artisan would have thought the combination would be significantly less effective, not reduce hyperemia, and create new dangers.  (*Id.*)  It might even increase hyperemia since BAK is known to irritate the eye.  (A55; A6174-75; A5832-36.)  Allergan's own efforts demonstrate as much—the team started by keeping the bimatoprost concentration at 0.03% because they were worried about efficacy loss and stumbled upon 200 ppm BAK by accident.  (*See* pp. 4-9.)

29

## 2. The Broad Prior Art Ranges Do Not Eliminate Appellants' Burden to Prove Motivation and Reasonable Expectation.

Appellants ignore these factual findings and never identify a motivation to select the claimed invention or a reasonable expectation of success. Instead, they merely argue (at 4) that "[b]ecause the prior art disclosed a range that encompasses the claimed invention, that establishes both a motivation and a reasonable expectation of success." Appellants then accuse the district court of error (at 29-34) because it assessed both the motivation to modify Lumigan® 0.03% to Lumigan® 0.01% and, alternatively, to select Lumigan® 0.01% from the broad prior art ranges. They are wrong on all counts.

The court assessed the motivation to modify Lumigan® 0.03% to Lumigan® 0.01% because that's how Appellants pitched their case below—they argued it was obvious to reformulate Lumigan® 0.03% by reducing the bimatoprost and compensating by increasing BAK. (A4281-82, A4288, A4297-98, A4385-87, A5099-100; A5877; A6579-84.) Neither of Appellants' experts mentioned the broad ranges in Allergan's prior art patents that Appellants use to build their case on appeal. Appellants' pre-trial and initial post-trial briefs never presented their "range" theory or suggested it dispensed with their burden to show motivation and reasonable expectation. Appellants first raised this argument months after trial in a supplemental brief. (A7816-21.) Faced with this flip-flop, the court correctly addressed **both** Appellants' trial theory about modifying Lumigan® 0.03% to 0.01%, (A60-61), and

their belated "range" theory.  (A80-81.)  Appellants cannot complain about the district

court addressing a theory they invited it to consider.  *Chemical Eng'g Corp. v. Essef

Indus., Inc.*, 795 F.2d 1565, 1572 (Fed. Cir. 1986).

Appellants are also wrong on the law.  There is no rigid rule that prior art

ranges dispense with Appellants' burden to show a motivation to pick the claimed

combination (0.01% bimatoprost/200 ppm) and a reasonable expectation it would

succeed.  Appellants' main cases still assess whether there was a motivation to select

the claimed invention from the prior art range.  *Galderma Labs. v. Tolmar*, 737 F.3d 731,

737-38 (Fed. Cir. 2013) (assessing whether "there was motivation to select the claimed

0.3% adapalene composition" and noting that studies showed 0.3% was "particularly

suitable" for treating acne, that 0.3% had treated other conditions "without intolerable

irritability" and that "dermatologists desired acne treatments that came in varying

concentrations"); *Tyco Healthcare v. Mutual Pharm*, 642 F.3d 1370, 1372-73 (Fed. Cir.

2011) (finding claims to a dosage of 6-8 mg obvious given prior art disclosing 5-15 mg

where "a physician would be motivated to prescribe a temazepam dosage lower than

15 mg because of the preference for the lowest effective dose").  This Court rightly

requires such a showing—otherwise, a formulation might seem obvious in hindsight

when, at the time of invention, there was no reason to pick that point in the range

over any other.  *In re NTP*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) ("Care must be taken

to avoid hindsight reconstruction by using the patent in suit as a guide through the

maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.").

Appellants are also wrong to rely on *Galderma*, *Tyco*, *and Iron Grip* to meet their burden given the facts here. The prior art ranges span three orders of magnitude—0.001%-1% bimatoprost and 0-1000 ppm of a "preservative." (A9107.) The "preservative" range was not specific to BAK—although BAK is mentioned among several preservatives, the prior art never links BAK to any point within the range. (*Id.*) Moreover, the invention here involved two different ranges—unlike *Galderma*, *Tyco*, and *Iron Grip*—so the skilled artisan had to combine multiple parameters. And a plethora of subsequent prior art directed the skilled artisan away from 0.01% bimatoprost/200 ppm BAK, obviating whatever guidance the ranges gave. (*See* pp. 13-22 above.)

Finally, the court correctly found that, unlike *Galderma, Tyco,* and *Iron Grip*, (1) the prior art taught away from the invention; (2) the invention achieved unexpected results; and (3) significant objective indicia demonstrated non-obviousness. Those findings were not clearly erroneous, as demonstrated in the next three sections.

## B.    The Prior Art Taught Away From the Invention.

"Whether the prior art teaches away from the claimed invention is a question of fact." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1343 (Fed. Cir. 2011). "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or

would be led in a direction divergent from the path that was taken by the applicant." *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009).

The court correctly found the prior art taught away by (1) teaching BAK would inhibit penetration of bimatoprost and other neutral prostaglandins; (2) discouraging high BAK concentrations like 200 ppm; and (3) discouraging 0.01% bimatoprost because of the substantial efficacy loss. (A52-59; A36-38.) The court correctly applied the law—not Appellants' erroneously rigid and heightened standard—and did not clearly err in interpreting the prior art.

### 1. The Prior Art Taught BAK Would Not Increase Bimatoprost's Penetration and Might Inhibit It.

The invention relies on BAK to enhance bimatoprost's penetration. But the prior art uniformly taught that BAK would not work as a penetration enhancer for bimatoprost. The only data involving bimatoprost itself showed that BAK had **no** impact on IOP-lowering, suggesting no improvement in penetration. (*See* pp. 16-18 above.) Moreover, Higaki and Camber taught that BAK **inhibited** penetration of uncharged prostaglandin analogs—the molecules most structurally similar to bimatoprost. (A9130-31, A6116-20; A6177-78; A5969-70; A44079-84.) And both Appellants' own experts had written articles cautioning against using BAK as a penetration enhancer due its potential damaging impact on the eye. (A5820, A5987-88, A56-57.) This all taught away under any standard. (A43-46.)

33

Perhaps recognizing as much, Appellants say (at 42) the court committed "legal error" by requiring them to show the skilled artisan would have thought that BAK would increase bimatoprost's penetration. That's wrong. Appellants told the court the invention "was obvious based on three facts," including that 200 ppm BAK was "likely to increase the amount of drug that passes through the cornea," (A5099-100), and relied on it in their pre- and post-trial briefs. (A4281, A4288; 4386-89; A6579-84.) So, again, Appellants cannot complain about something they asked the court to consider. That aside, Appellants needed to prove it to show obviousness—if BAK was not thought to enhance bimatoprost's penetration, there would have been no reason to select 200 ppm when 50 ppm was a sufficient preservative. *Depuy*, 567 F.3d at 1326 ("An inference of nonobviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a person of ordinary skill would have combined the known elements.").

Appellants also reassert their argument (at 42-45) that Lee, Abelson, and Keller taught BAK was a penetration enhancer, while studiously ignoring the testimony of Allergan's expert medicinal chemist, Dr. Macdonald. Dr. Macdonald demonstrated these references are inapplicable because they all deal with large, charged, or hydrophilic molecules that are structurally dissimilar to bimatoprost. (A6084-89, A6111-26; A45015.) For example, Abelson says "BAK can also enhance the effectiveness of *some* drugs," not all drugs, and then cites only studies on hydrophilic beta-blockers and large peptides. (A25813; A6123-28.) Keller provides further

discouragement because, although it teaches that 200 ppm BAK has an impact on inulin (a large, hydrophilic molecule unlike bimatoprost), it warns that even 100 ppm causes "cell damage and separation" and that "studies of the deleterious effects of BAC solutions on the cornea indicate that eyedrops containing BAC should be used with caution in the treatment of at least some eye conditions." (A9192; A6126-27.) Likewise, Lee discusses only molecules unlike bimatoprost and has similar warnings about "the possibility of accumulation of surfactants within the eye resulting in unknown toxicological complications, as exemplified by benzalkonium chloride." (A9145; A6121-27; A45015.) Appellants never rebutted Dr. Macdonald's testimony nor tried to show any of these molecules was similar to bimatoprost.

Appellants next misread Higaki and Camber, claiming (at 43) that Higaki "taught that BAK increased the penetration of three out of four prostaglandins into the cornea." What Appellants fail to mention is that, unlike bimatoprost, these three molecules were *charged*. (A6116-21; A6177-79.) Both Higaki and Camber reported that BAK decreased penetration of *uncharged* prostaglandins. (*Id.*) No prior art taught BAK would increase penetration of an uncharged prostaglandin. (*Id.*) And Dr. Macdonald explained the skilled artisan would have thought bimatoprost would act like the other uncharged prostaglandins. (*Id.*)

Appellants' attempt (at 43) to use the inventors' insights against them should be rejected. As explained at pp. 4-10, the inventors were surprised that BAK so significantly increased bimatoprost's penetration, and several doubted it even after the

35

initial results.  Indeed, the inventors stumbled upon 200 ppm BAK by accident—it was a "control" in other experiments.  That aside, even if some inventors were not surprised, this is irrelevant because it would use "that which the inventor taught against its teacher." *In re Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002).

Finally, Appellants show no clear error in the court's finding that the FDA Review taught BAK had no impact on bimatoprost's IOP-lowering.  Appellants argue (at 45-46) that "it does not even disclose the use of BAK."  That is wrong.  The Review refers to "preserved" and "unpreserved" formulations, and it identifies the "preserved" formulation as "9106X," (A44420)—the same identifier on the prior art Lumigan 0.03% label, which said the formulation included 50 ppm BAK.  (A44771, A44776.)  In fact, another part of the Review explicitly references 50 ppm BAK. (A44343.)  The skilled artisan would have thus interpreted the FDA Review to compare 0.03% bimatoprost with 50 and 0 ppm BAK.  (A41.)

## 2. The Prior Art Discouraged Using 200 ppm BAK.

The prior art also discouraged using 200 ppm BAK because it uniformly taught that BAK should be minimized to avoid safety problems.  Appellants' own expert summarized the prior art's widespread concern by describing BAK as "a natural-born killer" that was "from Satan."  (A5792-94.)  He was not exaggerating—BAK was known to cause increased IOP, hyperemia, and damage to corneal cells, and to exacerbate other eye disorders.  (*See* pp. 19-22 above.)  These dangers would have discouraged the skilled artisan from using any more than the 50 ppm BAK necessary

to preserve bimatoprost.  (A6181-82.)  Indeed, prior art studies showing the 50 ppm

BAK in Lumigan® 0.03% inflicted "significantly less damage" on the cornea than

Xalatan® specifically discouraged selecting 200 ppm BAK.  (A44168; A6233-35;

A5808-89; A57.)  Other prior art tried to move away from 200 ppm BAK in Xalatan®,

explaining that "BAK may cause corneal disorders when used at high concentration,"

so "it is desirable to lower its concentration as low as possible." (A8181-83.)  The

court correctly found this evidence taught away from 200 ppm BAK.  (A52-59.)

Neither of Appellants' arguments demonstrates error.  Appellants are wrong to

say (at 40) that "[t]eaching away requires the prior art to disclose that using 200 ppm

BAK would not work."  Although *In re Mouttet*, 686 F.3d 1322 (Fed. Cir. 2012), cited

by Appellants, says a teaching the invention is "unlikely to work," is one form of

teaching away, *Mouttet* does not say it is the only form.   *Mouttet* recognizes that prior

art indicating an element "should not" be used or that "criticizes, discredits, or

otherwise discourages" the invention is also teaching away.  *Id.* at 1334.  Here, the

prior art discouraged high levels of BAK and criticized 200 ppm BAK.  Moreover,

BAK's known link to increased IOP, hyperemia, corneal disorders, and exacerbation

of ocular surface disease and dry eye showed "the side effects would be serious

enough to dissuade the development of [the claimed] product." *Galderma*, 737 F.3d at

739.

Appellants' remaining arguments (at 41-42) attempt to relitigate the facts.

Appellants say BAK had both benefits and risks, citing the non-peer-reviewed

Abelson article, but the court properly rejected that argument.  (A58.)  The evidence

showed 200 ppm BAK was ***not*** within the "reasonable bounds" referenced in

Abelson.  (A5215-16, A5231-32.)  Appellants' reliance on other products with 200

ppm BAK is misplaced, as discussed at pp. 21-22.  Finally, Appellants' comments that

no evidence showed "use of BAK was unacceptable in 2005" and that "BAK

continues to be used in new formulations" are irrelevant.  The issue is not whether

BAK could be used in any amount, but whether 200 ppm BAK could be used with

bimatoprost.   The prior art all taught it could not.

### 3.    The Prior Art Discouraged Using 0.01% Bimatoprost.

The court correctly found the prior art taught away from 0.01% bimatoprost by

teaching it was markedly inferior to 0.03%.  (A36-39.)  Laibovitz, the only reference

with data comparing the two, showed that 0.03% bimatoprost reduced IOP by 50%

more than 0.01%—an efficacy gap that significantly increased the risk of vision loss

and often required surgical intervention.  (A6239-41; A5450; A8035.)  Lyons

confirmed that even 0.02% bimatoprost "loses efficacy." (A8348.)  This was not, as

Appellants would have it, a case where the prior art taught 0.01% was merely

"somewhat inferior" or expressed a weak preference for 0.03%.  It taught 0.03%

bimatoprost was "far superior" to 0.01%, (A6239-40), and thereby discouraged the

skilled artisan from using 0.01%.

Appellants show no clear error in the court's finding.  Appellants argue (at 37-

38) the prior art taught "toward" lowering the bimatoprost concentration because

bimatoprost causes hyperemia. Two responses. First, Appellants focus on only half the story—the skilled artisan needed a formulation that both reduced hyperemia **and** maintained efficacy. (A5134, A5171-72; A6162.) A teaching that less bimatoprost meant less hyperemia was discouraging where it also had significantly less efficacy, as in Laibovitz and Lyons. Second, a general teaching that less bimatoprost would eventually mean less hyperemia did not teach toward *0.01%*, as opposed to some other, lower amount. The court correctly found that the skilled artisan "would have no guidance as to whether a reduction from 0.03% to 0.01% bimatoprost would result in decreased frequency or severity of hyperemia." (A40.) Appellants' reliance (at 38-39) on Lyons's ranges is misplaced because Lyons lacked data. (A38-39.)

The Court should reject Appellants' attempt to challenge (at 38-39) the court's factual finding that 0.03% bimatoprost had "significantly" better efficacy than 0.01% bimatoprost. When interpreting Laibovitz, the court correctly credited the testimony of Allergan's expert (Dr. Noecker) and a Laibovitz co-author (Ms. Batoosingh) over Appellants' cited testimony. (A36-38; A6239-45; A5247-48, A5286-88, A5302-06; A5450.) Allergan's witnesses explained that Laibovitz did not teach 0.01% bimatoprost worked better than timolol—0.01% bimatoprost lowered IOP similarly to how timolol normally performs (~20% IOP-lowering). (*Id.*) The patient group in Laibovitz that took timolol experienced significantly less IOP-lowering than normally associated with timolol, probably because those patients were experiencing "tachyphylaxis," a phenomenon by which medications lose efficacy in patients who

have used them for a long period. (*Id.*) Laibovitz itself commented that timolol's IOP-lowering was "less than expected, possibly because some patients were not excluded for previous use of timolol." (A8837.) Moreover, even if 0.01% bimatoprost was better than timolol, Laibovitz would still be discouraging—by the time of invention, skilled artisans demanded the ~30% IOP-reduction Laibovitz reported for 0.03% bimatoprost, while the ~20% IOP-reduction for 0.01% bimatoprost was unacceptable. (A6239-45; A5450.)

### C. The Invention Has Unexpected Differences in Kind and "Marked Superiority" Over the Prior Art.

The court correctly found the invention exhibited significant unexpected results, namely (1) BAK enhanced bimatoprost's ocular penetration, (2) the invention maintained Lumigan 0.03%'s efficacy, and (3) the invention reduced hyperemia compared with Lumigan 0.03%. (A62-63, A81.) Much of the discussion above supports those findings, so it is streamlined here.

First, BAK's impact on bimatoprost penetration is the classic unexpected difference in kind that demonstrates non-obviousness. The prior art taught BAK would either have no impact on bimatoprost or ***decrease*** its penetration and "kill the clinical efficacy of the drug." (A6176-79.) The inventors surprisingly determined the opposite was true, as shown in Figures 1 and 2 of the patents-in-suit. That strongly demonstrates non-obviousness. Appellants have no response other than the erroneous arguments discussed above.

40

Second, the invention unexpectedly maintained Lumigan 0.03%'s efficacy, contrary to Laibovitz's teaching that 0.03% bimatoprost would have ~50% more IOP-lowering than 0.01%. This was indeed a difference in kind—the difference between being the most effective glaucoma drug available and an unacceptable one. (A6239-45; A5450.) That aside, this unexpected result is the type of "marked superiority" over prior art that supports patentability regardless of whether it is a difference in kind or degree. *In re Hoch*, 428 F.2d 1341, 1344 n.5 (C.C.P.A. 1970). The invention's surprising efficacy was contrary to Laibovitz's teaching that 0.03% bimatoprost was "far superior" to 0.01%. (A6239-40.) This increase was not "within the capabilities of one skilled in the art at the time"—a Laibovitz co-author testified that "we didn't believe we could bridge that 2-millimeter gap" (A5263)—and is thus not a "mere difference in degree." *Galderma*, 737 F.3d at 739 (unexpected increase by a "small percentage" was insufficient).

Third, the invention unexpectedly reduced hyperemia. Laibovitz taught there was no hyperemia difference between 0.03% and 0.01% bimatoprost. (A6245-49.) That was consistent with the skilled artisan's understanding that changes in dose often do not change the amount of a pharmacological effect when the receptors are saturated. (A6165-71.) The inventors surprisingly showed the invention had less frequent and severe hyperemia compared with Lumigan® 0.03%. (A44114.) That is both a difference in kind and "marked superiority," and it resulted in a far superior product.

41

The Court should reject Appellants' contrary arguments. For one thing, Appellants are wrong to say that "to be probative" an unexpected result "must be a difference in kind." This Court recently reiterated that "marked superiority" may demonstrate patentability. *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014). It should reject Appellants' invitation to create a rigid rule that would ignore anything other than differences in kind. Here, Lumigan® 0.01%'s "marked superiority" results in a significantly more effective drug that significantly fewer patients will discontinue. That is the sort of innovation the patent system is meant to protect and that, without patent protection, might not be created.

Appellants' reliance (at 50-52) on cases holding that "recitation of a formulation's clinical results in a claim generally cannot make an otherwise obvious claim nonobvious" are equally misplaced. The Lumigan® 0.01% formulation would ***not*** have been obvious—there was no known reason to select 0.01% bimatoprost/200 ppm BAK and every reason not to. That distinguishes this case from *Santarus*, *Tyco*, and others Appellants string-cite.

What is more, Appellants' inherency discussion is both incorrect and irrelevant. It is incorrect because it was not "undisputed" the claimed effects "necessarily" result from every 0.01% bimatoprost/200 ppm BAK formulation. Allergan's expert testified the result was inherent only to a formulation like Lumigan® 0.01% (with its other ingredients). (A5540-41.) It is irrelevant because the skilled artisan would have had no reason to select the claimed invention in the first place, and the prior art

42

taught away from it.  So Lumigan® 0.01%'s unknown benefits would not have rendered it obvious, regardless of whether they were "inherent."  Appellants have thus failed to show clear error in the district court's finding of unexpected results.

### D.  The Objective Indicia Show Appellants' Arguments Are Hindsight.

The court correctly found evidence of long-felt need, prior failures, proceeding contrary to conventional wisdom, skepticism, and commercial success supported non-obviousness.  (A61-64.)  These objective indicia "often serve as insurance against the insidious attraction of the siren hindsight," *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983), and they are necessary because, "knowing that the inventor succeeded in making the patented invention, a fact finder might develop a hunch that the claimed invention was obvious, and then construct a selective version of the facts that confirms the hunch." *Cyclobenzaprine*, 676 F.3d at 1079.  That is true here.

### 1.  There Was a Long-Felt Need for a Drug With Lumigan 0.03%'s Efficacy But Less Hyperemia.

The court correctly found that, at the time of the invention in 2005, "there existed a long-felt need for a glaucoma drug with Lumigan® 0.03%'s efficacy, but with an improved side-effect profile, including decreased instance and severity of hyperemia."  (A61; A6257-58.)  The need dated to at least 1996, when Higaki noted "a new type of antiglaucoma medication is needed," explaining that then-existing prostaglandins "have several adverse effects which must be overcome."  (A9127;

A61.)  The need continued after Lumigan® 0.03%'s 2001 introduction—although it had superior efficacy to Xalatan® and worked in Xalatan® non-responders, its hyperemia caused patient discontinuations.  (A5241-45; A6253-58; A44172-80; A44213-19.)  Lumigan® 0.01% met this long felt-need by providing comparable IOP-lowering to Lumigan® 0.03% with less hyperemia.  (A6257-58.)  Even Appellants' expert admitted it was "quite a good idea to get rid of the hyperemia" for "the sake of patient compliance and to have a better drug."  (A5827-28.)

Appellants now argue (at 56) the court "ignored the numerous glaucoma medications in the prior art" and that "any unmet need already was met by Xalatan." Wrong.  The court actually addressed Xalatan® and other medications and found "[c]linical studies showed that Lumigan® 0.03% lowered IOP more than other available drugs, including Xalatan."  (A13.)  So no other medication could substitute for its efficacy, which Lumigan® 0.01% maintained while reducing discontinuations.

## 2.    Years of Prior Failures Demonstrated Non-Obviousness.

The court rightly found that Allergan's years of failures leading up to the invention showed non-obviousness.  (A62, A14-21.)  "A retrospective view of the invention is best gleaned from those who were there at the time." *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 (Fed. Cir. 1985).  Allergan spent years on many failed attempts to achieve a bimatoprost formulation with the IOP-lowering efficacy of Lumigan® 0.03% but less hyperemia.  (*See* pp. 4-9.)  Ultimately, the team "stumbled" onto using 200 ppm BAK because a "control" formulation unexpectedly increased

ocular absorption.  (A5681, A5143-44.)  This strongly suggests non-obviousness.

*Micro Chem., Inc. v. Great Plains Chem. Co.*, 103 F.3d 1538, 1547 (Fed. Cir. 1997).

Appellants' responses (at 56-57) are unconvincing.  This is not a case like

*Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286 (Fed. Cir. 2013), where "much of the

formulators' struggles were associated with their attempts to utilize a proprietary

preservative [Purite], rather than BAK" and not at combining the two active

ingredients, as claimed.  *Id.* at 1292.  Here, the inventors' struggles were all directly

related to their attempts to solve the clinical problem with which they were faced—

maintaining efficacy while reducing hyperemia.  (A5124-30.)  Most of the inventors'

failures did not involve Purite, and even those that did only tried it to reduce

hyperemia.  (*Id.*)  Moreover, the formulation claims here recite the exact ingredients of

Lumigan 0.01%, while the claims there were "not drawn to the Combigan® 

formulation with any specificity."  Indeed, inventor Chin-Ming Chang was asked

about *Allergan/Combigan* and testified this "wasn't a case like that."  (A5170-72.)

Appellants' citations of inventor testimony do not suggest otherwise.  Inventor

Lin's testimony supports non-obviousness—it shows the inventors initially followed

the prior art teachings against BAK.  (A5681-82.)  Inventor James Chang's testimony

reflects how the inventors contravened the conventional wisdom—he characterized

using 200 ppm BAK as a "bold move" because BAK "damages your cells on the

ocular surface," adding that "[y]ou try not to use it if you can," and "we all try to

replace it if we could."  (A5692.)

45

It does not matter that development quickened after the unexpected result with 200 ppm BAK. "Often the inventive contribution lies in defining the problem in a new revelatory way." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012). Just so here—the invention was non-obvious in part because the skilled artisan never would have thought to approach the problem by using BAK as a penetration enhancer. The fact the inventors did not initially approach it that way—instead stumbling upon 200 ppm BAK when using it as a control—confirms Appellants' arguments are hindsight.

Finally, Appellants' criticism that this is not a failure of "others" is misplaced. The district court correctly found that many of the failures were "by scientists at Allergan other than the inventors," (A62), so this was a failure of "others." Regardless, the failures are equally probative either way. The point is that skilled artisans who knew of all the relevant prior art at the time did not take the approach Appellants now say was obvious, thus refuting Appellants' contention.

### 3. Proceeding Contrary to Conventional Wisdom.

The court correctly found the inventors "proceeded contrary to conventional wisdom" because the prior art "taught that BAK should be reduced or eliminated" and that "BAK would not enhance the penetration of bimatoprost, a small, neutral, lipophilic prostaglandin analog." (A62.) It also correctly explained "there were no other reformulations that had ever increased the concentration of BAK, only examples of reducing or eliminating BAK." (*Id.*) Those findings are well-supported,

(A6224; A6236-38; A6176-79; A6208-09; A5802-03; A5835-36; A6116-21; A5969-71), and are "strong evidence" of non-obviousness. *Gore*, 721 F.2d at 1552-53. Appellants' own experts had endorsed this conventional wisdom, cautioning against using BAK to enhance penetration. (A5820, A5987-88, A56-57.) Appellants ignore this factor.

### 4. The Inventors' Initial Skepticism Supports Non-Obviousness.

The court correctly noted that "[e]ven after their initial research, the inventors and others at Allergan doubted the potential of a formulation using 0.01% bimatoprost and 200 ppm BAK," (A63), and found this skepticism showed non-obviousness. (A81.) These findings are well-supported; as discussed at pp. 8-10, the inventors were skeptical that BAK's effects would translate from rabbits to humans, unsure whether 200 ppm BAK would be safe, and skeptical that 0.01% bimatoprost could maintain sufficient efficacy. This contemporaneous doubt demonstrates that Appellants' obviousness arguments are hindsight. Appellants ignore these findings.

### 5. Lumigan 0.01%'s Success Suggests the Invention Was Non-Obvious, Otherwise It Would Have Been Developed Sooner.

The court correctly found Lumigan® 0.01%'s commercial success showed non-obviousness. (A63-64; A5317-38; A5526-30; A44685-709.) Lumigan® 0.01%'s sales were expected to exceed $500 million in 2013, the Lumigan® business "expanded after the introduction of 0.01%, which was due to the unique features of Lumigan® 0.01%," and this was "particularly significant" because Xalatan®, a major competitor,

had gone generic, yet Lumigan® 0.01% "performed better than Allergan expected" and "has since become the best selling branded glaucoma drug in the United States." (A63.) Lumigan® 0.01%'s success, despite Xalatan® having gone generic, "demonstrates that Lumigan® 0.01% has unique attributes that fulfill a need unmet by any competitor." (A63-64.)

Appellants argue (at 52-54) that commercial success should have little weight because Allergan held blocking patents on bimatoprost. This argument ignores important facts. First, Lumigan® 0.01%'s success demonstrates that Allergan itself had a strong incentive to introduce the product earlier to better compete with Xalatan® and would have done so if the solution were obvious. The fact Allergan did not do so, thereby losing many millions, strongly suggests non-obviousness. Second, blocking patents did not prevent others from experimenting with bimatoprost and arriving at the invention—35 U.S.C. §271(e) protects such activity. *Merck KGAA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193 (2005). Indeed, others **were** experimenting with bimatoprost—Appellants admitted that an Alcon patent claimed a combination therapy using bimatoprost and a "prostaglandin synthesis inhibitor" to try to address hyperemia. (A4364-65 (Hellberg).) So the industry had both the motivation and incentive to find Lumigan 0.01%. That no one did demonstrates non-obviousness.

Appellants also reargue (at 54-55) the facts but show no clear error. Allergan's promotional expenditures were typical in the industry, and it was Lumigan® 0.01%'s "strong clinical profile" that caused its success. (A5330-32, A5338-40.) Moreover,

Lumigan® 0.01%'s performance relative to generic Xalatan® was impressive because Lumigan® 0.01% maintained its share, while the other branded competitor's share plunged, allowing Lumigan® to overtake it for the first time since both were introduced in 2001.  (A6325-29.)

***

For the reasons above, the district court did not err in finding that Appellants failed to meet their clear and convincing burden to show obviousness.

## II.     The '353 and '118 Patents Have Adequate Written Description.

Appellants failed to prove lack of written description by clear and convincing evidence.  "Whether a claim satisfies the written description requirement is a question of fact that, on appeal from a bench trial, we review for clear error." *Alcon Res. Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1190 (Fed. Cir. 2014).  "There is no requirement that the disclosure contain either examples or an actual reduction to practice; rather, the critical inquiry is whether the patentee has provided a description that in a definite way identifies the claimed invention in sufficient detail that a person of ordinary skill would understand that the inventor was in possession of it at the time of filing." *Id.* at 1191-92.  The patents here satisfy that requirement.

The '353 and '118 claims are directed to Lumigan 0.01% and recite its clinical benefits.  For example, claim 7 of the '353 patent covers a composition with "about 0.01% w/v bimatoprost" and "about 0.02% w/v [200 ppm] BAK" that "lowers intraocular pressure without a substantial loss in the intraocular pressure lowering

49

benefit" provided by once-daily administration of a 0.03% bimatoprost and 50 ppm

BAK formulation. (A103 at 6:3-11.) The court construed this to require the two have

"nearly equivalent" efficacy. (A2826.) Claim 8 further requires that the 0.01%

formulation "results in less hyperemia" than 0.03%. (A103 at 6:12-15.)

     The specification adequately describes the claimed invention. It identifies

Lumigan 0.01%'s exact formulation as the first example of a "best mode" of "the

present invention":

> The best mode of making and using the present invention are described in the
> following examples….
>
> One embodiment comprises 0.01% Bimatoprost, 0.02% [200 ppm]
> Benzalkonium Chloride, 0.268% Sodium Phosphate Dibasic, Heptahydrate,
> 0.014% Citric Acid, 0.81% Sodium Chloride, and water, wherein the pH is 7.3.

(A101-02 at 2:63-3:4; A38554.) The disclosed formulation has the claimed results—

human trials showed Lumigan 0.01% "was equivalent to bimatoprost 0.03% in

lowering IOP throughout 12 months of treatment" and had "less frequent and severe

conjunctival hyperemia." (A44114; A5493-98, A5529-30.) Appellants' expert agreed

Lumigan 0.01% has "less hyperemia" and "no real difference in efficacy" compared

with Lumigan 0.03%. (A5850-51.) The specification thus demonstrated the inventors

possessed their invention—the claims recite a formulation with clinical properties,

and the specification discloses a formulation with those properties. (A83-84.)

     Appellants argue (at 59-60) the "specifications fail to establish that the claimed

formulations have those clinical performance properties" and thus "risk preempting

some 'yet-unidentified ways of achieving a desired result.'" That is wrong for multiple reasons. First, Appellants' factual premise is wrong—their expert admitted the specification *would* establish the claimed formulation has less hyperemia and nearly equivalent efficacy to Lumigan 0.03%:

> Q.    If you turn to figures 1 and 2 of the '504 Patent, could someone of ordinary skill in the art looking at these figures have predicted that Lumigan .01 would have resulted in less hyperemia but nearly equivalent efficacy when compared to Lumigan .03?
>
> ***
>
> A.    I think yes.

(A6652-54.) Appellants' criticism of this data (at 63-64) is unsupported attorney argument that deserves no weight given that their expert testified to the opposite.

Second, the claims do not cover a "yet-unidentified" formulation or try "to preempt the future before it has arrived." They cover the Lumigan 0.01% formulation disclosed in the specification. This case is thus different from *Novozymes A/S v. DuPont Nutrition Biosceinces APS*, 723 F.3d 1336 (Fed. Cir. 2013), which invalidated claims where the specification "contains no disclosure of any variant that actually satisfies the claims." *Id.* at 1348. Appellants cite no case requiring a patentee to include clinical data. This should not be the first.

Indeed, this Court recently reiterated the specification need not include data proving the claims will work. *Alcon* rejected the argument that claims to a method of stabilizing a prostaglandin lacked written description where the patents did not

"disclose any data on chemical stability, prostaglandin degradation products, or prostaglandin degradation pathways." *Alcon*, 745 F.3d at 1188. The Court noted that, as here, the patent "provides exemplary formulations that embody the claimed invention, reciting concentrations of every ingredient." *Id.* at 1191. And it stressed that "written description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described; it is not about whether the patentee has proven to the skilled reader that the invention works, or how to make it work, which is an enablement issue." *Id.*

Appellants' other complaints fare no better. The court did not, as Appellants argue (at 60-61), use the inventors' documents to "substitute for an inadequate written description." Instead, the court used them simply to corroborate what the specification already showed—that the inventors had possession by the filing date. (A84.) Appellants are wrong to say (at 61) the inventors "fail to provide details beyond that already taught in the prior art." The specification shows that BAK increases bimatoprost's corneal penetration, while the prior art taught the opposite. Appellants' treatment (at 62-63) of the prophetic example is similarly flawed. Their own expert admitted the data in Figures 1 and 2 would allow the skilled artisan to predict Lumigan 0.01%'s performance. (A6652-54.) The prophetic example discusses relative efficacy and hyperemia of formulations from Figure 2. (A103 at 5:35-45.) So it helps demonstrate possession for the same reason the Figures do. Finally, Appellants are wrong to say (at 63) there is a conflict between non-obviousness and

52

written description—the latter is based on the disclosures of the patents-in-suit, while obviousness is not.

The court thus did not clearly err in finding Appellants failed to prove lack of written description by clear and convincing evidence.

## III. The '353 and '118 Patents Are Enabled.

Lupin failed to present clear and convincing evidence of non-enablement. (A84-86.) "Enablement is a question of law that we review without deference, based on underlying factual inquiries that we review for clear error." *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013). "[A] patent does not need to guarantee that the invention works for a claim to be enabled." *Alcon*, 745 F.3d at 1189-90. "Similarly, a patentee is not required to provide actual working examples; we have rejected enablement challenges based on the theory that there can be no guarantee that prophetic examples actually work." *Id.*

Lupin's argument fails because it is based on both factual and legal errors. We start with the facts. Lupin repeatedly argues (*e.g.*, at 24-25) that

> there is absolutely nothing by way of test results establishing that the claimed Lumigan® 0.01% formulation has comparable efficacy to the Lumigan® 0.03% formulation (or any efficacy, for that matter), or that the Lumigan® 0.01% formulation reduces hyperemia or any other side effects as compared to the Lumigan® 0.03% formulation.

Not so. The specification contains both *in vivo* and *in vitro* animal data showing BAK's impact on bimatoprost's ocular absorption. While the testing did not specifically include the claimed formulation, Lupin's own expert admitted that such an omission

53

is irrelevant when he conceded that the skilled artisan looking at the data that *is* in the patent "could have predicted that Lumigan .01 would have resulted in less hyperemia but nearly equivalent efficacy when compared to Lumigan .03." (A6652-54.) Therefore, that data, coupled with the patent's disclosure of Lumigan 0.01%, enabled the skilled artisan to make and use the claimed invention. *Eli Lilly v. Teva Pharms.,* 619 F.3d 1329, 1343 (Fed. Cir. 2010) (finding clinical claims enabled based on *in vitro* and *in vivo* data in the specification and ongoing clinical studies); *Eli Lilly v. Actavis Elizabeth*, 435 F. App'x 917, 926 (Fed. Cir. 2011) (non-precedential); MPEP § 2107.03 ("data generated using *in vitro* assays, or from testing in an animal model or a combination thereof almost invariably will be sufficient to establish therapeutic or pharmacological utility for a compound, composition or process"). Indeed, skilled artisans who knew of the patent's data **were** making and using the claimed invention at the filing date—clinical trials were underway, and they achieved the claimed result. (A41840, A5258-61.)

Now to Lupin's legal errors. Lupin says (at 28) that "if the asserted claims are non-obvious, they cannot possibly be enabled." But Lupin ignores that the two requirements are assessed using different information. Obviousness turns on what the **prior art** would have taught the skilled artisan. The claims here aren't obvious because, among other things, the prior art taught BAK wouldn't increase bimatoprost's ocular penetration. Enablement turns on whether the skilled artisan, **after reading the specification**, would have to unduly experiment to make and use

the invention. Here, the specification added key information that was contrary to the prior art—Figures 1 and 2 show the inventors' unexpected finding that BAK increases bimatoprost's penetration. So there is no conflict—the claims are both non-obvious and enabled. *Eli Lilly*, 619 F.3d at 1342 (rejecting similar argument because the specification "discloses two sets of information not found in the prior art").

Neither of Lupin's cited cases (at 21-23) support its argument. *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318 (Fed. Cir. 2005), affirmed the PTO's finding in an interference that claims to a cancer treatment method were not enabled because substantial evidence supported the PTO's finding the skilled artisan would not have believed the compound would be effective based simply on the class it belonged to. *See* 413 F.3d at 1322-24. The PTO had invalidated the claims because of the applicant's "failure to provide **any** data to demonstrate the effects of finasteride in treating prostate cancer," and, on appeal, this Court rejected the applicant's argument that he did not need to provide such data given prior art disclosures. *Id.* Here, by contrast, Allergan's patents **do** provide data that showed a result the prior art taught away from, and Lupin's expert admitted that data permitted the skilled artisan to predict the claimed results. (A6652-54.)

Likewise, *In re '318 Patent Infringement Litigation (Janssen)*, 583 F.3d 1317 (Fed. Cir. 2009), is inapplicable here. The *Janssen* patent covered an Alzheimer's treatment with galantamine. The Court stressed that "human trials are not required for a therapeutic invention to be patentable," and that "results from animal tests or in vitro

55

experiments may be sufficient." *Id.* at 1324-25. The problem was that the patent provided "neither in vitro test results nor animal test results," and so the patentee argued "utility may be established by analytic reasoning." *Id.* at 1325-26. The Court disagreed, holding that analytic reasoning alone was insufficient, especially where there was no "evidence that someone skilled in the art would infer galantamine's utility from the specification." *Id.* at 1326. Here, by contrast, the patents-in-suit contain the *in vitro* and *in vivo* results missing in *Janssen*, and, again, Lupin's expert admitted the skilled artisan would infer the claimed efficacy and reduced hyperemia from them. (A6652-54.)

The district court was thus correct to find Lupin failed to prove lack of enablement by clear and convincing evidence.

## IV.    Hi-Tech Infringes the '504, '605, and '479 Patents.

The court correctly found Hi-Tech's product has a "pH of about 7.3" and therefore infringes. "Infringement is a question of fact reviewed for clear error after a bench trial." *Teva Pharms, USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1373 (Fed. Cir. 2013). Hi-Tech's ANDA says "the pH during [the product's] shelf life ranges from 6.8-7.2," (A38564), and thus infringes literally and by equivalents.

### A.    Hi-Tech's ANDA Product Has a pH of 7.2, Which Is Literally "about 7.3."

Before turning to the evidence of literal infringement, we must correct two mistakes that Hi-Tech makes in framing its appeal.

First, Hi-Tech says (at 11-12) that "[t]he issue of literal infringement in this appeal is one of claim construction." That is wrong. Hi-Tech **never** argued the pH issue as a matter of claim construction below. Instead, Hi-Tech agreed the term "pH of about 7.3" means "pH of approximately 7.3," (A474, A1051), and the court adopted that construction. (A1635, A69.) Hi-Tech never asked for further construction. Having stipulated to a construction, Hi-Tech cannot raise claim construction for the first time on appeal. *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1278 (Fed. Cir. 2012). The parties' dispute is thus a garden-variety fact question reviewed for clear error. *Teva*, 723 F.3d at 1374.

Second, Hi-Tech stresses (at 14) its product's pH at manufacture "will not be higher than 7.1" and touts data to similar effect. That is irrelevant. This Court determines infringement of the product described in the ANDA, not based on manufacturing guidelines or promises to keep the product within a narrower range. *Sunovion Pharms, Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1278-80 (Fed. Cir. 2013). Here, Hi-Tech's ANDA seeks FDA approval for a product where "the pH during its shelf life ranges from 6.8-**7.2**." (A38564.) The court correctly assessed infringement of **that** product. Moreover, the court correctly analyzed infringement by asking whether **any** pH within that range is a "pH of about 7.3." (A69.) "It is well settled that an accused device that sometimes, but not always, embodies a claim[] nonetheless infringes." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013). Hi-

Tech told the FDA its product will sometimes have a pH of 7.2, and that infringes. It is irrelevant if the product sometimes has a lower pH.

With the issue properly framed, the infringement finding was amply supported. Allergan's expert testified that Hi-Tech's product met the pH limitation because "certainly 7.2 is approximately or about 7.3." (A5508-09.) That was consistent with Hi-Tech's ANDA, which said its product and Lumigan 0.01% "will behave similarly in humans" because they have "***very similar*** physical parameters, such as ***pH,***" A38571-72.) Lumigan 0.01%'s pH is 7.3. (A21.) So the court did not clearly err in finding literal infringement under the agreed construction and thereby rejecting Hi-Tech's factual arguments about rounding. (A69.)

Hi-Tech's other arguments have no merit. Hi-Tech attacks Allergan's expert because he was "not a formulator," but ignores that he was a glaucoma specialist who exceeded the level of ordinary skill. (A33; A5427-41.) He was well-qualified to opine on claims to a glaucoma treatment—pH is important to ophthalmologists because it is tied to patient comfort. (A5515.) Hi-Tech is also wrong to dismiss his testimony as "conclusory." Hi-Tech waived this point by never arguing it below, and it would be prejudicial to permit Hi-Tech to press it now. Regardless, Allergan's expert testimony was appropriately succinct where Allergan had limited trial time to prove infringement of 21 claims by 4 defendants. By contrast, Hi-Tech did not call an independent expert—it presented only its employee (Egbaria), whose stock options and bonus depend on whether Hi-Tech wins this case. (A5612-13.) The court based its findings

on the "credibility of the witnesses," (A6), and did not clearly err in resolving the dispute against Hi-Tech.

### B.    Hi-Tech Infringes the pH Limitation by Equivalents.

Hi-Tech also independently meets the "about 7.3" limitation by equivalents. (A69-73; A5515-19; A38554.)  Hi-Tech does not dispute its pH meets the function-way-result test.  Instead, it erroneously argues that prosecution history estoppel bars use of equivalents.  The court rightly disagreed because the amendments during prosecution were "tangential" to the pH limitation.  (A70-71.)

The PTO's patentability had nothing to do with pH.  The initial '504 application included broad independent claims with ranges of bimatoprost and BAK, plus narrower dependent claims with specific amounts of bimatoprost, BAK, and a list of other ingredients and pH (claims 4, 10, and 11).  (A26134-35; A26178-79; A26501-03.)  After the examiner rejected all claims, the Board affirmed for the broader claims but reversed on the dependent claims because they required 200 ppm BAK, from which the prior art taught away.  (A24698-99.)  The Board never mentioned pH.  (A24692-99.)  That's no surprise—Lumigan 0.03% had a pH of 6.8-7.8, so the pH limitation was in the prior art.  (A26186.)  Indeed, Allergan's patentability arguments were based only on the amounts of bimatoprost and BAK, not pH.  (A26463-64, A26493.)  On remand, the examiner allowed claims 4, 10, and 11.  (A26501-03; A26515-17.)  The examiner rejected others that still mostly included ranges of bimatoprost and BAK.  (*Id.*)  Allergan thus rewrote the allowed claims in

59

independent form and cancelled the others to expedite patent issuance.  (A26768-71.)

The examiner never mentioned the pH limitation as a reason for allowance, instead

simply referencing the Board's opinion.  (A26517, A26779.)

Given this history, the amendments were tangential to the pH limitation.  An

amendment is tangential if it is "peripheral, or not directly relevant, to the alleged

equivalent." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369

(Fed. Cir. 2003) (*en banc*).  The amendments here were meant to expedite allowance of

claims to a specific bimatoprost and BAK concentration, as the 200 ppm BAK

limitation was the Board's basis for patentability.  Although the allowed claims also

included limitations concerning other ingredients and pH, nobody suggested this was

a reason for patentability—it couldn't have been because this was in the prior art.

This is thus the type of case in which this Court has found the amendment

(which focused on bimatoprost and BAK concentrations) tangential to the equivalent

(which deals with pH).  *Funai Elec. v. Daewoo Elecs.*, 616 F.3d 1357, 1369-70 (Fed. Cir.

2010) (narrowing amendment specifying VCR's internal components was tangential to

the type of insulating material used where "[i]t is apparent that the nature of the

insulating material was not a factor in the allowance of claim 4, for this aspect was not

at issue during prosecution"); *Intervet, Inc v. Merial Ltd.*, 617 F.3d 1282, 1290-92 (Fed.

Cir. 2010) (narrowing amendment specifying the claimed virus was found only in pigs

was tangential to particular viral strain because "[s]uch a draconian preclusion would

be beyond a fair interpretation of what was surrendered"); *Univ. of Cal. v.*

60

*Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1378 (Fed. Cir. 2008) (amendment was tangential where made "to facilitate prosecution" and where its "focus" was something other than the equivalent).

Hi-Tech's arguments should be rejected. Hi-Tech never explains how the pH limitation could have been a basis for patentability. Instead, Hi-Tech focuses (at 16-17) on the examiner's continued rejection of claim 14 and infers pH must have been critical to patentability. But this is pure speculation. The examiner never gave a specific reason for rejecting claim 14, nor suggested the absence of a pH limitation was the problem. (A26516-17.) Instead, the examiner grouped it with the rejection of claims to broader ranges of bimatoprost and BAK. (*Id.*) The district court, which, contrary to Hi-Tech's accusations, was well aware of claim 14, (A6632-33), rightly rejected Hi-Tech arguments.

## CONCLUSION

For the reasons above, the Court should affirm.

Dated:  August 18, 2014           Respectfully submitted,

/s/ Craig E. Countryman
Craig E. Countryman
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone:  (858) 678-5070
Facsimile:  (858) 678-5099

*Attorneys for Appellee,*
Allergan, Inc.

61

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I hereby certify that I electronically filed the foregoing document with the

Clerk of the Court of the United States Court of Appeal for the Federal Circuit by

using the Court's CM/ECF filing system.

I certify that all participants in the case are registered CM/ECF users and that

all counsel were served via CM/ECF on August 18, 2014.


/s/ Craig E. Countryman
Craig E. Countryman

# CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that the opening brief for Allergan, Inc. complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B). The relevant portions of the brief, including all footnotes, contain 13,986 words as determined by Microsoft Word.

Dated: August 18, 2014

/s/ Craig E. Countryman
Craig E. Countryman
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

*Attorneys for Appellee,*
Allergan, Inc.